**FILED UNDER SEAL**
**CONTAINS PROTECTED MATERIAL TO BE**
**DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER**
**ENTERED BY U.S. COURT OF FEDERAL CLAIMS**

No. 02-898C
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VERMONT YANKEE NUCLEAR POWER CORPORATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-0365
Facsimile: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington D.C. 20585

May 4, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX TO THE APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. THE STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. VERMONT YANKEE IS REQUIRED TO PAY ITS ONE-TIME FEE BEFORE DOE IS OBLIGATED TO BEGIN ACCEPTING VERMONT YANKEE'S SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. BECAUSE VERMONT YANKEE HAS FAILED TO PAY ITS ONE-TIME FEE, IT HAS FAILED TO SATISFY A CONDITION TO DOE’S OBLIGATION TO BEGIN ACCEPTING VERMONT YANKEE’S SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. Payment Of The One-Time Fee Is A Condition Precedent To DOE's Obligation To Accept Any Of Vermont Yankee's SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. Vermont Yankee Cannot Claim Damages For A *Partial* Breach Of Contract Before It Satisfied Its Condition To DOE’s Obligation To Accept Its SNF . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. TO THE EXTENT THAT THE COURT DOES NOT DISMISS PLAINTIFF'S COMPLAINT AND AWARDS PLAINTIFF DAMAGES FOR PARTIAL BREACH, DEFENDANT IS ENTITLED TO RECOVER THE UNPAID ONE-TIME FEE, PLUS ACCRUED INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

## CASES

**Page(s)**

Alabama Power Company v. Department of Energy,
307 F.3d 1300 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 21

Cecile Industries, Inc. v. Cheney,
995 F.2d 1052 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cities Service Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

City of Fairfax, Va. v. Washington Metro. Area Transit Auth.,
582 F.2d 1321 (4th Cir. 1978), cert. denied, 440 U.S. 914 (1979) . . . . . . . . . . . . . . . . 13

Consumers Energy Company v. United States,
65 Fed. Cl. 364 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 22

Danzig v. AEC Corp.,
224 F.3d 1333 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

DPJ Co. v. FDIC,
30 F.3d 247 (1st Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

First Federal Savings & Loan Assoc. v. United States,
58 Fed. Cl. 139 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Franconia Assocs. v. United States,
536 U.S. 129 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

In re Gober,
100 F.3d 1195 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002), vacated and remanded on other grounds,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Indiana Michigan Power Company v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Landmark Land Co. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lester v. Resolution Trust Corp.,
994 F.2d 1247 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lovink v. Guilford Mills, Inc.,
878 F.2d 584 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Madden v. United States,
178 Ct. Cl. 121, 371 F.2d 469 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Massachusetts Bay Transp. Auth. v. United States,
129 F.3d 1226 (Fed. Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PVI, Inc. v. Ratiopharm,
253 F.3d 320 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Pinewood Realty Ltd. P'ship v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Project Map, Inc. v. United States,
203 Ct. Cl. 52, 486 F.2d 1375 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

REW Enters., Inc. v. Premier Bank, N.A.,
49 F.3d 163 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Roboserve, Inc. v. Kato Kagaku Co.,
78 F.3d 266 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Roehm v. Horst,
178 U.S. 13 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

San Carlos Irrigation & Drainage Dist. v. United States,
23 Cl. Ct. 276, 279 (1991), aff'd,111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . 10

S&R Corp. v. Jiffy Lube Int'l, Inc.,
968 F.2d 371 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sinclair Oil Corp. v. United States,
291 F.3d 822 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

System Fuels, Inc. v. United States,
65 Fed. Cl. 163 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,21

Tretchick v. Department of Transportation,
109 F.3d 749 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

United States v. Munsey Trust Co.,
332 U.S. 234 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Vari-Build, Inc. v. City of Reno,
622 F. Supp. 97 (D. Nev. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

White v. Delta Constr. Int’l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wisconsin Power & Light Co. v. Century Indem. Co.,
130 F.3d 787 (7th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATUTES, RULES AND REGULATIONS

10 C.F.R. § 961.11 . . . . . . . . . . passim

31 U.S.C. § 3716 . . . . . . . . . . 20

42 U.S.C. § 10222(a)(5) . . . . . . . . . . 6

## MISCELLANEOUS

3A A. Corbin, Corbin on Contracts § 639, at 51 (1960) . . . . . . . . . . 7

4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) . . . . . . . . . . 13

8 C. McCauliff, Corbin on Contracts § 31.2, at 49 (rev. ed. 1999) . . . . . . . . . . 7

Black's Law Dictionary 1275 (6th ed. 1990) . . . . . . . . . . 21

Restatement (Second) of Contracts § 236 cmt. b (1981) . . . . . . . . . . 13

Restatement (Second) of Contracts § 253(1) cmt. a . . . . . . . . . . 12, 13

Restatement (Second) of Contracts, Ch. 9 . . . . . . . . . . 7

S. Williston, Contracts § 669 (3d ed. 1961) . . . . . . . . . . 7

## INDEX TO THE APPENDIX


| Document | Page |
|---|---|
| Standard Contract between Vermont Yankee Nuclear Power Corporation and United States Department of Energy, entered into June 15, 1983 | 1 |
| Letter from John T. Pearson, Vice President, Vermont Yankee Nuclear Power Corporation, to Christopher T. Jedrey, Contracting Officer, U.S. Department of Energy, dated June 5, 1985 | 63 |
| Letter from John T. Pearson, Vice President, Vermont Yankee Nuclear Power Corporation, to Christopher T. Jedrey, Contracting Officer, U.S. Department of Energy, dated June 10, 1985 | 64 |
| Letter from R.M. Grube, Director, Vermont Yankee Nuclear Power Corporation, to Contracting Officer, U.S. Department of Energy, dated September 25, 1992 | 66 |
| Letter from Linda Strand, Contracting Officer, U.S. Department of Energy, to R.M. Grube, dated December 22, 1992 | 74 |
| Letter from Bruce W. Wiggett, President, Vermont Yankee Nuclear Power Corporation, to Herbert D. Watkins, Contracting Officer, U.S. Department of Energy, dated August 21, 2002 | 82 |
| Nuclear Waste Fund, Quarterly Statement of Payments, Vermont Yankee Nuclear Power Corporation, dated January 25, 2006 | 83 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 02-898C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES

Pursuant to Rule 56(b) of the Rules of this Court ("RCFC"), defendant, the United States, respectfully submits this motion for summary judgment and requests that this Court dismiss, in their entirety, Counts I and II of plaintiff's complaint. For the reasons explained below, plaintiff, Vermont Yankee Nuclear Power Corporation ("Vermont Yankee"), has failed to satisfy a condition to the Government's obligation to accept any of Vermont Yankee's spent nuclear fuel ("SNF") or high-level radioactive waste ("HLW").[1] There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In the alternative, to the extent that the Court does not dismiss Counts I and II of plaintiff's complaint in their entirety, defendant respectfully requests that the Court grant partial summary judgment in

[1] Defendant is filing the same motion in Entergy Nuclear Vermont Yankee, LLC v. United States, Fed. Cl. No. 03-2663C, because that case arises from the same Standard Contract at issue in this case, although it appears that Vermont Yankee, pursuant to the purchase and sale agreement between it and Entergy Nuclear Vermont Yankee ("ENVY"), has purported to retain the obligation to pay the one-time fee at issue in this motion. Regardless of whether these cases are consolidated, the obligation to pay the one-time fee should preclude a finding of liability, or, in the alternative, provide the right to an offset any damages paid as the result of the Department of Energy's ("DOE") partial breach of the Standard Contract at issue.

defendant's favor, finding that defendant is entitled to recover fees that Vermont Yankee has not paid under the Standard Contract or, in the alternative, that defendant is entitled to recoup those fees against any judgment awarded in Vermont Yankee's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

## SUMMARY OF ARGUMENT

This case is one of 58 cases currently pending before this Court in which plaintiffs are alleging damages arising from a partial breach by the Department of Energy ("DOE") of the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract") published at 10 C.F.R. § 961.11. Although this Court has found the Government liable for a partial breach of contract in several of the pending Standard Contract cases, this case presents an issue that exists in only ten of the pending cases and that precludes a finding of liability here.

Under the Standard Contract, contract holders are required to pay two "sets" of fees. One of the fees that each contract holder must pay is a continuing quarterly fee, the amount of which is determined by reference to the amount of electricity that the contract holder generates and sells, that continues to accrue throughout the life of the Standard Contract as long as the contract holder continues to generate electricity ("the continuing fee"). When the Standard Contracts were executed in 1983, however, most, if not all, commercial nuclear utilities already possessed SNF that DOE would be required to accept pursuant to the Standard Contract. To pay for DOE's acceptance and disposal of that pre-existing SNF, each contract holder possessing such SNF was required to pay a fee, calculated by reference to a formula contained in the Nuclear Waste Policy

Act, 42 U.S.C. § 10222(a)(3), and reiterated in the Standard Contract, to compensate DOE for accepting and disposing of that pre-existing SNF ("the one-time fee").

Under the Standard Contract, the contract holder was required, within two years after contract execution, to elect one of three options for payment of the one-time fee for the pre-existing SNF. One option required the contract holder to pay the one-time fee immediately (in the early 1980s), another option allowed the contract holder to defer its payment until a date prior to the date that DOE was first to accept any of that contract holder's SNF (although it required the contract holder to pay interest incurred from 1983 through the date of actual payment), and a final option required the contract holder to make 40 quarterly pro rata payments of its one-time fee, with the 40th payment due before the first date for DOE's acceptance of that contract holder's SNF. Under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of the one-time fee before DOE began accepting any of that contract holder's SNF.

Vermont Yankee has never satisfied this condition upon which DOE's obligation to accept any of Vermont Yankee's SNF rested. In accordance with the requirements of the Standard Contract, Vermont Yankee elected to pay its pre-existing SNF fee of $39,284,623.69 through "Option 2," which required Vermont Yankee to pay its one-time fee prior to DOE's acceptance of its SNF. Vermont Yankee has never paid its one-time fee, which, with interest as of December 31, 2005, totaled more than $128,724,683. Having failed to satisfy this condition to DOE's obligation to accept any of its SNF, Vermont Yankee has no basis for seeking damages for DOE's partial breach of the Standard Contract through its failure to begin accepting Vermont Yankee's SNF. Accordingly, Vermont Yankee's complaint should be dismissed.

## ARGUMENT

### I. THE STANDARD OF REVIEW

Summary judgment is a wholly acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c). In this case, there is no dispute over any facts that could preclude the Government's entitlement to summary judgment.

### II. VERMONT YANKEE IS REQUIRED TO PAY ITS ONE-TIME FEE BEFORE DOE IS OBLIGATED TO BEGIN ACCEPTING VERMONT YANKEE'S SNF

Pursuant to the Standard Contract, each contract holder is required to pay continuing quarterly fees "in the amount of 1.0 mil per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s)" and sold, designed to cover SNF generated after April 7, 1983. 10 C.F.R. § 961.11, Art. VIII.A.1 & B.1; see 42 U.S.C. § 10222(a)(2) (establishing quarterly fees). In addition to those quarterly fees, each contract holder is responsible for paying a separate fee for the disposal of any SNF and/or HLW that it had generated prior to April 7, 1983: "For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was

used to generate electricity in a civilian nuclear power prior to April 7, 1983, a one-time fee will be assessed." 10 C.F.R. § 961.11, Art. VIII.A.2 (emphasis added); see 42 U.S.C. § 10222(a)(3) (establishing the one-time fee). This fee for SNF generated prior to April 7, 1983 "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." 10 C.F.R. § 961.11, Art. A.2. (emphasis added).

Paragraph B of Article VIII provides each contract holder with three options for the payment of the fee for the disposal of SNF generated prior to April 7, 1983. Under the first option, Option 1, the contract holder agrees to pay its fee prorated evenly over 40 quarters, the last of which must be made prior to the date scheduled for DOE's first acceptance of that contract holder's SNF as identified in an approved DCS. 10 C.F.R. § 961.11, Art. VIII.B.2(a) (emphasis added). Pursuant to the second option, Option 2, the contract holder may elect to satisfy its financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. Id., Art. VIII.B.2(b). Pursuant to the third option, Option 3, the contract holder must pay his entire fee prior to June 30, 1985. Id., Art. VIII.B.2(c).

The contract holder is obligated to elect the payment option for its fee relating to the disposal of its pre-April 7, 1983 SNF within two years after contract execution: "For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options: . . . ." Id., Art. VIII.B.2 (emphasis added). Vermont Yankee executed the

Standard Contract that is at issue here on June 15, 1983. App. 34.[2] Accordingly, pursuant to the provisions of Article VIII(B)(2), Vermont Yankee had until June 30, 1985, which would have been "within two years of contract execution," to notify DOE as to which of the three available payment options Vermont Yankee would elect to pay for the disposal of its pre-April 7, 1983 SNF.

On or about June 5, 1985, Vermont Yankee elected to pay its one-time fee pursuant to Option 2. PFUF ¶ 5; App. 63. Accordingly, Vermont Yankee was required to make its entire fee payment at "anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance." 10 C.F.R. § 961.11, Art. VIII.B.2(b). Vermont Yankee subsequently submitted seven separate DCSs seeking to obtain DOE's commitment to accept SNF from Vermont Yankee beginning in 1999 and continuing in the years 2001, 2002, 2003, 2004, 2005 and 2007. PFUF ¶ 6; App. 66-73. DOE approved each of these DCSs. Id.; App. 74-81. Accordingly, in compliance with Vermont Yankee's election pursuant to Article VIII.B.2(b), Vermont Yankee was required, if it wanted DOE to begin acceptance of its SNF in 1999, to pay its one-time fee for its pre-April 7, 1983 SNF under its contract prior to the 1999 acceptance. In any event, under any of the options for payment of the one-time fee, the contract holder was required to pay the entirety of its one-time fee before DOE began acceptance of that contract holder's SNF and/or HLW. See 10 C.F.R. § 961.11, Art. VIII.B.2. In fact, section 302(a) of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10222(a)(5), expressly indicates that DOE's obligation to dispose of any

---

[2] "App. __" refers to the appendix to this motion. "Compl. ¶ ___" refers to Vermont Yankee's first amended complaint in this case, filed September 2, 2004.

utility's SNF is "in return for the payment of fees established by this section," conditioning DOE's acceptance obligation upon that payment. To the present day, Vermont Yankee has not paid its one-time fee. PFUF ¶ 7.

## III. BECAUSE VERMONT YANKEE HAS FAILED TO PAY ITS ONE-TIME FEE, IT HAS FAILED TO SATISFY A CONDITION TO DOE'S OBLIGATION TO BEGIN ACCEPTING VERMONT YANKEE'S SNF

### A. Payment Of The One-Time Fee Is A Condition Precedent To DOE's Obligation To Accept Any Of Vermont Yankee's SNF

Because Vermont Yankee has not yet paid its one-time fee, it has failed to satisfy a condition to DOE's obligation to begin acceptance of Vermont Yankee's SNF and/or HLW. "A fact or event may be made a condition of a contract right and duty by any form of words capable of interpretation." 3A A. Corbin, Corbin on Contracts § 639, at 51 (1960). Such conditions "are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." 3A A. Corbin, Corbin on Contracts § 628, at 16 (1960);[3] see 8 C. McCauliff, Corbin on Contracts § 31.2, at 49 (rev. ed. 1999); S. Williston, Contracts § 669 (3d ed. 1961) ("Since an express condition . . . depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties."). That is, "[a] condition

[3] Although Professor Corbin uses the term "condition precedent," the American Law Institute ("ALI"), because of the confusion sometimes engendered by the distinctions between conditions subsequent and conditions precedent, prefers the more generic term "conditions." Restatement (Second) of Contracts, Ch. 9, Topic 5, Conditions and Similar Events, at 159 (1981). ALI defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Id. § 224, at 160.

precedent is one which must be performed before . . . the other party is obligated to perform." Lester v. Resolution Trust Corp., 994 F.2d 1247, 1254 (10th Cir. 1993). Moreover, "if a contractual duty is subject to a condition precedent, that condition must be satisfied before the duty arises." Landmark Land Co. v. United States, 256 F.3d 1365, 1376 (Fed. Cir. 2001) (emphasis in original).

Under the terms of the Standard Contract and the NWPA, Vermont Yankee, regardless of the one-time fee payment option that it selected, was required to pay its one-time fee before DOE began acceptance of its SNF and/or HLW. Accordingly, Vermont Yankee's obligations in paying its fee for pre-April 7, 1983 SNF "were clearly intended to be performed prior to [DOE's] obligation to" accept Vermont Yankee's SNF. Lester, 994 F.2d at 1254. Vermont Yankee elected not to pay its one-time fee in 1985, which it could have done, but instead elected to defer its one-time fee payment, in accordance with Option 2, and to satisfy that financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. 10 C.F.R. § 961.11, Art. VIII.B.2(b). Because Vermont Yankee's first scheduled "delivery" of SNF to DOE was in 1999, Vermont Yankee was required to make its Option 2 fee payment no later than the date by which it wanted DOE to begin acceptance of its SNF. Until that payment is made, DOE has no obligation to accept Vermont Yankee's SNF. Because Vermont Yankee has, to date, failed to make that payment, Vermont Yankee has failed to perform its Option 2 fee payment obligation. Vermont Yankee's Option 2 fee payment obligation is a condition to DOE's contractual duty to accept SNF under Vermont Yankee's Standard Contract. Accordingly, DOE's duty to accept SNF under Vermont Yankee's Standard Contract has yet to arise. See Landmark, 256 F.3d at 1376.

Because DOE's duty to perform has not arisen, no cause of action for breach of this duty can have accrued to Vermont Yankee under its Standard Contract.

### B. Vermont Yankee Cannot Claim Damages For A *Partial* Breach Of Contract Before It Satisfies Its Condition To DOE's Obligation To Accept Its SNF

It appears that Vermont Yankee may attempt to avoid its obligation to satisfy its condition precedent to DOE's obligation to begin acceptance of Vermont Yankee's SNF by asserting that, once DOE announced that it would not be able to begin SNF acceptance from the industry as a whole beginning in 1998, Vermont Yankee was no longer required to pay its one-time fee until some unidentified date in the future. However, until Vermont Yankee actually pays its one-time fee, DOE will not be under an obligation to begin accepting Vermont Yankee's SNF. Although Vermont Yankee might be able to avoid paying its one-time fee in response to DOE's announcement had it viewed DOE's announcement as a total breach of the Standard Contract, Vermont Yankee has not claimed a total breach of contract in this case. To the contrary, Vermont Yankee is seeking damages in this litigation only for a partial breach of contract. The distinctions between a total breach claim and a partial breach claim are essential to a determination of Vermont Yankee's rights and continuing obligations under the Standard Contract.

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. That is, a claim for partial breach is "[a] claim for damages . . . based on only part of the injured party's remaining rights to

performance," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (quoting Restatement (Second) of Contracts § 236(2) (1981)), while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996) (concluding that the jury's determination that damages for partial breach of contract exceeded those for total breach was "obviously irrational"). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989). The distinction between partial and total breach "is particularly important in executory contracts." Id. at 586.

Aside from the different measure of damages applicable to a partial and total breach, these claims can also be distinguished based upon the remedies that they provide to an injured party. Indeed, a plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). A "total breach justifies termination of the contract and damages for complete failure of performance," but a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach");

Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004). As the Court held in Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976), a contractor must make an election in response to an anticipatory breach either to view the contract as concluded or to continue contract performance:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 323 (2002), aff'd in relevant part, 366 F.3d 1360 (Fed. Cir. 2004).[4]

Here, Vermont Yankee's decision to continue the contract and insist upon the Government's performance of its obligations after DOE announced that it could not begin SNF acceptance in 1998 has three consequences. First, because the Government's contractual obligations were not discharged as a result of Vermont Yankee's suit for partial breach, it did not

---

[4] Recently, some courts have opined that, in certain situations, this election may not be irrevocable to the extent that the defaulting party would not be prejudiced by the change in election. See Pacific Gas & Elec. Co. v. United States, Nos. 04-0074 & 04-0075, 2006 WL 1084005 (Fed. Cl. Apr. 25, 2006) (citing cases). Nevertheless, Vermont Yankee has not attempted to claim a total breach of contract in this case, rendering further discussion of that issue here unnecessary.

discharge the Government's ultimate obligation to accept and dispose of Vermont Yankee's SNF. Second, it obligated Vermont Yankee to continue to pay its fees into the Nuclear Waste Fund ("NWF"). Third, it limited the recovery of Vermont Yankee's damages to those for partial breach.

The only basis upon which Vermont Yankee could attempt to excuse its failure to pay its one-time fee would be its reliance upon DOE's announcement in 1996[5] that it would not be able to begin SNF acceptance in 1998, viewing DOE's 1996 announcement as some type of anticipatory repudiation of the Standard Contract. Vermont Yankee, presumably, would argue that DOE's announcement somehow excused its performance obligations under the Standard Contract. An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id.; see Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) ("[a]t common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract"); Tretchick v. Department of Transportation, 109 F.3d 749, 752 (Fed. Cir. 1997) (anticipatory repudiation "must be a distinct unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made").

[5] In Indiana Michigan, the United States Court of Appeals for the Federal Circuit stated that DOE "unequivocally announced in 1994," rather than 1996, "that it would not meet its contractual obligations beginning in 1998." Indiana Michigan, 422 F.3d at 1375. For purposes of this motion, the actual announcement date is unimportant.

An anticipatory repudiation of a contract is, in and of itself, a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir.1997) ("[t]he disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived"). However, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia Assocs., 536 U.S. at 143 (emphasis added) (citing Roehm v. Horst, 178 U.S. 13 (1900)). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm, 178 U.S. at 13. Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia Assocs., 536 U.S. at 143; see Indiana Michigan, 422 F.3d at 1374 ("[f]or an aggrieved party to recover damages for an anticipatory breach, it must elect to treat the repudiation as a total breach"); United States v. Dekonty Corp., 109 F.3d 749, 752 (Fed. Cir. 1991) (injured party who elects to sue for anticipatory breach of contract must "treat th[e] refusal [to perform] as a breach and commence an action at once therefor").

However, Vermont Yankee cannot claim anticipatory repudiation because it has proceeded with a partial breach claim. Indiana Michigan, 422 F.3d at 1374. "A breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts

§ 253 cmt. b (1981) (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"). To the contrary, an anticipatory repudiation gives rise only to a claim for total breach that concludes the parties' further performance obligations. Indiana Michigan, 422 F.3d at 1374.

Here, Vermont Yankee has proceeded under a partial breach theory following DOE's failure to begin accepting its SNF in 1999, pursuant to Vermont Yankee's approved DCSs. Vermont Yankee has not declared the Standard Contract to be at an end, preserving DOE's obligation to ultimately accept its SNF. Under a partial breach theory, however, Vermont Yankee is obligated to continue its own performance under the Standard Contract. Moreover, recognizing that its performance obligations are not at an end, Vermont Yankee (and now ENVY) continued to pay its quarterly fees due pursuant to the terms of the Standard Contract. In this partial breach action, Vermont Yankee has no basis for withholding its one-time fee when it has continued to pay its quarterly fees.

Because Vermont Yankee is pursuing a partial breach theory in its suit, Vermont Yankee cannot claim that it is entitled to avoid or defer (to some future unidentified date) paying fees that it would otherwise have to pay before DOE's obligation to begin SNF acceptance would

arise. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"). Absent an anticipatory breach or repudiation of the Standard Contract, Vermont Yankee would have no basis for delaying its payment of its one-time fee until after DOE began accepting its SNF. To the contrary, Vermont Yankee was obligated under the terms of the Standard Contract to pay its one-time fee before DOE was obligated to accept any of Vermont Yankee's SNF. Because it cannot rely upon the doctrine of anticipatory repudiation if it has elected to pursue only a partial breach claim, it cannot rely upon DOE's actions preceding its failure to begin accepting Vermont Yankee's SNF to justify non-payment of its one-time fee. In fact, if this Court were to award damages to Vermont Yankee now, but Vermont Yankee were later to refuse to pay its one-time fee when DOE eventually comes to accept Vermont Yankee's SNF, it is not clear how DOE would recoup the damages that this Court awarded for DOE's prior "failure" to conduct activities that are typically conditioned upon pre-payment of that fee. Because the rules typically applicable to partial breach of contract claims preclude an award of damages before conditions precedent to the alleged breaching party's breach have been satisfied, the Court should find that, in fact, Vermont Yankee has not yet suffered a partial breach.

In two other spent nuclear fuel cases, the Court has been asked to consider the effect of plaintiff's failure to pay its one-time fee upon the Government's liability for the delays in performance of the Standard Contract. In Consumers Energy Company v. United States, 65 Fed. Cl. 364 (2005), the Court held that the one-time fee obligation was not a condition precedent, but instead was a separately enforceable promise that DOE could not now enforce because it had not

established a first delivery date for the plaintiff's SNF because the process for the submission and approval of DCSs and final delivery schedules ("FDSs") had been suspended. With all due respect, the Court's analysis seeks to excuse the plaintiff's performance obligation, despite the fact that the utility plaintiff's obligations continue because it has elected to pursue a partial breach theory, whether viewed as a condition of DOE's performance or a "separately enforceable promise." In this case, Vermont Yankee is still expecting DOE's full performance pursuant to the Standard Contract. However, with that expectation comes the obligation to fully perform its own duties under the Standard Contract. Because the theory of anticipatory repudiation is not available to Vermont Yankee, it must fulfill all of its obligations under the contract, including payment of the one-time fee. Id. at 372.

That obligation came due in 1999, pursuant to the DCSs that Vermont Yankee submitted and DOE approved. The Court in Consumers found that the obligation had not arisen because the approved DCS in that case, just as in this case, specified only a delivery year. The Court found that, because there was no delivery date specified in the DCS and the process of submitting FDS, which would have provided a specific delivery date, was suspended before a date was established, that the plaintiff's one-time fee was not due. However, in this analysis, the Court reads more into the provisions of the Standard Contract than exist. The relevant provision only requires that the one-time fee would by paid "prior to the first delivery, as reflected in the DOE approved delivery commitment schedule." 10 C.F.R. § 961.11, Art. VIII.B.2(b)(emphasis added). That approved DCS gave plaintiff the right to have the amount of SNF covered by that approved DCS accepted during that 12-month period beginning January 31st of the relevant year. As the Court acknowledged, a delivery date would have been established with the

submission and approval of a final delivery schedule ("FDS"), but the obligation to pay the one-time fee is expressly tied in the fee payment provision to the approved DCS, not the FDS. 10 C.F.R. § 961.11, Art. VIII.B.2(b). The Court, by reading into the contract a requirement to establish a specific delivery date prior to the obligation to pay the one-time fee, has altered the terms of the contract between the parties. In any event, the important fact is that the one-time fee must be paid before DOE accepts the contract holder's SNF, see id., making payment of that fee a condition to acceptance.

In System Fuels, Inc. v. United States, 65 Fed. Cl. 163 (2005), the Court found that the one-time fee obligation was a mandatory condition to performance, but that it had been excused based upon a "temporary frustration of purposes caused by the government's suspension of the DCS process." Id. at 173. Again, this finding does not reflect the fact that the plaintiff was suing for a partial breach, and, as a result, its performance obligations cannot be excused.[6] Moreover, a similar finding that Vermont Yankee's obligation is temporarily excused now may eliminate DOE's ability ever to obtain payment of this one-time fee. Pursuant to Vermont Yankee's assignment and transfer of title of all of its SNF to ENVY, DOE (assuming the validity of the assignment) now owes the performance obligation to ENVY, but Vermont Yankee holds the obligation to pay the fee. Absent invalidation of the contract assignment, it appears that, if the Court finds that payment of the one-time fee is "temporarily excused" here, DOE may have

---

[6] The decisions in Consumers and System Fuels were both issued before the Federal Circuit announced its decision in Indiana Michigan, which held, in part, that plaintiffs in the SNF cases cannot rely upon anticipatory repudiation theories in pursuit of their partial breach theories. Indiana Michigan, 422 F.3d at 1374.

no remedy to allow it to obtain the one-time fee from Vermont Yankee if, when DOE begins SNF acceptance from ENVY, Vermont Yankee fails to pay the very substantial fee that is owed.

In sum, Vermont Yankee is pursuing a partial breach theory to recover damages allegedly resulting from DOE's delays in performance under the Standard Contract while at the same time preserving its right to full performance by DOE in the future. In this situation, Vermont Yankee still has to fulfill its obligations under the Standard Contract, including payment of its one-time fee. That fee payment was due in 1999, pursuant to Vermont Yankee's approved DCSs. Until Vermont Yankee pays its fee, a condition of DOE's performance, DOE cannot be held liable for the failure to begin acceptance of Vermont Yankee's SNF.

## IV. TO THE EXTENT THAT THE COURT DOES NOT DISMISS PLAINTIFF'S COMPLAINT AND AWARDS PLAINTIFF DAMAGES FOR PARTIAL BREACH, DEFENDANT IS ENTITLED TO RECOVER THE UNPAID ONE-TIME FEE, PLUS ACCRUED INTEREST

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir.1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

As demonstrated above, before DOE ever began accepting Vermont Yankee's SNF, Vermont Yankee would have been required to have paid its one-time fee pursuant to Article VIII.B.2(b) of the Standard Contract. The amount of that fee was originally $39,284,623.69, see App. 84, but, with interest calculated in accordance with the terms of Article VIII(B)(2), now exceeds approximately $128,724,683.62. App. 84; PFUF ¶ 8. Had DOE begun accepting Vermont Yankee's SNF in 1999, in accordance with Vermont Yankee's approved DCSs, or at any other time that Vermont Yankee alleges, Vermont Yankee first would have had to pay the entirety of its one-time fee. Because Vermont Yankee now seeks damages for DOE's failure to begin accepting its SNF and seeks to be placed in the financial position in which it would have been had DOE timely begun SNF acceptance, and to the extent that the Court determines that Vermont Yankee is entitled to damages for a partial breach of the Standard Contract, DOE should be entitled to recover the amount of Vermont Yankee's unpaid one-time fee (plus the interest calculated from April 7, 1983, as identified in Article VIII.B.2(b) of the Standard Contract) before the Court requires DOE to pay any damages for DOE's delay in performance – that is, the Court should require the satisfaction of the condition to DOE's obligation to accept Vermont Yankee's SNF before awarding Vermont Yankee's damages. If the Court were to require DOE to pay damages for failing to begin acceptance of Vermont Yankee's SNF, but failed to allow DOE to recover the monies that it would have received had it timely begun SNF acceptance, the Court would place Vermont Yankee in a better position than it would have been had there been no breach. See Bluebonnet Savings Bank, 339 F.3d at 1345.

Even if the Court did not allow the Government to force satisfaction of the condition precedent in its entirety prior to awarding damages to Vermont Yankee, the Court should allow

DOE to recoup the amount of the one-time fee against any judgment in Vermont Yankee's favor. The Supreme Court and the Federal Circuit have long recognized the Government's common-law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. The right of offset was first recognized by the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947), in which the Court held that the "government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Consistent with the Supreme Court's decision in Munsey Trust, the Court of Claims similarly recognized the Government's right of offset in Madden v. United States, 178 Ct. Cl. 121, 371 F.2d 469, 473 (1967), in which the Court held that the Government's right to offset debts owed to it against damages awarded to the debtor for an equitable adjustment of contract was superior to an attorney's lien.

Since the invocation of the common law doctrine of offset in Munsey Trust and Madden, the Government's right to offset or recoup contractual debts owed to it has been sustained in numerous decisions. See, e.g., First Federal Savings & Loan Assoc. v. United States, 58 Fed. Cl. 139, 165 (2003) (Government's right to offset damages can be raised as a "defense or argument in mitigation" during the damages phase of proceedings); Cecile Industries, Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (Debt Collection Act of 1982, 31 U.S.C. § 3716, does not abrogate or constrict "the Government's long-standing common law right to offset contract debts against contract payments"); Project Map, Inc. v. United States, 203 Ct. Cl. 52, 486 F.2d 1375, 1376 (1973) (Government could withhold amounts owed to a contractor under a contract when the contracting officer had found that plaintiff was overpaid on two other contracts, even though

the determination of overpayment was on appeal before the Board of Contract Appeals); Sinclair Oil Corp. v. United States, 291 F.3d 822, 828 (Fed. Cir. 2002) (proceeds received by a purchaser of gasoline from its settlement with a refiner would offset the gasoline purchaser's asserted refund from a DOE fund).[7]

The Government's common-law right to offset contractual debts owed to the Government against contract payments due to the debtor (and damages awarded to a plaintiff) is consistent with the contractual principle that damages for breach of contract cannot place the plaintiff in a better position than it would have been had there been no breach. The offset doctrine thus mandates that damages for breach of contract be reduced by the amount of contractual debts owed by a plaintiff to the Government to prevent unjust enrichment. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). Accord LaSalle Talman Bank v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach"). In another SNF case in which the one-time fee had not been

---

[7] Offsets are permissible whether the Government is seeking to recoup or to setoff contractor debts. "Recoupment" is "a demand asserted [by a defendant] to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim," while a "setoff" "arises out of a transaction extrinsic to the plaintiff's claim." In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) (emphasis added); see REW Enters., Inc. v. Premier Bank, N.A., 49 F.3d 163, 170 (5th Cir. 1995) (recoupment involves recovery of "part of a claim upon which one is sued" by means of a "counterclaim arising out of the same transaction"); Vari-Build, Inc. v. City of Reno, 622 F. Supp. 97, 99 (D. Nev. 1985) ("claim in recoupment must concern matters arising out of the same transaction that is the basis for the plaintiff's claim for relief"); Black's Law Dictionary 1275 (6th ed. 1990) ("[r]ecoupment is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to reduce or satisfy plaintiff's claim . . .").

paid, Consumers Energy, although the Court rejected the Government's showing that the obligation to pay the one-time fee was a condition of performance that discharged the Government's liability, the Court granted the Government's request that it be allowed to offset plaintiff's one-time fee against any damages that may be awarded. Consumers Energy, 65 Fed. Cl. at 373. The Court reasoned that "[p]laintiff's recovery of damages without having to account for its obligation to pay the one-time fee, which it would have owed had there been no breach, would surely put Plaintiff in a more advantageous position." Id.[8]

In this case, to the extent that the Court awards any damages to Vermont Yankee, Vermont Yankee's damages should be reduced by the amount of its unpaid one-time fee (plus interest calculated in accordance with Article VIII.B.2(b)) pursuant to the Government's common-law right of offset. See Munsey Trust Co., 332 U.S. at 239; Cecile Indus., 995 F.2d at 1054-55; Sinclair Oil, 291 F.3d at 828. If the Court did not require recoupment of this unpaid fee, it would place Vermont Yankee in a better position than it would have been had DOE performed the Standard Contract, contrary to established precedent.[9]

---

[8] The Court in System Fuels has deferred consideration of the Government's request for an offset until the damages phase of the case. System Fuels, 65 Fed. Cl. 174 n.12.

[9] Pursuant to the Purchase and Sale Agreement between Vermont Yankee and ENVY, Vermont Yankee has retained for itself "such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983," and has promised pay the one-time fee when it becomes "due and payable in accordance with the terms of the DOE Standard Contract . . . subject to any rights of set-off to which the Seller may be entitled by reason of the Department of Energy's defaults under said DOE Standard Contract." Appendix to "Defendant's Motion For Summary Judgment Regarding The Invalid Assignment Of Plaintiff's Standard Contract And Pre-Existing Claims From The Partial Breach Of That Contract" at 130-131. We do not understand what claims Vermont Yankee has reserved for itself, but it appears that any "set-off" of the one-time fee owed by Vermont Yankee would violate the prohibition in Alabama Power Company v. Department of Energy, 307 F.3d 1300 (11th Cir. 2002), that funds from the Nuclear Waste Fund ("NWF") may not be used to pay the interim storage costs

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant summary judgment in the Government's favor and dismiss Vermont Yankee's breach of contract claims, as set forth in Counts I and II of its complaint. In the alternative, we respectfully request that the Court grant summary judgment in our favor regarding the Government's right to recover Vermont Yankee's one-time fee or to offset it against any judgment in Vermont Yankee's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

---

currently being borne by utilities. The NWF is the Treasury account created by the NWPA into which the nuclear utilities pay fees and from which Congress appropriates monies to the Department of Energy for siting, developing, and operating a permanent nuclear waste repository. In Alabama Power, the United States Court of Appeals for the Eleventh Circuit found that, pursuant to the current language of the NWPA, DOE may not use the NWF to pay for utilities' on-site storage resulting from DOE's delay in beginning SNF acceptance or allow utilities to reduce their payments into the NWF to compensate themselves for that delay. Any "set-off" taken by Vermont Yankee from the fees that it owes to the NWF would reduce the money that it must pay to the NWF. By contrast, the Government has a mechanism whereby any money due Vermont Yankee as the result of a final judgment of this Court can be paid into the NWF to offset Vermont Yankee's outstanding one-time fee obligation, thereby ensuring that Vermont Yankee's remaining obligation to the NWF is paid in full.

s/ Marian E. Sullivan
MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0365
Fax: (202) 307-2503

May 4, 2006

Attorneys for Defendant

# APPENDIX

U. S. DEPARTMENT OF ENERGY CONTRACT NO. DE-CR01-83NE44431

CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE.

THIS CONTRACT, entered into this 10th day of June 19 83, by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereafter referred to as "DOE") and Vermont Yankee Nuclear Power Corp., (hereinafter referred to as the "Purchaser"), a corporation organized and existing under the laws of the State of Vermont

WITNESSETH THAT:

WHEREAS, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

WHEREAS, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and

WHEREAS, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

WHEREAS, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

WHEREAS, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

WHEREAS, the Purchaser desires to obtain disposal services from DOE; and

WHEREAS, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

WHEREAS this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, 42 U.S.C. 7101 et seq.) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, 42 U.S.C. 10101 et seq.)

NOW, THEREFORE, the parties hereto do hereby agree as follows:

ARTICLE I - DEFINITIONS

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.
2. The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

3. The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(b) of the Atomic Energy Act of 1954, as amended (42 U.S.C. 2133, 2134(b)).

4. The term "Commission" means the United States Nuclear Regulatory Commission.

5 The term "contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer of the DOE; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "delivery" means the transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

8. The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

9. The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

10. The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

11. The term "full cost recovery," means the recoupment by DOE, through Purchaser fees and any interest earned, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles consistently applied, of providing disposal services and conducting activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "cost" includes the application of Nuclear Waste Fund monies for those uses expressly set forth in section 302(d) and (e) of the said Act and all other uses specified in the Act.

12. The term "high-level radioactive waste" (HLW) means -

(a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

13. The term "kilowatt hours generated" means electricity generated by nuclear fuel at a civilian nuclear power reactor specified in Appendix A hereto as measured at the output terminals of the turbine generator, including an equivalent amount of electricity for any process heat generated by the reactor and used other than at the reactor.

14. The term "metric tons uranium" means that measure of weight equivalent to 2,204.6 pounds of uranium and other fissile and fertile material that are loaded into a reactor core as fresh fuel.

15. The term "Purchaser's site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "quarterly Treasury rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the Federal Register prior to the beginning of the affected quarter.

17. The term "shipping lot" means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date.

18. The term "spent nuclear fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing.

19. The term "spent nuclear fuel and high-level radioactive waste of domestic origin" means irradiated fuel material used, and radioactive wastes resulting from such use, in nuclear power reactors located only in the United States.

20. The term "year" means the period which begins on October 1 and ends on September 30.

ARTICLE II - SCOPE

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

ARTICLE III - TERM

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A.

ARTICLE IV - RESPONSIBILITIES OF THE PARTIES

A. Purchaser's Responsibilities

1. Discharge Information

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next

ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 A.M. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. Preparation for Transportation

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

B. DOE Responsibilities

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such casks(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

(a) written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

(b) training for Purchaser's personnel in cask handling and loading, as may be necessary;

(c) technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

(d) sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5.(a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

ARTICLE V - DELIVERY OF SNF AND/OR HLW

A. Description of SNF and HLW

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

B. Delivery Commitment Schedule

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (±) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

C. Final Delivery Schedule

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an

approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

D. <u>Emergency Deliveries</u>

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

E. <u>Exchanges</u>

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; <u>provided, however,</u> that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; <u>provided</u>, <u>however</u>, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date

specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

ARTICLE VI - CRITERIA FOR DISPOSAL

A. General Requirements

1. Criteria

(a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

(b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

2. Procedures

(a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of any changes in said SNF and/or HLW as soon as they

become known to the Purchaser.

(b) DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

B. Acceptance Procedures

1. Acceptance Priority Ranking

Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in subparagraph (b) below and Article V.D of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the

date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B, D and E of Article V.

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

2. Verification of SNF and/or HLW

During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot shall be subject to verification by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices E and F, DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above-named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U. S. Department of Transportation."



15

3. Improperly Described SNF and/or HLW

(a) Prior to Acceptance - If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) After Acceptance - If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such finding. In the event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days. In the event of a failure by the Purchaser to provide such proper designation, DOE may hold in abeyance any and all deliveries scheduled hereunder.

ARTICLE VII - TITLE

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be

solely responsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

ARTICLE VIII - FEES AND TERMS OF PAYMENT

A. Fees

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s). The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule

are listed below:

| Nuclear Spent Fuel Burnup Range | Dollars per Kilogram (1982 Dollars) |
|---|---|
| 0 - 5,000 MWDT/MTU | $ 80.00 |
| 5,000 - 10,000 MWDT/MTU | $ 142.00 |
| 10,000 - 20,000 MWDT/MTU | $ 162.00 |
| over 20,000 MWDT/MTU | $ 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of uranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans to reinsert. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4. DOE will annually review the adequacy of the fees and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

B. Payment

1. For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983 to June 30, 1983. A one time adjustment period payment shall be due on N/A, for the period N/A to N/A. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin July 1, 1983

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) OPTION 1 - The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee

balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) <u>OPTION 2</u> - The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the

outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) OPTION 3 - The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

3. Method of Payment

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to "Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

| | | | | | |
|---|---|---|---|---|---|
| Interest = | Unpaid Balance Due To DOE For Assigned Three Month Period | X | Quarterly Treasury Rate Plus Six Percent (6%) | X | Number of Months Late Including Month Of Payment (Fractions Rounded Up to Whole Months) / 12 |

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice for interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative for examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

ARTICLE IX - DELAYS

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE -- such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather--- cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

ARTICLE X - SUSPENSION

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion

of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

ARTICLE XI - REMEDIES

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

ARTICLE XII - NOTICES

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

U.S. Department of Energy
Procurement and Assistance Management Directorate
Office of Procurement Operations
Washington, D.C. 20585
Attention:
Thomas S. Keefe

To the Purchaser:

Vermont Yankee Nuclear Power Corp.
Engineering Office
1671 Worcester Road
Framingham, MA 01701
Attn: Manager, Nuclear Materials
with copy to:
Vermont Yankee Nuclear Power Corp.
Ferry Road, RD #5, Box 169
Brattleboro, VT 05301

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; provided, however, that notice of such changes shall be given by registered mail.

ARTICLE XIII - REPRESENTATION CONCERNING NUCLEAR HAZARDS INDEMNITY

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

ARTICLE XIV - ASSIGNMENT

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; provided, however, that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

ARTICLE XV - AMENDMENTS

The provisions of this contract have been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; provided, however, that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April 18, 1983 entitled, "Standard Contract for Disposal of SNF and/or HLW", as the same may be amended from time to time.

ARTICLE XVI - DISPUTES

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

ARTICLE XVII - OFFICIALS NOT TO BENEFIT

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

ARTICLE XVIII - COVENANT AGAINST CONTINGENT FEES

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

ARTICLE XIX - EXAMINATION OF RECORDS

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

ARTICLE XX - PERMITS

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

ARTICLE XXI - RIGHTS IN TECHNICAL DATA

A. Definitions.

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain, or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B. Allocation of rights.

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

LIMITED RIGHTS LEGEND

This "proprietary data," furnished under "Contract No. ____________" with the U. S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

ARTICLE XXII - ENTIRE CONTRACT

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

C. Appendices:

A. Nuclear Power Reactor(s) or Other Facilities Covered

B. Discharge Information (Ten Year; Annual)

C. Delivery Commitment Schedule

D. Final Delivery Schedule

E. General Specifications

F. Detailed Description of Purchaser's Fuel

G. Standard Remittance Advice

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF ENERGY

BY: [signature]
(Contracting Officer)
Thomas S. Keefe

WITNESSES AS TO EXECUTION ON BEHALF OF PURCHASER

[signature]
(Name)
Vermont Yankee Nuclear Power Corp.
Box 169, Brattleboro, VT 05301
(Address)

[signature]
(Name)
Vermont Yankee Nuclear Power Corp.
Box 169, Brattleboro, VT 05301
(Address)

VERMONT YANKEE NUCLEAR POWER CORP.
(Purchaser's Company Name)

By: William F. Conway

Title: President and Chief Executive Officer

I, J.A. Ritsher, certify that I am the Asst Secretary of the corporation named as Purchaser herein; that William F. Conway who signed this document on behalf of the Purchaser was then President & CEO of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said corporation this 15th day of June, 1983

(Corporate Seal)

John A Ritsher
(Signature)

# APPENDIX A

## NUCLEAR POWER REACTOR(S) OR OTHER FACILITIES COVERED

Purchaser Vermont Yankee Nuclear Power Corporation

Contract Number/Date DE-CR01-83NE44431 / June 10, 1983

Reactor/Facility Name Vermont Yankee Nuclear Power Station

Location:

Street Governor Hunt Road

City Vernon

County/State Windham / Vermont

Zip Code 05354

Capacity (MWE) - Gross 537

Reactor Type:

BWR [X]

PWR [ ]

Other (Identify) ____

Facility Description General Electric BWR with cooling towers located 5 miles South of Brattleboro, Vermont on the banks of the Connecticut River.

Date of Commencement of Operation March 24, 1972
(actual or estimated)

NRC License #: DPR-28 (Docket No. 50-271)

By Purchaser:

William F. Conway
Signature

President and Chief Executive Officer
Title

June 14, 1983
Date

# APPENDIX B

## TEN YEAR DISCHARGE FORECAST

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser ______________________________

Contract Number/Date ______________ / ____________

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ________

Type: BWR ☐

PWR ☐

Other (Identify) ______________________________

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date - mo/yr (or refueling shut down date) | | | | | | | | | | | |
| Metric tons - initial | | | | | | | | | | | |
| - discharged | | | | | | | | | | | |
| Number of assemblies discharged (per cycle) | | | | | | | | | | | |

By Purchaser:

______________________ ______________________ ______________

Signature Title Date



COE0230521

APPENDIX B
(Enclosure 1)

ACTUAL DISCHARGES

Purchaser ____________________

Contract Number/Date __________ / __________

Reactor/Facility Name ____________________

Location:

Street ____________________

City ____________________

County/State __________ / __________

Zip Code __________

Type:

BWR ☐

PWR ☐

Other (Identify) ____________________

Refueling Shutdown Date __________

Metric Tons Uranium (Initial/Discharged); __________ / __________
Initial Discharged

Number of Assemblies Discharged: ____________________

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| Signature | Title | Date |
|---|---|---|

# APPENDIX C

## DELIVERY COMMITMENT SCHEDULE

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ________

Type Cask Required: ______________________________

Shipping Lot Number (Assigned by DOE) ____________

Proposed Shipping Mode: Truck ☐ Rail ☐ Barge ☐

Proposed Delivery Date ____________

DOE Assigned Delivery Commitment Date ____________

Range of Discharge Date(s) (Earliest to Latest) ___ / ___ / ___ To ___ / ___ / ___
Mo Day Yr Mo Day Yr

Metric Tons Uranium: (Initial) ____________
(Discharged) ____________

Number of Assemblies:

BWR ______

PWR ______

Other ______

# APPENDIX C

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| Signature | Title | Date |
|---|---|---|

Approved by DOE:

| Technical Representative | Title | Date |
|---|---|---|

| Contracting Officer | | Date |
|---|---|---|

# APPENDIX D

## FINAL DELIVERY SCHEDULE

(To be submitted to DOE by Purchaser for each designated Purchaser Delivery site not later than twelve (12) months prior to estimated date of first delivery.)

Purchaser: ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

Location:

Street ______________________________

City ______________________________

County/State ______________ / ______________

Zip Code ________

Type(s) cask(s) required: ______________ # Assembilies per cask ___

Shipping Lot Number ______________ Shipping Mode: Truck ___
(Assigned by DOE) Rail ___
Barge ___

Metric Tons Urainum: (Initial) ________
(Discharged) ________

Range of Discharge Date(s) (Earliest to Latest) ___ / ___ / ___ To ___ / ___ / ___
Mo Day Yr Mo Day Yr
(From approved commitment schedule)

Number of Assemblies:

BWR ________

PWR ________

Other ________

Purchaser's Delivery Estimate First ___ / ___ / ___ Last ___ / ___ / ___
Mo Day Yr Mo Day Mo

## APPENDIX D

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

To confirm acceptability of delivery date(s):

Purchaser Contact ______________ Title ______________________
Phone ______________

DOE Contact ______________ Title ________
Phone ______________

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

| Signature | Title | Date |
|---|---|---|

Approved by DOE:

| Technical Representative | Title | Date |
|---|---|---|
| Contracting Officer | | Date |

# APPENDIX E

## GENERAL SPECIFICATIONS

A. Fuel Category Identification.

1. Categories--Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE, as follows:

   a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in paragraph B below.

   b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as Nonstandard Fuel Classes NS-1 through NS-5, pursuant to paragraph B below.

   c. "Failed Fuel" means SNF that meets the specifications set forth in subparagraphs 1 through 3 of paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below.

   d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

B. Fuel Description and Subclassification--General Specifications.

1. Maximum Nominal Physical Dimensions.

| | Boiling Water Reactor (BWR) | Pressurized Water Reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches |
| Cross Section* | 6 inches x 6 inches | 9 inches x 9 inches |

*The cross section of the fuel assembly shall not include the channel.

NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-1.

APPENDIX E

2. Nonfuel Components. Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

NOTE: Fuel that does not meet these specifications shall be classified as Nonstandard Fuel--Class NS-2.

3. Cooling. The minimum cooling time for fuel is five (5) years.

NOTE: Fuel that does not meet this specification shall be classified as Nonstandard Fuel--Class NS-3.

4. Non-LWR Fuel. Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel--Class NS-4. Such fuel may be unique and require special handling, storage, and disposal facilities.

5. Consolidated Fuel Rods. Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS-5.

6. Failed Fuel

a. Visual Inspection.

Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel--Class F-1.

b. Previously Encapsulated Assemblies.

Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel--Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

c. Regulatory Requirements.

Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

# APPENDIX E

## C. Summary of Fuel Classifications.

### 1. Standard Fuel:

a. Class S-1: PWR
b. Class S-2: BWR

### 2. Nonstandard Fuel:

a. Class NS-1: Physical Dimensions
b. Class NS-2: Non Fuel Components
c. Class NS-3: Short Cooled
d. Class NS-4: Non-LWR
e. Class NS-5: Consolidated Fuel Rods.

### 3. Failed Fuel:

a. Class F-1: Visual Failure or Damage
b. Class F-2: Radioactive "Leakage"
c. Class F-3: Encapsulated

## D. High-Level Radioactive Waste.

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

# APPENDIX F

## DETAILED DESCRIPTION OF PURCHASER'S FUEL

This information shall be provided by Purchaser for each distinct fuel type within a Shipping Lot not later than sixty (60) days prior to the schedule transportation date.

Purchaser ______________________________

Contract Number/Date ______________ / ______________

Reactor/Facility Name ______________________________

I. Drawings included in generic dossier: ______________

1. Fuel Assembly DWG# ______________

Dossier Number: ______________

DOE Shipping Lot #: ______________

# Assemblies Described: ______ BWR

______ PWR

______ Other

2. Upper & Lower end fittings DWG# ______________

II. DESIGN MATERIAL DESCRIPTIONS

Fuel Element

1. Element type ______________ (rod, plate, etc.)
2. Total length ______________ (in.)
3. Active length ______________ (in.)
4. Cladding material ______ (Zr, s.s., etc.)

Assembly Description

1. Number of Elements ______
2. Overall dimensions ______ / ______ (in.) length / cross section
3. Overall weight ______

III. Describe any distortions, cladding damage or other damage to the spent fuel, or nonfuel components within this Shipping Lot which will require special handling procedures. (Attach additional pages if needed.)

______________________________

______________________________

______________________________



COE0220530

APPENDIX F

IV. Assembly Number ______________

Shipping Lot # ______________

IRRADIATION HISTORY

CYCLE NUMBER

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1. Startup date (mo/day/yr) | | | | | |
| 2. Shutdown date (mo/day/yr) | | | | | |
| 3. Cumulative fuel exposure (mwd/mtu) | | | | | |
| 4. Avg. reactor power (mwth) | | | | | |

5. Total heat output/assembly in watts, using an approved calculational method: ______________ as of ______________ Date

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

______________ Signature ______________ Title ______________ Date

# APPENDIX G

Standard Remittance of Advice (RA) for Payment of Fees

Assigned Three-Month

Period Covered:

from ______ to ______

1. A. Purchaser (Utility name and address)

______________________________

______________________________

B. Contract Number ______________________________

II. Payment for Spent Nuclear Fuel $__________

A. Financial Obligation as of April 7, 1983 __________

B. Financial Obligation as of Date of First/Single Payment ______

C. Date of First/Single Payment ______________________________

D. Unpaid Balance to Date ______________________________

E. Date of This Payment ______________________________

F. Ten Year Treasury Note Rate ______________________________

III. Payment for M/KWH Fee $__________

A. Total Nuclear KWH Generated During Assigned Three Month Period Covered ______________________________

B. Date of This Payment ______________________________

C. M/KWH Fee Schedule Rate ______________________________

IV. Underpaymnet (as notified by DOE) ________

A. Date of Notification ________

B. DOE Invoice Number ________

C. Interest Paid ________

V. Late Payments (as notified by DOE) ________

A. Date of Notification ________

B. DOE Invoice Number ________

C. Interest Paid ________

VI. Other Credits Claimed (Explain $ (________)

VII. Total Remittance $ ________

Prepared by:

Title:

Phone Number:

Date:

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001.)

By Purchaser:

| Signature | Title | Date |
|---|---|---|

FOR DOE USE ONLY BELOW THIS LINE

1. Deposit to Account 89-5227 ________

2. Receipt of Payment Verification ________

a. Date Payment Received ________

b. Verification Performed by ________

3. Posted to Cumulative Remitter Ledger:

   a. Date Posted ______________________________

   b. Posted by ______________________________

4. Late Payments:

   a. Calculation of late charge (attach schedule) ____________

   b. Billing date ______________________________

5. After processing RA furnish copy to OCRWM

INSTRUCTIONS FOR COMPLETING DOE REMITTANCE ADVICE

Upon completion, this form must be mailed on the last workday of the month following each assigned three-month period.

SECTION I:

Name & Address (self explanatory)

Contract Number will be the identification number assigned by DOE upon execution.

SECTION II:

Based upon permanently discharged inventory of spent fuel and HLW amassed prior to April 7, 1983, and that portion of the in-core fuel burned through April 6, 1983. Under either payment option 1 or 2, interest will accrue and be compounded at 13-week Treasury bill rates until the first/single payment is made. If the 10 year option is selected, purchaser's financial obligation will be paid in level payment of principal and interest over the first payment. Payments will be made in quarterly installments concurrently with the normal three month assigned period. If option 2 is selected, purchaser will liquidate its total financial obligation, consisting of the fee plus accrued interest, in the form of a single payment. If option 3 is selected, no interest will accrue and lines A and E only must be filled out. This section of the Remittance Advice should be completed for each payment under the 10 year option and only once with either single payment option. (See Annex B, to be completed only once.)

a. Self explanatory

b. Fee obligation plus accrued interest

c. Self explanatory

d. Self explanatory

f. Ten year Treasury Note rate in effect at first/single payment

$ Amount paid

SECTION III:

Based upon electricity generated on or after April 7, 1983, a schedule should be attached specifying the gross power generated by each plant during the assigned three-month period as measured at the output terminals of the turbine generator. (See Annex A, to be completed with each submission of the remittance advice.)

a. Total of power generation from attached schedules

b. Self explanatory

c. Fee schedule rate in effect at time of payment

SECTIONS IV & V:

(Same instructions as above) DOE will invoice purchasers when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.

A. The date the purchaser received DOE invoice

B. DOE's invoice #

C. Interest paid

$. Consists of interest if late payment or fees plus interest if under payment

SECTION VI:

Explain on an attached sheet of paper, if necessary, why DOE has been overpaid and the proposed disposition of the payment, e.g., apply credit against this payment or send refund.

$ If applied against this payment, this number is negative. If refund desired, leave blank and pay gross amount due from Sections II through V.

SECTION VII:

The sum of Sections II through VI.

APPENDIX "G" (Continued)

Instruction Guide for Remittance of
Nuclear Waste Disposal Fees to
Department of Energy Via Wire Transfer

Payments made to the Department of Energy (DOE) for Nuclear Waste Disposal Fees will be affected by the Purchaser's commercial bank via the Federal Reserve Communications System (also known as Fedwire) to the Department of Treasury. If the Purchaser's commercial bank is not a Federal Reserve member, then the Purchaser's bank will use a correspondent member bank to effect the transfer of funds.

Purchaser must provide specific information to its bank so that the transfer of funds can take place. Failure to correctly provide the information could result in delay crediting of the remittance to DOE and could subject the purchaser to late charges.

A wire transfer of funds message with descriptions of specific date elements is provided in Enclosure A. Enclosure B contains instructions and a sample form of a transfer of funds that shows the specific information to be supplied by the Purchaser when requesting its commercial bank to initiate a transfer of funds.

Enclosure C shows a transfer of funds message form that may be photocopied and used each time a transfer of funds must be made. Constant information has been preprinted on the form. Only that information applicable to that particular monthly remittance (i.e., amount, date, company name) must be filled in prior to submitting the form to your bank.

If additional information is required, contact DOE representatives Mark Loop or Joe Startari on (301) 353-4899 or 353-5857).

Enclosure A

Guide for Funds Transfer

Messages to Treasury

The following instructions provide specific information which is required so that a funds (wire) transfer message can be transmitted to the Department of the Treasury. The funds transfer message format is shown in Exhibit 1. A narrative description of each item on the funds transfer message follows:

<u>Line 1</u>

Item 1 - Priority Code - The priority code will be provided by the sending bank. (Note: Some Federal Reserve district banks may not require this item.)

<u>Line 2</u>

Item 2 - Treasury Department Code - The nine-digit identifier "021030004" is the routing symbol of the Treasury. This item is a constant and is required for all funds transfer messages sent to Treasury.

Item 3 - <u>Type Code</u> - The type code, 10, identifies funds transfer messages. This item is a constant and is required for all funds transfer messages sent to Treasury.

Line 3

Item 4 - Sending Bank Code - This nine-digit identifier will be provided by the sending bank.

Item 5 - Class - The class field may be used at the option of the sending bank. (Note: Some Federal Reserve Districts prohibit use of this class/field.)

Item 6 - Reference Number - The reference number will be inserted by the sending bank to identify the transaction.

Item 7 - Amount - The amount must include the dollar sign and the appropriate punctuation including cents digits. This item will be provided by the Purchaser.

Line 4

Item 8 - Sending Bank Name - The telegraphic abbreviation which corresponds to item 4 will be provided by the sending bank.

Line 5

Item 9 - Treasury Department Name - This item is of critical importance. It must appear on the funds transfer message in the precise manner as stated to allow for the automated processing and classification of the funds transfer message to Treasury for credit to the Department of Energy. This item is comprised of a rigidly formatted, nonvariable sequence of 28 characters as follows:

TREAS NYC/(89000003) DOE NWF

EXHIBIT 1






COF0220541

Line 6, 7, and 8

Payment Identification - The payment identification should be furnished by the remitter in the following manner:

Item 10 - The constant "DOE NUCWASTE FEE" will be inserted.

Item 11 - The month and year the fees were incurred (i.e.; May 80) followed by a slash (/).

Item 12 - The company name is inserted following the slash.

ENCLOSURE B

# TRANSFER OF FUNDS MESSAGE FORM (COMPLETED SAMPLE)




The above example is a completed transfer of funds message form detailing those items (A thru C) filled in by the remitting company.

| Item | DESCRIPTION |
|---|---|
| A | Amount-must be properly punctuated to include cents digits. |
| B | Date - month and year followed by a slash(/) |
| C | Company Name. |

ENCLOSURE C

# TRANSFER OF FUNDS MESSAGE FORM

| TO | TYPE | | |
|---|---|---|---|
| 021030004 | 10 | | |
| FROM | | REF | AMOUNT |
| | | | $ |

ORIGINATING BANK AND RELATED DATA

TREAS NYC/(89000003) DOE - NWF

DOE

/

Annex A to Appendix G

STANDARD REMITTANCE OF ADVICE (RA) FOR PAYMENT OF FEES

This Annex should be completed to compute the MKWH fee for SNF burned on or after April 7, 1983.

I. Identification

A. Purchaser: ______________________

B. Period Covered

| | Last report | This report | Next report |
|---|---|---|---|
| 1. date submitted: | ________ | | |
| 2. period covered: Start date: | ________ | | |
| Finish date: | ________ | | |
| 3. length of period covered (days): | ________ | | |

C. Unit identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name: ______________________
2. Location: ______________________
3. Type: ______________________
4. Capacity: ______________________
5. Date of Commencement of Operations: ______________________
6. NRC License No.: ______________________

II. Fee Calculation

| | Prior Period | This Period |
|---|---|---|
| 1. Gross Thermal Energy produced (MWH) | ______ | ______ |
| 2. Gross Electrical Energy produced (MWH) | ______ | ______ |
| 3. Gross Thermal Energy not used to generate electrical output (MWH) | ______ | ______ |
| 4. Gross electrical equivalent of thermal electricity (MWH) | ______ | ______ |
| 5. Net electrical energy produced (MWH) | ______ | ______ |
| 6. Electricity consumed/lost on site (MWH) | ______ | ______ |
| 7. Current fee rate: ____________ mill/kWh | | |
| 8. Current fee due: | | ______ $ |

Prepared by: ______________________
Phone number: ______________________
Date: ______________________

Annex B to Appendix G

STANDARD REMITTANCE OF ADVICE (RA) FOR PAYMENT OF FEES

This Annex should be completed only for SNF burned before midnight between April 6/7, 1983.

I. Identification

A. Purchaser: ______________________

B. Unit identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name: ______________________
2. Location: ______________________
3. Type: ______________________
4. Capacity: ______________________
5. Date of Commencement of Operations: ______________________
6. NRC License No.: ______________________

II. Fee Calculation

A. Discharged nuclear fuel

| | | | | | |
|---|---|---|---|---|---|
| 1. | burnup[1] (MWDT/MTU) | 0-5000 | 5000-10000 | 10000 20000 | 20000 up |
| 2. | initial loading (KgU) (with indicated burnup) | ____ | ____ | ____ | ____ |
| 3. | fee rate ($/KgU) | 80.00 | 142.00 | 162.00 | 184.00 |
| 4. | fee ($) | ____ | ____ | ____ | ____ |
| 5. | total fee (4) | | | | |

B. Nuclear fuel in the reactor core as of midnight of 6/7 April 1983

| Assembly Identification | Initial loading (KgU) | burnup[1] as of midnight 6/7 April 1983 (MWDT/MTU) | fee |
|---|---|---|---|
| 1. ________ | ________ | ________ | ________ |
| 2. ________ | ________ | ________ | ________ |
| 3. ________ | ________ | ________ | ________ |
| 4. ________ | ________ | ________ | ________ |
| 5. ________ | ________ | ________ | ________ |
| 6. ________ | ________ | ________ | ________ |
| 7. ________ | ________ | ________ | ________ |
| 8. ________ | ________ | ________ | ________ |
| 9. ________ | ________ | ________ | ________ |
| 10. ________ | ________ | ________ | ________ |
| 11. ________ | ________ | ________ | ________ |
| 12. ________ | ________ | ________ | ________ |
| 13. ________ | ________ | ________ | ________ |
| 14. ________ | ________ | ________ | ________ |
| 15. ________ | ________ | ________ | ________ |
| 16. ________ | ________ | ________ | ________ |
| 12. ________ | ________ | ________ | ________ |
| 13. ________ | ________ | ________ | ________ |
| 14. ________ | ________ | ________ | ________ |
| 15. ________ | ________ | ________ | ________ |
| 16. ________ | ________ | ________ | ________ |
| 17. ________ | ________ | ________ | ________ |
| 18. ________ | ________ | ________ | ________ |
| 19. ________ | ________ | ________ | ________ |
| 20. ________ | ________ | ________ | ________ |
| 21. ________ | ________ | ________ | ________ |
| 22. ________ | ________ | ________ | ________ |
| 23. ________ | ________ | ________ | ________ |
| 24. ________ | ________ | ________ | ________ |
| 25. ________ | ________ | ________ | ________ |

C. Total fee ________

[1]Please provide (as an attachment) a clear reference to the methodology used to derive the burnup figures (computer codes, etc.) and a clear reference to all data used in the derivation of those figures.

VERMONT YANKEE
NUCLEAR POWER CORPORATION

RD 5, Box 169, Ferry Road, Brattleboro, VT 05301

(802) 257-5271

June 5, 1985
FMD 85-

U.S. Department of Energy
Procurement and Assistance Management
Directorate
Office of Procurement Operations
Washington, DC 20585

Subject: Contract No. DE-CR01-83NE44431 for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste - Payment for SNF Discharged Prior to April 7, 1983 and for In-Core Burned Fuel as of 12:00 AM April 7, 1983.

Attention: Christopher T. Jedrey

Dear Sir:

Pursuant to Article VIII B.2 of the above Contract, you are hereby notified that Vermont Yankee Nuclear Power Corporation (Vermont Yankee), the Purchaser under said Contract, has selected Option 2 of Article VIII B.2 which requires a one-time payment anytime prior to the first delivery of spent nuclear fuel and/or high level waste to DOE.

Consistent with that obligation, Vermont Yankee may desire to make a partial payment(s) toward that one-time fee should funds become available to Vermont Yankee for such purposes. We assume that DOE would welcome the opportunity to collect a portion of the one-time fee perhaps earlier than anticipated, if the opportunity arises. We would appreciate it if you would call either myself or Mr. W.J. Daley at your earliest convenience to discuss this matter.

Sincerely,

John T. Pearson
John T. Pearson
Vice President, Finance and
Administration, Treasurer

JTP/d

c: W.F. Conway
W.P. Murphy
R.M. Grube
J.M. Buchheit

PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

**VERMONT YANKEE**
**NUCLEAR POWER CORPORATION**

RD 5, Box 169, Ferry Road, Brattleboro, VT 05301

(802) 257-5271

June 10, 1985

U.S. Department of Energy
Procurement and Assistance Management
  Directorate
Office of Procurement Operations
Washington, DC 20585

Subject: Contract No. DE-CR01-83NE44431 for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste - Payment for SNF Discharged Prior to April 7, 1983 and for In-Core Burned Fuel as of 12:00 AM April 7, 1983.

Attention: Christopher T. Jedrey

Dear Sir:

Enclosed please find the form provided by your office for the one-time fee payment option selection. I had previously notified you of Vermont Yankee's selection in my letter of June 5, 1985 (copy enclosed).

Please let me know if you have any questions.

Sincerely,

John T. Pearson

John T. Pearson
Vice President, Finance and
Administration, Treasurer

JTP/d
Encl. 2
c: W.F. Conway
   R.M. Grube

PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

ONE-TIME FEE PAYMENT OPTION SELECTION

Name of Purchaser: Vermont Yankee Nuclear Power Corporation

Contract Number: DE-CR01-83NE 44431

Date: June 6, 1985

Option Choice

1 ___ Forty quarterly payments (Article VIII.B.2.a), with final payment prior to first scheduled SNF delivery. Expected date of first payment (optional): ______________

2 X One payment prior to first scheduled SNF delivery (Article VIII.B.2.b). Expected date of payment (optional): ______________

3 ___ One payment with no interest (Article VIII.B.2.c). Payment due on or before June 28, 1985.

Signature: John T. Pearson
John T. Pearson
Title: Vice President, Finance & Adm., Treasurer

Send to:

U.S. Department of Energy
Office of Procurement Operations
Attn: Mr. Christopher Jedrey
Contracting Officer
Room 1J-059 MA-453.2
Washington, D.C. 20585

PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

VERMONT YANKEE
NUCLEAR POWER CORPORATION

RD 5, Box 169, Ferry Road, Brattleboro, VT 05301

REPLY TO:
ENGINEERING OFFICE
580 MAIN STREET
BOLTON, MA 01740
(508) 779-6711

September 25, 1992
FMD 92-627
VY-L03-04-01

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

Dear Sir or Madam:

Enclosed are Delivery Commitment Schedules (DCSs) for Vermont Yankee Nuclear Power Station. We have completed DCSs for each allocation shown in the Annual Capacity Report for the first ten years of the Federal Waste Management System Operation.

Please do not hesitate to call if you have any questions.

Sincerely,

R. M. Grube

R. M. Grube, Director
Fuel Management Department

RMG/JMB/cmc

Enclosure

c: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 996001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ___; Rail X; Barge ___
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 94
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 72.8 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 400 PWR ___ Other ___

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 R M Grube [signature] — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 016001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ___; Rail X; Barge ___
2.4 Proposed Delivery Date: 2001
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 96
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 11.9 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 67 PWR ___ Other ___

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 026001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2002
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 97
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 8.6 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 48 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 036001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2003
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 98
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 27.4 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 154 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 046001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2004
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 99
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 25.6 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 144 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 056001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2005
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 00
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 16.9 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 95 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 076001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta.
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2007
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 02
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 22.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 124 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

Technical Representative — Title — Date

4.2

Contracting Officer — Date

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS

# Department of Energy

Washington, DC 20585

DEC 2 2 1992

Mr. R. M. Grube
Director, Fuel Management Department
Vermont Yankee Nuclear Power Corporation
RD 5, Box 169
Ferry Road
Brattleboro, VT 05301

Dear Mr. Grube:

The Department of Energy (DOE) has reviewed and approved the seven Delivery Commitment Schedules (DCS) submitted by Vermont Yankee Nuclear Power Corporation (Vermont Yankee) dated September 25, 1992, (DCS numbers 99-6001-4431-01, 01-6001-4431-01, 02-6001-4431-01, 03-6001-4431-01, 04-6001-4431-01, 05-6001-4431-01, and 07-6001-4431-01). Copies of the approved DCSs are enclosed for your records.

During our review of your DCSs, DOE noted an apparent inconsistency between the information provided in Item 2.1 ("Type Cask Required") of the DCSs and that previously provided to DOE by Vermont Yankee as part of the Facility Interface Capability Assessment (FICA) effort. Specifically, the DCSs indicate that Vermont Yankee Nuclear Power Station can accommodate a cask with a maximum loaded lifting weight of 110 tons. While the FICA data is in agreement with this, it also indicates that the loading pit dimensions of your site could preclude the loading of such large casks. DOE would appreciate an explanation of this apparent inconsistency.

If you have any questions concerning this action, please contact Nick Graham of my staff on (202) 634-4415 or Nancy Montgomery of the Department's Office of Civilian Radioactive Waste Management on (202) 586-8320.

Linda Strand
Contracting Officer
Office of Placement and
Administration

Enclosures

cc: J. M. Buchheit

SFL-CONT-1061.pdf

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 996001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 1999
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 94
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 72.8 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 400 PWR ____ Other ____

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 R M Grube — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] RW-432 12/4/92
Technical Representative — Title — Date

4.2 [signature] [date]
Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

## 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 016001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

## 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2001
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 96
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 11.9 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 67 PWR ____ Other ____

## 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube — 3.3 Director, Fuel Management Department
Name (Please Type or Print) — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

## 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] [signature] 1/4/93
Technical Representative — Title — Date

4.2 [signature]
Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 026001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power Sta
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2002
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: (Earliest to Latest) 1 17 73 Mo / Day / Yr to 1 1 97 Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 8.6 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 48 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] — Authorized Purchaser Signature; 25 September 1992 — Date

3.2 Rudolph H. Grube — Name (Please Type or Print)

3.3 Director, Fuel Management Department — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

[signature] Technical Representative — Title — Date

4.2 [signature] Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 036001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2003
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 98
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 27.4 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 154 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] [handwritten title] [handwritten date]
Technical Representative — Title — Date

4.2 [signature] [handwritten date]
Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 046001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X; Barge ____
2.4 Proposed Delivery Date: 2004
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 99
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 25.6 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 144 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature Date

3.2 Rudolph M. Grube 3.3 Director, Fuel Management Department
Name (Please Type or Print) Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] [title] 12/4/92
Technical Representative Title Date

4.2 [signature] 12/7/92
Contracting Officer Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 056001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ___; Rail X; Barge ___
2.4 Proposed Delivery Date: 2005
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 00
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 16.9 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 93 PWR ___ Other ___

### 3.0 CERTIFICATIONS

Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.

3.1 [signature] — 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature] [handwritten title] [handwritten date]
Technical Representative — Title — Date

4.2 [signature] [handwritten date]
Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

NWPA-830C

OMB No.: 1901-0260
Expires: 11/30/93

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: 076001443101

1.2 Contact Person:
(a) Name: J. M. Buchheit
(b) Telephone (include Area Code): (508)779-6711

1.3 Contract Number: DE-CR01-83NE44431

1.4 Reactor/Facility Information:
(a) Name: Vermont Yankee Nuclear Power St
(b) Address: Governor Hunt Road
(c) City, State & Zip Code: Vernon, Vermont 05354

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): 110
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck ____; Rail X ; Barge ____
2.4 Proposed Delivery Date: 2007
2.5 DOE Assigned Delivery Commitment Date: (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: 1 17 73 to 1 1 02
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial) 22.1 (Discharged) (Not Required)
2.8 Number of Assemblies: BWR 124 PWR ____ Other ____

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 [signature] 25 September 1992
Authorized Purchaser Signature — Date

3.2 Rudolph M. Grube
Name (Please Type or Print)

3.3 Director, Fuel Management Department
Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE
[signature]
Technical Representative — Title — Date

4.2 [signature]
Contracting Officer — Date

SFL-CONT-1061.pdf

Copy Distribution: 1 White, DOE-Contracting Officer; 2 Blue, DOE-OCRWM; 1 Pink, DOE-EIA; 1 Goldenrod, Utility Copy

**VERMONT YANKEE**
**NUCLEAR POWER CORPORATION**
185 OLD FERRY ROAD, PO BOX 7002, BRATTLEBORO, VT 05302-7002
(802) 257-5271

August 21, 2002

Herbert D. Watkins, Contracting Officer
Office of Headquarters, Procurement Services
U. S. Department of Energy
Washington DC 20585

Re: Assignment of Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (U. S. Department of Energy Contract #DE-CR01-83NE 44431) for Vermont Nuclear Power Station

Dear Mr. Watkins:

Pursuant to Article XIV of the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (U. S. Department of Energy Contract #DE-CR01-83NE 44431) (the "Contract"), this is to notify you that, with the consummation of the sale of Vermont Yankee Nuclear Power Station (the "Station"), Vermont Yankee Nuclear Power Corporation has transferred its title to Spent Nuclear Fuel Fuel and High-Level Radioactive Waste (as defined in the Contract) and, except as noted below, its rights and duties under the Contract to Entergy Nuclear Vermont Yankee, LLC, the new owner of the Station, effective July 31, 2002.

Vermont Yankee Nuclear Power Corporation, pursuant to the Purchase and Sale Agreement for the Station, has retained the rights to any and all damages and other remedies that might accrue under from the Department of Energy's breach of its obligations under the Contract to the extent of the one-time fee for fuel used to generate electricity prior to April 7, 1983.

Sincerely,
VERMONT YANKEE NUCLEAR POWER CORPORATION

By Bruce W. Wiggett
Bruce W. Wiggett
President

cc: Ms. Nancy S. Malmquist, Esq., Downs Rachlin & Martin
Mr. John Ritsher, Esq., Ropes & Gray
Mr. Jay Silberg, Esq., Shaw-Pittman
Mr. Paul Gauron, Esq., Goodwin-Procter
Mr. Michael R. Kansler, Entergy Nuclear Vermont Yankee

VY-GFR-0000000002

PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER



file copy

01/25/2006 09:27 — Consolidated Accounting and Investment System — Page: 209

Nuclear Waste Fund

Quarterly Statement of Payments

**(NE44431) Vermont Yankee Nuclear Power Corporation**

Fiscal Quarter: 10/01/2005 thru 12/31/2005

| | Vermont Yankee (6001) | Contract Total |
|---|---|---|
| Net KWH Payments thru Prior Quarter: | 78,231,298.36 | 78,231,298.36 |
| KWH Payments to DOE this Quarter: | | |
| KWH Fees | 991,693.00 | 991,693.00 |
| Adjustments | 0.00 | 0.00 |
| Less KWH Fee Credits/Refunds this Quarter: | | |
| KWH Fee Credits | 0.00 | 0.00 |
| KWH Fee Refunds | 0.00 | 0.00 |
| Adjustments | 0.00 | 0.00 |
| Net KWH Payments to Date | 79,222,991.36 | 79,222,991.36 |
| KWH Interest Credits/Refunds thru Prior Quarter: | 889,375.17 | 889,375.17 |
| KWH Interest Credits/Refunds this Quarter: | | |
| KWH Interest Credits | 0.00 | 0.00 |
| KWH Interest Refunds | 0.00 | 0.00 |
| Adjustments | 0.00 | 0.00 |
| KWH Interest Credits/Refunds to Date | 889,375.17 | 889,375.17 |
| KWH Penalties Assessed thru Prior Quarter: | 2,805.80 | 2,805.80 |
| KWH Penalties Assessed this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total KWH Penalties Assessed | 2,805.80 | 2,805.80 |
| KWH Penalties Paid thru Prior Quarter: | 2,805.80 | 2,805.80 |
| KWH Penalties Paid this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total KWH Penalties Paid to Date | 2,805.80 | 2,805.80 |
| BALANCE of KWH Penalties DUE | 0.00 | 0.00 |

Consolidated Accounting and Investment System
Nuclear Waste Fund
Quarterly Statement of Payments
(NE44431) **Vermont Yankee Nuclear Power Corporation** (continued)
Fiscal Quarter: 10/01/2005 thru 12/31/2005

| | Vermont Yankee (6001) | Contract Total |
|---|---|---|
| SNF Penalties Assessed thru Prior Quarter: | 0.00 | 0.00 |
| SNF Penalties Assessed this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Penalties Assessed | 0.00 | 0.00 |
| SNF Penalties Paid thru Prior Quarter: | 0.00 | 0.00 |
| SNF Penalties Paid this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Penalties Paid to Date | 0.00 | 0.00 |
| BALANCE of SNF Penalties DUE | 0.00 | 0.00 |
| SNF Principal Due thru Prior Quarter: | 39,284,623.69 | 39,284,623.69 |
| SNF Principal Due this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Principal Due | 39,284,623.69 | 39,284,623.69 |
| SNF Interest Accrued thru Prior Quarter: | 88,289,974.92 | 88,289,974.92 |
| SNF Interest Accrued this Quarter | 1,150,085.01 | 1,150,085.01 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Interest Accrued | 89,440,059.93 | 89,440,059.93 |
| Total SNF Principal & Interest Due | 128,724,683.62 | 128,724,683.62 |
| SNF Principal Paid thru Prior Quarter: | 0.00 | 0.00 |
| SNF Principal Paid this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Principal Paid to Date | 0.00 | 0.00 |
| SNF Interest Paid thru Prior Quarter: | 0.00 | 0.00 |
| SNF Interest Paid this Quarter | 0.00 | 0.00 |
| Adjustments this Quarter | 0.00 | 0.00 |
| Total SNF Interest Paid to Date | 0.00 | 0.00 |
| Total SNF Principal & Interest Paid to Date | 0.00 | 0.00 |
| BALANCE of SNF Principal & Interest Due | 128,724,683.62 | 128,724,683.62 |

84

Certificate of Filing

I hereby certify that on the 4th day of May 2006, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Marian E. Sullivan