(150) "Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local, provincial or foreign taxing authority, including, without limitation, income, excise, real or personal property, sales, transfer, franchise, payroll, withholding, social security, gross receipts, license, stamp, occupation, employment or other taxes, including any interest, penalties or additions attributable thereto, but excluding any payments related to the Texas Compact.

(151) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) required to be supplied to any taxing authority with respect to Taxes, including amendments thereto.

(152) "Technical Specifications" means the technical specifications included in the NRC Licenses for VYNPS in accordance with the requirements of 10 C.F.R. § 50.36.

(153) "Termination Date" has the meaning set forth in Section 10.1(b).

(154) "Texas Compact" means the Texas Low-Level Radioactive Waste Disposal Compact Consent Act, P.L. 105-236, 112 Stat. 1542, as implemented by the Vermont General Assembly in 10 VSA c. 162.

(155) "Third Party Claim" has the meaning set forth in Section 9.2(a).

(156) "Title Commitment" means the title insurance commitment attached as Exhibit I hereto.

(157) "Transferable Permits" means those Permits including Environmental Permits that may be transferred by the Seller either (i) without a filing with, or notice to, consent or approval of any Governmental Authority or (ii) with a filing with, or notice to, consent or approval of any Governmental Authority. Schedule 1.1(157) sets forth all such Transferable Permits.

(158) "Transferred Employee Records" means all records related to Transferred Employees, including, without limitation, the following information: (a) skill and development training, (b) biographies, (c) seniority histories, (d) salary and benefit information, (e) Occupational, Safety and Health Administration reports, (f) active medical restriction forms, (g) fitness for duty, and (h) disciplinary actions.

(159) "Transferred Employees" means any employees of the Seller who accept offers of employment from the Buyer.

(160) "Transferred Non-Union Employees" means employees of the Seller who accept offers of employment from the Buyer and are not in a VYNPC unit represented by a union that has been properly recognized or certified.

(161) "Transferred Union Employees" means employees of the Seller who accept offers of employment from the Buyer who are in a VYNPC unit represented by a union that has been properly recognized or certified.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(162) "Transition Committee" has the meaning set forth in Section 6.1(b).

(163) "Trustee" means, as the case may be, prior to the Closing the trustee of the Decommissioning Funds appointed by the Seller pursuant to the Seller's Decommissioning Trust Agreement.

(164) "Union Employee" means any employee of the Seller employed as of the Closing Date who provides services with respect to the Acquired Assets and is in a VYNPC bargaining unit represented by a union.

(165) "VEBA" means a trust which constitutes a "Voluntary Employees' Beneficiary Association" as defined in (and qualified as tax-exempt under) Section 501(c)(9) of the Code.

(166) "VELCO" means Vermont Electric Power Company, Inc.

(167) "Vermont Yankee Spent Fuel Disposal Trust" means the trust (including the assets thereof) formed by the Indenture of Trust, dated as of February 2, 1998, between the Seller and The Bank of New York, as supplemented and amended from time to time in form and substance reasonably satisfactory to the Buyer.

(168) "VTDPS" means the Vermont Department of Public Service and any successor agency thereto.

(169) "VTPSB" means the Vermont Public Service Board and any successor agency thereto.

(170) "VYNPC" has the meaning set forth in the preamble.

(171) "VYNPS" has the meaning set forth in the preamble.

(172) "WARN Act" means the federal Worker Adjustment Retraining and Notification Act of 1988, as amended.

1.2 Certain Interpretive Matters. In this Agreement, unless the context otherwise requires, the singular shall include the plural, the masculine shall include the feminine and neuter, and vice versa. The term "includes" or "including" shall mean "including without limitation." References to a Section, Article, Exhibit or Schedule shall mean a Section, Article, Exhibit or Schedule of this Agreement, and reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented and restated through the date as of which such reference is made.

**ARTICLE II**
**PURCHASE AND SALE**

2.1 Transfer of Assets. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase, assume and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), all of the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Seller's right, title and interest immediately prior to the Closing in and to all of the properties and assets constituting or used in the operation of the Facility on or prior to the Closing Date (collectively, "Acquired Assets"), including, without limitation:

(a) The Real Property, including, without limitation, all buildings, the Facility, the Switchyards and other improvements thereon, described in Schedule 2.1(a), and all rights arising out of the ownership thereof or appurtenant thereto, including, without limitation, rights of ingress and egress;

(b) All Inventories and Nuclear Fuel wherever located and all Spent Nuclear Fuel and other Nuclear Materials located at the Site to which Seller has title;

(c) All machinery, mobile or otherwise, equipment (including, without limitation, computer hardware and software and communications equipment used for internal corporate purposes or emergency plan purposes), vehicles, tools, spare parts, fixtures, furniture and furnishings, work-in-process, emergency plan supplies and equipment wherever located, and other personal property owned by the Seller, and all of Seller's rights in any leased personal property, relating to or used in the operation or maintenance of the Facility, other than property constituting part of the Excluded Assets (collectively, "Tangible Personal Property");

(d) Subject to the provisions of Sections 2.4(c) and 6.4(c), all the Seller's Agreements (other than the Seller's Agreements listed on Schedule 2.3(a));

(e) Subject to the provisions of Sections 2.4(c) and 6.4(c), all Real Property Agreements;

(f) All Transferable Permits (but with respect to Transferable Permits referred to in clause (ii) of Section 1.1(157), only to the extent such Transferable Permits can be assigned by the Seller to the Buyer through the exercise by the Seller of Commercially Reasonable Efforts);

(g) Except as provided in Schedule 2.1(g), all documents, correspondence, books, records, employee records (including Transferred Employee records and Benefit Plan records), medical records, operating, safety and maintenance manuals, inspection reports, drawings, models, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports, quality assurance records, purchasing records and equipment repair, data, safety, maintenance or service records of the Seller relating to the design, construction, licensing, regulation, operation or Decommissioning of the Facility and the other Acquired Assets, and all other similar items of Seller, which documents are in the possession or control of the Seller, wherever located and whether existing in hard copy or magnetic or electronic form, (including, without limitation, all rights in and licenses or other right to use such documents owned by other Persons and licensed and held for use by Seller) subject to the right of the Seller to retain copies of same for its own use;

(h) All unexpired, transferable warranties and guarantees from third parties with respect to any item of Real Property or personal property constituting part of the Acquired Assets to the extent such warranties and guarantees are transferable by the Seller;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(i) The name "Vermont Yankee Nuclear Power Station";

(j) All Owned Intellectual Property, described in Schedule 2.1(j), relating primarily to, or used in the operation of, the Acquired Assets; provided that the Seller shall retain an irrevocable, perpetual, non-exclusive, and fully paid-up license to use such Owned Intellectual Property; provided, further, that each Party shall have no obligation following the Closing to provide the other Party with any updates, maintenance or technical support with respect to such Owned Intellectual Property;

(k) The assets comprising the Decommissioning Funds, including all income, interest and earnings accrued thereon, together with all related Tax, accounting and other records, including, without limitation, records necessary to determine the Tax Basis of each asset in the Decommissioning Funds;

(l) All Nuclear Insurance Policies to the extent transferable and the rights to proceeds from insurance policies for coverage of Acquired Assets and Assumed Liabilities and Obligations, excluding, however, (i) any rights to receive premium refunds, distributions and continuity credits with respect to periods prior to the Closing pursuant to the ANI nuclear industry credit rating plan and (ii) the Seller's account balance with respect to its membership in NEIL accrued up to the Closing;

(m) All rights in and to any causes of action against third parties (including indemnification and contribution) relating to any of the Acquired Assets or Assumed Liabilities and Obligations, or any portion thereof, if any, including any claims for refunds, prepayments, offsets, recoupment, insurance proceeds, condemnation awards, judgments and the like, whether received as payment or credit against future liabilities, relating to the Acquired Assets or Assumed Liabilities and Obligations, other than any such rights relating solely to Excluded Assets or Excluded Liabilities;

(n) Subject to Section 6.11(b), any claims of the Seller related to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing, whether relating to periods prior to or following the Closing, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983;

(o) All funds held by any third party in connection with the Texas Compact, including those funds held by the State of Vermont with respect to the Texas Low Level Radioactive Waste Disposal Compact pursuant to Vermont Title 10, Ch. 162, Section 7067;

(p) Subject to Section 2.2(k), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8; and

(q) All licenses for the Licensed Intellectual Property, including any related maintenance agreements for such Licensed Intellectual Property.

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed as conferring on the Buyer, and the Buyer is not acquiring, any right, title or interest in or to the following specific assets which are associated



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

with the Acquired Assets, but which are hereby specifically excluded from the sale and the definition of Acquired Assets herein (the "Excluded Assets"):

(a) Certificates of deposit, shares of stock, securities, bonds, debentures, debt instruments and interests in joint ventures, partnerships, limited liability companies and other entities (including, without limitation, the Seller's member account balances with NEIL), except the assets comprising the Decommissioning Funds, the funds referred to in Section 2.1(o), and, subject to Section 2.1(p), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8;

(b) All cash, cash equivalents, bank deposits, accounts and notes receivable (trade or otherwise), and any income, sales, property, payroll or other Tax receivables, except the assets comprising the Decommissioning Funds, the funds referred to in Section 2.1(o), and, subject to Section 2.1(p), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8;

(c) All rights to premium refunds made after the Closing under any insurance policies of the Seller, including (i) any rights to receive premium refunds, distributions and continuity credits with respect to periods prior to the Closing Date pursuant to the ANI nuclear industry credit rating plan and (ii) the Seller's account balance with respect to its membership in NEIL accrued up to the Closing;

(d) All claims for refunds of Department of Energy Decontamination and Decommissioning Fees paid by the Seller;

(e) All tariffs, agreements and arrangements to which the Seller is a party for the sale of electric capacity and/or energy or ancillary services and which are set forth in Schedule 2.2(e);

(f) Any asserted or unasserted rights or claims that relate to the Excluded Assets or the Excluded Liabilities;

(g) Any rights that accrue or will accrue to the Seller under this Agreement;

(h) Except as disclosed in Schedule 4.15(a), any and all of the Seller's rights in any contract representing an intercompany transaction between the Seller and an Affiliate of the Seller, whether or not such transaction relates to the provision of goods and services, payment arrangements, intercompany charges or balances, or the like, and which are listed in Schedule 2.2(h);

(i) The Vermont Yankee Spent Fuel Disposal Trust and claims of the Seller related or pertaining to the Department of Energy's defaults under the DOE Standard Contract to the extent applicable to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(j) The name "Vermont Yankee Nuclear Power Corporation" and any related or similar trade names, trademarks, service marks, corporate names or logos, and any part, derivative or combination thereof, except "Vermont Yankee Nuclear Power Station";

(k) That portion of the assets funding the Seller's Benefit Plans that is necessary to fully fund the benefits for those employees remaining in the employ of the Seller after the Closing;

(l) Any attorney-client privilege between the Seller and any counsel representing the Seller in connection with the negotiation, preparation, execution and delivery of and closing under this Agreement and all matters arising from or relating to this Agreement and the transactions contemplated hereby, and all attorney work product associated therewith; and

(m) The Seller's Agreements set forth in Schedule 2.3(a).

2.3 Assumed Liabilities and Obligations. On the Closing Date, the Buyer shall deliver to the Seller the Assignment and Assumption Agreement pursuant to which the Buyer shall assume and agree to discharge when due, all of the following Liabilities of the Seller (collectively, "Assumed Liabilities and Obligations"):

(a) All Liabilities of the Seller accruing on or after the Closing under (i) the Seller's Agreements (except as set forth in Schedule 2.3(a)), the Real Property Agreements and the Transferable Permits in accordance with the terms thereof (including post-closing continuing Liabilities imposed on Seller by any third party in connection with obtaining consents pursuant to Section 6.4(a)), (ii) the contracts, agreements, personal property leases, commitments, understandings or instruments entered into by the Seller with respect to the Acquired Assets and disclosed on other schedules to this Agreement (other than any schedule specifically excluding any such agreements), (iii) the contracts, agreements, personal property leases, commitments, understandings or instruments entered into by the Seller with respect to the Acquired Assets after the date hereof consistent with the terms of Section 6.1 hereof, and (iv) the Acquired Assets (except to the extent any Liabilities related to such Acquired Assets are Excluded Liabilities), except in each case to the extent such Liabilities, but for a breach or default by the Seller or a related waiver or extension, would have been paid, performed or otherwise discharged on or prior to the Closing or to the extent the same arise out of any such breach or default or related waiver or extension or out of any event which after the giving of notice would constitute a default by the Seller;

(b) All Liabilities (except for Excluded Liabilities) under or related to Environmental Laws or the common law with respect to the Acquired Assets;

(c) All Liabilities associated with the Acquired Assets in respect of Taxes for which the Buyer is liable pursuant to Section 3.5 hereof;

(d) All Liabilities with respect to the Transferred Employees on and after the Closing for which the Buyer is responsible pursuant to Section 6.8;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(e) With respect to the Acquired Assets, any Tax that may be imposed by any federal, state or local government on the ownership, sale, operation or use of the Acquired Assets on or after the Closing, except for any Income Taxes attributable to income received by the Seller or any Taxes allocated to the Seller in Section 6.17;

(f) All Liabilities of the Seller in respect of (i) the Decommissioning of the Facility following permanent cessation of operations, (ii) the management, storage, transportation and disposal of Spent Nuclear Fuel located at the Site (other than that excluded pursuant to Section 2.4(m) and as provided in Section 6.11), (iii) the Texas Compact and (iv) any other post-shut-down disposition of the Facility or any other of the Acquired Assets;

(g) Except as provided in Sections 2.4(m) and 2.4(n) and except for the Seller's obligations set forth in Sections 6.11 and 6.12, all Liabilities arising under or relating to Nuclear Laws or relating to any claim in respect of Nuclear Material arising out of the ownership or operation of the Acquired Assets whether occurring prior to, on or after the Closing, including liabilities or obligations arising out of or resulting from an "extraordinary nuclear occurrence," "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Site, or any other licensed nuclear reactor site in the United States, including, without limitation, liability for any deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act, 10 C.F.R. Part 140, and 10 C.F.R. § 50.54(w);

(h) All Liabilities under the NRC Licenses relating to the period after the Closing imposed by the NRC;

(i) All Liabilities of Seller for any Price Anderson Act secondary financial protection retrospective premium obligations for (i) the Seller's nuclear worker Liability attributable to employment on or prior to the Closing Date or (ii) for any third-party nuclear Liability arising out of any nuclear incident on or prior to the Closing Date (it being agreed that if the Seller is unable to cause the assignment of all or any part of such retrospective premium obligations, the Seller shall remain primarily liable for such obligations and the Buyer shall indemnify the Seller therefor pursuant to Section 9.1); and

(j) All Liabilities of the Seller for retrospective premium obligations under the Seller's NEIL nuclear property insurance policies arising out of any occurrence prior to the Closing Date (it being agreed that if the Seller is unable to cause the assignment of all or any part of such retrospective premium obligations, the Seller shall remain primarily liable for such obligations and the Buyer shall indemnify the Seller therefor pursuant to Section 9.1).

2.4 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed to impose on the Buyer, and the Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Liabilities of the Seller that are not expressly identified in Section 2.3 as Assumed Liabilities and Obligations, including, without limitation, the following excluded Liabilities (the "Excluded Liabilities"):



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(a) Any Liabilities of the Seller in respect of, or otherwise arising from the operation or use of, any Excluded Assets or other assets of the Seller which are not Acquired Assets;

(b) Any Liabilities in respect of Taxes attributable to the ownership, operation or use of Acquired Assets for taxable periods, or portions thereof, ending on or before the Closing, except for Taxes for which the Buyer is liable pursuant to Sections 3.5 or 6.17(a) hereof;

(c) Any Liabilities of the Seller accruing under any of the Seller's Agreements or Real Property Agreements prior to the Closing and any Liabilities of the Seller under the Seller's Agreements listed in Schedule 2.3(a);

(d) Any fines, penalties or costs imposed by a Governmental Authority with respect to the Acquired Assets or any Permits or Environmental Permits or NRC Licenses accruing prior to the Closing, including without limitation those relating to (i) any investigation, proceeding, request for information, or inspection arising out of the acts or omissions of the Seller or its employees, agents or contractors occurring on or prior to the Closing or (ii) any illegal acts, willful misconduct or gross negligence of the Seller or its employees, agents or contractors;

(e) Any payment obligations of the Seller for goods delivered or services rendered prior to the Closing, including, without limitation, rental or lease payments pursuant to the Real Property Agreements and any leases relating to Tangible Personal Property;

(f) Any Liability arising under or related to Environmental Laws or the common law, whether such Liability is known or unknown, contingent or accrued (whether or not arising or made manifest before the Closing Date or on or after the Closing Date), arising as a result of, in connection with or allegedly caused by, the disposal, treatment, storage, transportation, discharge, Release or recycling, or arrangement of such activities, of Hazardous Substances off-Site prior to the Closing;

(g) Any Liabilities to third parties (including employees) for personal injury or tort arising out of the ownership or operation of the Acquired Assets prior to the Closing, whether or not such Liability arose or was made manifest prior to the Closing;

(h) Subject to Section 6.8, any Liabilities relating to any Benefit Plan established or maintained by the Seller, or any employee benefit plan as defined in Section 3(3) of ERISA and maintained by any trade or business (whether or not incorporated) which is or ever has been under common control, or which is or ever has been treated as a single employer, with the Seller under Section 414 (b) , (c) , (m) or (o) of the Code ("ERISA Affiliate") or to which the Seller or any ERISA Affiliate contributed (the "ERISA Affiliate Plans"), including any multi-employer plan contributed to at any time by the Seller or any ERISA Affiliate, or any multi-employer plan to which the Seller or any ERISA Affiliate is or was obligated at any time to contribute, including, without limitation, any such Liability (i) relating to benefits payable under any Benefit Plans, (ii) relating to the PBGC under Title IV of ERISA, (iii) relating to a multi-employer plan, (iv) with respect to noncompliance with the notice and benefit continuation



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

requirements of COBRA, (v) with respect to any noncompliance with ERISA or any other applicable laws, or (vi) with respect to any suit, proceeding or claim which is brought against Buyer, any Benefit Plan, ERISA Affiliate Plan, or any fiduciary or former fiduciary of any such Benefit Plan or ERISA Affiliate Plan;

(i) Subject to Section 6.8, any Liabilities relating to the employment or termination of employment, including discrimination, wrongful discharge, unfair labor practices, the constructive termination by the Seller of any individual or any similar or related claim or cause of action, arising or related to the period prior to the Closing, except to the extent such Liabilities result from the conduct of the Buyer;

(j) Except as provided in Section 6.8, any obligations for wages, overtime, employment Taxes, severance pay, transition payments in respect of compensation or similar benefits or similar claims or causes of action accruing or arising at or prior to the Closing under any term or provision of any contract, plan, instrument or agreement relating to any of the Acquired Assets;

(k) Any Liability of the Seller arising out of a breach by the Seller of any of its obligations under this Agreement or the Ancillary Agreements;

(l) Any obligation of the Seller to indemnify a Buyer Indemnitee under this Agreement;

(m) Any Liability of the Seller under the DOE Standard Contract with respect to the one-time fee for fuel burned prior to April 7, 1983;

(n) Any Liability for assessments for Department of Energy Decontamination and Decommissioning Fees relating to Nuclear Fuel purchased and consumed at the Facility and accrued prior to the Closing; and

(o) Any Liability which is or would be required to be accrued on a balance sheet as of the Closing, prepared in accordance with generally accepted accounting principles, other than those Liabilities which are expressly set forth as Assumed Liabilities and Obligations in Section 2.3.

## ARTICLE III
## THE CLOSING

3.1 Closing. Upon the terms and subject to the satisfaction of the conditions contained in Article VII of this Agreement, the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Buyer, the payment of the Cash Purchase Price to the Seller, and the consummation of the other respective obligations of the Parties contemplated by this Agreement shall take place at a closing (the "Closing") (except for obligations specifically contemplated hereby to be completed after the Closing), to be held at the offices of Ropes & Gray, One International Place, Boston, Massachusetts 02110, at 10:00 a.m. local time, or another mutually acceptable time and location, on the date that is fifteen (15) Business Days following the date on which the last of the conditions precedent to Closing set forth in Article VII of this



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Agreement have been either satisfied or waived by the Party for whose benefit such conditions precedent exist but in any event not after the Termination Date, unless the Parties mutually agree on another date. The date of Closing is hereinafter called the "Closing Date." The Closing shall be effective for all purposes as of 12:01 a.m. on the Closing Date.

3.2 Purchase Price; Payment. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the Seller's sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Buyer, at the Closing the Buyer will (a) pay or cause to be paid to the Seller (A) an aggregate amount of One Hundred Sixteen Million One Hundred Sixty-Nine Thousand Forty-Nine Dollars ($116,169,049) for the Acquired Assets (other than the Seller's Nuclear Fuel and Inventories), (B) an aggregate amount of Thirty-Five Million One Hundred Seven Thousand Eight Hundred Forty-Four Dollars ($35,107,844) for the Seller's Nuclear Fuel (being the estimated Adjusted Book Value of such Nuclear Fuel as of the Closing), and (C) an aggregate amount of Twenty-Eight Million Seven Hundred Twenty-Three Thousand One Hundred Seven Dollars ($28,723,107) for the Seller's Inventories (being the estimated Adjusted Book Value of such Inventories as of the Closing), plus or minus any adjustments pursuant to the provisions of this Agreement (as so adjusted, the "Cash Purchase Price"), in immediately available funds denominated in U.S. dollars in accordance with written instructions of the Seller given to the Buyer at least three (3) Business Days prior to the Closing, and (b) assume the Assumed Liabilities and Obligations specified in Section 2.3 (the sum of the Cash Purchase Price and the Assumed Liabilities and Obligations is referred to herein collectively as the "Purchase Price").

3.3 Adjustment to Cash Purchase Price.

(a) Subject to Section 3.3(b), at the Closing, the Cash Purchase Price shall be adjusted, without duplication, to account for the items set forth in this Section 3.3(a):

(i) The Cash Purchase Price shall be adjusted to account for the items prorated as of the Closing pursuant to Section 3.5.

(ii) If, during the period from the Effective Date and the Closing, the Seller fails to spend the Required Capital Expenditure Amount designated for any capital project set forth in Schedule 3.3(a)(ii), then the Cash Purchase Price shall be decreased by an amount equal to the difference between (A) the Required Capital Expenditure Amount for each such capital project for which the Seller has not spent at least the Required Capital Expenditure Amount and (B) the amount of capital expenditures made by the Seller for such capital project on or after the Effective Date through the Closing, provided that the Required Capital Expenditure Amount for each such capital project scheduled for 2002 shall be pro rated for the number of days of the quarter allocated to such project in Schedule 3.3(a)(ii) elapsed prior to the Closing divided by the total number of days in each such quarter.

(iii) The Cash Purchase Price shall be increased by an amount equal to (w) any amount paid by the Seller pursuant to Section 6.1(d), (x) any operation and maintenance expenses actually paid by the Seller during the Interim Period related to the Refueling Outage that are incurred consistently with the Seller's past practices and



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

approved in writing by the Buyer, (y) any operation and maintenance expenses actually paid by the Seller during the Interim Period that the Seller would not have actually paid but for the specific written request by the Buyer, and (z) any capital expenditures actually paid by the Seller during the Interim Period that are agreed to by Buyer in writing, other than Required Capital Expenditure Amounts.

(iv) The Cash Purchase Price shall be (i) increased if and to the extent that the actual Adjusted Book Value of the Seller's Nuclear Fuel on the Closing Date is greater than the amount stated in clause (B) of Section 3.2 and (ii) decreased if and to the extent such Adjusted Book Value is less than such stated amount.

(v) The Cash Purchase Price shall be (i) increased if and to the extent that the actual Adjusted Book Value of the Seller's Inventories on the Closing Date is greater than the amount stated in clause (C) of Section 3.2 and (ii) decreased if and to the extent such Adjusted Book Value is less than such stated amount.

(vi) The Cash Purchase Price shall be decreased to the extent the Low Level Waste that has been generated at the Facility prior to the Closing and is on Site at the Closing has an associated disposal cost in excess of $250,000.

(vii) The Cash Purchase Price shall be decreased for all accrued but unpaid obligations for vacation pay, sick pay, floating holidays or personal days as may be due to Transferred Employees as of the Closing (determined in accordance with generally accepted accounting principles consistent with the Seller's past practices).

(b) At least thirty (30) calendar days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer an estimated closing statement (the "Estimated Closing Statement") that shall set forth the Seller's best estimate of all estimated adjustments to the Cash Purchase Price required by Section 3.3(a) (the "Estimated Adjustment"), together with reasonably detailed information supporting the calculated Estimated Adjustment. Within twenty (20) calendar days after the delivery of the Estimated Closing Statement by the Seller to the Buyer, the Buyer may object in good faith to the Estimated Adjustment in writing. The Seller agrees to cooperate with the Buyer and give the Buyer and its representatives information used to prepare the Estimated Adjustment. If the Buyer objects to the Estimated Adjustment, the Parties shall attempt to resolve their differences by negotiation. If the Parties are unable to do so prior to the Closing Date (or if the Buyer does not object to the Estimated Adjustment), the Cash Purchase Price shall be adjusted (the "Closing Adjustment") for the Closing by the amount of the Estimated Adjustment not in dispute. The disputed portion shall be resolved in accordance with the provisions of Section 3.3(c) and paid as part of any Post-Closing Adjustment to the extent required by Section 3.3(c).

(c) Within sixty (60) days after the Closing Date, the Seller shall prepare and deliver to the Buyer a final closing statement (the "Post-Closing Statement") that shall set forth all adjustments to the Cash Purchase Price required by Section 3.3(a) not previously effected by the Closing Adjustment (the "Proposed Post-Closing Adjustment") and all work papers detailing such adjustments. The Post-Closing Statement shall be prepared using the same accounting principles, policies and methods as the Seller has historically used in connection with the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

calculation of the items reflected on such Post-Closing Statement. Within thirty (30) days after the delivery of the Post-Closing Statement by the Seller to the Buyer, the Buyer may object to the Proposed Post-Closing Adjustment in writing. The Seller agrees to cooperate with the Buyer to provide the Buyer with the information used to prepare the Post-Closing Statement and information relating thereto. If the Buyer objects to the Proposed Post-Closing Adjustment, the Parties shall attempt to resolve such dispute by negotiation. If the Parties are unable to resolve such dispute within thirty (30) days after any objection by the Buyer, the Parties shall appoint the Independent Accounting Firm, which shall, at the Seller's and the Buyer's joint expense, review the Proposed Post-Closing Adjustment and determine the appropriate adjustment to the Cash Purchase Price, if any, within thirty (30) days after such appointment. The Parties agree to cooperate with the Independent Accounting Firm and provide it with such information as it reasonably requests to enable it to make such determination. The finding of such Independent Accounting Firm shall be in writing and be binding on the Parties hereto. Upon determination of the appropriate adjustment (the "Post-Closing Adjustment") by agreement of the Parties or by binding written determination of the Independent Accounting Firm, the Party owing the difference shall deliver such amount to the other Party no later than two (2) Business Days after such determination, in immediately available funds or in any other manner as reasonably requested by the payee.

3.4 Allocation of Purchase Price. The Buyer and the Seller shall use their good faith efforts to agree upon an allocation among the Acquired Assets of the Purchase Price consistent with Section 1060 of the Code and the Treasury Regulations thereunder within 120 days of the Effective Date (or such other date as the Parties may agree). If the Buyer and the Seller cannot agree on any such allocation, such dispute shall be resolved in accordance with Section 6.17(d) of this Agreement. The Buyer and the Seller shall treat the transaction contemplated by this Agreement as the acquisition by the Buyer of a trade or business for United States federal income tax purposes and agree that no portion of the consideration therefor shall be treated in whole or in part as the payment for services or future services. The allocation required by this Section 3.4 shall be revised based on the Post-Closing Adjustment within one hundred eighty (180) days after the Closing Date. Within thirty (30) days prior to the Closing Date, the Buyer shall prepare and deliver to the Seller a proposed IRS Form 8594. Within ten (10) days after receipt by the Seller of such proposed IRS Form 8594, the Seller shall the notify the Buyer whether it has any objection to such proposed IRS Form 8594, and if so, the Seller and the Buyer shall resolve such objections prior to filing the IRS Forms 8594 as set forth in the next sentence. Each of the Buyer and the Seller agrees to file IRS Form 8594 (which shall be based on the proposed IRS Form 8594 referred to in the preceding sentence) as modified by any Post-Closing Adjustment and as otherwise modified by the Seller and the Buyer pursuant to the preceding sentence, and all federal, state, local and foreign Tax Returns, in accordance with any such agreed allocation as adjusted as provided herein. Each of the Buyer and the Seller shall report the transactions contemplated by this Agreement for federal Tax and all other Tax purposes in a manner consistent with any such allocation determined pursuant to this Section 3.4. Each of the Buyer and the Seller agrees to provide the other promptly with any information required to complete IRS Form 8594. The Buyer and the Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding any allocation of the Purchase Price determined pursuant to this Section 3.4. The Buyer and the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with such allocation.

3.5 Prorations.

(a) The Buyer and the Seller agree that all of the items normally prorated, including those listed below (but not including Income Taxes), relating to the business and operation of the Acquired Assets shall be prorated as of the Closing, with the Seller liable to the extent such items relate to any time period prior to the Closing, and the Buyer liable to the extent such items relate to periods commencing with the Closing (measured in the same units used to compute the item in question, otherwise measured by calendar days):

(i) Personal property, real estate and occupancy Taxes, assessments and other charges, including those of the type that could give rise to a Permitted Encumbrance, if any, on or with respect to the business and operation of the Acquired Assets;

(ii) Rent, Taxes and all other items (including prepaid services or goods not included in Inventory) payable by or to the Seller under any of the Seller's Agreements (other than the Seller's Agreements listed on Schedule 2.3(a)) or the Real Property Agreements;

(iii) Any permit, license, registration, compliance assurance fees or other similar fees with respect to any Transferable Permit;

(iv) Sewer rents and charges for water, telephone, electricity and other utilities;

(v) Rent and Taxes and other items payable by the Seller under the Real Property Agreements assigned to the Buyer;

(vi) Fees or charges imposed by the Institute for Nuclear Power Operations, Nuclear Energy Institute, NRC or any other Governmental Authority; and

(vii) Insurance premiums with respect to the Nuclear Insurance Policies transferred to the Buyer pursuant to Section 2.1(l).

(b) In connection with the prorations referred to in (a) above, in the event that actual figures are not available at the Closing, the proration shall be based upon the actual Taxes or other amounts accrued through the Closing or paid for the most recent year (or other appropriate period) for which actual Taxes or other amounts paid are available. Such prorated Taxes or other amounts shall be re-prorated and paid to the appropriate Party within sixty (60) days of the date that the previously unavailable actual figures become available. The prorations shall be based on the number of days in a year or other appropriate period (i) before the Closing and (ii) including and after the Closing. The Seller and the Buyer agree to furnish each other with such documents and other records as may be reasonably requested in order to confirm all adjustment and proration calculations made pursuant to this Section 3.5.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

3.6 Deliveries by the Seller. At the Closing; the Seller will deliver, or cause to be delivered, the following to the Buyer:

(a) The Bill of Sale, duly executed by the Seller;

(b) Copies of any and all governmental and other third party consents, waivers or approvals obtained by the Seller with respect to the transfer of the Acquired Assets, or the consummation of the transactions contemplated by this Agreement, together with notice to, and if required by the terms thereof, consents by other Persons that are parties to such Seller's Agreements, Real Property Agreements and Transferable Permits to the extent obtained by the Seller;

(c) The opinion of counsel and officer's certificate contemplated by Section 7.1;

(d) One or more quitclaim deeds conveying the Real Property to the Buyer, substantially in the form of Exhibit F hereto, duly executed and acknowledged by the Seller in recordable form, and any owner's affidavits or similar documents reasonably required by the title company;

(e) All Ancillary Agreements to which the Seller is a party, duly executed by the Seller and the other parties thereto other than the Buyer;

(f) A FIRPTA Affidavit, duly executed by the Seller;

(g) The Power Purchase Agreement, duly executed by the Seller, and the Amendatory Agreements duly executed by the Seller and the Sponsors set forth therein;

(h) The Interconnection Agreement duly executed by VELCO;

(i) The Seller's Decommissioning Funds Certificate, if required by the Seller's Decommissioning Trust Agreement;

(j) Copies, certified by the Secretary or Assistant Secretary of the Seller, of corporate resolutions of the stockholders and board of directors of the Seller authorizing the execution and delivery of this Agreement and all of the agreements and instruments to be executed and delivered by the Seller in connection herewith, and the consummation of the transactions contemplated hereby;

(k) A certificate of the Secretary or Assistant Secretary of the Seller identifying the name and title and bearing the signatures of the officers of the Seller authorized to execute and deliver this Agreement and the other agreements and instruments to be executed and delivered by the Seller in connection herewith;

(l) A certificate of good standing with respect to the Seller (dated a date reasonably close to the Closing Date), issued by the Secretary of State of the State of Vermont;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(m) To the extent available, originals of all written Seller's Agreements, Real Property Agreements, Permits and Environmental Permits and, if not available, true and correct copies thereof, provided that such documents shall be delivered at the Site;

(n) The assets of the Decommissioning Funds to be transferred pursuant to Section 6.10 shall be delivered to the Trustee under the Buyer's Post-Closing Decommissioning Trust Agreement;

(o) Evidence that the Mortgage Indentures have or will be released;

(p) All such other instruments of assignment, transfer or conveyance as shall, in the reasonable opinion of the Buyer and its counsel, be necessary or desirable to transfer to the Buyer the Acquired Assets, in accordance with this Agreement and where necessary or desirable in recordable form; and

(q) Such other agreements, consents, documents, instruments and writings as are reasonably required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.7 Deliveries by the Buyer. At the Closing, the Buyer will deliver, or cause to be delivered, the following to the Seller:

(a) The Cash Purchase Price, as adjusted pursuant to Section 3.3;

(b) The opinion of counsel and officer's certificate contemplated by Section 7.2;

(c) All Ancillary Agreements to which the Buyer is a party, duly executed by the Buyer;

(d) Copies, certified by the Secretary or Assistant Secretary of the Buyer, of resolutions authorizing the execution and delivery of this Agreement, and all of the agreements and instruments to be executed and delivered by the Buyer in connection herewith, and the consummation of the transactions contemplated hereby;

(e) A certificate of the Secretary or Assistant Secretary of the Buyer identifying the name and title and bearing the signatures of the officers of the Buyer authorized to execute and deliver this Agreement and the other agreements to be executed and delivered by the Buyer in connection herewith;

(f) Certificates of good standing with respect to the Buyer (dated a date reasonably close to the Closing Date), issued by the Secretary of State of the State of Delaware and the Secretary of State of the State of Vermont;

(g) All such other instruments of assumption as shall, in the reasonable opinion of the Seller and its counsel, be necessary for the Buyer to assume the Assumed Liabilities and Obligations in accordance with this Agreement;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(h) Copies of any and all governmental and other third party consents, waivers or approvals obtained by the Buyer with respect to the transfer of the Acquired Assets, or the consummation of the transactions contemplated by this Agreement;

(i) Such other agreements, documents, instruments and writings as are reasonably required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith; and

(j) Evidence of the Buyer's membership in NEPOOL.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as follows:

4.1 Organization; Qualification. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Vermont and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller has heretofore made available to the Buyer complete and correct copies of its Articles of Association and Bylaws as currently in effect.

4.2 Authority. The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. Except for approval of this Agreement by the Seller's shareholders, which approval has not been obtained as of the Effective Date, the execution and delivery of this Agreement and the Ancillary Agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action required on the part of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by the Seller, and assuming that this Agreement constitutes a valid and binding agreement of the Buyer, subject to the receipt of the Seller's Required Regulatory Approvals, constitutes the legal, valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms. When each Ancillary Agreement to which the Seller is a party has been executed and delivered by the other parties thereto, subject to the receipt of the Seller's Required Regulatory Approvals, such Ancillary Agreement will constitute a valid and legally binding obligation of the Seller, enforceable in accordance with its terms.

4.3 Consents and Approvals; No Violation.

(a) Except as set forth in Schedule 4.3(a), and subject to the receipt of the Seller's Required Regulatory Approvals, neither the execution and delivery by the Seller of this Agreement or the Ancillary Agreements to which the Seller is a party nor the consummation of the transactions contemplated hereby or thereby will (i) conflict with or result in the breach or violation of any provision of the Articles of Association or Bylaws of the Seller, (ii) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, license



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

or other restriction of any Governmental Authority to which the Seller or any of its property is subject, (iii) result in a default (or give rise to any right of termination, cancellation, acceleration or create in any Person the right to acquire all or any portion of the Acquired Assets) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller or any of the Acquired Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect, or (iv) constitute violations of any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation, individually or in the aggregate, would have a Material Adverse Effect.

(b) Except as set forth in Schedule 4.3(b) (the filings and approvals, including all relevant decisions and orders, applicable to the Seller and/or the Sponsors and referred to in Schedule 4.3(b) are collectively referred to as the "Seller's Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the consummation by the Seller of the transactions contemplated hereby.

4.4 Financial Statements.

(a) Seller has delivered to Buyer complete and correct copies of (i) its balance sheets at December 31, 1998, 1999 and 2000 and the related statements of income and retained earnings and statements of cash flows and capital expenditures for the years then ended, together with the notes thereto and the report thereon by Arthur Andersen LLP and (ii) its unaudited balance sheets at the end of each calendar month ended after December 31, 2000 and prior to the Effective Date and its unaudited statements of operations and cash flows for such months. Such financial statements, including all related notes, fairly present in all material respects the consolidated financial position, assets and liabilities (whether accrued, absolute, contingent or otherwise) of the Seller as of the respective dates thereof and the consolidated results of operations, changes in retained earnings and cash flows of the Seller for the periods indicated in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except for changes in accounting principles disclosed in the notes thereto) and subject in the case of interim financial statements to year-end adjustments and the absence of notes. The audited financial statements of the Seller as of and for the year ended December 31, 2000 are referred to herein as the "2000 Financial Statements." The balance sheet of the Seller as of the latest date referred to in clause (ii) above fairly presents in all material respects, subject to year end adjustments and the absence of notes, the amounts owed by the Seller to the Sponsors and owed to the Seller by the Sponsors as of such date.

(b) Since December 31, 2000, except as set forth in Schedule 4.4(b), (a) there has not occurred any facts or circumstances that constitute a Material Adverse Effect, or (b) there has not been any damage, destruction or casualty loss, whether or not covered by insurance, which, individually or in the aggregate, created or could reasonably be expected to create a Material Adverse Effect.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER