4.5 Reports. Since January 1, 1998, the Seller has filed or caused to be filed with the applicable state or local utility commissions or regulatory bodies, the NRC and the FERC, as the case may be, all material forms, statements, reports and documents (including all exhibits, amendments and supplements thereto) required to be filed by the Seller with respect to the Acquired Assets or the operation thereof under each of the applicable state public utility laws, the Federal Power Act, the Atomic Energy Act, the Energy Reorganization Act and the Price-Anderson Act and the respective rules and regulations thereunder, all of which complied in all material respects with all applicable requirements of the appropriate act and the rules and regulations thereunder in effect on the date each such report was filed, and there are no material misstatements or omissions relating to the Acquired Assets in any such report; provided, however, that the Seller shall not be deemed to be making any representation or warranty to the Buyer hereunder concerning the financial statements of the Seller contained in any such reports.

4.6 Accounting Methods. Since December 31, 2000, the Seller has not materially changed its accounting methods or practices.

4.7 Title and Related Matters. Except for Permitted Encumbrances, the Seller has good and marketable title as set forth in the Title Commitment, insurable by a nationally recognized title insurance company, to the Real Property to be conveyed by it hereunder, which, to Seller's Knowledge, is free and clear of all Encumbrances, except the Mortgage Indentures. The Real Property constitutes all of the real property necessary to operate the Facility as currently operated. Except for Permitted Encumbrances and as set forth in Schedule 4.7, the Seller has good and valid title to each of the Acquired Assets not constituting Real Property free and clear of all Encumbrances.

4.8 Real Property Agreements. Schedule 4.8 lists, as of the date of this Agreement, all real property leases, easements, licenses and other rights in real property (collectively, the "Real Property Agreements") to which the Seller is a party and which (a) are to be transferred and assigned to the Buyer on the Closing Date, (b) affect all or any part of any Real Property in any material respect, or (c) (i) provide for annual payments of more than $100,000 or (ii) are material to the ownership or operation of the Acquired Assets. Except as set forth in Schedule 4.8, all such Real Property Agreements are valid, binding and enforceable on the Seller in accordance with their terms and are in full force and effect; there are no existing material defaults by the Seller or, to the Seller's Knowledge, any other party thereunder; and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a material default by the Seller or, to the Seller's Knowledge, any other party thereunder.

4.9 Insurance. All material policies of fire, liability, property damage, worker's compensation, nuclear and other forms of insurance owned or held by the Seller and insuring the Acquired Assets are listed in Schedule 4.9 along with the amount of the coverage, the type of insurance, the risks insured, the expiration date and the policy number. The Seller maintains policies of liability and property insurance with respect to the ownership, operation and maintenance of the Facility which afford protection against the insurable hazards and risks with respect to which units of similar size and type customarily maintain insurance, and which meets the requirements of 10 C.F.R. 50.54(w) and 10 C.F.R. Part 140. Such coverage includes nuclear liability insurance from ANI, in such form and in such amount as meets the financial protection



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

requirements of the Atomic Energy Act, and an agreement of indemnification as contemplated by Section 170 of the Atomic Energy Act. Except as set forth in Schedule 4.9, all of such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the date as of which this representation is being made have been paid or will be paid prior to Closing (other than retroactive premiums which may be payable with respect to comprehensive general liability and workers' compensation insurance policies, as to which Seller has received no notice), and no notice of cancellation or termination has been received with respect to any such policy which was not replaced on substantially similar terms prior to the date of such cancellation. Except as described in Schedule 4.9, the Seller has not been refused any insurance with respect to the Acquired Assets nor has the Seller's coverage been limited by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance during the last twelve months.

4.10 Environmental Matters; etc. The Seller has obtained and holds all Environmental Permits for the ownership and operation of the Facility as currently operated by the Seller, and the Seller is in compliance in all material respects with all Environmental Laws and Environmental Permits. Except as disclosed in Schedule 4.10, (i) the Seller has not received any written notice from any Governmental Authority that the Seller is not or has not been in compliance with Environmental Laws, the violation of which would have a Material Adverse Effect, (ii) there are no Environmental Claims pending or, to the Seller's Knowledge, threatened against the Seller and (iii) the Seller is not aware of any facts or circumstances which are reasonably likely to form the basis for an Environmental Condition or an Environmental Claim against the Seller or the Buyer.

Except as disclosed in Schedule 4.10: (i) Seller has not transported or arranged for the treatment, storage, handling, disposal or transportation of any Hazardous Substances to or at any off-Site location; (ii) the Site is not an Environmental Cleanup Site; (iii) there are no Environmental Conditions and no losses arising under or pursuant to any Environmental Law with respect to the Site or the Acquired Assets; and (iv) Seller has not made any Environmental Claim for any loss or Liability under any insurance relating to the Acquired Assets.

Except as disclosed in Schedule 4.10, there are no underground storage tanks, active or abandoned, or polychlorinated-biphenyl-containing equipment located at the Site. All reports relating to Hazardous Substances or under Environmental Laws by or on behalf of the Seller have been made available to the Buyer prior to execution of this Agreement.

Except as disclosed in Schedule 4.10, no Release of Hazardous Substances has occurred at, from, on, under or to the Site.

The Seller has not disposed or transported, or arranged for the disposal or transportation of, any Nuclear Material to any off-Site location, except for Low Level Waste shipped by or on behalf of Seller, to, and delivered at, licensed disposal sites.

4.11 Labor Matters. Schedule 4.15(a) lists all written agreements with employees in effect as of the Effective Date. The Seller has previously made available to the Buyer a true, correct and complete copy of the Old IBEW Contract, which on the Effective Date is the only collective bargaining agreement with unionized workers to which the Seller is a party or is



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

subject and which relates to the Acquired Assets. With respect to the ownership or operation of the Acquired Assets, except to the extent set forth in Schedule 4.11 (which matters shall remain the sole responsibility of the Seller): (a) the Seller is in material compliance with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours; (b) the Seller has not received notice of any unfair labor practice complaint pending before the National Labor Relations Board or any other Governmental Authority; (c) there is no labor strike, slowdown or stoppage actually pending or, to the Seller's Knowledge, threatened by any authorized representative of any union or other representative of employees against or affecting the Seller; (d) the Seller has not received notice that any representation petition respecting the employees of the Seller has been filed with the National Labor Relations Board; (e) no arbitration proceeding arising out of or under collective bargaining agreements is pending against the Seller; and (f) the Seller has not experienced any primary work stoppage since at least December 31, 1994; and, (g) there are no charges of discrimination or other claims pending with the Equal Employment Opportunity Commission or state or local counterparts, the U.S. Department of Labor, the NRC or any other Governmental Authority related to services performed in connection with the Acquired Assets.

4.12 ERISA; Benefit Plans.

(a) Schedule 4.12(a) lists all deferred compensation, profit-sharing, retirement and pension plans and all material bonus and other employee benefit or fringe benefit plans (including, without limitation, any severance policies and/or agreements or executive or management retirement arrangement) maintained or with respect to which contributions are made by the Seller in respect of employees employed at the Acquired Assets, including any trusts or other funding arrangements maintained in connection therewith ("Seller's Benefit Plans"). True, correct and complete copies of all such Benefit Plans have been made available to the Buyer.

(b) Except as set forth in Schedule 4.12(b), the Seller and any ERISA Affiliates have fulfilled their respective obligations under the minimum funding requirements of Section 302 of ERISA and Section 412 of the Code with respect to each of Seller's Benefit Plans which is an "Employee Pension Benefit Plan" and to which Section 302 of ERISA applies, and each such plan is in compliance in all material respects with the presently applicable provisions of ERISA and the Code. Except as set forth in Schedule 4.12(b), neither the Seller nor any ERISA Affiliate has incurred any liability under Sections 4062(b), 4063 or 4064 of ERISA to the PBGC in connection with any of Seller's Benefit Plans which is subject to Title IV of ERISA, nor any withdrawal liability to any multiemployer pension plan under Section 4201 et seq. of ERISA or to any multiemployer welfare benefit plan, nor is there or has there been any reportable event (as defined in Section 4043 of ERISA) with respect to any of Seller's Benefit Plans except as set forth in Schedule 4.12(b). No non-exempt prohibited transaction under Section 4975 of the Code or Sections 404 or 406 of ERISA has occurred with respect to any Benefit Plans. Except as set forth in Schedule 4.12(b), the IRS has issued a letter for each Benefit Plan which is intended to be a qualified plan determining that such plan is exempt from federal Income Tax under Sections 401(a) and 501(a) of the Code and there has been no occurrence since the date of any such determination or opinion letter (including, without limitation, statutory or regulatory changes to the requirements of Section 401(a) of the Code for



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

which the remedial amendment period has expired or other applicable provision of the Code) which has or could have a Material Adverse Effect on such qualification. Except as set forth in Schedule 4.12(b), any voluntary employees' beneficiary association under Section 501(c)(9) of the Code has been determined to be tax-exempt and there has been no occurrence since the date of any such determination which has or could have a Material Adverse Effect on such qualification. Except as set forth in Schedule 4.12(b), at no time during the last five years has there been a reportable event (as defined in Section 4043 of ERISA) with respect to any of the Seller's Benefit Plans for which a waiver did not apply or that was required to be reported to the PBGC.

(c) Neither the Seller nor any ERISA Affiliate or parent or successor corporation (within the meaning of Section 4069(b) of ERISA) has engaged in any transaction which may be disregarded under Section 4069 or Section 4212(c) of ERISA. The Seller does not contribute to and has no liabilities or obligations under any multiemployer plan (within the meaning of Section 3(37) of ERISA). No Benefit Plan or ERISA Affiliate Plan is a multiemployer plan. Neither the Seller's "Thrift Plan for Management Employees" nor its "Thrift Plan for Employees who are members of the IBEW" is an employee stock ownership plan as defined in Section 4975(c)(7) of the Code.

(d) The Seller has materially complied with all reporting, disclosure, notice, election, coverage and other benefit requirements of Sections 4980B and 9801-9833 of the Code and Sections 601-734 of ERISA as applicable to any Benefit Plan.

(e) With respect to each Benefit Plan Buyer is to assume pursuant to Section 6.8, except as disclosed in Schedule 4.12(b): (i) such Benefit Plan has been maintained in compliance with the applicable requirements of ERISA, the Code, the securities laws, and other applicable law; (ii) such Benefit Plan may, subject to any applicable collective bargaining agreement, be amended, terminated, or otherwise modified by the sponsoring employer to the greatest extent permitted by applicable law (including, without limitation, elimination of future accruals under any such Benefit Plan which is an Employee Pension Benefit Plan and the elimination of the obligation to make any benefit payments with respect to any other such Benefit Plan), and no employee communication or provision in any document governing such Benefit Plan has failed to reserve effectively the right of the sponsoring employer (including, after its assumption of such Benefit Plan, the Buyer) to so amend, terminate, or otherwise modify such Benefit Plan; (iii) no litigation or governmental administrative proceeding (or investigation) or other proceeding (other than those relating to routine claims for benefits) is pending or, to the Seller's knowledge, threatened with respect to such Benefit Plan; (iv) such Benefit Plan covers and provides (and has covered and provided) benefits to (or in respect of) only those individuals who have been classified by Seller as its employees for federal income tax withholding purposes and Seller has not failed to classify properly as its employee (for federal income tax withholding purposes) any individual who should have been so classified.

(f) Except as set forth in Schedule 4.12(f), the Seller has not made any commitment to establish any new Benefit Plan, to modify any Benefit Plan (except as required under applicable law), nor has any intention to do so been communicated to employees or former employees of the Seller.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.13 Real Property; Plant and Equipment.

(a) Schedule 2.1(a) contains a description of, and exhibits indicating the location of, the real property owned by the Seller and included in the Acquired Assets (the "Real Property"). Complete and correct copies of any current surveys in the Seller's possession or any policies of title insurance currently in force and in the possession of the Seller with respect to the Real Property have heretofore been made available by the Seller to the Buyer. Except for Permitted Encumbrances and except as set forth in such surveys or in Schedules 2.1(a) and 4.7, to Seller's Knowledge there are no encroachments onto, overlaps, boundary line disputes or other similar matters with respect to the Real Property and no improvements included in the Real Property encroach upon any adjacent property or any easement or right-of-way.

(b) Schedule 4.13(b) contains a description of the major equipment components, personal property and inventory under the agreement between the Seller and Pooled Equipment Inventory Company (f/k/a BWR Equipment Inventory Company) comprising the Acquired Assets.

(c) The Acquired Assets conform in all material respects to the Technical Specifications and the Final Safety Analysis Report (FSAR) and are being operated and are in material conformance with all applicable requirements under the Atomic Energy Act, the Energy Reorganization Act, and the rules, regulations, orders and licenses issued thereunder. The Acquired Assets related to the metering of power to and from the VYNPS are in material conformance with all applicable NEPOOL standards and requirements.

(d) The Facility is operational and the Seller is not aware of any condition that would prevent the Facility's operation at full rated power.

(e) The sewer and water systems and all other utilities that currently service the Real Property are sufficient for the operation of the Facility. The Seller has no reason to believe that such systems and utilities will not be sufficient to continue to service the Facility, or that such services will not exist on the Closing Date. The Seller has not received and has no reason to believe that it will receive any notice of the curtailment of any utility service supplied to the Real Property.

4.14 Condemnation; Public Improvements. Neither the whole nor any part of the Real Property or any other real property or rights leased, used or occupied by the Seller in connection with the ownership or operation of the Acquired Assets is subject to any pending or, to the Seller's Knowledge, threatened suit for condemnation or other taking by any Governmental Authority. No assessment for public improvements has been served upon the Seller with respect to the Real Property which remains unpaid, including, without limitation, those for construction of sewer, water, electric, gas or steam lines and mains, streets, sidewalks and curbing. There are no public improvements with respect to the Real Property which have been ordered to be made by any Governmental Authority which have not been completed, assessed and paid for prior to the date hereof.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.15 Certain Contracts and Arrangements.

(a) Except (i) as listed in Schedule 4.15(a) or the other schedules to this Agreement or (ii) for contracts, agreements, personal property leases, commitments, understandings or instruments in which all obligations of the Seller will expire prior to the Closing or (iii) contracts or agreements entered into during the Interim Period in accordance with this Agreement, the Seller is not a party to any written contract, agreement, personal property lease, commitment, understanding or instrument which is material to the ownership or operation of the Acquired Assets.

(b) Except as disclosed in Schedule 4.15(b), each of the Seller's Agreements and each of the Real Property Agreements (i) constitutes the legal, valid and binding obligation of the Seller, (ii) is in full force and effect, and (iii) may be transferred or assigned to the Buyer at the Closing without consent or approval of the other parties thereto, and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder.

(c) Except as set forth in Schedule 4.15(c), there is not, under any of the Seller's Agreements or Real Property Agreements, any default or event which, with notice or lapse of time or both, would constitute a default on the part of any of the Seller or, to the Seller's Knowledge, the other parties thereto, except such events of default and other events as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect.

4.16 Legal Proceedings, etc. Except as set forth in Schedule 4.16, there are no claims, actions, proceedings or investigations pending or, to the Seller's knowledge, threatened against the Seller before any Governmental Authority or any arbitrating body which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 4.16 or in any filing made by the Seller prior to the date hereof pursuant to the Atomic Energy Act, the Seller is not subject to any outstanding judgment, order, writ, injunction or decree of any Governmental Authority which, individually or in the aggregate, would have a Material Adverse Effect.

4.17 Permits; Compliance with Law.

(a) The Seller has all permits, licenses, franchises and other governmental authorizations, consents and approvals other than with respect to permits under Environmental Laws referred to in Section 4.10 or permits issued by the NRC referred to in Section 4.18 hereof (collectively, "Permits"), necessary for the ownership and operation of the Acquired Assets as presently conducted. Except as set forth in Schedule 4.17(a), the Seller has not received any written notification that it is in violation of any such Permits, or any law, statute, order, rule, regulation, ordinance or judgment of any Governmental Authority applicable to it, except for notifications of violations which would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is in compliance with all Permits, laws, statutes, orders, rules, regulations, ordinances or judgments of any Governmental Authority applicable to the Acquired Assets, except for violations which would not, individually or in the aggregate, have a Material


PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Adverse Effect. No Governmental Authority has taken any action that would prevent the Facility from operating at its full rated capacity at or after the Closing.

(b) Schedule 4.17(b) sets forth all material Permits and Environmental Permits, other than Transferable Permits (which are set forth in Schedule 1.1(157)) applicable to the Acquired Assets.

4.18 NRC Licenses.

(a) The Seller has all permits, licenses, and other consents and approvals issued by the NRC necessary to own and operate the Acquired Assets as presently operated, pursuant to the requirements of all Nuclear Laws. Except as set forth in Schedule 4.18(a), the Seller has not received any written notification that it is in violation of any such licenses, or any order, rule, regulation or decision of the NRC with respect to the Acquired Assets, except for notifications of violations which would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is in compliance with all Nuclear Laws and all orders, rules, regulations or decisions of the NRC applicable to the Seller with respect to the Acquired Assets, except for violations which would not, individually or in the aggregate, have a Material Adverse Effect. The NRC has not issued any order or confirmatory action letter that would prevent the Facility from operating at its full rated capacity at or after the Closing.

(b) Schedule 4.18(b) sets forth all material permits, licenses, and other consents and approvals issued by the NRC applicable to the Acquired Assets.

4.19 Regulation as a Utility. The Seller is an electric utility company within the meaning of the Holding Company Act, a public utility within the meaning of the Federal Power Act, an electric utility within the meaning of the NRC regulations implementing the Atomic Energy Act, and an electric company under the laws of Vermont.

4.20 Qualified Decommissioning Fund.

(a) The Seller's Qualified Decommissioning Fund is a trust validly existing under the laws of the State of New York with all requisite authority to conduct its affairs as it now does. The Seller has heretofore made available to the Buyer a copy of the Seller's Decommissioning Trust Agreement as in effect on the date of this Agreement. The Seller's Qualified Decommissioning Fund satisfies the requirements necessary for such Fund to be treated as a "Nuclear Decommissioning Reserve Fund" within the meaning of Code Section 468A(a) and as a "nuclear decommissioning fund" and a "qualified nuclear decommissioning fund" within the meaning of Treas. Reg. § 1.468A-1(b)(3). Such Fund is in compliance in all material respects with all applicable rules and regulations of the NRC, FERC, the VTDPS, the VTPSB, the IRS and any other Governmental Authority. The Seller has made timely and valid elections to make annual contributions to the Qualified Decommissioning Fund since 1984. The Seller has heretofore made available copies of such elections to the Buyer.

(b) Subject only to the Seller's Required Regulatory Approvals, the Seller and the Trustee have all requisite authority to cause the assets of the Qualified Decommissioning Fund to be transferred in accordance with the provisions of this Agreement.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(c) The Seller and/or the Trustee of the Qualified Decommissioning Fund has/have filed or caused to be filed with the NRC, FERC, the IRS and any other Governmental Authority all material forms, statements, reports and documents (including all exhibits, amendments and supplements thereto) required to be filed by such entities. The Seller has made available to the Buyer a copy of the schedule of ruling amounts most recently issued by the IRS for the Qualified Decommissioning Fund, a copy of the request that was filed to obtain such schedule of ruling amounts and a copy of any pending request for revised ruling amounts, in each case together with all exhibits, amendments and supplements thereto. Any amounts contributed to the Qualified Decommissioning Fund while such request is pending before the IRS and which turn out to exceed the applicable amounts provided in the schedule of ruling amounts issued by the IRS will be withdrawn by the Seller from the Qualified Decommissioning Fund within the period provided under Treas. Reg. § 1.468A-5(c)(2)(i). There are no interim rate orders that may be retroactively adjusted or retroactive adjustments to interim rate orders that may affect amounts that the Buyer may contribute to the Qualified Decommissioning Fund or may require distributions to be made from the Qualified Decommissioning Fund.

(d) The Seller has made available to the Buyer the balance sheets for the Qualified Decommissioning Fund as of December 31, 2000, and promptly after becoming available, but in any event prior to Closing, such balance sheets as of December 31, 2001, and for the last quarter prior to Closing, and will make available to the Buyer the balance sheets for the Qualified Decommissioning Fund as of the last Business Day before Closing, and they present or will present, as the case may be, fairly in all material respects as of December 31, 2000 and as of the last Business Day before Closing, as the case may be, the financial position of the Qualified Decommissioning Fund in conformity with generally accepted accounting principles applied on a consistent basis, except as otherwise noted therein. The Seller will make available to the Buyer information from which the Buyer can determine the Tax Basis of all assets in the Qualified Decommissioning Fund as of the last Business Day before Closing. There are no liabilities (whether absolute, accrued, contingent or otherwise and whether due or to become due), including, without limitation, any acts of "self-dealing" as defined in Treas. Reg. § 1.468A-5(b)(2), or agency or other legal proceedings that may materially affect the financial position of the Qualified Decommissioning Fund other than those, if any, that are disclosed in Schedule 4.20(d).

(e) The Seller has made available to the Buyer copies of all contracts and agreements to which the Trustee of the Qualified Decommissioning Fund, in its capacity as such, is a party.

(f) The Qualified Decommissioning Fund has filed all Tax Returns required to be filed. Such Tax Returns were true, correct and complete in all material respects and all Taxes shown to be due on such Tax Returns have been paid in full. Except as shown in Schedule 4.20(f), no notice of deficiency or assessment has been received from any taxing authority with respect to liability for Taxes of the Qualified Decommissioning Fund which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 4.20(f) is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 4.20(f), there are no outstanding agreements or waivers extending the applicable statutory periods of limitations for Taxes associated with the Qualified Decommissioning Fund for any period.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(g) To the extent Seller has pooled assets of the Qualified Decommissioning Fund with those of any other assets for investment purposes in periods prior to the Closing, such pooling arrangement is a partnership for federal income tax purposes and the Seller has filed all Tax Returns required to be filed with respect to such pooling arrangement for such periods.

(h) For the period from and including April 1, 2001 to and including June 30, 2001, the Seller has made contributions to the Qualified Decommissioning Fund in accordance with the terms of the FERC approved settlement agreement for rates effective January 1, 1995, at a rate of not less than $8,360,330 per annum, pro rated on a daily basis.

4.21 Nonqualified Decommissioning Fund.

(a) The Seller's Nonqualified Decommissioning Fund is a trust validly existing under the laws of the State of New York with all requisite authority to conduct its affairs as it now does. The Seller's Nonqualified Decommissioning Fund is in compliance in all material respects with all applicable rules and regulations of the NRC, the FERC and any other Governmental Authority. The Seller's Nonqualified Decommissioning Fund is classified as a grantor trust under Sections 671-677 of the Code.

(b) Subject only to the Seller's Required Regulatory Approvals, the Seller has all requisite authority to cause the assets of the Nonqualified Decommissioning Fund to be transferred in accordance with the provisions of this Agreement.

(c) The Seller and the Trustee of the Nonqualified Decommissioning Fund have filed or caused to be filed with the NRC and any relevant state or local authority all material forms, statements, reports and documents (including all exhibits, amendments and supplements thereto) required to be filed by either of them.

(d) The Seller has made available to the Buyer the balance sheets for the Nonqualified Decommissioning Fund as of December 31, 2000, and promptly after becoming available, but in any event prior to Closing, such balance sheets as of December 31, 2001, and for the last quarter prior to Closing, and will make available to the Buyer the balance sheets for the Nonqualified Decommissioning Fund as of the last Business Day before Closing, and they present or will present, as the case may be, fairly in all material respects as of their respective dates the financial position of the Nonqualified Decommissioning Fund in conformity with generally accepted accounting principles applied on a consistent basis, except as otherwise noted therein. The Seller will make available to the Buyer information from which the Buyer can determine the Tax Basis of all assets in the Nonqualified Decommissioning Fund as of the last Business Day before Closing. There are no liabilities (whether absolute, accrued, contingent or otherwise and whether due or to become due) including, without limitation, agency or other legal proceedings, that may materially affect the financial position of the Nonqualified Decommissioning Fund other than those, if any, that are disclosed in Schedule 4.21(d).

(e) The Seller has made available to the Buyer copies of all contracts and agreements to which the Trustee of the Nonqualified Decommissioning Trust, in its capacity as such, is a party.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER



VY-GFR-0000000060

(f) If the Seller has pooled the assets of the Nonqualified Decommissioning Fund with any other assets at any time prior to Closing, such pooling arrangement is not and shall not be deemed a corporation for tax purposes.

(g) For the period from and including April 1, 2001 to and including June 30, 2001, the Seller has made aggregate contributions to the Qualified Decommissioning Fund and the Nonqualified Decommissioning Fund, in accordance with the terms of the FERC approved settlement agreement for rates effective January 1, 1995 at a rate of not less than $16,777,380 per annum, pro rated on a daily basis.

4.22 Zoning Classification. The Real Property is zoned as set forth in Schedule 4.22. The current zoning categories permit, and as of the Closing will permit, the operation of the Facility. The Seller has not requested, applied for, or given its consent to, and has no Knowledge of, any pending zoning variance or change with respect to the zoning of any of the Real Property.

4.23 Intellectual Property. Except as set forth in Schedule 4.23, the Seller has ownership of, or license to use, all of the Intellectual Property necessary for the operation of the Acquired Assets and the rights of the Seller in such (i) Owned Intellectual Property relating to the Acquired Assets are freely transferable and (ii) Licensed Intellectual Property relating to the Acquired Assets are freely assignable. The Seller has not received written notice of any claims or demands of any other Person pertaining to any such Intellectual Property and no proceedings have been instituted, or are pending or, to the Seller's Knowledge, threatened, which challenge the rights of the Seller in respect thereof. All licenses or other agreements under which the Seller is granted rights in Intellectual Property relating to the Acquired Assets are listed in Schedule 1.1(87). All Owned Intellectual Property relating to the Acquired Assets is set forth in Schedule 2.1(j). All licenses or other agreements under which the Seller has granted rights to others in Intellectual Property relating to the Acquired Assets are listed in Schedule 4.23. Except as set forth in Schedule 4.23, all of such licenses or other agreements are in full force and effect, there is no material default by any party thereto, and all the Seller's rights thereunder are freely assignable. The business and activities of the Seller related primarily to the Facility do not infringe any Intellectual Property of any other Person. The Seller is not making unauthorized use of any confidential information or trade secrets of any Person, including without limitation any former employer of any past or present employee of the Seller.

4.24 Taxes. With respect to the Acquired Assets (a) all Tax Returns required to be filed have been filed, (b) when filed, such Tax Returns were true, correct and complete in all material respects, and (c) all Taxes shown to be due on such Tax Returns have been paid in full. Except as set for in Schedule 4.24, no notice of deficiency or assessments has been received from any taxing authority with respect to liabilities for Taxes of the Seller in respect of the Acquired Assets, which have not been fully paid or finally settled, and any such deficiency shown in such Schedule 4.24 is being contested in good faith through appropriate proceedings. Except as set forth in Schedule 4.24, there are no outstanding agreements or waivers extending the applicable statutory periods of limitation for Taxes associated with the Acquired Assets for any period. Schedule 4.24 sets forth the taxing jurisdictions in which the Seller owns assets or conducts business that require a notification to a taxing authority of the transactions contemplated by this Agreement, if the failure to make such notification, or obtain Tax clearances in connection



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

therewith, would either require the Buyer to withhold any portion of the Purchase Price or would subject the Buyer to any liability for any Taxes of the Seller. There is no unpaid Tax on the Seller's ownership, operation or use of any of the Acquired Assets for which the Buyer could become liable. There are no Liens for Taxes upon any of the Acquired Assets, except for Liens for Taxes not yet due and payable and Liens for Taxes that are being contested in good faith as set forth in Schedule 4.24.

4.25 Operability. Except to the extent any Seller's Agreement may not be assigned or assignable in whole or in part to the Buyer or any Permit may not be transferable to the Buyer and except for changes in the ordinary course of business and except for Excluded Assets, the Acquired Assets constitute all the assets used by the Seller in connection with its ownership and operation of the Facility during the twelve-month period immediately prior to the Effective Date.

4.26 Brokers' Fees. The Seller has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement or the Ancillary Agreements for which the Buyer could become liable or obligated.

4.27 Disclaimer. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE IV, THE ACQUIRED ASSETS ARE BEING SOLD AND TRANSFERRED "AS IS, WHERE IS," AND ACCORDINGLY THE SELLER IS NOT MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING SUCH ACQUIRED ASSETS, INCLUDING, IN PARTICULAR, ANY WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED OR AS TO THE WORKMANSHIP THEREOF OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, OR COMPLIANCE WITH ENVIRONMENTAL REQUIREMENTS, OR AS TO THE CONDITION OF THE ACQUIRED ASSETS, OR ANY PART THEREOF, OR WHETHER THE SELLER POSSESSES SUFFICIENT REAL PROPERTY OR PERSONAL PROPERTY TO OPERATE THE ACQUIRED ASSETS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTIONS 4.10, 4.17 AND 4.18, THE SELLER FURTHER SPECIALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY REGARDING THE ABSENCE OF HAZARDOUS SUBSTANCES OR LIABILITY ARISING UNDER ENVIRONMENTAL LAWS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF ANY KIND REGARDING THE CONDITION OF THE ACQUIRED ASSETS OR THE SUITABILITY OF THE FACILITY FOR OPERATION AS A POWER PLANT AND NO OTHER MATERIAL OR INFORMATION PROVIDED BY OR COMMUNICATION MADE BY THE SELLER OR ANY SPONSOR, OR ANY OFFICER, EMPLOYEE, CONSULTANT OR AGENT THEREOF, OR ANY BROKER OR INVESTMENT BANKER WILL CAUSE OR CREATE ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, VALUE OR QUALITY OF THE ACQUIRED ASSETS OR ANY PART THEREOF.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

THE PROVISIONS OF THIS SECTION HAVE BEEN NEGOTIATED BY THE PARTIES HERETO AFTER DUE CONSIDERATION AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED OR STATUTORY, OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, THE RELATED AGREEMENTS OR ANY CERTIFICATE, EXHIBITS OR SCHEDULES HERETO AND THERETO THAT MAY ARISE PURSUANT TO ANY LAW NOW OR HEREAFTER IN EFFECT.

The disclaimers contained in this section are "conspicuous" disclaimers. Any covenants implied by law or by the use of the words "contribute," "grant," "convey," "assign," "transfer," or "deliver," or any other words used in this Agreement are hereby expressly excluded, disclaimed, waived and negated.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER AND GUARANTOR

A. The Buyer represents and warrants to the Seller as follows:

5.1 Organization. The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Formation and Operating Agreement (or other similar governing documents), as currently in effect. The Buyer is, or on the Closing Date will be, qualified to conduct business in the State of Vermont.

5.2 Authority. The Buyer has full organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which the Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action required on the part of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement and the Ancillary Agreements to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer's Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms. When each Ancillary Agreement to which the Buyer is a party has been executed and delivered by the other parties thereto, subject to the receipt of the Buyer's Required Regulatory Approvals, such Ancillary Agreement will constitute a valid and legally binding obligation of the Buyer, enforceable in accordance with its terms.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

5.3 Consents and Approvals; No Violation.

(a) Except as set forth in Schedule 5.3(a), and subject to the receipt of the Buyer's Required Regulatory Approvals, neither the execution and delivery by the Buyer of this Agreement and the Ancillary Agreements to which the Buyer is a party nor the consummation of the transactions contemplated hereby or thereby will (i) conflict with or result in any breach of any provision of the Certificate of Formation and Operating Agreement (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer is a party or by which any of its assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect, or (iv) violate any law, regulation, order, judgment or decree applicable to the Buyer, which violations, individually or in the aggregate, would have a Material Adverse Effect.

(b) Except as set forth in Schedule 5.3(b) (the filings and approvals, including all relevant decisions and orders, referred to in such Schedule are collectively referred to as the "Buyer's Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

5.4 Availability of Funds. The Buyer has provided the Seller with true and valid evidence that it has sufficient funds available to it, or has received binding written commitments from third parties to provide sufficient immediately available funds, to pay the Cash Purchase Price on the Closing Date and to enable the Buyer timely to perform all of its obligations under this Agreement (including, without limitation, the Assumed Liabilities and Obligations) and the Ancillary Agreements to which it is a party.

5.5 Legal Proceedings. There are no actions, suits or proceedings pending, or, to the Buyer's Knowledge, threatened, against the Buyer or its members before any court, arbitrator or Governmental Authority which, individually or in the aggregate, would have a Material Adverse Effect or that questions the validity of this Agreement or the Ancillary Agreements to which the Buyer is a party or of any action taken or to be taken pursuant to or in connection with the provisions of this Agreement or the Ancillary Agreements to which the Buyer is a party. Neither the Buyer nor its members is subject to any outstanding judgments, rules, orders, writs, injunctions or decrees of any court, arbitrator or Governmental Authority which, individually or in the aggregate, would have a Material Adverse Effect, or impair, estop, impede, restrain, ban or otherwise adversely affect the Buyer's ability to satisfy or perform the Assumed Liabilities under any federal, state or local law.

5.6 WARN Act. The Buyer shall not, with respect to the Acquired Assets, engage in a "plant closing" or "mass layoff," as such terms are defined in the WARN Act, within ninety (90) days after the Closing Date.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

5.7 "As Is Sale". The representations and warranties set forth in Article IV hereof constitute the sole and exclusive representations and warranties of the Seller in connection with the transactions contemplated hereby. There are no representations, warranties, covenants, understandings or agreements among the Parties regarding the Acquired Assets or their transfer other than those incorporated in this Agreement. Except for the representations and warranties expressly set forth in Article IV hereof, the Buyer disclaims reliance on any representations, warranties or guarantees, either express or implied, by the Seller, including but not limited to any representation or warranty expressed or implied in the Offering Memorandum dated April, 2001, and materials provided in connection therewith, including any oral, written or electronic response to any information request provided to the Buyer. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE BUYER ACKNOWLEDGES AND AGREES THAT THE ACQUIRED ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR CONDITION ON THE CLOSING DATE, AND THAT THE BUYER IS RELYING ON ITS OWN EXAMINATION OF THE ACQUIRED ASSETS, AND IS NOT RELYING ON ANY REPRESENTATION OR WARRANTY MADE BY THE SELLER OR ANY SPONSOR, OR ANY OFFICER, EMPLOYEE, CONSULTANT OR AGENT THEREOF, OR ANY BROKER OR INVESTMENT BANKER.

5.8 Affiliate Guaranty. If the Buyer assigns its rights and interests hereunder to any Affiliate or Affiliates pursuant to Section 11.5 hereof, the Buyer shall be deemed to have made the representations and warranties in Part A of this Article V on behalf of itself and any such Affiliate as if such Affiliate were a signatory to this Agreement.

5.9 Qualified Buyer. The Buyer is qualified to obtain any Permits necessary for the Buyer to own and operate the Acquired Assets as of the Closing Date, to the extent such operation is required by any Ancillary Agreement or this Agreement.

5.10 Brokers' Fees. The Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to this transactions contemplated by this Agreement or the Ancillary Agreements for which the Seller could become liable or obligated.

B. Guarantor represents and warrants to the Seller as follows:

5.11 Organization. Guarantor is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as is now being conducted.

5.12 Authority. Guarantor has full organizational power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the performance of the obligations contemplated hereby have been duly and validly authorized by all necessary corporate action required on the part of Guarantor and no other corporate proceedings on the part of Guarantor are necessary to authorize this Agreement or to perform the obligations contemplated hereby. This Agreement has been duly and validly executed and delivered by Guarantor, and assuming that this Agreement constitutes a valid and binding agreement of the Seller and Buyer, subject to the receipt of the Seller's and Guarantor's



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Required Regulatory Approvals, constitutes a valid and binding agreement of Guarantor, enforceable against Guarantor in accordance with its terms.

5.13 Consents and Approvals; No Violation.

(a) Neither the execution and delivery by Guarantor of this Agreement nor the performance of the obligations contemplated hereby will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation and By-laws of Guarantor, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which Guarantor is a party or by which any of its assets may be bound, except for such defaults (or rights or termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect, or (iv) violate any law, regulation, order, judgment or decree applicable to Guarantor, which violations, individually or in the aggregate, would have a Material Adverse Effect. No declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the consummation by Guarantor of the transactions contemplated hereby.

5.14 Legal Opinion. On the Effective Date Guarantor will deliver to the Seller an opinion of counsel to the effect that this Agreement is the legal, valid and binding obligation of Guarantor enforceable in accordance with its terms.

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1 Conduct of Business During the Interim Period.

(a) During the period from the date of this Agreement to the Closing (the "Interim Period"), the Seller (i) shall operate and maintain the Acquired Assets in the ordinary course consistent with Good Utility Practices and Seller's past practices unless otherwise contemplated by this Agreement or with the prior written consent of the Buyer. Without limiting the generality of the foregoing, and, except as contemplated in this Agreement or as required under applicable law or by any Governmental Authority, during the Interim Period, without the prior written consent of the Buyer (which shall not be unreasonably withheld), the Seller will not with respect to the Acquired Assets:

(i) make any material change in the levels of fuel inventory (other than Nuclear Fuel) customarily maintained by the Seller with respect to the Acquired Assets except for changes consistent with Good Utility Practices;

(ii) except for Permitted Encumbrances, sell, lease (as lessor), pledge, encumber, restrict, transfer or otherwise dispose of, or grant any right with respect to, any



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

of the Acquired Assets, other than assets acquired, leased, used, consumed or replaced in the ordinary course of business consistent with Good Utility Practices;

(iii) modify, amend or voluntarily terminate prior to the expiration date thereof any Seller's Agreement, Real Property Agreement, Permit, Environmental Permit or NRC License or waive any default by, or release, settle or compromise any claim against any other party thereto, other than (A) in the ordinary course of business, to the extent consistent with Good Utility Practices, (B) with cause, to the extent consistent with Good Utility Practices, (C) as may be required in connection with the Seller's obligations to the Buyer under this Agreement, or (D) as may be reflected in Seller's Operating or Capital Budgets for 2001 and Tentative Operating and Capital Budget for 2002 (as set forth in Schedule 6.1(a)(vi);

(iv) enter into any commitment for the purchase or sale of Nuclear Fuel having a term that extends beyond the Refueling Outage or such other date that the Parties mutually agree;

(v) other than the Amendatory Agreements, enter into any power sales agreement having a term that extends beyond the Closing;

(vi) enter into any commitment, lease or contract for goods or services (including through a modification or amendment of an existing agreement or otherwise) not reflected in Seller's Operating or Capital Budgets for 2001 and Tentative Operating and Capital Budgets for 2002 (as set forth in Schedule 6.1(a)(vi)) or addressed in clauses (i) through (v) above that will be delivered or provided after February 28, 2002 or such other date that the Parties mutually agree to be the date on which the Closing is expected to occur that exceeds two hundred and fifty thousand dollars ($250,000) in the aggregate unless such commitment or contract is terminable by the Seller (or by the Buyer after the Closing) without further liability or has been agreed to by the Buyer in writing;

(vii) enter into, amend, make any material waivers under or otherwise materially modify any agreement or settlement with any Governmental Authority or make any new or modify any current election relating to or regarding the tax status of the Acquired Assets for any taxable period ending after December 31, 2000 or change any current election with respect to Taxes affecting the Acquired Assets, in each case other than in the ordinary course of business;

(viii) change, in any material respect, its accounting methods or practices;

(ix) establish, adopt, enter into or amend the Benefits Plans or other employment plans, arrangements or practices, or grant to any Transferred Employee any material increase in compensation, nor shall the Seller hire any new employees or transfer any existing employees other than to fill vacancies in existing positions, in all cases except (A) to the extent required by the terms of the IBEW Collective Bargaining Agreement or applicable law, (B) in the ordinary course of business consistent with past practice, (C) as set forth in Schedule 6.1(a)(ix), or (D) if the Old IBEW Contract is in



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER