effect on the Effective Date, the Seller may enter into a new contract to replace the Old IBEW Contract;

(x) amend or modify the Seller's Decommissioning Trust Agreement or the Vermont Yankee Spent Fuel Disposal Trust (other than an amendment to reflect the transactions contemplated hereby);

(xi) make any material change in the levels of Inventory customarily maintained by the Seller with respect to the Acquired Assets, other than consistent with Good Utility Practices; or

(xii) settle or compromise any Environmental Claim, including with any Governmental Authority, except to the extent such settlement or compromise does not impose any post-Closing Liabilities on the Buyer or require any post-Closing Remediation.

(b) During the Interim Period, in the interest of facilitating an orderly transition of the management of the Acquired Assets at the Closing and permitting informed action by the Buyer regarding its rights pursuant to Section 6.1(a), the Parties agree that a committee comprised of one or more senior representatives designated by the Seller and one or more senior representatives designated by the Buyer (the "Transition Committee") will be established as soon as practicable after the execution of this Agreement to permit the Buyer to observe the operation of the Acquired Assets and to facilitate the transfer of the Acquired Assets to the Buyer at the Closing. The Transition Committee will be kept fully apprised by the Seller of all material VYNPS management and operating developments. The Transition Committee shall have regular access to the management of the Seller (including to any written management reports on the operations of VYNPS given to the Board of Directors). The Transition Committee shall be accountable directly to the respective chief executive officers of the Buyer and the Seller and shall from time to time report its findings to the senior management of each of the Seller and the Buyer. The Transition Committee shall have no authority to enter into a legally binding agreement to bind the Buyer or the Seller. The Buyer in its sole discretion may send personnel to the Site at the Buyer's expense to continue the Buyer's transition efforts with respect to the Acquired Assets. The Seller shall provide the Buyer, at no cost to the Buyer, interim furnished office space, utilities and HVAC at the Facility reasonably necessary to allow the Buyer and its Representatives to conduct their transition efforts during the Interim Period; provided that all other costs and expenses of the Buyer's transition activities shall be borne by the Buyer, including without limitation the cost of workers' compensation and employers' liability coverage and reimbursement of the Seller for any such costs initially charged to the Seller.

(c) During the Interim Period, the Seller shall retain full authority to conduct all operations at the VYNPS and to make all decisions and take all actions necessary to comply with NRC requirements and the conditions of the NRC Licenses. Nothing contained in this Agreement shall be construed to diminish or impair such authority of the Seller.

(d) During the Interim Period the Buyer and the Seller will cooperate to work on any mutually agreeable uprate of the Facility, and the Purchase Price shall be increased to reflect the cost of any such uprate work paid for by the Seller.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

6.2 Access to Information. During the Interim Period, the Seller will, during ordinary business hours and upon reasonable notice and subject to compliance with all applicable NRC rules and regulations: (i) permit the Buyer and Buyer's Representatives to have reasonable access, in a manner so as not to unreasonably interfere with the normal operations of the Seller, to all books, records, plants, offices and other facilities and properties constituting the Acquired Assets in order to plan for and facilitate an orderly transition of ownership of the Acquired Assets; (ii) furnish the Buyer with operating data and other information with respect to the Acquired Assets as the Buyer may from time to time reasonably request; and (iii) furnish the Buyer a copy of each material report, schedule or other document filed or received by the Seller with respect to the Acquired Assets with the NRC, FERC, VTDPS, VTPSB or any other Governmental Authority having jurisdiction over the Acquired Assets. All access and inspections by the Buyer (whether pursuant to this Section 6.2 or otherwise) are subject to the following provisions:

(a) Physical Access (Escorted and Unescorted).

(i) The Buyer shall, with respect to each Person designated by the Buyer to have escorted access to the Facility, provide the following information for each such Person to the Plant Manager for the Facility (or his designee) no later than twenty-four (24) hours prior to the proposed time of access by such Person: name, date of birth, social security number, and the name of each nuclear power plant at which such Person has a current badge for unescorted access. The Seller reserves the right where necessary to limit the number of Persons to whom escorted access is provided at any one time on account of safety and/or reasonable logistical considerations.

(ii) Subject to the immediately succeeding sentence, the Buyer shall, with respect to each Person designated by the Buyer to have unescorted access to the Facility, provide reasonable notice to the Plant Manager for the Facility (or his designee), so as not to interfere with the normal business operations of the Facility, and such Person shall comply with all existing requirements of the Facility and NRC for unescorted access, including, but not limited to, background investigation, training requirements, fitness-for-duty requirements, a psychological assessment and behavioral observation.

(iii) In the event that the Buyer shall have a fitness-for-duty program meeting the requirements of 10 C.F.R. Part 26, the Buyer may request that any Person subject to such program be excused from compliance with the fitness-for-duty program of VYNPS, in which event the provisions of 10 C.F.R. Section 26.23 shall be applicable to such Person designated by the Buyer to have unescorted access to the Facility.

(b) Access to Records and Information. Under no circumstances shall the Seller be required to provide access to any documents or information constituting or containing "Classified National Security Information" or "Restricted Data", as defined in 10 C.F.R. Part 73. The Seller shall not be required to provide access to any documents or information constituting or containing "Safeguards Information", as defined in 10 C.F.R. Part 73, except to any Person designated by the Buyer to have access to such information and the Buyer shall have first obtained authorization or concurrence from the NRC for the disclosure of such information to such Person.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(c) Limitations. Notwithstanding anything to the contrary in this Section 6.2, the Seller shall: (i) only furnish or provide such access to confidential personnel records and medical records as is allowed by applicable laws; (ii) not provide any information that the Seller or the Seller's counsel reasonably believes constitutes or could reasonably be deemed to constitute a waiver of the attorney-client privilege; and (iii) not be required to supply the Buyer with any information that the Seller is under a legal obligation not to supply, provided that Seller shall use Commercially Reasonable Efforts to obtain consent to disclose all material information otherwise described under this Section 6.2.

(d) The Buyer and the Seller acknowledge that all information regarding the Seller and the Sponsors furnished to or obtained by the Buyer or the Buyer's Representatives pursuant to this Section 6.2 shall be treated as Proprietary Information.

(e) Until December 31, 2012 or such other date as the Parties may agree in writing and subject to all applicable NRC rules and regulations, each Party agrees to provide, at its expense, safe storage for all of the books and records relating to the Acquired Assets, including all Transferred Employee Records or other personnel and medical records required by law, legal process or subpoena, in its possession after the Closing and agrees to provide to the other Party and its Representatives reasonable access to all such materials in its possession to the extent that such access may reasonably be required by such Party in connection with the Assumed Liabilities and Obligations or the Excluded Liabilities, or other matters relating to or affected by the operation of the Acquired Assets. Such access shall be afforded by the Party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours. The Party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 6.2(e). If the Party in possession of such books and records shall desire to dispose of any such books and records upon or prior to December 31, 2012, such Party shall, prior to such disposition, give the other Party a reasonable opportunity at such other Party's expense, to segregate and remove such books and records as such other Party may select. Notwithstanding the foregoing, the rights of access to medical records and other confidential employee records shall be subject to all applicable legal requirements.

(f) Seller agrees (i) not to release any Person (other than Buyer) from any confidentiality agreement now existing with respect to the Acquired Assets, or waive or amend any provision thereof and (ii) to assign any rights arising under any such confidentiality agreement (to the extent assignable) to Buyer.

(g) Notwithstanding the terms of the Confidentiality Agreement, Section 6.2(b) and Article VIII, the Parties agree that prior to the Closing Buyer may reveal or disclose Proprietary Information to any other Persons in connection with Buyer's financing and risk management of the Acquired Assets. During the Interim Period the Buyer and the Seller shall consult with each other and coordinate their dealings with Seller's suppliers and vendors. Except as may be permitted in the Confidentiality Agreement or as may have been permitted, with the Seller's written consent during the course of the Buyer's due diligence investigation of the Acquired Assets prior to the Effective Date, the Buyer agrees that, prior to the Closing Date, it will not (i) contact any employees or other contracting parties (other than suppliers and vendors)



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

of the Seller with respect to their employment or service relationship with the Seller or the Buyer in connection with the Acquired Assets, without the prior written consent of the Seller or (ii) contact INPO with respect to any aspect of the Acquired Assets, or the transactions contemplated hereby, without the prior written consent of the Seller.

(h) Upon notice to the other Party, either Party may provide Proprietary Information of the other Party to the SEC, NRC, FERC, VTDPS, VTPSB or any other Governmental Authority having jurisdiction over the Acquired Assets or any stock exchange, as may be necessary to obtain Seller's Required Regulatory Approvals or Buyer's Required Regulatory Approvals, respectively, or to comply generally with any relevant law, order, rule or regulation. The disclosing Party shall seek confidential treatment for the Proprietary Information provided to any such Governmental Authority and the disclosing Party shall notify the other Party as far in advance as practical of its intention to release to any Governmental Authority any such Proprietary Information.

6.3 Expenses. Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including the cost of legal, technical and financial consultants and the cost of filing for and prosecuting applications for Required Regulatory Approvals, shall be borne by the Party incurring such costs and expenses. Notwithstanding anything to the contrary herein, Buyer and Seller will share equally the cost of all filing fees under the HSR Act and with respect to any NRC filings required to consummate the transactions contemplated hereby.

6.4 Further Assurances; Cooperation.

(a) Subject to the terms and conditions of this Agreement, each of the Parties hereto will use Commercially Reasonable Efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Acquired Assets pursuant to this Agreement, including, without limitation, using Commercially Reasonable Efforts to ensure satisfaction, but not waiver, of the conditions precedent to each Party's obligations hereunder. Notwithstanding anything in the previous sentence to the contrary, the Seller and the Buyer shall use Commercially Reasonable Efforts to obtain all Permits and Environmental Permits and the NRC Licenses necessary for the Buyer to acquire and operate the Acquired Assets. Neither of the Parties hereto will, without the prior written consent of the other Party, take or fail to take any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement, other than as required of such Party under any requirement of law or order or rule of any Governmental Authority.

(b) From time to time after the Closing, without further consideration, the Seller will, at its own expense, execute and deliver such documents to the Buyer and take such additional action as the Buyer may reasonably request in order to more effectively consummate the sale and purchase of the Acquired Assets or to more effectively vest in the Buyer good and marketable title to the Acquired Assets subject to the Permitted Encumbrances. The Seller shall cooperate with the Buyer, at the Buyer's expense, in the Buyer's efforts to cure or remove any Permitted Encumbrances that the Buyer reasonably deems objectionable. From time to time



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

after the Closing, without further consideration, the Buyer will, at its own expense, execute and deliver such documents to the Seller as the Seller may reasonably request in order to evidence the Buyer's assumption of the Assumed Liabilities and Obligations.

(c) To the extent that the Seller's rights under any Seller's Agreement, Licensed Intellectual Property, or Real Property Agreement may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use Commercially Reasonable Efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of any Seller's Agreement or Real Property Agreement shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the applicable Seller's Agreement or Real Property Agreement so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and such Seller's Agreement or Real Property Agreement shall after the Closing appoint the Buyer to be the Seller's agent with respect to such Seller's Agreement or Real Property Agreement, and the Seller shall, to the maximum extent permitted by law and such Seller's Agreement or Real Property Agreement, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of such Seller's Agreement or Real Property Agreement. The Seller and the Buyer shall cooperate and shall each use Commercially Reasonable Efforts after the Closing to obtain an assignment of such Seller's Agreement, Licensed Intellectual Property, or Real Property Agreement to the Buyer. The exercise by Buyer and Seller of the terms of this Section shall in no event constitute a waiver of the conditions to Closing set forth in Article VII.

(d) For a reasonable time after the Closing Date, the Buyer and the Seller agree to provide services to each other as reasonably required to the extent necessary to ensure the continuity of support for VYNPS and the orderly completion of projects or other work in progress that would be adversely affected if those services were interrupted. Such support by one Party to the other will not be unreasonably withheld, provided that requests for such support are made in a timely manner. The Party providing the requested support will be reimbursed for all reasonable costs thereof in accordance with established accounting procedures or on an alternative cost reimbursement basis as mutually agreed by the Parties.

(e) Until December 31, 2012 or such other date as the Parties may agree in writing, the Buyer shall provide to the Seller, on a rent-free basis, three contiguous offices with secretarial support space at the Brattleboro Site (as designated in Schedule 6.4(e) hereto) or comparable office facilities in the Buyer's other office buildings at the Vernon Site or other site, together with the requisite office furniture, communications equipment, heat, cooling and electric service as is reasonably requested by Seller and in all cases comparable to that provided to Buyer's employees and unrestricted access and egress therefrom necessary to conduct the continuing administrative support activities for the Seller's business. During such period, the Buyer shall also provide to the Seller (at the Buyer's cost) accounting support services for the preparation of employee and contractor tax reports and other audit matters.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(f) The Buyer agrees to comply with all applicable NEPOOL standards and requirements.

(g) Within twenty (20) days after the Effective Date, the Seller will call and hold a meeting of its shareholders to seek approval of this Agreement and will promptly give the Buyer a written notice of the results thereof.

6.5 Public Statements. From time to time after the date hereof until thirty (30) days after the Closing Date, the Parties shall not issue any public announcement or statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Party, which consent will not be unreasonably withheld or delayed, except as may be required by law, or by orders or rules of any Governmental Authority, the rules of the New York Stock Exchange or by any listing or trading agreement.

6.6 Notices, Consents and Approvals.

(a) HSR Filing. The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice any notifications required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The Parties shall cooperate with each other and shall use Commercially Reasonable Efforts to make such filings as promptly as possible after the Effective Date, to respond promptly to any requests for additional information made by either such agency and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. Buyer and Seller shall be equally responsible for the cost of all filing fees under the HSR Act, but each Party will bear its own costs for the preparation of any such filing.

(b) Required Approvals. The Seller and the Buyer shall cooperate with each other and use Commercially Reasonable Efforts to (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) obtain the transfer, issuance or reissuance to the Buyer of all necessary Transferable Permits, and (iv) obtain all necessary consents, approvals and authorizations of all other parties necessary or advisable to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements (including, without limitation, the Seller's Required Regulatory Approvals and the Buyer's Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which either of them is bound. Prior to either Party's submission of any filing made in connection with the transactions contemplated by this Agreement or the Ancillary Agreements, the submitting Party shall give such filing to the other Party and the receiving Party shall have the opportunity to review and comment on, as promptly as possible after receipt of such draft filing, all characterizations of the information relating to the transactions contemplated by this Agreement and the Ancillary Agreements which appear therein, and the receiving Party shall have the right to attend and appear in the proceedings relating to such filings. The Parties shall consider, in good faith, such comments before making any filings.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(c) Nuclear Regulatory Commission Approval. (i) Application. As promptly after the Effective Date as may be feasible, the Buyer and the Seller shall jointly prepare and file an application with the NRC seeking transfer of the NRC Licenses to the Buyer on a schedule consistent with other recent applications for the transfer of other facilities. Thereafter, the Buyer and the Seller shall cooperate with one another to facilitate review of the Application by the NRC Staff, including but not limited to promptly providing the NRC Staff with any and all documents or information that the NRC Staff may reasonably request or require any of the parties to provide or generate.

(i) Prosecution of Application. The application shall identify the Buyer and the Seller as separate parties to the application. In the event the processing of such application by the NRC becomes a contested proceeding, until such contested proceeding is completed, the Buyer and the Seller shall have the right to separately appear therein by their own counsel.

(ii) Costs of Application and Prosecution. The Buyer and the Seller will each bear their own costs of the preparation, submission and processing of the application, including any contested proceeding that may occur in respect thereof; provided, however, that the Buyer shall bear the costs of all NRC Staff fees payable in connection with the application. In the event that the Parties agree upon the use of common counsel, they shall share equally the fees and expenses of such counsel.

(d) Other than Transferable Permits, the Buyer shall have the primary responsibility for securing the transfer, reissuance or procurement of the Permits, Environmental Permits and the NRC Licenses effective as of the Closing Date. The Seller shall have the primary responsibility for securing the transfer, reissuance or procurements of Transferable Permits effective as of the Closing Date. Each Party shall cooperate with the efforts of the other Party in this regard and assist in any transfer or reissuance or procurement of a Permit or Environmental Permit or a Transferable Permit.

(e) In no event shall either Party in connection with the foregoing proceedings be required to take or refrain from taking any action, or advance or refrain from advancing any position if such action would violate any applicable law, order or rule, or any code of professional conduct applicable to attorneys-at-law.

6.7 Interim Period Notice.

(a) The Buyer shall notify the Seller promptly if any information comes to its attention that would excuse the Buyer from the performance of its obligations under this Agreement or the Ancillary Agreements due to the Seller's inability to satisfy any condition to close set forth in Section 7.1.

(b) The Seller shall notify the Buyer promptly if any information comes to its attention that would excuse the Seller from the performance of its obligations under this Agreement or the Ancillary Agreements due to the Buyer's inability to satisfy any condition to close set forth in Section 7.2.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(c) The Seller shall promptly notify the Buyer in writing of the existence of any matter, which if in existence on the Effective Date or the Closing Date would cause any of the representations or warranties in Article IV above to be untrue or incorrect. If all of such untrue or incorrect representations or warranties could reasonably be expected to cost more than five hundred thousand dollars ($500,000) in the aggregate to cure, the Buyer shall have the right, if the Seller has not within twenty (20) days after receipt by the Buyer of the notice referred to in the preceding sentence (the "Cure Commencement Period") committed in writing to cure such untrue or incorrect representations or warranties, to terminate this Agreement upon written notice to the Seller. If the cost to cure all of such untrue or incorrect representations or warranties could reasonably be expected to be five hundred thousand dollars ($500,000) or less in the aggregate or if the Buyer does not exercise the right referred to in the preceding sentence or the final sentence of this Section 6.7(c) to terminate this Agreement within twenty (20) days after the Cure Commencement Period or within ninety (90) days after the Cure Commencement Period for such longer period, as the case may be, the written notice pursuant to this Section 6.7(c) shall be deemed to have amended the appropriate Schedule or Schedules as of the Effective Date, to have qualified the representations and warranties contained in Article IV above as of the Effective Date, and to have cured any misrepresentation or breach of warranty that otherwise might have existed hereunder by reason of the existence of such matter. If, after the Seller commits to cure such untrue or incorrect representations or warranties exceeding five hundred thousand dollars ($500,000) in the aggregate, the same remain uncured for the earlier of (i) 90 days after the Cure Commencement Period (or such longer period as the Seller is diligently pursuing such cure) or (ii) the Closing, the Buyer may terminate this Agreement by giving written notice of termination to the Seller.

(d) The Buyer shall promptly notify the Seller in writing of the existence of any matter, which if in existence on the Effective Date or the Closing Date would cause any of the representations or warranties in Article V above to be untrue or incorrect. If all of such untrue or incorrect representations or warranties could reasonably be expected to cost more than five hundred thousand dollars ($500,000) in the aggregate to cure, the Seller shall have the right, if the Buyer has not within twenty (20) days after receipt by the Seller of the notice referred to in the preceding sentence committed in writing to cure such untrue or incorrect representations or warranties, to terminate this Agreement upon written notice to the Buyer. If the cost to cure all of such untrue or incorrect representations or warranties could reasonably be expected to be five hundred thousand dollars ($500,000) or less in the aggregate or if the Seller does not exercise the right referred to in the preceding sentence or the final sentence of this Section 6.7(c) to terminate this Agreement within twenty (20) days after the Cure Commencement Period or within ninety (90) days after the Cure Commencement Period (or such longer period), as the case may be, the written notice pursuant to this Section 6.7(d) shall be deemed to have amended the appropriate Schedule or Schedules as of the Effective Date, to have qualified the representations and warranties contained in Article V above as of the Effective Date, and to have cured any misrepresentation or breach of warranty that otherwise might have existed hereunder by reason of the existence of such matter. If, after the Buyer commits to cure such untrue or incorrect representations or warranties exceeding five hundred thousand dollars ($500,000) in the aggregate, the same remain uncured for the earlier of (i) ninety (90) days after the Cure Commencement Period (or such longer period as the Buyer is diligently pursuing such cure) or


PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(ii) the Closing, the Seller may terminate this Agreement by giving written notice of termination to the Buyer.

(e) As soon as practicable after the Effective Date, the Buyer shall notify the Seller in writing whether, after a diligent review, it has determined in its reasonable discretion that one or more of the Special Exceptions numbered 14, 23 or 44 listed in Part A of Schedule 4.7 would constitute a material obstacle to the Buyer's ability to operate the Facility after the Closing. If that determination is affirmative, the Buyer and the Seller shall promptly mutually assess the available cures therefor. If the cost to cure such obstacle could reasonably be expected to be five hundred thousand dollars ($500,000) or less, the Seller shall, at its sole expense, undertake to perform such cure as soon as practicable, but in any event prior to Closing. If the cost to cure such obstacle could reasonably be expected to be more than five hundred thousand dollars ($500,000), the Buyer shall have the right, if the Seller has not within a reasonable time committed in writing to cure such obstacle, to terminate this Agreement.

(f) The Seller shall be entitled to amend, substitute or otherwise modify any Seller's Agreement to the extent that such Seller's Agreement expires by its terms prior to the Closing or is terminable without liability to the Buyer on or after the Closing, or if the terms and conditions of such modified Seller's Agreement constituting the Assumed Liabilities and Obligations are on terms and conditions not less favorable to the Buyer than the original Seller's Agreement. Subject to Sections 6.7(a), (b), (c) and (d), nothing contained herein shall relieve the Seller or the Buyer of any breach of representation, warranty or covenant under this Agreement existing as of the date hereof or any subsequent date as of which such representation, warranty or covenant shall have been made.

(g) Within ten (10) Business Days after the receipt of any Buyer's or Seller's Required Regulatory Approval, the Party receiving such approval (the "Receiving Party") shall notify the other Party in writing if the approval is not in form and substance reasonably satisfactory to the Receiving Party, in its sole discretion.

6.8 Employees.

(a) The Buyer or an Affiliate will offer employment at the Site, commencing as of the Closing, at wages, including, without limitation, base pay and bonuses, not less than the employee was receiving immediately prior to the Closing, and benefits, including benefits provided under any employee benefit plan or program that are comparable to those existing immediately prior to the Closing, for a period of at least twelve months from that date to all regular employees of VYNPC on the Closing Date. As used in Section 6.8, the term "regular employee" excludes those employees who are temporary or casual or who may be considered jointly employed by VYNPC and any other person or entity.

(b) The Buyer will honor and assume all existing employment contracts referred to in the first sentence of Section 4.11 of VYNPC employees who are Transferred Employees and those entered into pursuant to Section 6.1(a)(ix).

(c) All offers of employment shall be made in accordance with applicable federal, state and local laws and regulations.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(d) Unless otherwise specifically provided herein, all Transferred Employees shall retain their seniority and receive full credit for service with the Seller (including service with a Sponsor to the extent credited by Seller) in connection with entitlement to compensation, vacation, benefits and rights under any employment agreement or agreements with any union, to the extent such service is recognized by the Seller.

(e) If the Buyer terminates the employment of any Transferred Employee, who is not in the bargaining unit represented by the IBEW, during the twelve months immediately following the Closing Date for any reason other than for cause, the Buyer shall provide severance benefits to such affected employee pursuant to any VYNPC severance policy and/or agreements in effect on the Closing (and as set forth in Schedule 4.12(a)) or entered into in accordance with this Agreement.

(f) As of the Closing, the Buyer shall succeed to all VYNPC's obligations to recognize and bargain with the IBEW or any other properly recognized or certified collective-bargaining representative and shall assume any agreements between the IBEW and VYNPC.

(g) As of the Closing, all Transferred Employees and their eligible dependents shall commence participation in welfare benefit plans of the Buyer or its Affiliates (the "Replacement Welfare Plans") that will provide benefits or coverage substantially similar to the benefits or coverage provided to the Transferred Employees and their eligible dependents under the Seller's plans and programs in effect for the Transferred Employees and their eligible dependents immediately prior to the Closing. The Buyer shall (i) waive all limitations as to pre-existing condition exclusions and waiting periods with respect to the Transferred Employees and their eligible dependents under the Replacement Welfare Plans, other than, but only to the extent of, limitations or waiting periods that were in effect with respect to such employees under the welfare benefit plans maintained by the Seller and that have not been satisfied as of the Closing Date , and (ii) provide each Transferred Employee and their eligible dependents with credit for any co-payments and deductibles paid prior to the Closing Date,during a plan year under the Seller's plan that has not ended as of the Closing Date , in satisfying any deductible or out-of-pocket requirements under the Replacement Welfare Plans (on a pro-rata basis in the event of a difference in plan years).

(h) The Buyer shall assume sponsorship of the Seller's "Thrift Plan for Management Employees" and "Thrift Plan for Employees who are members of the IBEW" (the "Assumed Thrift Plans"), which includes (but is not limited to) the assumption of any and all past, present and future Liabilities pursuant to the Assumed Thrift Plans. The Seller shall cause the Transferred Employees and the Non-Transferred Employees to be fully vested in their respective account balances under the Assumed Thrift Plans immediately before the Closing Date. Non-Transferred Employees will not be considered active participants in the Assumed Thrift Plans, and will not be able to make contributions to the Assumed Thrift Plans. Non-Transferred Employees will be treated as terminated/retired employees under the Assumed Thrift Plans as of the Closing. The Seller shall remain responsible for, and in accordance with the Code, shall timely transfer to the trustee for the Assumed Thrift Plans all required employee contributions to the Assumed Thrift Plans with respect to employment prior to the Closing.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(i) The Buyer shall assume sponsorship of (i) the "Retirement Plan for the IBEW", which is the Seller's defined benefit pension plan for Union Employees, and (ii) the Final Average Pay Pension Plan, which is the Seller's defined benefit pension plan for Non-Union Employees (collectively referred to as the "Seller's Defined Benefit Plans"), which includes (but is not limited to) the assumption of any and all past, present and future Liabilities pursuant to the Seller's Defined Benefit Plans. The Buyer assumes Liability for all benefit payments under the Seller's Defined Benefit Plans for all participants, whether active, retired, terminated vested participants, or eligible beneficiaries. The Seller shall cause all Transferred Employees and all Non-Transferred Employees to be fully vested in their respective accrued benefits under the Seller's Defined Benefit Plans as of the Closing. Non-Transferred Employees will be treated as terminated/retired employees under the Seller's Defined Benefit Plans as of the Closing.

(j) The Buyer shall assume sponsorship of the Seller's VEBA for Non-Union Employees and the Seller's VEBA for Union Employees, as well as the 401(h) accounts in the Seller's Defined Benefit Plans maintained by the Seller for the purpose, in whole or in part, of funding post-retirement benefits (collectively referred to as the "Seller's Retiree Welfare Plans"). The Buyer assumes responsibility and Liability for all benefit payments under the Seller's Retiree Welfare Benefit Plans for all participants, whether active, retired, or beneficiaries.

(k) The Seller shall file in a timely manner all reports or other information required by the Pension Benefit Guaranty Corporation under Section 4043 of ERISA in connection with the transfer of sponsorship of the Seller's Defined Benefit Plans.

(l) On and after the Closing, the Buyer shall assume Liability for all benefit payments from the Seller's Defined Benefit and Retiree Welfare Benefit Plans.

(m) The Buyer shall assume Liability for any obligations to make severance payments to any (i) Transferred Employees whose employment with the Buyer or its Affiliates is terminated by the Buyer on or after the Closing or (ii) employees of the Seller terminated by the Seller prior to the Closing with the written consent of the Buyer.

(n) The Seller shall be responsible, with respect to the Acquired Assets, for performing and discharging all requirements under the WARN Act and under applicable state and local laws and regulations for the notification of its employees of any "employment loss" within the meaning of the WARN Act which occurs solely as a result of actions taken prior to the Closing. The Buyer shall be responsible, with respect to the Acquired Assets, for performing and discharging all requirements under the WARN Act and under applicable state and local laws and regulation for the notification of employees of any "employment loss" within the meaning of the WARN Act which occurs directly or indirectly as a result of any action taken on or after the Closing.

(o) The Buyer agrees to assume Liability for COBRA administration for all Transferred Employees, Non-Transferred Employees, and former employees of the Seller, and their qualified beneficiaries who become or became entitled to such COBRA continuation coverage on or before the Closing. Any COBRA coverage provided pursuant to the preceding



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

sentence shall be provided under the Replacement Welfare Plans and need not be identical to the coverage provided under the Seller's welfare benefit plans, except as required by applicable law.

(p) The Buyer agrees to assume Liability for all of the Seller's obligations to reimburse Transferred Employees who are hired and start work during the Interim Period for relocation expenses payable in accordance with the Seller's policy in effect on the Effective Date and consistent with the Seller's past practice to the extent any such obligations to reimburse eligible expenses are outstanding on the Closing, provided that such amount did not become due, consistent with the Seller's past practice, prior to the Closing. The Buyer further agrees, to the extent consistent with the Seller's past practice, that it will not attempt to recoup from any Transferred Employee who leaves the Buyer's employ after the Closing any relocation expenses that were paid to such employee by the Seller.

(q) The Seller shall remain responsible for paying Transferred Employees for (i) all salary and wages, and a pro rata share of all bonuses and incentive compensation that were earned for time worked for the Seller prior to the Closing, and (ii) all workers' compensation, disability benefits or other insurance benefits that were accrued and for which entitlement is based upon events occurring prior to the Closing including any incurred claims under employee benefit plans maintained by the Seller. Nothing in this Agreement shall be construed as making the Seller liable for any benefit under any of the Seller's Benefit Plans for which the Seller would not be liable under the terms of such plans. The Seller shall pay to the Buyer as promptly as practicable following the Closing, but by no later than the thirtieth (30th) day after the Closing, the cash equivalent for all unpaid vacation and holiday time for Transferred Employees which have accrued prior to the Closing. The Buyer shall thereafter be responsible for the payment of such vacation and holiday benefits to Transferred Employees. The Seller shall not be responsible for the payment of sick pay or personal time associated with the Transferred Employees on or after the Closing.

(r) At the Closing, the Buyer agrees to adopt and assume Liability for any (i) non-tax qualified executive or management retirement program or incentive for any VYNPC employee, (ii) all change-in-control arrangements or agreements for any VYNPC employee, and (iii) all other Benefit Plans and programs of the Seller not expressly referred to in the other clauses of this Section 6.8, if and to the extent that the assets funding any benefit identified in clause (i), (ii) or (iii), if any, and their income and appreciation, if any, are transferred to the Buyer. In the event those assets cannot be transferred to the Buyer, Seller shall retain all responsibility for those benefits accrued through the Closing. The Buyer shall then establish, effective as of the Closing, comparable benefits for covered executives.

(s) Subject to the provision of Section 6.8(a), individuals who are otherwise "Union Employees" or "Non-Union Employees" but who on any date are not actively at work due to a leave of absence covered by the Family and Medical Leave Act of 1993, the Vermont Parental and Family Leave laws and regulations, or due to any other authorized leave of absence, shall nevertheless be treated as "Union Employees" or as "Non-Union Employees," as the case may be, on such date if they are able to (i) return to work within the protected period under the Family and Medical Leave Act of 1993, the Vermont Parental and Family Leave laws and regulations, or such other leave (which in any event shall not extend more than twelve (12)



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

weeks after the Closing Date or such longer period required by law), whichever is applicable, and (ii) perform the essential functions of their job with or without a reasonable accommodation.

(t) The Seller shall make available to the Buyer reasonable information regarding compensation and employee benefit coverages and the services of appropriate employees at such reasonable times, including prior to the Closing, as may be reasonably necessary for the design and proper administration by the Buyer of any matters relating to service, compensation and employee benefits affecting Transferred Employees. The Seller shall use Commercially Reasonable Efforts (i) to secure any consent necessary in order to provide the Buyer such information and (ii) to cooperate to effect the transfer to the Buyer of any insurance policies, third-party administration agreements or any other contracts or agreements maintained by the Seller that relate to the Benefit Plans and which are necessary of the delivery of benefits to the Transferred Employees.

(u) The Buyer shall pay all employees who are employed by the Seller on the Closing Date (whether they become Transferred Employees or not) and who are not in the bargaining unit represented by IBEW Local 300 a one-time One Thousand Dollar ($1,000) payment, less applicable deductions, within 30 days after the Closing. The Buyer shall negotiate with the IBEW a payment for Union Employees which when added to any bonus relating to the sale of the Facility provided in the IBEW Collective Bargaining Agreement shall equal $1,000.

6.9 Risk of Loss.

(a) From the date hereof through the Closing Date, all risk of loss or damage to the property included in the Acquired Assets shall be borne by the Seller. The Seller shall replace or repair any damage to the Acquired Assets in accordance with Good Utility Practices, except as otherwise provided in paragraphs (b) or (c) below. The Seller agrees to provide the Buyer such information as the Buyer shall reasonably request in connection with the repair, replacement or damage to any Acquired Asset.

(b) If, before the Closing all or any portion of the Acquired Assets is taken by eminent domain or is the subject of a pending or (to the Knowledge of the Seller) contemplated taking which has not been consummated, the Seller shall notify the Buyer promptly in writing of such fact. If such taking could reasonably be expected to have a Material Adverse Effect, the Buyer and the Seller shall negotiate in good faith to settle the loss resulting from such taking (including, without limitation, by making a fair and equitable (i) adjustment to the Purchase Price or (ii) restoration or replacement of such Acquired Assets) and, upon such settlement, consummate the transactions contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after the Seller has notified the Buyer of such taking, then the Buyer or the Seller may terminate this Agreement pursuant to Section 10.1(g). If such taking could not reasonably be expected to have a Material Adverse Effect, there shall be no adjustment to the Purchase Price.

(c) If, before the Closing all or any portion of the Acquired Assets are damaged or destroyed by fire or other casualty, the Seller shall notify the Buyer promptly in writing of such fact. If such damage or destruction could reasonably be expected to have a Material Adverse Effect and the Seller has not notified the Buyer of its intention to cure such



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

damage or destruction within fifteen (15) days after its occurrence, the Buyer and the Seller shall negotiate in good faith to settle the loss resulting from such casualty (including, without limitation, by making a fair and equitable adjustment to the Purchase Price) and, upon such settlement, consummate the transactions contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after the Seller has notified the Buyer of such casualty, then the Buyer may terminate this Agreement pursuant to Section 10.1(g). If such damage or destruction could not reasonably be expected to have a Material Adverse Effect, there shall be no adjustment to the Purchase Price, provided that Seller shall remain obligated to replace or repair such damage.

6.10 Decommissioning Funds.

(a) Between the Effective Date and the Closing, the Seller will make additional deposits from time to time to the the Decommissioning Funds in accordance with the FERC Order and IRS requirements. Notwithstanding the foregoing, in the event the aggregate value of the Qualified Decommissioning Fund and the Nonqualified Decommissioning Fund, as of the Closing, is less than the minimum decommissioning amount required for VYNPS by the applicable regulations of the NRC (the "NRC Minimum"), Seller shall be required to make an additional deposit to the Nonqualified Decommissioning Fund so that the aggregate value of the Qualified Decommissioning Fund and Nonqualified Decommissioning Fund together, measured as of the Closing, is equal to the NRC Minimum, provided, however, that such additional deposit together with the deposits made pursuant to the preceding sentence, shall in no event exceed an aggregate amount equal to (x) $16,777,380 multiplied by (y) the number of days between July 1, 2001 and the Closing Date and divided by (z) 365.

(b) At the Closing, the Seller shall cause all of the assets of the Decommissioning Funds to be transferred to the Trustee under the Buyer's Post-Closing Decommissioning Trust Agreement.

(c) Except as otherwise directed by the Buyer, the Seller shall ensure that the assets in the Nonqualified Decommissioning Fund as of the Closing Date consist of equity securities and/or fixed income securities and include minimal cash or general deposit accounts or other "Class I assets" within the meaning of Treas. Reg. §1.338-6T(b)(1).

(d) Between the date hereof and the Closing, the Seller (i) will cause the assets of the Decommissioning Funds to be invested in accordance with the Investment Guidelines to the Seller's Decommissioning Trust Agreement in effect as of January 1, 2001 and (ii) will cause the Decommissioning Funds to maintain target protection positions in accordance with the policy described in the Vermont Yankee Decommissioning Master Trust Protection Program Policy Statement dated February 20, 2001.

6.11 Spent Nuclear Fuel Fees.

(a) Between the date hereof and the Closing, and at all times thereafter, the Seller will pay as they come due all Spent Nuclear Fuel Fees and any other fees associated with electricity generated at VYNPS prior to the Closing, and the Buyer shall have no liability or responsibility therefor. The Buyer shall pay and discharge all fees and expenses associated with



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

electricity generated at VYNPS from and after the Closing, and the Seller shall have no liability or responsibility therefor. The Buyer shall assume title to and responsibility for the storage and disposal of the Spent Nuclear Fuel in VYNPS as of the Closing. The Seller shall assign to the Buyer the DOE Standard Contract, except for the obligation to pay the one time fee, and shall provide the required notice to the DOE within ninety (90) days of transfer of title to spent fuel.

(b) The Seller agrees, upon receipt of at least 30 days advance written notice from the Buyer of the date on which the one-time fee for fuel burned prior to April 7, 1983 under the DOE Standard Contract will become due and payable in accordance with the terms of the DOE Standard Contract, to cause such fee to be duly paid when due, subject to any rights of set-off to which the Seller may be entitled by reason of the Department of Energy's defaults under said DOE Standard Contract.

6.12 Department of Energy Decontamination and Decommissioning Fees. The Seller will continue to pay all Department of Energy Decontamination and Decommissioning Fees relating to nuclear fuel purchased and consumed at VYNPS prior to the Closing, including, without limitation, all annual Special Assessment invoices to be issued after the Closing by the Department of Energy, as contemplated by its regulations at 10 C.F.R. Part 766 implementing Sections 1801, 1802 and 1803 of the Atomic Energy Act.

6.13 Cooperation Relating to Insurance and Price-Anderson Act. Until the Closing, the Seller will maintain in effect the same level of property damage and liability insurance for the Facility as in effect on the date hereof, including those insurance policies described in Schedule 4.9. The Seller shall cooperate with the Buyer's efforts to obtain insurance, including insurance required under the Price-Anderson Act or other Nuclear Laws with respect to the Acquired Assets. In addition, the Seller agrees to use reasonable efforts to assist the Buyer in making any claims against pre-Closing insurance policies of the Seller that may provide coverage related to Assumed Liabilities and Obligations.

6.14 Tax Clearance Certificates. The Seller and the Buyer shall cooperate and use their Commercially Reasonable Efforts to cause the Tax clearance certificates described in Schedule 4.24 of this Agreement to be issued by the appropriate taxing authorities prior to the Closing Date or as soon as practicable thereafter.

6.15 Nuclear Insurance Policies. The Buyer shall obtain and maintain policies of liability and property insurance with respect to the ownership, operation and maintenance of the Facility which shall afford protection against the insurable hazards and risks with respect to which units of similar size and type customarily maintain insurance, and which meets the requirements of 10 C.F.R. 50.54(w) and 10 C.F.R. Part 140. Such coverage shall include nuclear liability insurance from ANI in such form and in such amount as will meet the financial protection requirements of the Atomic Energy Act, and an agreement of indemnification as contemplated by Section 170 of the Atomic Energy Act. In the event that the nuclear liability protection system contemplated by Section 170 of the Atomic Energy Act is repealed or changed, the Buyer shall obtain and maintain, to the extent commercially available on reasonable terms, alternate protection against nuclear liability. In addition, the Buyer shall provide the financial assurance that it will be able to pay the retrospective premiums for the Facility as prescribed by Section 170 of the Atomic Energy Act.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

6.16 Private Letter Ruling Requests. The Parties agree to cooperate in good faith in the preparation and filing of any private letter ruling requests to be made by the Buyer and the Seller (which shall be made as a single, joint filing by both Parties) in order to obtain the tax treatment desired by the Parties with respect to the transfer of the Decommissioning Funds pursuant to the terms of this Agreement (the "Private Letter Ruling Requests"). Without limiting the generality of the foregoing, the Buyer and the Seller shall use Commercially Reasonable Efforts to obtain one or more private letter ruling(s) from the IRS (the "Requested Rulings"), and further, the Buyer and the Seller shall use Commercially Reasonable Efforts to obtain private letter ruling(s) from the IRS determining that the Seller's net operating loss attributable to the decommissioning obligations assumed by the Buyer will qualify for specified liability loss treatment under section 172 of the Code. Neither the Buyer nor the Seller shall take any action that would cause the transfer of assets from the Seller's Qualified Decommissioning Fund to the Buyer's Qualified Decommissioning Fund to fail to satisfy the requirements of Treas. Reg. 1.468A-6(b) (assuming solely for purposes of this sentence that the interest acquired by the Buyer constitutes a "qualified interest" in a "nuclear power plant" as defined in Treas. Reg. 1.468A-5(b), or cause the Buyer and the Seller to fail to obtain such a private letter ruling. The Buyer and the Seller shall take such actions as may be reasonably necessary to ensure that the request for such rulings does not result in a delay in receipt of the Requested Rulings.

6.17 Tax Matters.

(a) All transfer and sales Taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer. The Buyer will file, to the extent required by applicable law, all necessary Tax Returns and other documentation with respect to all such transfer or sales Taxes, and Seller will be entitled to review such Tax Returns in advance and, if required by applicable law, will join in the execution of any such Tax Returns or other documentation. Prior to the Closing, the Buyer will provide to the Seller, to the extent possible, an appropriate exemption certificate in connection with this Agreement and the transactions contemplated hereby, due from each applicable taxing authority.

(b) With respect to Taxes to be prorated in accordance with Section 3.5 of this Agreement, Buyer shall prepare and timely file all Tax Returns required to be filed after the Closing with respect to the Acquired Assets, if any, and shall duly and timely pay all such Taxes shown to be due on such Tax Returns. Buyer's preparation of any such Tax Returns shall be subject to the Seller's approval for those periods prior to the Closing, which approval shall not be unreasonably withheld. The Buyer shall make such Tax Returns available for the Seller's review and approval no later than fifteen (15) Business Days prior to the due date for filing such Tax Return. Not less than five (5) Business Days prior to the due date of any such Tax Return, the Seller shall pay to Buyer the amount shown as due on such Tax Return determined in accordance with Section 3.5 of this Agreement.

(c) The Buyer and the Seller shall provide the other Party with such assistance as may reasonably be requested by the other Party in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to liability for Taxes, and each will retain and provide the requesting Party with any records or information which may be relevant to such return, audit or examination,



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER