No. 02-898C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VERMONT YANKEE NUCLEAR POWER CORPORATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-0365
Facsimile: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington D.C. 20585

July 6, 2006

Attorneys for Defendant

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX TO THE SUPPLEMENTAL APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I. VERMONT YANKEE'S OBLIGATION TO PAY ITS ONE-TIME FEE BEFORE DOE BEGINS ACCEPTING VERMONT YANKEE'S SNF IS A CONDITION PRECEDENT TO DOE's DUTY . . . . . . . . . . . . . . . . . . . . . . . . 8

A. Contrary To Vermont Yankee's Contentions, Its One-Time Fee Is Currently Due And Owing Based Upon Its Approved DCSs . . . . . . . . . . 8

B. Contrary To Vermont Yankee's Arguments, The Obligation To Pay The One-Time Fee Is A Condition Precedent To DOE's Performance That Has Not Been Excused By DOE's Delay In Beginning Acceptance . . . . . . . 13

II. IF THE COURT DECLINES TO FIND THAT THE ONE-TIME FEE PAYMENT IS A CONDITION PRECEDENT, IT SHOULD ALLOW THE GOVERNMENT TO RECOVER THE ONE-TIME FEE PAYMENT IN CONJUNCTION WITH ANY DAMAGES AWARD . . . . . . . . . . . . . . . . . . . . 22

III. TO THE EXTENT THAT VERMONT YANKEE'S OBLIGATION TO PAY ITS ONE-TIME FEE IS NOT FOUND TO BE A CONDITION PRECEDENT, THE FINDING OF LIABILITY BASED UPON DOE's FAILURE TO BEGIN ACCEPTANCE FROM THE INDUSTRY AS A WHOLE IN 1998 IS INAPPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. The Delivery Commitment Schedules That Vermont Yankee Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case . 26

B. Vermont Yankee's Assertion That The Decisions In *Maine Yankee* And *Northern States* Are Dispositive As To The Issue Of The Date Of DOE's Liability Is Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES


Alabama Power Co. v. Dep't of Energy,
307 F.3d 1300 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

Allan & O'Hara, Inc. v. Barrett Wrecking, Inc.,
964 F.2d 694 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B-B Co. v. Piper Jaffray & Hopwood, Inc.,
931 F.2d 675 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Beacon Oil Co. v. O'Leary,
71 F.3d 391 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table) . . . . . . . . . . . . . . . . . 35

Bettis v. Islamic Republic of Iran,
315 F.3d 325 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Brazos Elec. Power Coop., Inc. v. United States,
49 Fed. Cl. 398 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cities Serv. Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

City of Fairfax, Va. v. Washington Metro. Area Transit Auth.,
582 F.2d 1321 (4th Cir. 1978), cert. denied, 440 U.S. 914 (1979) . . . . . . . . . . . . . . . . 17

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Columbia Gas System, Inc. v. United States,
50 F.3d 233 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conley v. Pitney Bowes,
34 F.3d 714 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Consumers Energy Company v. United States,
65 Fed. Cl. 364 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

DPJ Co. v. FDIC,
30 F.3d 247 (1st Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

David Nassif Assocs. v. United States,
214 Ct. Cl. 372, 644 F.2d 4 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

David Nassif Assocs. v. United States,
214 Ct. C 557 F.2d 249 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In re Enron Corp. Secs., Derivatives & ERISA Litig.,
284 F. Supp. 511 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,
No. 03-242, 2004 WL 2700019 (D. Del. Nov. 18, 2004) . . . . . . . . . . . . . . . . . . . . . . 10

Indiana Michigan Power Co. v. Dep't of Energy,
88 F.3d 1272 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . 17

Loud v. Pomona Land & Water Co.,
153 U.S. 564 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Morris v. United States,
33 Fed. Cl. 733 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Northern Heel Corp. v. Compo Indus., Inc.,
851 F.2d 456 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Northern States Power Co. v. Dep't of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

PSEG Nuclear, LLC v. United States,
No. 05-5162 (Fed. Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

S&R Corp. v. Jiffy Lube Int'l, Inc.,
968 F.2d 371 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Southeastern Airways Corp. v. United States,
230 Ct. Cl. 47, 673 F.2d 368 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. April 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

System Fuels, Inc. v. United States,
65 Fed. Cl. 163 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Munsey Trust Co.,
332 U.S. 234 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl. June 26, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 2514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. §§ 10101-10270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**MISCELLANEOUS**

8 C. McCauliff, Corbin on Contracts § 30.7 (rev. ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8 C. McCauliff, Corbin on Contracts § 30.10 (rev. ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

2 E. Farnsworth, Farnsworth on Contracts § 8.11 (3d ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . 14

L. Simpson, Handbook of the Law of Contracts § 152 (1965) . . . . . . . . . . . . . . . . . . . . . . . . 14

13 R. Lord, Williston on Contracts § 38.8, at 405 (4th ed. 2000) . . . . . . . . . . . . . . . . . . . . . . 18

Restatement (Second) of Contracts § 225 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Restatement (Second) of Contracts § 237 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

Restatement (Second) Contracts § 243 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20, 21

Restatement (Second) Contracts § 269 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**INDEX TO THE SUPPLEMENTAL APPENDIX**

Document Page

Excerpt of the 1987 Annual Capacity Report, dated June 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt of the 1991 Annual Capacity Report, dated December 1991 . . . . . . . . . . . . . . . . . . . . . . 23

Excerpt of the 1991 Acceptance Priority Ranking, dated December 1991 . . . . . . . . . . . . . . . . . . 41

Letter from M. Detmer, Contracting Officer, U.S. Department of Energy, to Glenn J. Morgan, Vermont Yankee Nuclear Power Corporation, dated March 4, 1992 . . . . . . . . . . . . . . . . . . . . . . 48

Letter from B. Tomasoni, Contracting Officer, U.S. Department of Energy, to Linda S. Griffin, Vermont Yankee Nuclear Power Corporation, dated June 3, 1997 . . . . . . . . . . . . . . . . . . . . . . . . 58

Letter from D. Zabransky, Contracting Officer, U.S. Department of Energy, to John B. Carden, Tennessee Valley Authority, dated November 3, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Excerpts of Trial Testimony of Mr. Robert Morgan, former Director, Nuclear Waste Policy Office, in Yankee Atomic Electric Co. v. United States, No. 98-128C, on August 2-3, 2004 . . 86

Excerpts of Trial Testimony of Mr. Morgan, in Tennessee Valley Authority v. United States, No. 01-149C, on July 14, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 02-898C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Defendant, the United States, respectfully submits this reply and response to "Plaintiff's Response To Defendant's Motion for Summary Judgment Upon Counts I and II of Plaintiff's First Amended Complaint and, In the Alternative, For Partial Summary Judgment Upon Defendant's Right To Recover Unpaid Fees, And Plaintiff's Cross-Motion For Summary Judgment Upon Liability," filed June 8, 2006 by plaintiff, Vermont Yankee Nuclear Power Corporation ("Vermont Yankee").

## SUMMARY OF THE ARGUMENT

With regard to Vermont Yankee's response to the Government's motion for summary judgment regarding Vermont Yankee's failure to pay the one-time fee, Vermont Yankee's obligation arose based upon the first approved DCS for 1999. Despite Vermont Yankee's arguments to the contrary, a plain reading of all the parts of the contract clearly shows that the payment of the one-time fee is to precede the first acceptance of SNF as set forth in the approved DCS. Vermont Yankee's evidence regarding the later suspension in the process of approving

additional DCSs does not undercut the fact that Vermont Yankee has an approved DCS that provided for the first delivery in 1999; that it owes its one-time fee based upon that DCS to the extent that it wants DOE to accept its SNF; and that, in a partial breach case where the plaintiff expects and is demanding contract performance by both the Government and plaintiff, the Government had and has no obligation to accept the SNF located at the Vermont Yankee Nuclear Power Station until Vermont Yankee has paid its one-time fee. In any event, absent a ruling that Vermont Yankee's failure to pay the one-time fee precludes a finding of liability, the Court should order that any damages amount awarded to Vermont Yankee be offset against Vermont Yankee's one-time fee obligation.

With regard to Vermont Yankee's cross-motion for liability, Vermont Yankee claims that the Government "breached Vermont Yankee's Standard Contract when it failed to begin disposal of Vermont Yankee's and other utilities' spent nuclear fuel on January 31, 1998." Pl. Br. 18. Consequently, Vermont Yankee seeks the entry of an order establishing DOE's liability as of January 31, 1998. Id. However, Vermont Yankee's request is meritless because, under the terms of the Standard Contract, DOE was not obligated to accept spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") from every Standard Contract holder on January 31, 1998. Instead, as discussed below, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF and/or HLW that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. Vermont Yankee acted in accordance with the Standard Contract's contractual mechanism for creating these

specific acceptance obligations, submitting delivery commitment schedules ("DCSs") to DOE that DOE subsequently approved. [1]

Under this contractual mechanism, DOE's liability is to be adjudged based upon DOE's failure to accept the amounts set forth in these approved DCSs, beginning in 1999. Assuming that Vermont Yankee's claims are not barred by Vermont Yankee's failure to pay the one-time fee, this date would be the earliest date upon which DOE's potential liability under the Standard Contract could be established with regard to DOE's delay in accepting Vermont Yankee's SNF.

## BACKGROUND

The Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, timely to submit a DCS to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See A. 11, 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's

[1] As we noted in our response to cross-motion for liability filed by Entergy Nuclear Vermont Yankee LLC ("ENVY"), ENVY seeks the same ruling, but lacks standing to obtain such a ruling. ENVY was not a party to the Standard Contract on January 31, 1998. Indeed, on August 21, 2002, Vermont Yankee notified DOE that it had assigned its Standard Contract to ENVY. Appendix to Defendant's Motion for Summary Judgment Upon Counts I and II Of Plaintiff's First Amended Complaint And, In The Alternative, For Partial Summary Judgment Upon Defendant's Right To Recover Unpaid Fees ( "A.") at 82 (filed May 4, 2006). The Department of Energy could not have had any obligation to accept any of ENVY's SNF and/or HLW until some time after the date of the assignment. Consequently, ENVY lacks standing to contend that the Court should enter an order on liability as of January 31, 1998.

approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

The Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." A. 9, 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the "order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." A. 10, 10 C.F.R. § 961.11, Art. IV.B.5.b, and SA. 1 (1987 Annual Capacity Report).[2] The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time,

[2] "SA. __" refers to the Government's supplemental appendix that accompanies this brief.

might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a. In December 1991, DOE published both the Annual Capacity Report and the Acceptance Priority Ranking ("APR"). SA 23 and 41. In the APR, DOE notified purchasers that "[f]inal delivery schedule approval and waste acceptance will be contingent upon these Purchasers meeting their one-time fee obligations." SA. 47.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." A. 11, 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; SA. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." A. 11, 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule

from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a particular contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. A. 38, 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." A. 6, Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. The Standard Contract requires that, beginning January 1, 1992, the

contract holder "shall submit to DOE the [delivery commitment schedules] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." A. 11, 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). Further, the Standard Contract defines the scope of the Standard Contract as relating to the acceptance by DOE of SNF "specified in a delivery commitment schedule as provided in Article V below." A. 6, 10 C.F.R. § 961.11, Art. II. Until a contract holder submits a DCS for a particular year, DOE cannot approve a specific delivery commitment to that contract holder for that year. A. 11, 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. A. 11-12, 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW

acceptance during the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[3] Id.

In this case, Vermont Yankee followed the procedures described above in submitting DCSs against each of the allocations it had in the 1991 ACR for the years 1999, 2001, 2002, 2003, 2004, 2005 and 2007. Compare SA. 37 and A. 66-73. DOE approved all of the DCSs submitted by Vermont Yankee. A. 74-81. Nevertheless, as represented in the APR, "[f]inal delivery schedule approval and waste acceptance will be contingent upon th[is] Purchaser[] meeting [its] one-time fee obligation[]." SA. 47. Vermont Yankee sold the Vermont Yankee Nuclear Power Station and, on August 21, 2002, notified DOE that it had assigned its Standard Contract to ENVY. A. 82.

## ARGUMENT

### I. VERMONT YANKEE'S OBLIGATION TO PAY ITS ONE-TIME FEE BEFORE DOE BEGINS ACCEPTING VERMONT YANKEE'S SNF IS A CONDITION PRECEDENT TO DOE's DUTY

#### A. Contrary To Vermont Yankee's Contentions, Its One-Time Fee Is Currently Due And Owing Based Upon Its Approved DCSs

In our motion for summary judgment upon Counts I and II of Vermont Yankee's first amended complaint, we established that Vermont Yankee has not yet paid the one-time fee that it

[3] If the parties could not agree upon a disapproved delivery commitment schedule or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. A. 27, 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

is obligated to pay before DOE begins accepting the SNF and/or HLW covered by the Standard Contract to which Vermont Yankee is a party. As we explained in our motion, the Nuclear Waste Policy Act ("NWPA") expressly provides that DOE's obligation to accept any SNF or HLW from a nuclear utility is "[i]n return for the payment of fees" required by the NWPA. 42 U.S.C. § 10222(a)(5)(B). The plain language of the Standard Contract specifies that the method of payment of the one-time fee which Vermont Yankee selected requires that Vermont Yankee's "financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. 10 C.F.R. § 961.11, Art. VIII.B.2(b) (emphasis added). As we further explained in our motion, the scheduling of DOE's acceptance of any SNF from an individual contract holder is wholly dependent upon the existence of an approved DCS. Finally, with the publication of the 1991 APR, DOE warned contract holders which had not paid their one-time fee that "[f]inal delivery schedule approval and waste acceptance will be contingent upon these Purchasers meeting their one-time fee obligations." SA. 47. Accordingly, Vermont Yankee is obligated under the terms of the Standard Contract to pay its one-time fee before DOE's obligation to accept Vermont Yankee's SNF arises. Because Vermont Yankee has not satisfied this condition precedent to DOE's obligation to accept Vermont Yankee's SNF, Vermont Yankee has no basis for maintaining its claim.

To overcome the plain language of Article VIII.B.2(b), Vermont Yankee asks the Court to interpret the obligation as tied to the first actual delivery of SNF under the Contract. Pl. Br. 6-7. Specifically, Vermont Yankee asserts that the payment of the one-time fee is tied to the actual delivery of SNF pursuant to the contract and, since no delivery by Vermont Yankee or any other

utility has occurred, the fee is currently not due. Pl. Br. 7. In essence, Vermont Yankee is arguing that, even though Article VIII.B.2(b) expressly requires that the contract holder "shall" pay its one-time fee before the date "reflected in" the earliest-approved DCS, the language of Article VIII.B.2(b) actually means that the one-time fee is due after DOE actually accepts Vermont Yankee's SNF. Clearly, the phrase "as reflected in" means "as identified in" or "as established by." See, e.g., Bettis v. Islamic Republic of Iran, 315 F.3d 325, 337 (D.C. Cir. 2003) ("[t]here is a commonly understood meaning of the term, as reflected in State and common law" (emphasis added)); Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp., No. 03-242, 2004 WL 2700019, at *14 (D. Del. Nov. 18, 2004) ("proposed constructions are consistent with the ordinary meaning of those terms as reflected in common usage dictionaries . . ." (emphasis added)); In re Enron Corp. Secs., Derivatives & ERISA Litig., 284 F. Supp. 511, 625 (S.D. Tex. 2003) ("express preemption occurs by express statutory term, as reflected in § 514(a) of ERISA" (emphasis added)). Here, Vermont Yankee has an approved DCS for delivery in 1999, and it was required to pay its one-time fee prior to 1999, the date "reflected in" its earliest-approved DCS.

Vermont Yankee concedes that tying the payment obligation to an approved DCS "makes the most sense because it applies all of the contract language," but argues that the Court should not reach this interpretation because there is no "valid, operative DCS." Pl. Br. 7. Vermont Yankee, relying upon evidence from other utilities, explains how the DCS process was suspended by DOE when it became apparent that DOE would be unable to perform in 1998.[4]

---

[4] Tellingly, Vermont Yankee relies upon evidence from Northern States to support its claims regarding the suspension of the DCS process in late 1996 and early 1997. Pl. Br. 4 and PA. 1-21. Vermont Yankee has no similar evidence of its own because its DCSs were all submitted

The suspension of the DCS process did not, however, eliminate the fact that Vermont Yankee has a valid, approved DCS committing DOE to accept a specific quantity of fuel in 1999. As we will discuss below, this DCS, absent Vermont Yankee's failure to pay its one-time fee, would provide the basis for DOE's liability for its delay in accepting the amount of SNF set forth in this DCS. In response to this showing, Vermont Yankee claims, without benefit of citation to authority, that this and the other six approved DCSs held by Vermont Yankee are "invalid on their face." Pl. Br. 8. Because Vermont Yankee asks the Court to enforce this commitment to perform through the payment of damages, the Court should also enforce Vermont Yankee's obligation to pay its one-time fee as required by the commitment that this approved DCS embodies.

Vermont Yankee also relies upon the Court's decision in Consumers Energy Company v. United States, 65 Fed. Cl. 364 (2005).[5] Pl. Br. 13-14. As we explained in our opening brief, we respectfully disagree with the Court's analysis in Consumers because the Court read into the contract a greater obligation than actually exists – to establish a date of delivery rather than a year. Regarding the Court's finding that the suspension of the DCS process renders the contract illusory, 65 Fed. Cl. at 371, we note that the suspension of the DCS process did not affect Vermont Yankee. It obtained all of the approved DCSs that it could prior to 1998. Compare A.

---

and approved in 1992. A. 66-81. These approved DCSs were not changed, suspended, or later voided. Moreover, none of the evidence that Vermont Yankee provides supports its contention that the approved DCSs were invalid. Instead, the evidence merely shows that, after early 1997, DOE suspended its approval of DCSs that some other contract holders were then submitting.

[5] As discussed below, the Court in Consumers granted the Government's alternative motion, seeking the right to offset any damages awarded to Consumers against the one-time fee obligation. Consumers, 65 Fed. Cl. at 373.

74-81 to SA. 37. However, before the Court can enforce those approved DCSs, it must first enforce Vermont Yankee's obligation to pay its one-time fee.

Although Vermont Yankee argues that its one-time payment is not yet due, Pl. Br. 6-9, Vermont Yankee's cross-motion for liability is based upon the premise that DOE was obligated to begin SNF acceptance from the contract holders, including Vermont Yankee, by January 31, 1998. Pl. Br. 18. Before DOE would have had any duty to accept Vermont Yankee's SNF, Vermont Yankee would first have to have paid its one-time fee. As a result, before Vermont Yankee can complain that DOE's performance to Vermont Yankee is or was "due," it must satisfy its own condition precedent to DOE's duty to perform. Although it promises that, once DOE comes to accept its or ENVY's SNF, it will pay the one-time fee to DOE, see Pl. Br. 10, it is unlikely that DOE will have any ability to recover previously paid damages that DOE paid in response to a court judgment if Vermont Yankee does not subsequently satisfy this promise.[6] Quite simply, the Standard Contract itself establishes the order of performances: payment of the one-time fee by the contract holder first, followed by SNF acceptance by DOE. To the extent that Vermont Yankee seeks an award of damages for DOE's failure to accept Vermont Yankee's SNF at an earlier date than that by which DOE actually performs, Vermont Yankee must satisfy its condition precedent to that duty before its damages claim can accrue.

[6] The enforcement of the obligation is made even more difficult by the fact that Vermont Yankee has given title to all of its SNF to ENVY and assigned its Standard Contract to ENVY, minus the obligation to pay the one-time fee. See Appendix to Defendant's Motion For Summary Judgment Regarding The Invalid Assignment Of Plaintiff's Standard Contract And Pre-existing Claims From The Partial Breach Of That Contract, at 92, 130-31 (filed May 4, 2006). Once performance begins, DOE owes its performance obligations to ENVY as the holder of the SNF and has no realistic and efficient way to enforce Vermont Yankee's obligation to pay its fee, if the Court declines to read the obligation to pay the one-time fee as a condition precedent to DOE's performance obligations.

B. Contrary To Vermont Yankee's Arguments, The Obligation To Pay The One-Time Fee Is A Condition Precedent To DOE's Performance That Has Not Been Excused By DOE's Delay In Beginning Acceptance

As we established in our opening brief, the language of Article VIII.B.2(b) creates a condition precedent, making DOE's duty to accept Vermont Yankee's SNF conditional upon Vermont Yankee's prior payment of its one-time fee. Conditions precedent "are those *facts and events*, occurring *after the making of a valid contract*, that must exist or occur before there is a right to immediate performance, before there is a breach of a contract duty and before the usual judicial remedies become available." 8 C. McCauliff, Corbin on Contracts § 30.7, at 14 (rev. ed. 1999) (italics in original); see Brazos Elec. Power Coop., Inc. v. United States, 49 Fed. Cl. 398, 405 (2001); B-B Co. v. Piper Jaffray & Hopwood, Inc., 931 F.2d 675, 678 (10th Cir. 1991). A fact or event becomes a condition of a duty "by agreement of the parties, expressed in definite language when the contract is made" as an "express" condition. 8 C. McCauliff, supra, § 30.10, at 19. However, "contractors can 'express' their intentions otherwise than by the use of specific words." Id. Indeed, "[a] fact or event may be made a condition of a contract right and duty by any form of words capable of interpretation." Id. § 31.1, at 41 (emphasis added). Further, "[j]ust as parties can make promises without using words to do so, they can also express an intention that a fact or event shall be a condition of legal duty without putting it into words." Id. § 30.10, at 19. Nevertheless, "[i]f a condition is found by the processes of interpretation of language, it is called an express condition; if otherwise, the condition" may be a "constructive" condition or an "implied" condition. Id. § 31.1, at 49. "In specific cases it is not always possible to classify the condition involved in the case as being an express condition or a constructive one." Id. § 31.1, at 48.

Here, the language of the Standard Contract is quite clear. DOE is to begin acceptance of SNF from an individual contract holder at some point after January 31, 1998, as identified in an approved DCS. 10 C.F.R. § 961.11, Art. VI.B.1(b) ("DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B [the DCS provision], D and E of Article V"). However, Article VIII.B.2(b) expressly provides that, before DOE accepts any SNF from the contract holder under an approved DCS, the contract holder "shall" pay its one-time fee. Id., Art. VIII.B.2(b). In establishing conditions to the duty of subsequent performance, "[s]ometimes the parties themselves fix the order of performance by the language of their agreement." 2 E. Farnsworth, Farnsworth on Contracts § 8.11 (3d ed. 2004). In this case, the language of the agreement expressly places upon the contract holder the obligation (or condition) to pay its one-time fee before DOE's duty to begin SNF acceptance arises, creating an express condition under the specific language of the Standard Contract. Accordingly, DOE's duty to begin accepting Vermont Yankee's SNF has not yet arisen, and Vermont Yankee is not entitled to damages for DOE's failure to satisfy that duty.

Even if the language of the Standard Contract itself did not create an express condition, the contractual requirement that the contract holder pay its one-time fee before DOE began SNF acceptance clearly was intended to condition DOE"s obligation to accept and dispose of SNF upon the contract holder's prior payment of its fees, creating a "constructive" condition. "One well-established rule of contract construction is that '[i]n bilateral contracts for an agreed exchange of performances, . . . where one party's performance is to be rendered prior in time to that of the other, it is a constructive condition precedent to the latter's duty.'" Conley v. Pitney

Bowes, 34 F.3d 714, 717 (8th Cir. 1994) (quoting L. Simpson, Handbook of the Law of Contracts § 152 (1965)); see Restatement (Second) of Contracts § 237 (1981) ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no material failure by the other party to render any such performance due at an earlier time"). "Such a 'performance is as much a condition precedent to the other's duty as though expressly made so.'" Conley, 34 F.3d at 714 (quoting L. Simpson, supra, § 152, and citing Loud v. Pomona Land & Water Co., 153 U.S. 564, 577 (1894) (agreement to convey land "after the making of the payment and full performance" rendered such payment and performance a condition precedent to the duty to convey)).

Here, again, the Standard Contract expressly provided that the contract holder "shall" pay its one-time fee before DOE began accepting its SNF. Whether viewed as an express or a constructive condition, it is, under traditional contract interpretation principles, a condition precedent to DOE's obligation to begin accepting Vermont Yankee's SNF. Because Vermont Yankee has not satisfied that condition, DOE is not yet obligated to begin accepting Vermont Yankee's SNF, and Vermont Yankee cannot maintain a suit for damages for DOE's failure to begin that acceptance.

To rebut the Government's showing that the obligation to pay the one-time fee is a condition precedent to DOE's own performance obligation, Vermont Yankee first argues that the fact that interest continues to run on the outstanding one-time fee obligation should somehow negate the need to enforce this provision of the Standard Contract. Pl. Br. 9.[7] The continuing

[7] Vermont Yankee also argues that "DOE be indifferent, as a purely economic matter" because interest continues to run on the one-time fee amount. Pl. Br. 9-10. However, the interest rate applied to the one-time fee obligation is only the low 13-week Treasury bill rate,

accrual of interest is properly viewed as DOE's consideration for allowing Vermont Yankee and other utilities, at their option, to defer payment of the one-time fee until the date established for the first delivery in the approved DCSs. The fact that interest continues to accrue because of DOE's delay does not eliminate the need for the Court to enforce the provisions of the contract as written prior to the awarding of damages based upon a partial breach of that contract.

Vermont Yankee also refers to Article VIII.B.4, which states that "any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII," A. 22, and suggests that this provision is the penalty for non-payment. Pl. Br. 9. However, Article VIII.C shows the calculation of interest for quarterly fees that are late or miscalculated and Article VIII.B.2, the option that Vermont Yankee chose for its payment of its one-time fee, provides itself for the calculation of interest. Reading these provisions together suggests that Article VIII.B.4, upon which Vermont Yankee relies, only provides the penalty for the late payment of the quarterly fees that Vermont Yankee and others have been paying. See Pl. Br. 12 (Vermont Yankee has paid more than $64 million in quarterly fees). The one-time fee provision provides its own penalty for non-payment, which is deferred performance by DOE until at least such time that the fee is paid. Art. VIII.B.2 ("[p]urchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery . . .") (emphasis added).

Vermont Yankee further complains that, because DOE had announced prior to January 31, 1998, that it would not be able to begin SNF acceptance by that date, DOE excused the

---

which is a lower rate of return than Vermont Yankee can obtain with other investment vehicles. A. 21, 10 C.F.R. § 961.11, Art. VIII.B.2(b).

condition precedent when it failed to begin accepting SNF from the nuclear utility contract holders on January 31, 1998, which Vermont Yankee apparently believes was itself a condition to Vermont Yankee's obligation to pay the one-time fee. Pl. Br. 10-11. In essence, Vermont Yankee is claiming that DOE anticipatorily breached the Standard Contract and that Vermont Yankee was, therefore, not required to satisfy any of its condition precedents to DOE's further duty to perform.[8] However, Vermont Yankee's decision to pursue a claim for only a partial breach of contract, and not for a total breach of contract, affects its ability to claim that DOE's anticipatory breaches excuse or defer its own performance obligations. As we explained in our opening brief, in response to an anticipatory breach or repudiation of a contract, the non-breaching party must make an affirmative election: either (1) declare the contract in total breach and sue for all damages under the contract, or (2) await the contract performance due date and seek partial breach damages if that performance is not forthcoming.[9] S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). Further, even when the actual performance date arrives and is not satisfied, the non-breaching party, to the extent that it elects to view the breach as only partial, must continue to perform its continuing contractual obligations and seek damages for the delay in performance. Cities Serv. Helex, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976). Here, Vermont Yankee elected to treat the Standard Contract as

---

[8] Vermont Yankee states that it is not alleging anticipatory repudiation, but fails to provide a better explanation regarding the nature of its arguments. Pl. Br. 15.

[9] As we explained in our motion for summary judgment, no legal theory of an "anticipatory partial breach" exists. See City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) ("an anticipatory breach cannot be predicated on a partial breach of the contract . . ." (emphasis added)), cert. denied, 440 U.S. 914 (1979); see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004) (finding in SNF case that "[a]nticipatory repudiation does not apply in a partial breach situation"), aff'd, 422 F.3d 1369 (Fed. Cir. 2005).

continuing, not to declare it at an end, and to pursue only a partial breach of contract claim in this Court. "If [the non-breaching party] elects . . . to continue the contract" in response to a breach and to treat the breach as only partial, "the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach." Id. at 234, 543 F.2d at 1313. Accordingly, having elected to continue the contract, Vermont Yankee was obligated to continue its own contract performance, including the timely payment of its fees. See id.; Restatement (Second) Contracts § 243 cmt. a. With Vermont Yankee having made this election, DOE's duty to accept Vermont Yankee SNF has not yet arisen because Vermont Yankee, which was obligated to continue its own contract performance, has never satisfied its condition precedent to DOE's duty: payment of its one-time fee. The non-occurrence of this condition "excuses performance by the party whose performance is conditioned . . . ." 13 R. Lord, Williston on Contracts § 38.8, at 405 (4th ed. 2000); see Columbia Gas System, Inc. v. United States, 50 F.3d 233, 240 (3d Cir. 1995).

Vermont Yankee's contention that DOE was obligated to have "an operational repository (or interim storage facility) . . . [as] a condition precedent to Vermont Yankee's payment of its one-time fee" is similarly unavailing. Pl. Br. 10-11. As the D.C. Circuit held in Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE's obligation to begin performance is independent of the existence of an operational repository or other facility. The Indiana Michigan court construed the meaning of subsections (A) and (B) of section 302(a)(5) of the NWPA. 42 U.S.C. § 10222(a)(5) ("section 302(a)(5)"). Subsection (A) of section 302(a)(5) discusses the commencement of a repository and DOE's subsequent taking of title to SNF and HLW, but does not mention any date by which the repository must be available.

42 U.S.C. § 10222(a)(5)(A) ("section 302(a)"). Subparagraph (B) identifies a date of January 31, 1998, by which DOE must begin to dispose of SNF and/or HLW. Id. § 10222(a)(5)(B).[10] The D.C. Circuit in Indiana Michigan held that "[s]ections 302(a)(5)(A) and (B) set forth two independent obligations." Indiana Michigan, 88 F.3d at 1276. "The duties imposed on DOE under subsections (A) and (B) are linked to different events and are triggered at different times." Id. "DOE's duty under subsection (A) to take title is linked to the commencement of repository operations," while "DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees and is triggered, at the latest, by the arrival of January 31, 1998." Id. As a result, as the Indiana Michigan court held, the language of subsection (A), dealing with the repository, may not be read into subsection (B), dealing with the January 31, 1998 date. Id. at 1276, 1277.

Nevertheless, the utility plaintiffs apparently believes that the language of subsection (B) should be read into subsection (A), creating an obligation to have the repository ready by January 31, 1998. That argument is completely inconsistent with the argument that the nuclear utilities made to the D.C. Circuit and is in conflict with the D.C. Circuit's rationale and holding in Indiana Michigan, which identified subsections (A) and (B) as "two independent requirements" and "separate obligations." Id. at 1276. Although the D.C. Circuit recognized that "Congress anticipated the existence of a repository by 1998," id. at 1277, the statute did not create a statutory obligation, or a contractual obligation, mandating it. The utility plaintiffs' new argument that, in fact, the Court should read the provisions of subsection (B) into subsection (A) renders suspect the D.C. Circuit's entire holding in Indiana Michigan. Further, the D.C. Circuit's

[10] No other provision in the NWPA identifies the January 31, 1998 date.

subsequent decision in Northern States Power Co. v. Department of Energy, 128 F.3d 754 (D.C. Cir. 1997), which in essence barred the Government from arguing that its delay in beginning SNF and/or HLW acceptance by January 31, 1998, did not constitute a breach of the Standard Contract, was entirely dependent upon Indiana Michigan. Having obtained rulings effectively barring the Government from raising certain defenses to the utility plaintiffs' breach of contract claims through arguments that subsections (A) and (B) are separate and independent, the utility plaintiffs cannot now argue that they, in reality, are completely dependent and intertwined. In any event, because DOE's obligation to begin performance continued in the absence of a repository, Vermont Yankee's obligation to pay its one-time fee prior to the beginning of that performance continued as well.

Vermont Yankee relies, in part, upon this Court's decision in System Fuels, Inc. v. United States, 65 Fed. Cl. 163 (2005), in which the Court found that the obligation to pay the one-time fee is a condition precedent, but that the condition was excused in System Fuels' situation "based upon temporary frustration of purpose caused by the [G]overnment's suspension of the DCS process." In making this finding, the Court relies upon Restatement (Second) Contracts § 269 regarding when impracticability of performance or frustration of purpose can suspend an obligor's performance. However, as the comment to this section makes clear, this provision "applies only to the duty of the party adversely affected by the impracticability or frustration; the effect on the duty of the other party, as to a performance to be exchanged under an exchange of promises, is governed by §§ 267, 268, 237 and 238." Restatement (Second) Contracts § 269, cmt. Better guidance regarding the conditions precedent in claims for partial breach of contract is provided by section 243, which states:

> If, in spite of the breach, he wishes to await performance by the party in breach and to have merely a claim for damages for partial breach rather than for total breach, he can excuse the non-occurrence of the condition of his remaining duties (§ 237) by promising to perform them in spite of its non-occurrence. His remaining duties are then not discharged, and the rule stated in Subsection (1) does not apply.

Restatement (Second) Contracts § 243, cmt. a. Vermont Yankee has chosen to await performance by DOE and claim damages for partial, rather than total, breach. Having done so, Vermont Yankee was obligated to fulfill its obligation to pay its one-time fee in 1999. Vermont Yankee's decision to defer satisfying its condition to DOE's duty to begin accepting Vermont Yankee's SNF also defers DOE's duty to begin accepting Vermont Yankee's SNF. The "[n]on-occurrence of a condition is not a breach by [Vermont Yankee] unless he is under a duty that the condition occur." Restatement (Second) of Contracts § 225(3) (1981). Vermont Yankee's claim for damages for DOE's failure to perform its duties to Vermont Yankee cannot accrue until Vermont Yankee pays its one-time fee. Because Vermont Yankee has not paid that fee, it cannot seek damages here.

With regard to Vermont Yankee's assertion that DOE excused the condition precedent by rendering its payment futile, Pl. Br. 11, its argument ignores the nature of a partial, rather than total, breach claim. When a non-breaching party elects to continue a contract despite a breach and to sue only for partial breach, "the obligations of both parties remain in force." Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976) (emphasis added). That is, the non-breaching party cannot elect not to perform its own obligations while still holding the other party to its obligations. Although Vermont Yankee cites cases purporting to excuse its condition precedent based upon those futility, see Pl. Br. 11, those cases, most of

which relate to total breach claims, relate to situations in which "the breach caused the failure of the condition precedent." Allen & O'Hara, Inc. v. Barrett Wrecking, Inc., 964 F.2d 694, 696 (7th Cir. 1992); see Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461-62 (1st Cir. 1988) (breach deprived plaintiff "of the opportunity to demonstrate the fulfillment of the conditions precedent"). Here, DOE did not somehow preclude Vermont Yankee from paying its one-time fee. Vermont Yankee itself voluntarily elected not to pay that fee. Because, in a partial breach case in which the anticipatory repudiation doctrine is inapplicable, a non-breaching party must perform its own contract obligations, Vermont Yankee's failure to satisfy its condition to DOE's obligation to accept Vermont Yankee's SNF precludes a liability finding here.[11]

## II. IF THE COURT DECLINES TO FIND THAT THE ONE-TIME FEE PAYMENT IS A CONDITION PRECEDENT, IT SHOULD ALLOW THE GOVERNMENT TO RECOVER THE ONE-TIME FEE PAYMENT IN CONJUNCTION WITH ANY DAMAGES AWARD

In our motion for summary judgment, we requested that, if the Court declines to find that Vermont Yankee's payment of the one-time fee was a condition precedent to DOE's duty to perform, it require Vermont Yankee to pay the one-time fee either directly or as an offset against any damages award. In response, Vermont Yankee asserts that the fee is not yet due and that it

[11] To the extent that the Court in Morris v. United States, 33 Fed. Cl. 733, 751 n.16 (1995), held that a condition precedent may be waived in a partial breach case based upon futility, that case involved a partial breach with regard to a contract that, by the time of suit, had already been fully performed and the condition precedent fulfilled prior to the Government's actual, but delayed, performance. To the extent that the rationale of that decision were applied in the context of a partial breach case where the contract has not yet been fully performed and the condition precedent still not satisfied, it would potentially permit plaintiffs to recover substantial damages from the Government without any guarantee that the non-breaching party would ever perform the obligation that constituted the condition precedent. Only by enforcing the condition precedent would the Court ensure that the non-breaching part, as required by the nature of a partial breach case, fully perform its own obligations.

will not be placed in a better monetary position, once it receives damages for DOE's delay, than it would be had DOE timely performed. Pl. Br. 15-16. Vermont Yankee also claims that this offset would violate the holding in Alabama Power Co. v. United States Department of Energy, 307 F.3d 1300 (11th Cir. 2002). These allegations are without merit.

As we have explained above, if DOE had accepted Vermont Yankee's SNF at a particular date, Vermont Yankee would have been obligated to pay the one-time fee prior to that acceptance. See Consumers, 65 Fed. Cl. 364, 372. "Plaintiff's recovery of damages without having to account for its obligation to pay the one-time fee, which it would have owed had there been no breach, would surely put Plaintiff in a more advantageous position." Id. at 373; see Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) ("non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("[t]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed'" (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)). Based upon finding that the nuclear utility in Consumers would be put in a "more advantageous position," the Court has ordered that any award of damages be offset against the utility's one-time fee obligation. Consumers, 65 Fed. Cl. at 373.[12]

Vermont Yankee asserts that it will not be in a better position because "it will still have had to store the SNF for a longer period of time – with all the costs, responsibilities, and liabilities that this entails – that would have been the case had DOE performed." Pl. Br. 16. Yet,

[12] In System Fuels, the Court deferred the Government's motion that it be allowed to take an offset until "the damages phase of this case." System Fuels, Inc., 65 Fed. Cl. at 174.

in this litigation, Vermont Yankee is seeking to be compensated for those additional costs of storage that it allegedly has had to incur. With the payment of these costs as damages, it will be in a better position than if DOE had performed because it will have recovered its costs and deferred the payment of its one-time fee, retaining the use of that money for other purposes. Accordingly, assuming that Vermont Yankee is entitled to damages arising from DOE's delay, Vermont Yankee should be required to pay the fee that it would have had to have paid had DOE timely performed.[13]

Contrary to Vermont Yankee's contention, granting the Government the right to offset Vermont Yankee's one-time fee obligation against any damages award would not violate the prohibition set forth in Alabama Power that funds from the Nuclear Waste Fund ("NWF") may not be used to pay the interim storage costs currently being borne by utilities. The NWF is the Treasury account created by the NWPA into which the nuclear utilities pay fees and from which Congress appropriates monies to the Department of Energy for siting, developing, and operating a permanent nuclear waste repository. 42 U.S.C. § 10222©. In the settlement with Pennsylvania

[13] In any event, the Government has a common-law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947). This Court's predecessor, the Court of Claims, recognized that the debt need not even be formally "determined, liquidated, or assessed" when the Government withholds monies from the contractor's payments. Southeastern Airways Corp. v. United States, 230 Ct. Cl. 47, 65, 673 F.2d 368, 379 (1982). Here, to the extent that Vermont Yankee is awarded damages based upon DOE's failure to begin SNF acceptance from Vermont Yankee in 1999 or at any other time, that damages award would have to be based upon an assumption that DOE was required to begin SNF acceptance from Vermont Yankee at that time, as explained above. Assuming that DOE is paying damages based upon its failure to satisfy an obligation to begin SNF acceptance from Vermont Yankee in 1999 or at any specific date, it should be entitled to recoup the monies that it would have obtained before it would have accepted that SNF.

Electric Company ("PECO")[14] that led to the Alabama Power challenge, DOE was to allow PECO to demonstrate the amount that it had expended for interim storage activities and then to deduct those amounts from its quarterly fee submissions under the Standard Contract. Alabama Power, 307 F.3d at 1306. The United States Court of Appeals for the Eleventh Circuit found that, pursuant to the current language of the NWPA, DOE may not use the NWF to pay for utilities' on-site storage resulting from DOE's delay in beginning SNF acceptance or to allow utilities to reduce their payments into the NWF to compensate themselves for that delay. Id. at 1312. Because the NWF is unavailable to pay these damages, delay costs to other plaintiffs have been paid from the Judgment Fund. 28 U.S.C. § 2514.

Based upon Alabama Power, Vermont Yankee incorrectly believes that, if we were to offset the recovery for DOE's delay by the amount of its one-time fee, Vermont Yankee will not actually pay its fee into the NWF, in violation of Alabama Power. Pl. Br. 17. Vermont Yankee's mistaken belief probably stems from a failure to understand how an offset would be administered. If the Court finds that damages are due to be paid to Vermont Yankee and also orders that an offset be taken, the Judgment Fund would pay the amount of damages ordered to the NWF. Vermont Yankee's outstanding one-time fee obligation would be reduced by the amount paid.[15] Rather than depriving the NWF of fees due and owing, this accounting

---

[14] PECO was subsequently acquired by Exelon Generation Company, LLC, and Exelon was an intervenor in Alabama Power.

[15] Although the Government has not been provided with the current damages claim for either Vermont Yankee or ENVY, based upon the size of the claims submitted and litigated to date by other spent nuclear fuel plaintiffs, we would expect that any damages award to Vermont Yankee or ENVY would be less than the current one-time fee obligation of approximately $129 million. Proposed Finding of Uncontroverted Fact, ¶ 8.

mechanism would seek to ensure that the total amount due to the NWF is paid. The NWF will not be deprived of any funds that would otherwise be paid into it, and no funds from the NWF will be used to pay the judgment, contrary to Vermont Yankee's concerns.

## III. TO THE EXTENT THAT VERMONT YANKEE'S OBLIGATION TO PAY ITS ONE-TIME FEE IS NOT FOUND TO BE A CONDITION PRECEDENT, THE FINDING OF LIABILITY BASED UPON DOE'S FAILURE TO BEGIN ACCEPTANCE FROM THE INDUSTRY AS A WHOLE IN 1998 IS INAPPROPRIATE

### A. The Delivery Commitment Schedules That Vermont Yankee Submitted To DOE And That DOE Approved Constitute Binding Commitments That Provide A Contractual Basis For Determining Liability In This Case

The delivery commitment schedules submitted by Vermont Yankee, and subsequently approved by DOE, establish that DOE's obligation to accept SNF and/or HLW would have occurred between January 31, 1999 and January 30, 2000. Although Vermont Yankee claims that DOE's delay in beginning SNF acceptance by January 31, 1998, constitutes a partial breach of the Standard Contract, that breach, in and of itself, does not render DOE liable to Vermont Yankee. Nor does it establish that Vermont Yankee has incurred any damages as a result of DOE's alleged breach of the Standard Contract. If the Court denies the Government's motion for summary judgment based upon Vermont Yankee's failure to pay its one-time fee, DOE's contractual liability should be adjudged based upon its inability to accept the amounts of SNF identified in the approved DCSs held by Vermont Yankee.

As explained above, Vermont Yankee submitted for approval DCSs for 1999, 2001, 2002, 2003, 2004, 2005, and 2007. A. 66-73. These DCSs were approved by DOE. A. 74-81. Therefore, prior to 1999, DOE was not obligated to accept Vermont Yankee's SNF. Rather, at most, and assuming that Vermont Yankee paid its one-time fee, DOE had an obligation to accept

Vermont Yankee's SNF and/or HLW in 1999, 2001, and 2002, and then from ENVY thereafter.[16] The entry of liability as of January 1998 is inappropriate under the circumstances of this case.[17]

B. Vermont Yankee's Assertion That The Decisions in *Maine Yankee* and *Northern States* Are Dispositive As To The Issue Of The Date Of DOE's Liability Is Misplaced

In its motion for summary judgment on liability, Vermont Yankee suggests that it was entitled to have DOE begin accepting its SNF by January 31, 1998. Pl. Br. 18. However, any such requirement would completely conflict with the "oldest fuel first" acceptance requirement in the Standard Contract. Moreover, Vermont Yankee asserts that the United States Court of Appeals for the Federal Circuit has "already determined that the Government breached every Standard Contract, when the DOE failed to begin accepting SNF on January 31, 1998" in its decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000). Pl. Br. 18. Vermont Yankee is incorrect. At the time that the Government filed its interlocutory appeal in Maine Yankee in July 1999, all three of the plaintiffs-appellees in that appeal had previously submitted and obtained approval of DCSs that required DOE to begin acceptance of

[16] Because the sale occurred in the middle of 2002, it is unclear which entity, Vermont Yankee or ENVY, owns the rights to the acceptance under the DCS approved for 2002. This uncertainty is yet another reason why the cases should be consolidated.

[17] The fact that Vermont Yankee and ENVY have made identical claims of liability is interesting, given their opposition to consolidation of their respective cases. Rather than recognize, as stated in their opposition to the Government's motion to consolidate, that the Government's liability to each arises in a different time frame – Vermont Yankee up to the date of a valid assignment and ENVY after the date of that assignment – Vermont Yankee and ENVY simply assert that the Government is liable to both of them as holders of the Standard Contract. Because the plaintiffs fail to parse for the Court the respective obligations owed to each of them, the cases should be consolidated to allow determination of these obligations.

specific amounts of their SNF either by January 31, 1998, or January 31, 1999. Accordingly, because the date for DOE to begin acceptance of these plaintiffs-appellees' SNF had already passed, DOE had already committed its partial breach, and no reason existed to note the contractual mechanisms for establishing the specific SNF delivery and acceptance commitments. As a result, unlike this case, the Government did not raise in the Maine Yankee appeal the point concerning the DCS process or the lack of specific commitments absent approved DCSs under the Standard Contract's schedule terms.

Because the Government did not, and did not need to, raise the issue presented here in the Maine Yankee appeal, the Maine Yankee decision does not constitute stare decisis regarding whether DOE partially breached the Standard Contract with regard to the plaintiff in this case. "Stare decisis applies only to legal issues that were actually decided in a prior action" and not to issues that "were not litigated or resolved" in a prior action. Beacon Oil Co. v. O'Leary, 71 F.3d 391, 395 (Fed. Cir. 1995). Because the issues regarding plaintiff's need to submit DCSs and the role of DCSs in the contractual scheme of defining acceptance commitments was not evaluated or decided in Maine Yankee, that decision does not constitute stare decisis regarding that issue and does not, in any event, establish that DOE breached every single Standard Contract on January 31, 1998, in a manner that creates liability to each contract holder.

Vermont Yankee also relies upon the decision of the United States Court of Appeals for the District of Columbia in Northern States Power Co. v. Department of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997), as support for its contention that DOE "had a clear duty to begin accepting SNF by January 31, 1998." Pl. Br. 18. This case arose out of the preliminary decision by the DOE contracting officer, in 1997, that DOE's delay was unavoidable under the "Unavoidable

Delays" clause of the Standard Contract. SA. 58. That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages cause by failure to perform its obligations hereunder, if such failure arises our of causes beyond the control and without the fault or negligence of the party failing to perform." A. 23, 10 C.F.R. § 961.11, Art IX.A (emphasis added). Included in the excusable bases for a failure to perform are delays in the scheduled delivery, acceptance, or transport of SNF arising our of causes beyond the "reasonable control of . . .[the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual capacity." Id. As noted by Vermont Yankee, the Federal Circuit has held that DOE's delay in accepting spent nuclear fuel constitutes a "[f]ailure to perform." Maine Yankee, 225 F.3d. at 1346. Nevertheless, following the contracting officer's issuance of her preliminary determination, the D.C. Circuit issued a writ of mandamus, ordering DOE "to proceed with contractual remedies in a manner consistent with the command of the NWPA that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Northern States, 128 F.3d at 760. The D.C. Circuit, after barring "DOE from concluding that its delay is unvoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," held that the "Unavoidable Delays" clause, "insofar as it is applied to DOE's failure to perform in 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty" and issued its writ to preclude DOE from relying upon that provision. Id. at 760-61. Nevertheless, that obligation runs to the utility industry as a

whole, not specifically to Vermont Yankee. Accordingly, it lends no support to an argument that DOE was obligated to accept Vermont Yankee's SNF by January 31, 1998.[18]

C. Other Decisions Of This Court, Finding That The Delivery Commitment Schedule Provisions Of The Standard Contract Do Not Define The Parties' Delivery And Acceptance Obligations Under The Contract, Render The Contract's Schedule Terms Meaningless And Render The Contract Too Indefinite To Enforce

As the Court may be aware, this Court has issued two published decisions and two unpublished decisions resolving motions regarding the effect of the DCSs in the cases in which they were issued, two of which Vermont Yankee cites in its brief. Pl. Br. 8. In those cases, the Court has either determined that the DCSs are meaningless or have reserved the issue for trial. However, with all due respect, the Court's decisions in those cases do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract and essentially render the contract too indefinite to enforce.

[18] We have consistently argued, most recently in briefing before the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.), that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters) and, further, that the "Unavoidable Delays" clause in the Standard Contract was wholly appropriate and legal. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. The effect of the D.C. Circuit's elimination of at least a portion of this contract clause from the Standard Contract, 14 years after the contract was entered, has a staggering effect upon the United States: rather than excusing DOE's liability for the court of the unavoidable delay, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, further bringing into question the appropriateness of a liability finding here. Nevertheless, because the D.C. Circuit's writ of mandamus is continuing, we are barred from attempting to invoke the "Unavoidable Delays" clause.

The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the rationale of which the Court adopted by unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl. June 26, 2003) (Merow, S.J.), and Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl. April 7, 2004) (Merow, S.J.), rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, could, or will work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court failed to explain how,

given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. The Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in these cases.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented in Indiana Michigan required a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. There is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. SA. 101 (Testimony of Mr. Robert Morgan, Director, Nuclear Waste Policy Act Office). Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

Moreover, the trial court's decisions in all four cases were issued prior to DOE's resumption of the DCS process in 2004, when the repository was still scheduled to begin operations in 2010. Appendix to Plaintiff's Response to Defendant's Motion For Summary Judgment Upon Counts I and II of Plaintiff's Complaint and, In the Alternative, For Partial Summary Judgment Upon Defendant's Right To Recover Unpaid Fees, And Plaintiff's Cross-Motion For Summary Judgment On Liability ("PA"), at 29-42 (filed June 8, 2006). As evidenced by DOE's resumption of this process, the DCS process is the manner in which DOE

intends to administer the contract and schedule SNF acceptance from individual contract holders.[19] If the Court determines that this process is "non-binding and preliminary," it will eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or

---

[19] Moreover, to the extent that Vermont Yankee cites to the resumption of the DCS process in 2004 as evidence regarding the validity of the existing DCSs held by Vermont Yankee, Vermont Yankee has not provided to the Court the letter sent by the DOE contracting officer to Tennessee Valley Authority and provided to other utilities on DOE's website, advising utilities that any new DCSs submitted in response to DOE's request in 2004, would replace, rather than supplement, the existing DCSs. SA. 84-85. As the contracting officer explained in this letter, any changes to existing DCSs would be accomplished only through bilateral modifications, showing that these approved DCSs represent binding commitments that could not be changed without agreement of the contract holder. Id.

language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without

agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

As indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 214 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1981). However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved

DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[20]

In summary, the Court cannot find liability based solely upon DOE's failure to begin acceptance pursuant to the Standard Contract on January 31, 1998, from the industry as a whole. Instead, DOE's liability is properly tied to the commitments it made in approving the DCSs submitted by Vermont Yankee. Absent a determination of no liability based upon Vermont Yankee's failure to pay its one-time fee, the Court should enter a finding of liability based upon these approved DCSs.

---

[20] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

## CONCLUSION

For the foregoing reasons and the reasons set forth in our opening brief, we respectfully request that the Court grant summary judgment in the Government's favor and dismiss Vermont Yankee's breach of contract claims, as set forth in Counts I and II of its complaint. In the alternative, we respectfully request that the Court grant summary judgment in our favor regarding the Government's right to recover Vermont Yankee's one-time fee or to offset it against any judgment in Vermont Yankee's favor. We also request that the Court deny Vermont Yankee's cross-motion for summary judgment upon liability.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Marian E. Sullivan
MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0365
Fax: (202) 307-2503

July 6, 2006

Attorneys for Defendant

# Appendix

DOE/RW-0146

Office of Civilian Radioactive
Waste Management

# Annual Capacity Report

June 1987

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

HQ0002704

HQR-001-2705

This report has been reproduced directly from the best available copy.

Available from the National Technical Information Service, U.S. Department of Commerce, Springfield, Virginia 22161.

Price: Printed Copy
Microfiche A01

Codes are used for pricing all publications. The code is determined by the number of pages in the publication. Information pertaining to the pricing codes can be found in the current issues of the following publications, which are generally available in most libraries: *Energy Research Abstracts, (ERA); Government Reports Announcements* and Index (*GRA* and I); *Scientific and Technical Abstract Reports (STAR);* and publication, NTIS-PR-360 available from (NTIS) at the above address.

DOE/RW-0146

Office of Civilian Radioactive
Waste Management

# Annual Capacity Report

June 1987

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, DC 20585

HQ0002706

HQR-001-2707

**Department of Energy**
Washington, DC 20585

This Annual Capacity Report is the first in a series to be published by the Department of Energy. The report, required by the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, provides, for planning purposes, the projected annual receiving capacity and annual acceptance rankings for the first 10 years of waste management system operations.

The projections in this initial report are based on current plans and best available information; they are not contractually binding. Nevertheless, this first report represents a significant milestone -- it starts the essential process of communicating to owners and generators of spent nuclear fuel and high-level radioactive waste how the Department intends to discharge its responsibilities under the Contract. Even more importantly, it activates a mechanism through which Contract holders can express their views on how the waste management system can achieve maximum efficiency, while assuring equity among the parties. In a full-cost recovery program such as that mandated by the Nuclear Waste Policy Act of 1982, this represents no small challenge.

As the waste management system evolves, we will need to cooperate closely to ensure that the decisions that are made serve us well in the years ahead. I am confident that, together, we will succeed.

Ben C. Rusche

Ben C. Rusche, Director
Office of Civilian Radioactive
Waste Management

*Celebrating the U.S. Constitution Bicentennial — 1787-1987*

HQ0002707

HQR-001-2708

CONTENTS


SUMMARY ........................................................ v

1.0 INTRODUCTION ............................................. 1
1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT ............................. 1
1.2 THE ROLE OF THE ANNUAL CAPACITY REPORT ............ 2
1.2.1 Expanded Scope of the Annual Capacity Report ....................................... 2
1.2.2 The Annual Capacity Report Approach ........ 3
1.2.3 Submittal of Comments on the Annual Capacity Report ........................... 4

2.0 PROJECTED WASTE ACCEPTANCE CAPACITY ..................... 7

3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM ANNUAL ACCEPTANCE CAPACITY ................................... 9
3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY ............................................. 9
3.2 BASIS FOR ACCEPTANCE CAPACITY AVAILABLE FOR ALLOCATION ........................................... 10

4.0 ISSUES WHICH MAY AFFECT ANNUAL ACCEPTANCE CAPACITY, ALLOCATION OF CAPACITY, DELIVERY SCHEDULES, AND ACCEPTANCE CRITERIA ................................... 13
4.1 ANNUAL ACCEPTANCE CAPACITY ........................ 13
4.2 ALLOCATION OF CAPACITY ............................ 14
4.3 DELIVERY SCHEDULES ................................ 14
4.4 ACCEPTANCE CRITERIA ............................... 15

REFERENCES ..................................................... 17

APPENDIX A - ANNUAL ACCEPTANCE RANKING OF DOE CONTRACTS FOR THE DISPOSAL OF SPENT NUCLEAR FUEL .............A.1

APPENDIX B - LISTING OF SPENT NUCLEAR FUEL BY DATE OF DISCHARGE .....................................B.1

SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel (SNF) and/or High-Level Radioactive Waste (HLW) requires the U.S. Department of Energy (DOE) to issue, by July 1, 1987, an Annual Capacity Report (ACR) for planning purposes. The ACR will set forth the projected annual receiving capacity of the Waste Management System (WMS) for 10 years following the expected commencement of facility operation, and the annual acceptance ranking of SNF and/or HLW to be received by the WMS. This report is the first in the series of ACRs to be published by DOE.

The system configuration used as the basis for this report is defined in the Mission Plan Amendment. It includes a Monitored Retrievable Storage (MRS) facility as an integral system component. DOE's proposal for such a facility, as required by Section 141 of the Nuclear Waste Policy Act, was submitted to Congress on March 31, 1987. The illustrative waste acceptance schedule for this configuration reflects the amended first repository schedule and the proposed schedule for the MRS facility. The schedule presumes Congressional approval of DOE's MRS proposal. During the first 10 years of WMS operation, the total quantity of spent fuel that could be accepted is 18,600 metric tons uranium (MTU). By starting WMS operations in 1998, the MRS facility could accept 6000 MTU of spent fuel by the time repository operations are projected to begin in 2003. The allocation of "acceptance rights" is currently based on the projected annual capacity of the WMS to receive SNF and the age of permanently discharged spent fuel as determined from 1985 data provided to the Energy Information Administration by the Purchasers of waste disposal services on the 1986 Nuclear Fuel Data Form, RW-859. The allocations are based on the oldest fuel having the highest priority.

Section 1.0 provides a discussion of the requirement for the ACR and the role the ACR will play in DOE's interaction with the Purchasers in implementing the provisions of the Standard Disposal Contract. The currently projected annual acceptance capacity to be allocated is discussed and presented in Section 2.0. Section 3.0 discusses the procedure and basis for allocation of this capacity (acceptance rights). Allocation will be based on the chronological listing of spent fuel assemblies

and equivalent MTU, as summarized in Appendix A and detailed in Appendix B. Some of the contingencies which may have an impact on Contract implementation and system operation considerations which could affect the projected annual capacity and its allocation are identified in Section 4.0.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982[1] (the Act) assigns responsibility to the Federal Government to provide for the permanent disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy under the Act. Section 302(a) of the Act authorizes the Secretary to enter into contracts* for disposal services with owners or generators** of commercial SNF and/or HLW. The Standard Disposal Contract[2] represents the sole contractual mechanism for DOE disposal of SNF or HLW. It establishes the requirements and operational responsibilities of the signatories in the areas of administrative matters, fees and terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Disposal Contract provides for the acquisition of title to the SNF and HLW by DOE, its transportation and subsequent disposal. Article II of the Contract indicates these services are scheduled to begin "...after commencement of facility operations, not later than January 31, 1998...."

### 1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT

Under the terms of the Standard Disposal Contract [Article IV.B.5(b)], an Annual Capacity Report (ACR) will be issued by DOE, beginning not later than July 1, 1987, setting forth "...the projected annual receiving capacity for the DOE facility(ies) and

---

* Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961.11) which will be referred to as the "Standard Disposal Contract" or "Contract" for subsequent discussion in this report.

** Owners and generators of SNF and HLW who have entered into agreements with DOE for purchase of disposal services are referred to as "Purchasers."

the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." As specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers. The ACR will be published each year through 1990.

Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

## 1.2 THE ROLE OF THE ANNUAL CAPACITY REPORT

DOE recognizes that the Standard Disposal Contract may not provide sufficient detail and guidance to enable DOE and the Purchasers to carry out all of their contractual responsibilities and/or for the Purchasers to make certain spent fuel management decisions. Additional information, beyond that required by the Contract, could facilitate long-range waste management planning. Consequently, future ACRs will be expanded to include documentation of the resolution of Contract-related issues and WMS decisions which might affect the Purchasers' planning and operational decisions.

### 1.2.1 Expanded Scope of The Annual Capacity Report

This report identifies several topics that go beyond the scope of the ACR reporting requirements. Additional Contract guidance may be needed to fully address such issues as the criteria and procedures for acceptance of consolidated SNF, fuel storage containers, nonfuel-bearing components, or dual-purpose casks. DOE also expects to develop and report on procedures for submittal and criteria for approval of Delivery Commitment

Schedules, exchanges of approved Delivery Commitment Schedules, Final Delivery Schedules, and criteria for evaluation of requests for emergency deliveries and changes to the acceptance priority.

In addition, DOE will identify issues and system considerations which could affect annual acceptance capacity. For example, capacity used to accommodate changes in SNF quantities resulting from the Contract's provision for a 20 percent adjustment to approved Delivery Commitment Schedules would reduce the capacity available for allocation. DOE will also address instances when overall WMS efficiency considerations may affect delivery quantities. If it is determined that casks used for shipping SNF need to be fully loaded when accepted for transport, reductions in the acceptance capacity available for allocation to some Purchasers in a given year may be required. In the interest of operational efficiency, it may also be appropriate to delay the acceptance of SNF/HLW which requires special handling. Such delays would not result in changes to the acceptance ranking.

DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated WMS derives, in part, from decisions yet to be made by Congress. DOE has presented the appropriate issues to Congress in the form of the OCRWM Mission Plan Amendment.[3]

DOE also recognizes that the development of procedures for effective and equitable implementation of the WMS is an iterative process that requires the cooperative efforts of both DOE and the Purchasers. DOE intends to work with the Purchasers or their representatives to develop these procedures and to issue appropriate guidance to Purchasers for their use in planning for at-reactor storage and ultimate delivery of SNF/HLW to the WMS. This ACR is intended as a major step in that process.

### 1.2.2 The Annual Capacity Report Approach

Since the configuration and operational details of the WMS are still at the stage of conceptual design, this initial ACR uses a projected waste acceptance schedule for an illustrative

system configuration as defined in the Mission Plan Amendment (discussed in Section 2.0). The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal[4] and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

DOE is required to accept all SNF and HLW for permanent disposal. However, since acceptance capacity is limited in any given year, a ranking or sequencing process is necessary for allocating available capacity. Using the "oldest fuel first" (OFF) criterion (discussed in Section 3.0), the ranking is based on 1985 date-of-discharge data supplied to the Energy Information Administration (EIA) by the Purchasers on the 1986 Nuclear Fuel Data Form, RW-859. Tables in Appendix A list the Purchasers and their quantities of SNF for each year based on this ranking and current estimates of the available waste acceptance capacity. The table in Appendix B lists eligible SNF (that SNF currently included in contracts with DOE) for the same 10-year period.

DOE has begun the process of identifying issues or questions that need to be resolved for efficient and equitable waste acceptance. The identification and resolution of these issues is expected to be a cooperative and interactive effort between DOE and the Purchasers. It is expected that mutual understanding of issues and their impacts will strengthen the waste management planning base and will result in system improvements. Subsequent ACRs will document the progress made in issue resolution. If such resolutions require Contract interpretations, clarifications or amendments, the Contracting Officer would then initiate the appropriate contractual action. In those cases where adoption of a change would not be consistent with the Contract, formal rulemaking procedures would be followed.

### 1.2.3 Submittal of Comments on the Annual Capacity Report

Written comments are requested, specifically from the Purchasers, on the content of this initial ACR. Comments received will be used to identify issues that need to be addressed and will be considered in the development of the following year's ACR. The data in Appendix B, used for the

acceptance ranking and annual allocations in this report, reflect DOE's interpretation of the information supplied by the Purchasers on the Form RW-859. Purchasers are urged to carefully review the data in Appendix B.

Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management
U.S. Department of Energy
RW-13
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 PROJECTED WASTE ACCEPTANCE CAPACITY

The waste acceptance schedule in this ACR is consistent with the schedule from the Mission Plan Amendment.* This schedule is only an approximation of how the system may operate and is subject to uncertainties that are recognized in the Mission Plan Amendment. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses. The schedule will serve as a basis for planning and will be updated annually consistent with the latest forecasts of waste disposal requirements. The projected waste acceptance schedule for the first 10 years of operations is summarized in Table 2.1.

TABLE 2.1

Illustrative Waste Acceptance Schedule for the First 10 Years of Facility Operation

| Year | System Receipt Rate Metric Tons Uranium (MTU) |
|---|---|
| 1998 | 1,200 |
| 1999 | 1,200 |
| 2000 | 1,200 |
| 2001 | 1,200 |
| 2002 | 1,200 |
| 2003 | 2,000 |
| 2004 | 2,650 |
| 2005 | 2,650 |
| 2006 | 2,650 |
| 2007 | 2,650 |
| | 18,600 |

Source: OCRWM Mission Plan Amendment (DOE/RW-0128), June 1987 (extracted from Appendix F, Table F-1).

* The waste acceptance schedule for HLW is not included since the Mission Plan Amendment does not specify acceptance of HLW during the 10-year period covered by this report.

The number of Purchasers whose Final Delivery Schedules may be accommodated in any given year will be constrained by the capacity of the WMS to accept SNF. The acceptance capacity available for allocation to the Purchasers will equal the system operating capacity, unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the Contract's 20 percent adjustment provision, and cask loading considerations. To the extent that such capacity would be needed, the remaining acceptance capacity available for allocation to Purchasers in a given year would be reduced. For purposes of this initial ACR, acceptance capacity is assumed to equal the system operating capacity, as shown in Table 2.1.

## 3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM ANNUAL ACCEPTANCE CAPACITY

Acceptance capacity allocation in this report is based on the oldest fuel having the highest priority (OFF). An example of the results of this allocation using the first 10 years of the illustrative waste acceptance schedule is presented in Appendix A.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process assigns WMS annual acceptance capacity to the Purchasers. The Standard Disposal Contract stipulates that this allocation will be based on an OFF priority. The age of a particular fuel assembly discharged from a specific reactor determines the Purchaser's acceptance "rights" expressed in equivalent metric tons uranium (MTU) of acceptance capacity. The SNF data used as the basis for allocating annual acceptance rights include both the historical data on SNF discharges available through December 1985 and Purchaser projections of future SNF discharges through 2007.

The SNF assemblies were first listed in order of date of discharge* from the reactor (see Appendix B) consistent with the Standard Disposal Contract provisions [Article IV.B.5(a)] for acceptance priority based on OFF. The "date of discharge" of an assembly was assumed to be the date the reactor went subcritical prior to discharge. All SNF, regardless of its subsequent classification for delivery,** qualifies for acceptance rights based on an OFF priority.

---

* Since the day of the month of discharge was not supplied for 35 percent of the SNF listed in the 1985 data base, only the month and year of discharge were used for ordering. For this ACR, where the month and year were the same for more than one reactor, the order was randomly selected.

** The Standard Disposal Contract requires the Purchaser to classify SNF prior to delivery in accordance with the classification definitions of Appendix E of the Contract.

After the SNF was listed by date of discharge, it was divided into groupings whose totals were consistent with the annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The results are presented in Appendix A.

The exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate both the Purchasers' and DOE's operational requirements. Grouping the listing of Purchasers into annual capacity segments provides a basis for initiating planning for delivery. The tables, therefore, list the Purchasers alphabetically with a sublisting of the reactors that were the source of the qualifying SNF assemblies, the number of qualifying assemblies, and their equivalent MTU (acceptance rights).

3.2 BASIS FOR ACCEPTANCE CAPACITY AVAILABLE FOR ALLOCATION

The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the Purchasers. The projected WMS capacity equals the system operating capacity unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the 20 percent adjustment provision, or cask loading considerations, as discussed in Section 2.0. Section 4.0 provides a discussion of the potential impacts of such contingencies.

This initial ACR does not assign priority to non-light-water reactor spent fuel, Federally owned SNF being used for research and development activities, HLW, nonfuel-bearing wastes, or SNF from future Purchasers. If required, adjustments to priority listings, resulting from the inclusion of these wastes, will be reported in future ACRs.

Appendix B contains more data than are required for the priority listing and annual capacity allocation. However, as the WMS develops, the accuracy of these data will become more important since they reflect DOE's interpretation of information

in Form RW-859. The data will also be used to establish compatibility between the Purchasers' transport requirements and DOE's transportation system.

## 4.0 ISSUES WHICH MAY AFFECT ANNUAL ACCEPTANCE CAPACITY, ALLOCATION OF CAPACITY, DELIVERY SCHEDULES, AND ACCEPTANCE CRITERIA

Many issues will require analysis and resolution to ensure optimization of the waste acceptance process and the WMS. This section identifies selected examples of these issues. DOE plans to evaluate alternative solutions for these issues and examine their potential impacts on the Purchasers and the overall efficiency of the WMS.

### 4.1 ANNUAL ACCEPTANCE CAPACITY

Annual acceptance capacity is dependent on the annual receiving capacity of the WMS that is ultimately developed. The Standard Disposal Contract does not specify the annual acceptance capacity that will be available for allocation. Thus, the WMS acceptance schedule presented as the basis for the Acceptance Priority Ranking due in 1991 may differ from the illustrative waste acceptance schedule presented in this initial ACR. Any changes could affect the annual acceptance capacity available for allocation.

The introduction of a Federal Interim Storage (FIS) facility into the WMS, although not presently anticipated by DOE, could also have an impact on the annual acceptance capacity available to Purchasers during the early years of facility operation. All acceptance schedules would be affected since the Act requires that all SNF stored at an FIS facility (up to 1900 MTU) be shipped to the first receiving facility (repository or MRS) within 3 years of the start of operations of that facility. In this case, allocation of acceptance capacity to the Purchasers could be reduced by the acceptance capacity required to serve the FIS facility during this 3-year period.

In its proposal for the construction of an MRS facility, DOE has asked Congress to limit the MRS storage capacity to 15,000 MTU and to prohibit receipt of SNF at an MRS until the Nuclear Regulatory Commission (NRC) has authorized construction of the first repository. These provisions were requested to emphasize that the MRS facility is an integral part of the WMS and is not

intended to become a substitute for a permanent repository. If Congress adopts the DOE-proposed provisions, and if the NRC authorization to construct a repository is not received by the time the MRS facility becomes operational, the WMS would be unable to accept any SNF in 1998. Under such circumstances, the current DOE position, as stated in the Mission Plan Amendment, is that utilities will continue to be responsible for storing their SNF.

## 4.2 ALLOCATION OF CAPACITY

The Standard Disposal Contract makes provisions for granting acceptance priority for emergency deliveries of SNF. The Contract also provides the Purchasers with the right to adjust the SNF quantities proposed for delivery in their Delivery Commitment Schedules by ± 20 percent. However, no guidance on establishment of an acceptance capacity reserve for such contingencies has been specified. Establishment of an acceptance capacity reserve would result in a reduction in the annual capacity available for allocation to the Purchasers and may affect the year in which the Purchasers are served.

The Contract makes no provisions for the minimum amount of SNF that DOE will accept and transport in a given period. For this report, the system acceptance capacity has been defined and allocated on an annual (12-month) basis for planning and analysis purposes. Operational considerations may suggest a more efficient method of allocation and subsequent delivery--such as 18- to 24-month periods or other methods to approximate reactor discharge patterns. While the SNF priority listings would not change under such alternatives, larger quantities of acceptance rights would accrue to the Purchasers over a longer time interval. This approach may reduce the impact on the Purchasers at the reactor sites as well as minimize the handling equipment changes at the DOE receiving facility, while maximizing the use of the cask fleet.

## 4.3 DELIVERY SCHEDULES

The Contract requires DOE to provide casks and transportation of SNF from the Purchaser's site to the DOE facility. System operating efficiencies may indicate that SNF shipping casks

should be fully loaded when accepted by DOE for transport. If a Purchaser's allocated acceptance rights are not compatible with the capacities of the cask(s), minor adjustments to the quantities of SNF listed in the delivery schedules may be required. The resulting increase or decrease in the actual quantity of SNF delivered may affect future allocations and require adjustments to schedules for other Purchasers.

The Contract also makes provision for the possible priority acceptance of SNF from reactors that have reached the end of their useful life or that have been permanently shut down for whatever reason. The granting of such priority would result in a reordering of the Final Delivery Schedules.

## 4.4 ACCEPTANCE CRITERIA

The Standard Disposal Contract states that "DOE will first accept from Purchaser the oldest SNF/HLW for disposal in the DOE facility ..." [Article VI.B.1(a)], unless otherwise requested by the Purchaser in accordance with Article VI.B. Further evaluation of WMS performance and Purchaser fuel management considerations is required to determine the basis for DOE approval of modifications to this guidance.

The Contract states that delivery of SNF designated by the Purchaser as other than standard SNF will be subject to confirmation of handling procedures and delivery schedules. Since it is possible that not all nonstandard and/or failed SNF will require special handling by the WMS, it may be unnecessary to subject all such fuel to special handling procedures and delivery schedules. Consequently, DOE must establish specific criteria identifying which fuel will require special handling and define procedures for acceptance of such fuel.

The Contract states that DOE is to provide specifications on Purchaser-furnished canisters for containment of failed fuel, but additional criteria compatible with the needs of both DOE and the Purchasers have yet to be developed. Similarly, no criteria have been established for the acceptance of consolidated SNF or nonfuel-bearing components or for their associated canister configurations.

The Contract states that the Purchasers have the right to exchange approved Delivery Commitment Schedules, with DOE's approval. However, if exchanges result in substitutions of such characteristics as fuel age, fuel type (PWR/BWR), or transport mode (rail/truck), system efficiencies may be affected. Further study is needed to evaluate system impacts and establish criteria for DOE approval/disapproval of exchange requests.

## REFERENCES

1. Public Law 97-425, "Nuclear Waste Policy Act of 1982," (January 7, 1983).

2. U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," Code of Federal Regulations, Title 10, Part 961, (1986).

3. U.S. Department of Energy, OCRWM Mission Plan Amendment, DOE/RW-0128, Washington, D.C., (June 1987).

4. U.S. Department of Energy, Monitored Retrievable Storage Submission to Congress, DOE/RW-0035/1-Rev 1, Washington, D.C., (1987).

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

**December 1991**

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*

Available from:

**U.S. Department of Energy**
Office of Scientific and Technical Information
Post Office Box 62
Oak Ridge, TN 37831

HQ0003589



HQR-002-0798

DOE/RW-0331P

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

***December 1991***

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

HQ0003590

CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT . . . . . . . . . . . . 1

1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES . . . . . . . . . . . . . . 2

1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . 2

2.0 WASTE ACCEPTANCE PROJECTIONS . . . . . . . . . . . . . . . . . . 4

3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . . . . . 6

3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY . . . . 6

3.2 DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . 7

4.0 ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . . . . . . . . . 10

4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS . . . . . . . . . . 10

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . A.1

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . B.1

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) requires the Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. This report is the fourth in the series published by DOE. In December 1991, the Department published the 1991 Acceptance Priority Ranking (APR) that established the order in which the Department will allocate acceptance capacity. As required by the Standard Contract, the priority ranking for acceptance capacity is based on the date the spent nuclear fuel (SNF) was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR, resulting in individual Purchaser allocations. These allocations are listed in Appendix A and summarized in Table 3.1

The projected waste acceptance rates for SNF presented in Table 2.1 assume: a site for a Monitored Retrievable Storage (MRS) facility will be obtained and the facility will initiate operations in 1998; and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy of 1982, as amended (NWPA) will be modified. During the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA. The annual acceptance rates provide an approximation of the system throughput and are subject to change as the program progresses. The ACR allocates only that portion of the FWMS capacity assigned to SNF originating from reactors and covered by the Standard Contract and DOE-owned SNF from commercial industry and civilian development programs.

Section 1.0 provides a discussion of the requirement for the ACR and the role it plays in the Department's interaction with the Purchasers in implementing the provisions of the Standard Contract. The FWMS projected

acceptance schedule is presented in Section 2.0. Section 3.0 discusses the basis and procedure for allocating acceptance capacity to each Purchaser, summarizes the annual allocations for the ten year period covered by this report, and addresses Delivery Commitment Schedules. A description of the ACR issue resolution process and a report on its current status are contained in Section 4.0. Annual acceptance capacity allocations to each Purchaser are listed in Appendix A. Appendix B, extracted from the APR, is a detailed listing of the SNF by date of permanent discharge.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982, as amended (NWPA)[1] assigns the Federal Government responsibility for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy (Secretary) under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] (Standard Contract) established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the parties to the Standard Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 PURPOSE OF THE ANNUAL CAPACITY REPORT

Under the terms of the Standard Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance capacity allocations to the Purchasers for ten years following the projected commencement of DOE facility operations. Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers. As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961).

**Owners or generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers."

Purchasers. Beginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter. The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser.

## 1.2 STAFF-TO-STAFF TECHNICAL EXCHANGES

DOE and the Purchasers recognized that there is a need for coordination in the implementation of the provisions of the Standard Contract in order for both parties to carry out all of their responsibilities. Identification and resolution of Standard Contract-related issues and the development of procedures for the effective and equitable implementation of the FWMS are elements of an iterative process that requires the cooperative efforts of both parties. In the 1987 ACR[3], DOE offered to cooperate with the Purchasers to identify, prioritize, and evaluate solutions to issues of mutual concern arising from implementation of the Standard Contract. Interactions to date with representatives of Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing sixty-four of the sixty-six owners or generators of commercial SNF, indicate a desire by both DOE and the Purchasers to continue these staff-to-staff technical exchanges. The status of these exchanges is presented in Section 4.0.

## 1.3 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of this ACR. Comments received on previous ACRs were used to identify issues that needed to be addressed by DOE and the Purchasers in the

implementation of the Standard Contract provisions. Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management, RW-432
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 WASTE ACCEPTANCE PROJECTIONS

The waste acceptance projections used in this ACR are representative of a FWMS configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998...." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or a geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. Under current conditions, the owners and generators of SNF will

continue to be responsible for storing their spent fuel until acceptance by DOE.

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

## 3.0 ALLOCATION OF THE FEDERAL WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY

DOE is required to accept for disposal all commercial SNF/HLW from owners or generators, as prescribed by the NWPA. However, since acceptance capacity will be limited in any given year, an acceptance priority ranking is established in the Standard Contract to allocate the projected acceptance capacity to individual Purchasers. The ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. Tables in Appendix A list the Purchasers' annual allocations for each of the first ten years of projected FWMS operation. The table in Appendix B is extracted from the 1991 Acceptance Priority Ranking (APR) and chronologically lists the SNF which provides the basis for the allocation of acceptance capacity. Table 3.1 presents a summary of Purchasers' annual allocations for the ten year period covered by this report.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process apportions projected acceptance capacity to the Purchasers on an annual basis. The priority for acceptance capacity allocation is based on the 1991 APR. The permanent discharge date for each spent fuel assembly is the basis for determining the Purchasers' positions in the APR. Acceptance capacity allocated in the ACR is expressed in terms of MTU. All SNF, regardless of its subsequent classification for delivery,* qualifies for an allocation based on an OFF priority on an industry-wide basis. There are currently no procedures for assigning priority ranking to non-fuel components or high-level radioactive waste. Priority ranking has not been afforded to temporarily discharged fuel or to projected SNF discharges.

*The Standard Contract (Appendix E) requires the Purchaser to classify SNF as standard, nonstandard and/or failed SNF prior to delivery.

After the SNF was listed in accordance with the APR, it was divided into ten groupings, each of whose cumulative MTU equals the projected annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The Purchasers' allocations for each year are presented in Tables A.1 through A.10 in Appendix A.

The tables in Appendix A list the owners of the SNF alphabetically, with a sublisting of the reactors that were the source of the qualifying SNF by the number of assemblies and their equivalent MTU. The exact order of deliveries within each year will not be specified until the Purchasers' Final Delivery Schedules (FDS) are approved by DOE.

As in past ACRs, allocations in the 1991 ACR are based on a 1-year allocation period. DOE continues to investigate the impacts on the system of expanding these allocation periods from eighteen to thirty-six months. Use of expanded allocation periods could result in a reduction in the frequency of deliveries when serving each Purchaser. Final results of this study are not yet available. DOE will keep Purchasers apprised of the results of this analysis.

3.2 <u>DELIVERY COMMITMENT SCHEDULES</u>

The Standard Contract provides that beginning January 1, 1992, Purchasers shall submit to DOE DCSs that identify all SNF the Purchasers plan to deliver to DOE beginning sixty-three months thereafter. Due to the limited projected annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year may be approved.

A summary of Purchaser allocations is presented in Table 3.1. These allocations are the basis for DCS submittals. Among other things, the DCS identifies the range of discharge dates from which the SNF will ultimately be selected for delivery. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation. DCS forms and instructions will be sent to Purchasers in early 1992.

The information contained on the Purchasers' approved DCSs will assist DOE in implementing the waste acceptance process. Approved DCSs will be the basis for the Purchasers' FDSs, to be submitted twelve months prior to delivery. As provided in Article V of the Standard Contract, the Purchasers also have the right to exchange approved DCSs with other Purchasers, subject to DOE approval.

TABLE 3.1 SUMMARY OF PURCHASERS' ANNUAL ALLOCATIONS (MTU)

| PURCHASER | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA POWER COMPANY | -- | -- | -- | -- | -- | 21.1 | -- | -- | 24.4 | 12.9 | 58.4 |
| ARIZONA PUBLIC SERVICE COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ARK POWER & LIGHT COMPANY | -- | -- | -- | 23.2 | 28.2 | -- | 30.1 | -- | 46.4 | -- | 127.9 |
| BABCOCK AND WILCOX COMPANY | -- | -- | <0.1 | <0.1 | -- | -- | -- | -- | -- | -- | <0.1 |
| BALTIMORE GAS & ELEC COMPANY | -- | -- | -- | 12.6 | 41.4 | 28.5 | 52.1 | -- | 55.3 | 29.5 | 219.3 |
| BOSTON EDISON COMPANY | -- | 3.9 | 25.4 | 82.6 | -- | -- | 11.4 | 5.5 | -- | 42.7 | 171.5 |
| CAROLINA POWER & LIGHT COMPANY | -- | 70.1 | 24.3 | 23.7 | 50.4 | 32.0 | 20.6 | 93.1 | -- | 49.5 | 363.7 |
| CLEVELAND ELEC ILLUM COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| COMMONWEALTH EDISON COMPANY | 21.1 | 60.4 | 153.8 | 121.0 | 163.8 | 175.3 | 66.8 | 107.8 | 98.2 | 98.2 | 1066.4 |
| CONNECTICUT YANKEE ATOMIC POWER | 65.5 | 22.5 | 19.8 | 21.8 | 21.8 | 20.2 | -- | 21.8 | -- | 21.8 | 215.1 |
| CONSOLIDATED EDISON COMPANY | 2.9 | 27.7 | 32.7 | -- | 27.0 | -- | 28.3 | 2.3 | 22.2 | -- | 143.0 |
| CONSUMERS POWER COMPANY | -- | 2.5 | 87.3 | 2.7 | 27.3 | 3.5 | 26.5 | -- | 2.8 | 30.8 | 183.4 |
| DAIRYLAND POWER COOP | 0.7 | 6.0 | 3.0 | 3.9 | -- | 3.4 | -- | -- | 1.4 | 3.3 | 21.7 |
| DETROIT EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. DOE | 18.1 | 11.1 | 3.2 | 4.5 | 7.3 | 72.8 | 16.3 | -- | 3.3 | 19.9 | 156.5 |
| DUKE POWER COMPANY | -- | 24.8 | 47.6 | 62.4 | 58.3 | 56.1 | 61.1 | 31.5 | 63.5 | 66.3 | 471.7 |
| DUQUESNE LIGHT COMPANY | -- | -- | -- | -- | -- | -- | 16.6 | -- | -- | 24.4 | 41.0 |
| FLORIDA POWER & LIGHT COMPANY | -- | 20.8 | 37.0 | 40.4 | 32.8 | 40.8 | 71.3 | 33.1 | 52.1 | 37.6 | 366.1 |
| FLORIDA POWER CORP | -- | -- | -- | -- | 1.4 | -- | 26.0 | 20.4 | -- | 30.1 | 78.0 |
| G. E. URANIUM MGT. CORP | 145.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 145.0 |
| GENERAL ATOMICS | <0.1 | <0.1 | -- | -- | <0.1 | -- | -- | <0.1 | <0.1 | <0.1 | <0.1 |
| GEORGIA POWER COMPANY | -- | -- | -- | 0.7 | 4.5 | -- | 35.2 | -- | 56.4 | 15.2 | 112.1 |
| GPU NUCLEAR | 31.1 | 43.0 | 46.8 | 49.4 | 33.9 | 55.2 | -- | 27.6 | -- | -- | 286.9 |
| GULF STATES UTILITIES | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| HOUSTON LIGHTING & POWER | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ILLINOIS POWER COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| INDIANA & MICH ELEC COMPANY | -- | -- | -- | 28.5 | 29.1 | -- | 62.4 | 27.9 | 69.7 | -- | 217.6 |
| IOWA ELEC LIGHT & POWER COMPANY | -- | -- | 15.4 | 13.9 | 21.8 | 0.8 | -- | 16.5 | 15.5 | -- | 83.8 |
| KANSAS GAS AND ELECTRIC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LONG ISL LIGHT COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| LOUISIANA POWER AND LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| MAINE YANKEE ATOMIC | -- | 26.3 | 57.9 | 27.2 | -- | 50.6 | -- | 26.2 | 28.2 | -- | 216.5 |
| MISSISSIPPI POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NEBRASKA PUB POWER DIS | -- | -- | -- | 23.5 | 13.8 | -- | 31.2 | 28.7 | 21.0 | -- | 118.1 |
| NHY DIVISION OF PSNH | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| NIAGARA MOHAWK POWER CORP | 9.3 | 49.0 | 38.8 | 30.7 | -- | 31.1 | -- | -- | 36.8 | -- | 195.8 |
| NORTHEAST UTIL SVC COMPANY | 5.4 | 40.6 | 28.2 | 24.3 | 41.9 | 26.5 | 28.1 | 59.1 | -- | 28.3 | 282.4 |
| NORTHERN STATES POWER COMPANY | -- | 26.1 | 83.5 | 29.8 | 33.9 | 17.5 | 32.5 | 43.2 | 35.7 | 16.0 | 318.3 |
| OMAHA PUB POWER DIST | -- | -- | 9.3 | 12.8 | 18.9 | 16.4 | -- | 14.7 | -- | 14.6 | 86.7 |
| PACIFIC GAS AND ELECT | 7.2 | 6.1 | 2.6 | 13.0 | -- | -- | -- | -- | -- | -- | 28.9 |
| PENNSYLVANIA POWER & LIGHT | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PHILADELPHIA ELEC COMPANY | -- | -- | 36.3 | 68.0 | 47.7 | 48.7 | 51.6 | 51.3 | 40.5 | 50.7 | 394.9 |
| PORTLAND GENERAL ELEC | -- | -- | -- | -- | 0.5 | -- | -- | 24.4 | 16.1 | 17.5 | 58.4 |
| POWER AUTH OF NY STATE | -- | -- | -- | 25.8 | 3.7 | 51.1 | 34.7 | 30.0 | -- | 69.8 | 215.0 |
| PUB SVC COMPANY OF COLORADO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| PUB SVC ELEC & GAS COMPANY | -- | -- | -- | -- | -- | -- | 17.5 | 29.4 | -- | 25.8 | 72.7 |
| ROCHESTER GAS & ELEC | 32.0 | 4.6 | 24.4 | 16.0 | 16.1 | 15.7 | -- | 14.1 | 5.9 | 6.7 | 135.5 |
| SACRAMENTO MUNICIP UTIL DISTR | -- | -- | -- | 9.3 | -- | 25.9 | -- | 30.1 | 18.9 | -- | 84.2 |
| SOUTH CAROLINA ELEC & GAS CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| SOUTHERN CALIF EDISON COMPANY | 35.6 | 20.5 | 19.3 | 19.2 | -- | 19.2 | -- | 19.2 | -- | -- | 132.9 |
| TENNESSEE VALLEY AUTHORITY | -- | -- | -- | -- | 58.6 | 5.5 | 115.5 | 65.9 | 116.1 | 52.3 | 414.0 |
| TEXAS UTILITIES GENERATING CO | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| TOLEDO EDISON COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | 25.0 | 25.0 |
| UNION ELEC COMPANY | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| VERMONT YANKEE NUCLEAR POWER CORP | -- | 72.8 | -- | 11.9 | 8.6 | 27.4 | 25.6 | 16.9 | -- | 22.1 | 185.5 |
| VIRGINIA POWER | -- | 8.2 | 69.4 | 43.9 | 54.7 | 20.1 | 23.4 | 32.9 | 29.0 | 52.8 | 334.3 |
| WASH PUB POWER SUPPLY SYSTEM | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| WISCONSIN ELEC POWER COMPANY | 16.3 | 43.0 | 19.8 | 27.1 | 36.7 | 24.8 | 10.0 | 12.8 | 16.1 | 21.7 | 228.4 |
| WISCONSIN PUB SVC CORP | -- | -- | 4.4 | 17.6 | 16.0 | -- | 5.2 | 13.2 | 16.4 | 14.5 | 87.4 |
| YANKEE ATOMIC ELEC COMPANY | 9.8 | 10.1 | 9.7 | 8.6 | -- | 9.4 | -- | -- | 8.5 | -- | 56.1 |
| TOTAL | 400 | 600 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 8200 |

## 4.0 ACR ISSUE RESOLUTION PROCESS

In the 1987 ACR, DOE indicated that many Standard Contract-related issues will require analysis and resolution so that the FWMS can achieve maximum efficiency while attempting to assure equity among the parties. EEI/UWASTE and USCEA established an ACR Committee to represent the Purchasers in staff-to-staff technical exchanges with DOE. The ACR Committee is represented by an ACR Response Team in its interactions with DOE. DOE and the Purchasers' representatives initiated a cooperative effort in 1987, in response to an offer by DOE, to address and ultimately develop recommendations for resolution of Standard Contract-related issues. The dual objectives of this process are to retain SNF/HLW management flexibility and equity among the Purchasers while providing for the effective and economical functioning of the FWMS.

### 4.1 STATUS OF THE ACR ISSUE RESOLUTION PROCESS

DOE has prepared a list of thirty-four Standard Contract-related issues that are under consideration by the ACR Response Team. In May 1989, DOE submitted preliminary draft discussion papers to the ACR Response Team for review and comment. These papers discussed several issues, including canister specifications, classification of SNF for delivery, DOE acceptance of multi-element sealed canisters and transportable storage casks, failed fuel, and waste selection for delivery.

DOE met with the ACR Response Team in November 1989 to discuss the issue of waste selection for delivery and in March 1990 to discuss the Purchasers' position on proposed canister specifications.

In October 1990, the ACR Response Team met with DOE and presented the Purchasers' positions on seven of the original thirty-four issues. The ACR Response Team indicated that these positions represented the consensus, not necessarily unanimous, non-binding views of the Purchasers. The issues addressed were: clarification of the phrase "all SNF" as applied to DCS

instructions; whether Purchasers should be subject to sanctions for improperly described SNF after DOE acceptance; the Purchaser two-month and ±20 percent flexibility clause in the Standard Contract's DCS/FDS process; whether the ACR and FDS should be adjusted to accommodate for full cask loads; whether acceptance priority should be provided for emergency deliveries and shutdown reactors; and the use of Nuclear Waste Fund (NWF) monies for capital improvements to Purchasers' facilities. In June 1991, the ACR Response Team submitted their consensus positions on eleven additional issues. DOE is evaluating the Purchasers' responses to all eighteen issues.

## REFERENCES


1. "Nuclear Waste Policy Act of 1982," Public Law 97-425 (January 7, 1983) and the "Nuclear Waste Policy Amendments Act of 1987," Title V, Subtitle A, Public Law 100-203 (December 22, 1987).

2. U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," *Code of Federal Regulations*, Title 10, Part 961 (1990).

3. U.S. Department of Energy, *Annual Capacity Report*, DOE/RW-0146, Washington, D.C. (June 1987).

DOE/RW-0328P

# 1991 Acceptance Priority Ranking

December 1991

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

HQ0006854

The following number is for OCRWM Records Management purposes only and should not be used when ordering this publication.

Accession No: HQO•911211•0001

HQ0006855

DOE/RW-0328P

# 1991 Acceptance Priority Ranking

December 1991

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, DC 20585

HQ0006856

## SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) that the Department of Energy (DOE) has executed with the owners and generators of civilian spent nuclear fuel requires annual publication of the Acceptance Priority Ranking (APR). The 1991 APR details the order in which DOE will allocate Federal waste acceptance capacity. As required by the Standard Contract, the ranking is based on the age of permanently discharged spent nuclear fuel (SNF), with the owners of the oldest SNF, on an industry-wide basis, given the highest priority.

The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of Federal waste management facility operations may submit Delivery Commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

This document is based on SNF discharges as of December 31, 1990, and reflects Purchaser comments and corrections, as appropriate, to the draft APR issued on May 15, 1991. It should be noted that the ranking in the 1991 APR is subject to change for several reasons. First, if assemblies currently in the ranking are reinserted into the reactor, they will be removed from the ranking and added to the queue when they are permanently discharged. Second, for Purchasers who have informed DOE of assembly status changes in the comments on the draft APR, formal revisions to their existing Form RW-859 or Annex B to Appendix G of the Standard Contract must be submitted as appropriate or their ranking in the 1992 APR will revert back to the ranking reflected in the draft APR. Finally, because of variations in individual utility RW-859 reporting schedules, the final year's discharges reported in the APR will be subject to correction. Future editions of the APR will reflect SNF discharges beyond December 31, 1990.



HQ0006857

1991 ACCEPTANCE PRIORITY RANKING

LISTING OF SPENT NUCLEAR FUEL BY DATE OF PERMANENT DISCHARGE[1,2]

| PURCHASER | FUEL ORIGINATOR | STORAGE LOCATION | TYPE[3] | DISCHARGE DATE[4] | # OF ASMB | MTU | CUMULATIVE TOTAL MTU |
|---|---|---|---|---|---|---|---|
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 67 11 30 | 1 | < 0.001 | < 0.01 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 67 12 31 | 7 | 0.001 | < 0.01 |
| *U.S. DOE | BIG ROCK 1 | WEST VALLEY | BWR | 68 06 21 | 5 | 0.638 | 0.64 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 68 10 31 | 1 | < 0.001 | 0.64 |
| *U.S. DOE | BIG ROCK 1 | WEST VALLEY | BWR | 69 04 18 | 1 | 0.113 | 0.75 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 1 | DRESDEN 2 | BWR | 69 09 06 | 39 | 3.969 | 4.72 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 1 | DRESDEN 3 | BWR | 69 09 06 | 55 | 5.632 | 10.35 |
| *CONNECTICUT YANKEE ATOMIC POWER | HADDAM NECK | MORRIS | PWR | 70 04 17 | 51 | 21.441 | 31.79 |
| MORRIS OPERATION | DRESDEN 2 | MORRIS | BWR | 70 06 05 | 29 | 5.569 | 37.36 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | MORRIS | PWR | 70 10 02 | 48 | 17.575 | 54.94 |
| *U.S. DOE | GINNA | WEST VALLEY | PWR | 71 02 04 | 12 | 4.586 | 59.52 |
| MORRIS OPERATION | DRESDEN 2 | MORRIS | BWR | 71 02 26 | 215 | 41.528 | 101.05 |
| *CONNECTICUT YANKEE ATOMIC POWER | HADDAM NECK | HADDAM NECK | PWR | 71 04 16 | 23 | 9.687 | 110.74 |
| *CONNECTICUT YANKEE ATOMIC POWER | HADDAM NECK | MORRIS | PWR | 71 04 16 | 29 | 12.213 | 122.95 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 71 05 31 | 8 | 0.001 | 122.95 |
| PACIFIC GAS AND ELECT | HUMBOLDT BAY | HUMBOLDT BAY | BWR | 71 06 05 | 40 | 3.054 | 126.01 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 71 06 30 | 1 | < 0.001 | 126.01 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 1 | DRESDEN 2 | BWR | 71 09 10 | 63 | 6.447 | 132.46 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 1 | DRESDEN 3 | BWR | 71 09 10 | 49 | 5.050 | 137.51 |
| *NIAGARA MOHAWK POWER CORP | NINE MILE POINT 1 | NINE MILE POINT 1 | BWR | 71 09 18 | 17 | 3.285 | 140.79 |
| *GPU NUCLEAR | OYSTER CREEK 1 | OYSTER CREEK 1 | BWR | 71 09 18 | 24 | 4.627 | 145.42 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | MORRIS | PWR | 71 12 25 | 47 | 17.248 | 162.67 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | SAN ONOFRE 1 | PWR | 71 12 25 | 1 | 0.367 | 163.03 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | SAN ONOFRE 2 | PWR | 71 12 25 | 1 | 0.367 | 163.40 |
| YANKEE ATOMIC ELEC COMPANY | YANKEE-ROWE 1 | YANKEE-ROWE 1 | PWR | 72 02 12 | 36 | 9.837 | 173.24 |
| MORRIS OPERATION | DRESDEN 2 | MORRIS | BWR | 72 02 19 | 509 | 97.862 | 271.10 |
| *U.S. DOE | BIG ROCK 1 | WEST VALLEY | BWR | 72 03 20 | 6 | 0.831 | 271.93 |
| *NIAGARA MOHAWK POWER CORP | NINE MILE POINT 1 | NINE MILE POINT 1 | BWR | 72 04 02 | 31 | 6.013 | 277.94 |
| *ROCHESTER GAS & ELEC | GINNA | GINNA | PWR | 72 04 15 | 33 | 12.943 | 290.89 |
| *U.S. DOE | GINNA | WEST VALLEY | PWR | 72 04 15 | 28 | 10.701 | 301.59 |
| *GPU NUCLEAR | OYSTER CREEK 1 | OYSTER CREEK 1 | BWR | 72 05 01 | 136 | 26.473 | 328.06 |

HQ0006858

1991 ACCEPTANCE PRIORITY RANKING (Continued)

| PURCHASER | FUEL ORIGINATOR | STORAGE LOCATION | TYPE | DISCHARGE DATE | # OF ASMB | MTU | CUMULATIVE TOTAL MTU |
|---|---|---|---|---|---|---|---|
| *CONNECTICUT YANKEE ATOMIC POWER | HADDAM NECK | HADDAM NECK | PWR | 72 06 10 | 53 | 22.123 | 350.18 |
| DAIRYLAND POWER COOP | LACROSSE | LACROSSE | BWR | 72 08 19 | 6 | 0.718 | 350.90 |
| PACIFIC GAS AND ELECT | HUMBOLDT BAY | HUMBOLDT BAY | BWR | 72 08 25 | 55 | 4.195 | 355.10 |
| *NORTHEAST UTIL SVC COMPANY | MILLSTONE 1 | MILLSTONE 1 | BWR | 72 09 01 | 28 | 5.437 | 360.53 |
| WISCONSIN ELEC POWER COMPANY | POINT BEACH 1 | POINT BEACH 1 | PWR | 72 09 30 | 41 | 16.282 | 376.81 |
| *U.S. DOE | POINT BEACH 1 | INEL | PWR | 72 09 30 | 3 | 1.194 | 378.01 |
| *ROCHESTER GAS & ELEC | GINNA | GINNA | PWR | 72 10 06 | 48 | 19.037 | 397.05 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 72 11 30 | 1 | < 0.001 | 397.05 |
| CONSOLIDATED EDISON COMPANY | INDIAN POINT 1 | INDIAN POINT 1 | PWR | 72 12 29 | 40 | 7.784 | 404.83 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | MORRIS | PWR | 73 02 06 | 53 | 19.175 | 424.00 |
| *SOUTHERN CALIF EDISON COMPANY | SAN ONOFRE 1 | SAN ONOFRE 1 | PWR | 73 02 06 | 4 | 1.289 | 425.29 |
| *U.S. DOE | BIG ROCK 1 | WEST VALLEY | BWR | 73 03 02 | 37 | 5.015 | 430.31 |
| NORTHERN STATES POWER COMPANY | MONTICELLO | MONTICELLO | BWR | 73 03 03 | 2 | 0.387 | 430.70 |
| NORTHERN STATES POWER COMPANY | MONTICELLO | MORRIS | BWR | 73 03 03 | 11 | 2.130 | 432.83 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 3 | DRESDEN 3 | BWR | 73 03 03 | 51 | 9.869 | 442.69 |
| CAROLINA POWER & LIGHT COMPANY | ROBINSON 2 | BRUNSWICK 1 PWR POOL | PWR | 73 03 16 | 7 | 3.192 | 445.89 |
| CAROLINA POWER & LIGHT COMPANY | ROBINSON 2 | BRUNSWICK 2 PWR POOL | PWR | 73 03 16 | 43 | 19.608 | 465.49 |
| CAROLINA POWER & LIGHT COMPANY | ROBINSON 2 | ROBINSON 2 | PWR | 73 03 16 | 3 | 1.368 | 466.86 |
| DAIRYLAND POWER COOP | LACROSSE | LACROSSE | BWR | 73 03 30 | 26 | 3.115 | 469.98 |
| *GPU NUCLEAR | OYSTER CREEK 1 | OYSTER CREEK 1 | BWR | 73 04 13 | 148 | 28.896 | 498.87 |
| *NIAGARA MOHAWK POWER CORP | NINE MILE POINT 1 | NINE MILE POINT 1 | BWR | 73 04 14 | 104 | 20.222 | 519.10 |
| *CONNECTICUT YANKEE ATOMIC POWER | HADDAM NECK | HADDAM NECK | PWR | 73 07 08 | 55 | 22.466 | 541.56 |
| PACIFIC GAS AND ELECT | HUMBOLDT BAY | HUMBOLDT BAY | BWR | 73 08 31 | 52 | 3.965 | 545.53 |
| *VERMONT YANKEE NUCLEAR POWER CORP | VERMONT YANKEE 1 | VERMONT YANKEE 1 | BWR | 73 09 29 | 50 | 9.473 | 555.00 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 1 | DRESDEN 1 | BWR | 73 10 09 | 52 | 5.353 | 560.35 |
| DAIRYLAND POWER COOP | LACROSSE | LACROSSE | BWR | 73 11 03 | 24 | 2.876 | 563.23 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 73 11 30 | 2 | < 0.001 | 563.23 |
| BOSTON EDISON COMPANY | PILGRIM 1 | PILGRIM 1 | BWR | 73 12 28 | 20 | 3.881 | 567.11 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 73 12 31 | 2 | < 0.001 | 567.11 |
| *ROCHESTER GAS & ELEC | GINNA | GINNA | PWR | 74 01 01 | 12 | 4.599 | 571.71 |
| *COMMONWEALTH EDISON COMPANY | DRESDEN 3 | DRESDEN 3 | BWR | 74 03 11 | 44 | 8.569 | 580.28 |
| NORTHERN STATES POWER COMPANY | MONTICELLO | MORRIS | BWR | 74 03 15 | 111 | 21.483 | 601.76 |
| NORTHERN STATES POWER COMPANY | MONTICELLO | MONTICELLO | BWR | 74 03 15 | 11 | 2.129 | 603.89 |

## 1991 ACCEPTANCE PRIORITY RANKING (Continued)

| PURCHASER | FUEL ORIGINATOR | STORAGE LOCATION | TYPE | DISCHARGE DATE | # OF ASMB | MTU | CUMULATIVE TOTAL MTU |
|---|---|---|---|---|---|---|---|
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 91 01 31 | 1 | < 0.001 | 22024.93 |
| GENERAL ATOMICS | GENERAL ATOMICS | GENERAL ATOMICS | RCH | 91 04 30 | 1 | < 0.001 | 22024.93 |

### NOTES

*Final Delivery Schedule approval and waste acceptance will be contingent upon these Purchasers meeting their one-time fee obligations.

[1]Data contained in the APR are based on the Nuclear Fuel Data Form RW-859 (Form RW-859) through the survey year ending on December 31, 1990, with the following exceptions. First, corrections have been made in response to Purchaser comments on the draft APR reflecting changes in data not yet reported on the Form RW-859 (e.g. reinsertion in a current cycle of assemblies previously reported as permanently discharged). Second, information has been added regarding non-utility Purchasers that do not report their spent nuclear fuel inventories on the Form RW-859. While every effort has been made to be as accurate as possible, data regarding discharges in the most recent Form RW-859 reporting cycle is subject to change by the Purchasers due to corrections or variance in individual Purchaser's Form RW-859 reporting cycles.

[2]The 1991 APR does not include 0.006 MTU of waste currently stored at the General Electric-Vallecitos facility since specific information regarding this waste has not been made available to DOE.

[3]Although some of the SNF listed in the 1991 APR has been reconstituted, consolidated or otherwise canistered, it has not been separately identified since classification does not affect the ranking. SNF listed as type "RCH" is fuel from research reactors.

[4]The date of permanent discharge is based on information submitted by the Purchasers on the Form RW-859. When additional information was required, the date of permanent discharge was determined either from the Nuclear Regulatory Commission's Average Daily Unit Power Level data or from Purchasers' comments on the draft APR.

[5]This entry represents DOE-owned SNF from commercial industry and civilian development programs.



HQ0006888

VYW 3-04-01

RECEIVED
FINANCE
MAR 9 1992
VERMONT YANKEE NUCLEAR POWER CORPORATION

**Department of Energy**
Washington, DC 20585

MAR 04 1992

Mr. Glenn J. Morgan
Vermont Yankee Nuclear Power Corporation
R.D. 5, Box 169, Perry Road
Brattleboro, VT 05301

Dear Mr. Morgan:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

VY-GFR-0000000575

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible.

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

VY-GFR-0000000576

U. S. DEPARTMENT OF ENERGY

INSTRUCTIONS FOR COMPLETING THE APPENDIX C DELIVERY COMMITMENT SCHEDULE

GENERAL INSTRUCTIONS

1. PURPOSE AND USE OF DATA
The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) states that, beginning January 1, 1992, Purchasers may begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter. The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

2. WHO SHOULD SUBMIT
The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

3. WHEN TO SUBMIT
Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited. For each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992).

4. WHERE TO SUBMIT
Purchasers shall forward the completed DCS and one copy to:

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

cc: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

5. AUTHORITY
Data on the DCS are collected under the authority of the Nuclear Waste Policy Act of 1982, as amended, (42 U.S.C. 10101 et seq.) and Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.

6. PROVISIONS REGARDING CONFIDENTIALITY OF INFORMATION
Data being collected on the DCS are not considered to be confidential.

7. BACKGROUND INFORMATION

(a) The 1991 Acceptance Priority Ranking (APR) established the order in which FWMS acceptance capacity is allocated in the 1991 ACR. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual Purchaser allocations. The Purchasers' allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval. Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval (e.g., in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.)

(b) Once a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation (see also Item 7.(h)).

(c) The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

(d) Over the 10 year period for which the 1991 ACR allocated FWMS acceptance capacity, Purchasers may qualify for a specific number of allocations (from 0 through 10). Beginning in January 1992, Purchasers may submit DCSs for any or all of their allocations, up through year 10. Early submission of DCSs will facilitate the exchange of approved DCSs between Purchasers, as allowed by Article V.E. of the Standard Contract.

(e) The actual number of DCSs submitted by a Purchaser will vary according to the number of allocations they have in the ACR and the number of DCSs they choose to submit for each allocation. A DCS should be submitted for only one designated delivery site, only one fuel type (BWR, PWR, or Other) and only one delivery

year. Therefore, if a Purchaser splits an allocation between two or more delivery sites or between fuel types, more than one DCS will be required. There is no limit to the number of DCSs that can be submitted for each allocation, as long as the total metric tons of uranium (MTU) requested does not exceed the Purchaser's total MTU allocation for that year.

(f) Unless specifically requested otherwise, DOE will evaluate all DCSs submitted against a single allocation period independently. If a Purchaser prefers all DCSs submitted against a single allocation year to be considered as one package, this should be communicated to DOE at the time of submission. When evaluating the DCSs as a package, if one DCS is disapproved then all DCSs for that period will be disapproved and returned to the Purchaser for resubmittal.

(g) Waste acceptance capacity allocated to Purchasers is expressed in terms of MTU. The MTU allocation does not necessarily limit the number of assemblies that can be delivered. The DCS is designed to cover a given quantity of SNF as measured in MTU, not assemblies. DOE realizes that the number of assemblies associated with an allocation will vary according to the actual SNF designated for delivery. The appropriate entry for the blank on the DCS labeled "Number of Assemblies" is discussed in more detail below in the Specific Instructions For Completion of DCS.

(h) Since the DCS does not require the identification of the specific fuel to be delivered, each DCS is assumed to be for Standard Fuel, Class S1 or Class S2, as defined in Appendix E of the Standard Contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The Contract makes specific provisions for delivery of other than standard fuel. If a Purchaser intends to deliver other than standard fuel, the Purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the Purchaser has the option to deliver standard fuel on the schedule in the approved DCS or exchange the approved DCS with another Purchaser, provided contractual time limitations can be met.

## 8. DCS PROCESS

Upon receipt by DOE, each DCS will be date stamped. DOE shall approve or disapprove the DCS within 3 months of receipt. Such approval will be confirmed by signatures of the DOE Contracting Officer and DOE Technical Representative on the DCS returned to the Purchaser. If the DCS is incomplete or if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the

Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. QUESTIONS ON THE DCS

If you have any questions or require more information for completing the DCS, please contact Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634. Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

## SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 **DCS IDENTIFICATION NUMBER:** A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

YY = the last two digits of the Proposed Delivery Year
RRID = RW-859 reactor identification number of the designated delivery site
NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 **CONTACT PERSON:** Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 **CONTRACT NUMBER:** Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 **REACTOR/FACILITY INFORMATION:** Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 **TYPE OF CASK REQUIRED:** Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 **SHIPPING LOT NUMBER:** ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 **PROPOSED SHIPPING MODE:** Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 **PROPOSED DELIVERY DATE:** Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 **DOE ASSIGNED DELIVERY COMMITMENT DATE:** This entry will be completed by DOE.

2.6 **RANGE OF DISCHARGE DATES (Earliest to Latest):** Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 **METRIC TONS OF URANIUM (Initial):** Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

**(Discharged)** **"Not Required"** has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.

2.8 **NUMBER OF ASSEMBLIES--BWR/PWR/Other:** Enter the number of SNF assemblies corresponding to the Metric Tons Uranium indicated in Item 2.6 in the appropriate blank for BWR, PWR or Other (e.g., HTGR, TRIGA). If the SNF in the designated range of discharge dates encompasses assemblies with a wide range of MTU/assembly, state the maximum number of assemblies that may be delivered. Since the actual number of assemblies to be delivered may vary according to the specific SNF selected for delivery, adjustments to the number of assemblies will be made during the FDS process.

3.0 **CERTIFICATIONS:** An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE. Insert the appropriate signatory's title and date.

4.0 **NOTIFICATION OF DOE APPROVAL:** The signatures of DOE's Technical Representative and the Contracting Officer will indicate that the DCS has been approved.

NWPA-830C

OMB No.:
Expires:

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: ____________________

1.2 Contact Person:
(a) Name: ____________________
(b) Telephone (include Area Code): ____________________

1.3 Contract Number: ____________________

1.4 Reactor/Facility Information:
(a) Name: ____________________
(b) Address: ____________________
(c) City, State & Zip Code: ____________________

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ____________________
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck______; Rail______; Barge______
2.4 Proposed Delivery Date: ____________________
2.5 DOE Assigned Delivery Commitment Date: __________ (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: __ __ __ to __ __ __
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial)__________ (Discharged)__________ (Not Required)
2.8 Number of Assemblies: BWR ______ PWR ______ Other ______

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 ____________________
Authorized Purchaser Signature Date

3.2 ____________________ 3.3 ____________________
Name (Please Type or Print) Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

____________________
Technical Representative Title Date

4.2 ____________________
Contracting Officer Date

VY-GFR-0000000584

**Department of Energy**
Washington, DC 20585

June 3, 1997

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Linda S. Griffin
Treasury and Risk Management
Vermont Yankee Nuclear Power Corporation
Ferry Road, RD #5, Box 169
Brattleboro, VT 05301

Vermont Yankee Nuclear Power Corporation
Contract DE-CR01-83NE44431

Dear Ms. Griffin:

This letter follows up on my letter to you dated December 17, 1996, in which I informed you of the Department's anticipated delay in beginning spent nuclear fuel disposal by January 31, 1998, and on the responses from contract holders to the Department's request for comments on how best to accommodate the delay. The Department has reviewed the comments received, and I am attaching to this letter a summary of those comments and the Department's responses to them. The purpose of this letter is to advise you how the Department intends to proceed in light of the anticipated delay.

The Department has determined that two different provisions of the Standard Contract are applicable in the present circumstance: Article IX - Delays, and Article XV - Amendments. Article IX deals specifically with how the parties are to proceed in the event either the Department or the contract holder experiences a delay in its ability to deliver, accept or transport spent fuel or high level waste in accordance with an applicable schedule. Article XV recognizes the "uncertainties necessarily attendant upon long-term contracts" and provides a means by which the parties can mutually agree to amend the contract "as the parties may deem to be necessary or proper to reflect their respective interests." While the Department believes the Article IX remedy governs the presently anticipated delay, we also recognize that the delay may create particular hardships for certain contract holders. Accordingly, in addition to proceeding under the Delays clause, we are inviting any interested contract holder to propose to the Department, in accordance with Article XV, particularized contract amendments that may assist it in dealing with hardships it may experience as a result of the Department's delay in accepting its spent fuel on the contract holder's presently scheduled delivery date.

Printed with soy ink on recycled paper

**Article IX - Delays**

A number of the contract holders submitted comments in response to the Department's December 17, 1996 letter indicating that they believe the Department's delay in accepting spent fuel was avoidable and that an adjustment of fee or other compensation would therefore be appropriate. The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have preliminarily determined that this delay was unavoidable. (A copy of that preliminary determination is attached.) Because of the difference of views regarding whether or not the delay was avoidable, I have determined that a dispute exists within the meaning of Article XVI-Disputes, regarding whether or not the Department's anticipated delay was avoidable. Therefore, I am hereby providing you with 60 days within which to respond to my preliminary determination by submitting a written statement, supported by any relevant documentation, setting forth the factual and legal basis for any contention that the delay was avoidable. After considering any such submissions, I will issue a final determination that will be appealable to the Board of Contract Appeals as described in Article XVI.

If you wish to contest my preliminary determination that the Department's delay in beginning disposal of spent fuel was unavoidable, please submit on or before August 4, 1997, written statements and documentation supporting your position to the following address:

U.S. Department of Energy
Office of Headquarters Procurement Services
ATTN: Ms. Beth Tomasoni, HR-542
1000 Independence Avenue, S.W.
Washington, D.C. 20585

**Article XV - Amendments**

While the Department believes that the delay at issue was unavoidable, and that the Department is therefore not obligated to provide a financial remedy for the delay, as noted above, we recognize that such delay may have resulted in hardship to certain contract holders. Therefore, the Department is prepared to address individual contract holders' spent fuel storage concerns through negotiation of amendments to individual contracts. Specifically, the Department is willing to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel. Possible amendments could include, for example, compensation for onsite storage costs.

If you are interested in proposing amendments to your contract, please contact Mr. David Zabransky at (202) 586-9198 to schedule a meeting for the purpose of discussing such amendments.

Sincerely,

Beth G. Tomasoni

Beth A. Tomasoni
Contracting Officer
Office of Headquarters Procurement Services

Attachments

cc: Ross Barkhurst (w/o attachment)

**SUMMARY OF COMMENTS AND RESPONSES TO THE DEPARTMENT'S DECEMBER 17, 1996 LETTER TO CONTRACT HOLDERS**

Comment: A number of respondents indicated their belief that the Department has a statutory and contractual obligation to begin spent fuel acceptance in 1998.

Response: The Department recognizes that Section 302 of the Nuclear Waste Policy Act authorizes the Department to enter into contracts for the disposal of spent nuclear fuel. The Department further recognizes that Section 302 specifies that the contracts shall provide for the Department to begin to dispose of spent fuel not later than January 31, 1998. The Department believes that the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date.

Comment: Many respondents stated their belief that the Nuclear Waste Policy Act does not allow for claims of delay in the commencement of waste acceptance and, therefore, the Department cannot utilize the Delays provision of the Standard Contract as a remedy for the delay. Other respondents stated their belief that neither the Delays provision nor any other Standard Contract provision limits their legal rights and remedies or governs the nature and amount of damages, nor limits the options available to DOE for mitigating the harm caused by the delay.

Response: While the Nuclear Waste Policy Act authorized the Department to enter into contracts for the disposal of spent nuclear fuel, it did not prescribe the consequences of a potential inability by DOE to satisfy its obligation to begin disposal by January 31, 1998. The Standard Contract, however, addresses this potential and provides an administrative remedy for such a delay. The Department believes that Article IX - Delays, of the Standard Contract is applicable. As explained in the accompanying letter, the Department believes Article XV - Amendments, can also be applied to the current circumstances to mitigate the impacts of the delay on particular contract holders.

Comment: A number of respondent's indicated that any delay in beginning waste acceptance was avoidable, not unavoidable, as they believe that DOE suggested in the Contracting Officer's letter of December 17, 1996.

Response: After reviewing the record of Office of Civilian Radioactive Waste Management activities, the Department has reached the preliminary determination that the delay in waste acceptance is unavoidable as defined under Article IX.A of the Standard Contract. This issue is discussed in further detail in the Contracting Officer's Preliminary Determination which accompanies this Summary of Comments and Responses.

HQ0017321

Comment: Many respondents expressed their concern that the Department's December 17, 1996 letter inappropriately attempts to shift the responsibility for dealing with the delay to the Purchasers.

Response: Through its letter of December 17, 1996, the Department was seeking input from the Purchasers on actions the Department could take to address the delay. The Department recognizes that, under the terms of the Standard Contract, it bears the responsibility of determining the contractual consequences of any delay on its part.

Comment: Some respondents asserted that the Department's position that it lacks the authority under the Nuclear Waste Policy Act to provide interim storage is incorrect, and that it must immediately begin a program that will allow it to begin spent fuel acceptance by January 31, 1998. One respondent suggested that the Department immediately begin the design and construction of an interim storage facility.

Response: Under Section 145(b) of the Nuclear Waste Policy Act, the Secretary may not select a site for a Monitored Retrievable Storage Facility until the Secretary recommends to the President the approval of a site for the development of a repository. The Secretary's recommendation, in turn, must be preceded by scientific characterization analyses, which as yet have not been completed. Under current circumstances, the Department believes it lacks the authority to provide interim storage services. Nevertheless, it has begun generic design work for an interim storage facility, which activity is permitted under the Act.

Comment: Some respondents argued that, if the Department determines that it lacks authority to provide interim storage, it must immediately act to seek authority from Congress. In addition, a number of respondents requested that the Department support ongoing legislative efforts to amend the Nuclear Waste Policy Act.

Response: The Administration is committed to resolving the complex spent fuel storage issue in a timely and sensible manner, consistent with sound science and the protection of public health, safety, and the environment. The Administration believes that the pending legislation would undermine the scientific credibility of the Nation's nuclear waste disposal program by, in effect, designating a site for an interim storage facility before the viability of that site as a permanent geologic repository has been assessed, and therefore it does not support such legislation.

Comment: A number of respondents suggested that some form of compensation might be appropriate to address the impact of the delay, but that compensation would not be a substitute for performance. It was also suggested that the source of the compensation must not be from the Nuclear Waste Fund. One respondent noted the Department is precluded from preferential or discriminatory treatment in implementation of the contracts.

Response: The Department remains committed to accepting spent fuel as soon as practicable under the authority provided by the Nuclear Waste Policy Act. As noted above, the Department has made a preliminary determination that the delay in beginning waste acceptance was unavoidable, as defined in the Standard Contract. Therefore, the appropriate remedy under the Standard Contract is an adjustment of schedules for waste acceptance. The Department also recognizes however, that it has a contractual relationship with each contract holder; consistent with Article XV of the Standard Contract, DOE is willing to discuss with individual contract holders amendments to their own contracts that can address the delay in a mutually-agreed manner. While each contract holder faces unique circumstances, the Department also recognizes it has an obligation to treat all contract holders in a fair and equitable manner. The Department understands the industry's concern regarding use of the Nuclear Waste Fund for compensation for its delay, and will take this concern into account as we move forward.

Comment: A number of respondents cited the recent Department actions, such as the return of highly-enriched foreign research reactor fuel and the settlement with Public Service of Colorado (PSC) which resulted in the Department's taking title and responsibility for PSC's Fort St. Vrain spent fuel, as examples of the Department's ability to begin spent fuel acceptance. They suggested that the Department consider similar actions with respect to implementing its waste acceptance obligation under the Standard Contract.

Response: The Department's action seeking the return of U.S. Government-provided highly-enriched uranium spent fuel from foreign research reactors was made to further the Nation's long-standing policy of reducing weapon proliferation risk of strategic nuclear materials pursuant to the responsibility of the Department under the Atomic Energy Act. There is no parallel between that action and the current situation with commercial reactor spent nuclear fuel. The NWPA grants specific authority for DOE to dispose of commercial spent fuel; the particular limits in the statute on storage and disposal preclude reliance on any more general authority in the Atomic Energy Act. The actions taken with regard to PSC's Fort St. Vrain spent nuclear fuel were the result of a 1965 agreement between the Atomic Energy Commission and PSC under which the government agreed to take title to spent fuel from the Fort St. Vrain reactor demonstration project in connection with the research and development purposes associated with this demonstration project, which was undertaken pursuant to the Atomic Energy Act.

Comment: A number of respondents suggested that the Department consider various arrangements for taking title to spent fuel that is subject to delayed waste acceptance and, in some cases, storage facilities that were constructed due to delayed waste acceptance.

Response: As indicated in the accompanying letter, the Department is inviting contract holders to propose possible amendments to their individual contracts pursuant to Article XV of the Standard Contract to relieve the particular hardships they will experience as the result of the Department's inability to commence spent fuel acceptance on the dates in their current delivery schedules.

Comment: One commentor suggested the establishment of a customer oversight group to monitor the Program's progress. Another suggested that the Department develop a proposal for resolving the current impasse within 30 days, and meet with stakeholders within 60 days.

Response: Subsequent to the submission of comments, Secretary Peña met with representatives of nuclear utilities to discuss the delay in spent fuel acceptance and possible remedies therefor. He also offered to establish working groups to develop options for addressing the delay and to provide additional information to contract holders on the Program's progress. Subsequently, the Department held similar meetings with representatives of stakeholder groups and members of the National Association of Regulatory Utility Commissioners. A meeting is being scheduled for July to follow up on the Department's commitment to keep contract holders apprised of the Program's recent progress and to discuss the technical aspects of some of the remedies that may be available to address the Department's delay.

Comment: One commentor suggested that the Department revise the basis for allocation of waste acceptance capacity from the current "oldest-fuel-first" basis to a methodology that is based upon the need of the contract holder. Another suggested that the Department grant priority waste acceptance capacity to shutdown reactors.

Response: The Department is willing to discuss with individual contract holders amendments to their individual contracts that may address their particular needs. With respect to the issue of delivery schedules, however, the Department remains concerned that in granting priority to any one contract holder or in changing the basis for waste acceptance allocation, it may adversely impact the waste acceptance status of other contract holders.

Comment: Some respondents requested that the Department expedite work at Yucca Mountain to complete the repository as soon as possible.

Response: The Department remains committed to completing work at Yucca Mountain to assess its viability as a permanent geologic repository in 1998 and, assuming that it is viable, to proceed as expeditiously as possible toward a suitability determination, licensing, and operation.

June 3, 1997

**CONTRACTING OFFICER'S PRELIMINARY DETERMINATION THAT THE DEPARTMENT OF ENERGY'S DELAY IN BEGINNING SPENT FUEL DISPOSAL WAS UNAVOIDABLE**

## BACKGROUND

In Indiana Michigan Power v. DOE, 88 F.3d 1272 (D.C. Cir. 1996), the Court held that section 302(a)(5)(B) of the Nuclear Waste Policy Act of 1982, as amended (Amended NWPA), creates an obligation in the Department of Energy (DOE), in return for payment of fees by utilities that contracted with DOE for disposal services, to start disposing of spent nuclear fuel no later than January 31, 1998. The Court remanded the matter to DOE for further proceedings consistent with the court's opinion. DOE advised contract holders that it anticipated that it will be unable to begin acceptance of spent nuclear fuel for disposal by January 31, 1998. The Office of Civilian Radioactive Waste Management (OCRWM) contends that the delay in disposing of the contract holders' spent fuel is an "unavoidable delay" as defined in Article IX of the Contract, and, accordingly, DOE is not liable for damages caused by failure to perform under the terms of the Contract. In keeping with the mandate of the Court, DOE's Office of Procurement has been requested to review the relevant provisions in the Contract and preliminarily determine whether or not the delay in beginning disposal of spent fuel is unavoidable within the meaning of Article IX.

Article IX provides, in brief, that neither the Government nor the contract holder shall be liable for damages caused by failure to perform its obligations if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. This article indicates that an unavoidable delay includes circumstances beyond the reasonable control of a party to the Contract, such as acts of God, of the public enemy, or of Government in either its sovereign or contractual capacity. In the event of an unavoidable delay, the parties are to readjust schedules as appropriate to accommodate the delay.

## PRELIMINARY DETERMINATION

The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have reviewed the record provided by OCRWM, and I preliminarily find that this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was "unavoidable" within the meaning of Article IX of the Standard Contract.

HQ0017325

June 3, 1997

## BACKGROUND OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM

In order to understand the context within which the delays described below have occurred and the basis for my preliminary determination, it is helpful to review the history of the program and how DOE's statutory authority for the implementation of its disposal obligation has evolved over time.

While spent fuel discharged from nuclear power reactors has been safely stored for decades with no discernible adverse effects on the health and safety of the public, spent fuel will remain radioactive, and thus must be isolated, for thousands of years. Consistent with the views of other nations, United States policy has been that our responsibilities to future generations are better discharged by a strategy of final disposal than by reliance on storage. Deep geologic disposal is internationally recognized as a safe and viable means of disposing of spent nuclear fuel. OCRWM, DOE, Mission Plan 3, DOE/RW-0005 (1985), Environmental and Ethical Basis of Geologic Disposal 8,18, Nuclear Energy Agency, OECD, Paris, France. However, there is not yet any permanent disposal facility for spent nuclear fuel anywhere in the world.

The Nuclear Waste Policy Act of 1982 was enacted (NWPA) against this background and consistent with federal policy to utilize deep geologic disposal as a permanent solution to spent fuel and high level radioactive waste management (hereinafter used interchangeably). The NWPA established the Office of Civilian Radioactive Waste Management (OCRWM) within the Department of Energy (DOE) to develop and implement a spent fuel management and disposal system for the nation.

DOE recognized in its 1985 Mission Plan the difficult technical and institutional challenges that must be overcome during the course of this program. The technical challenges are great because the isolation of spent fuel involves long time periods not often considered in other human endeavors. The institutional challenges are complex because a few states, and possibly Indian Tribes, have been and will be, asked to host, for the good of the nation, spent fuel disposal or storage facilities. Many states will be traversed by shipments of spent fuel to one or more centralized facilities. Mission Plan 3. The NWPA not only requires extensive consultation and cooperation with potential host jurisdictions, but also requires grants to be made to such jurisdictions for the purpose of conducting scientific oversight and public information activities. One of the findings of the NWPA is that "State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal." Section 111(a)6) of the NWPA.

The original NWPA required DOE to site, obtain a license, construct, and operate two geologic repositories. The NWPA gave DOE 180 days to issue general guidelines for the recommendation of sites, which were published in final in November 1984 after extensive public review and concurrence by the Nuclear Regulatory Commission (NRC). Draft environmental assessments (EA) for nine potential sites were issued in December 1984. More than 20,000 comments were received. As required by the NWPA, after public briefings and hearings on the draft EA's, in

1986, DOE issued five final EA's and selected five potentially acceptable sites for the first repository in Mississippi, Nevada, Texas, Utah, and Washington. DOE then recommended to the President, as required by the NWPA, that three sites (Yucca Mountain, Nevada; Hanford, Washington; and Deaf Smith County, Texas) be characterized to determine their suitability as repositories. The NWPA also required that DOE select potential sites for the second repository. In 1986, DOE issued a draft area recommendation report that identified potentially acceptable sites for the second repository in 12 areas of seven states and an additional eight backup candidate areas in the same seven states. That report was not finalized because DOE suspended work on the second repository so that information gained in the first repository program could be applied to the second repository. OCRWM, DOE Mission Plan Amendment 49-50, DOE/RW-0128 (1987).

In compliance with section 141 of the NWPA, DOE completed a study on the need for a Monitored Retrievable Storage facility and submitted a timely proposal to Congress in 1987 for authorization to construct and operate a licensed temporary storage facility in Oak Ridge, Tennessee. DOE stated in 1987 that its plan to start storage operations in 1998 would allow the system to receive spent fuel a full five years sooner than without the storage facility under then-current schedules. OCRWM, DOE Monitored Retrievable Storage, Submission to Congress Volume 1, page 3 (March 1987), DOE/RW-0035/1-Rev 1.

The Nuclear Waste Policy Amendments Act of 1987 made significant changes to the program. The amendments directed DOE to characterize only the Yucca Mountain site for its suitability as a repository site and prohibited site-specific activities for a second repository. With regard to temporary storage for the spent fuel, the amendments: 1) established an independent Monitored Retrievable Storage (MRS) Review Commission to report to Congress in 1989 on the need for an MRS facility; 2) prohibited MRS siting until the site for the first repository has been recommended to the President and prohibited MRS construction until the issuance of an NRC construction authorization for the repository; 3) limited the capacity of the MRS facility to no more than 10,000 metric tons of heavy metal; 4) nullified DOE's recommendation to site an MRS facility in Tennessee; 5) prohibited siting an MRS facility in Nevada; and 6) established the Office of Nuclear Waste Negotiator for the purpose of finding a volunteer site for an MRS facility. Furthermore, the amendments established an eleven-member Nuclear Waste Technical Review Board to be appointed by the President to evaluate the technical and scientific validity of the program activities.

Although the amendments were intended to ease the task of the geological repository program by limiting site characterization activities to one site, the singling out of Nevada as the only potential site caused the State, which strongly opposed that decision, to greatly increase its efforts to halt the program. Shortly thereafter, the Nuclear Waste Technical Review Board recommended that the major component of the site characterization program at Yucca Mountain be reevaluated.

And the statutory prohibition on siting a temporary storage facility before a site for a repository has been recommended to the President made it virtually impossible for DOE to begin spent fuel acceptance by 1998.

## BASIS FOR DETERMINATION

When Congress passed the Nuclear Waste Policy Act in 1982 (NWPA), it prescribed a complex and cumbersome process for the construction and operation of a first-time, state-of-the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high-level waste. Because such a facility had never been constructed before, either in this country or elsewhere in the world, there was no established blueprint for achieving this goal. Congress, nevertheless, established the expectation that a repository could be sited, licensed, constructed and operating by January 31, 1998. Experience has shown that the schedule established by the NWPA for an operational geologic repository was overly optimistic and underestimated the technical, regulatory and institutional challenges that would confront such effort. I conclude that the Department's inability to meet the date established by Congress was the result of unavoidable delay and that the causes for that unavoidable delay fall into six broad and overlapping categories:

1. Technical problems
2. Regulatory delays
3. Roadblocks to implementation of interim or monitored retrievable storage
4. Funding restrictions
5. Litigation delays
6. Consultation requirements

The discussion that follows demonstrates how each of these causes contributed to the delay.

## 1. TECHNICAL PROBLEMS

As a state-of-the art scientific and engineering project grounded in geoscience, hydrology and other scientific endeavors, and one that must project through mathematical modeling of facility performance of a natural and engineered system for at least 10,000 years, the site characterization program ran into many technical difficulties that led to unavoidable delay in commencement of repository operations. Examples of these technical problems include:

> **Delay in development of prototype dry drilling equipment.** Characterization of the unsaturated rocks at Yucca Mountain required the collection of undisturbed samples from boreholes up to 2,500 feet deep. Then-current drilling technology methods used for environmental, water well, or oil field drilling could not be utilized to obtain the required undisturbed samples. Thus, special, first-of-a-kind drilling systems had to be designed, procured and tested by DOE before drilling could proceed.

Moreover, air had to be used as the circulating medium, rather than mud, to assure that samples were representative of the in situ rock. Air is not a particularly efficient circulation medium for removing cuttings from the bottom of a hole, and a special reverse/vacuum assist system had to be developed. Penetration rates were lower than expected; equipment development time was longer than anticipated; and the cost of borehole drilling and sampling was greater than expected. As a result, the sampling and analysis of the rock at Yucca Mountain was delayed. Acquisition Technical Specifications for the LM-300 Drill Rig, the LM-300 Vacuum System, and the Venturi Reverse Air Circulation Drill Bits.

**Available methods to address volcanism and faulting were inadequate.** Defining the potential hazards posed by volcanoes and earthquakes requires age-dating of soil and rock deposits. Available methods proved to be inadequate to characterize the age either of the Lathrop Wells cinder cone, a volcanic upwelling near Yucca Mountain, or the earthquake faulting at Yucca Mountain. This led to unprecedented scientific debate over the age and origin of the deposits in and around the Yucca Mountain area. As a result, new age-dating techniques had to be pioneered for use in the Yucca Mountain area. Several age-dating techniques were developed, used and then revised based on the scientific debate. We expect to reach closure with Nuclear Regulatory Commission staff on this issue this year. OCRWM, DOE, Characterization Progress Report: Yucca Mountain, Nevada, Number 15, pages A52-A55, DOE/RW-0498 (April 1997)

**Groundwater Debate--The Szymanski Reports.** The vein-like deposits of calcite and silica exposed in the walls of Trench 14 at the Bow Ridge Fault at Yucca Mountain and extending to the floor of the trench have been the subject of extensive scientific debate. The debate concerns the origin of the water responsible for depositing the minerals in the veins. Most scientists believe the deposits were formed by downward percolating rainwater that dissolved carbonate minerals and silica as it moved through the soils and redeposited them when the waters evaporated at lower levels. However, some scientists, including Jerry S. Szymanski, a scientist employed by DOE at Yucca Mountain, believed that these deposits could have been placed by an upward movement of the groundwater aquifer caused by seismic activity. OCRWM, DOE, FY 1992 Annual Report To Congress 20, DOE/RW-0422 (July 1993)

Mr. Szymanski published two reports on this problem, in 1989 and in 1992. Because of the potentially serious impact of the concerns raised on the suitability of Yucca Mountain as a geological repository for spent fuel, DOE concluded that it was necessary to accept Mr. Szymanski's recommendation for "an external and independent peer review" of his 1989 report. In January 1990, a five-member panel was selected. The reports resulting from the peer review were completed in 1991. Those reports prompted still further debate, and additional reviews were performed, one by a panel of 17 scientists at the National Academy of Sciences, and one, at the request of the NRC, by the Center of

Nuclear Waste Regulatory Analysis. The second report was reviewed by the United States Geological Survey and the Los Alamos National Laboratory. These reviews were submitted to OCRWM's Yucca Mountain office in 1992 and indicated the scenarios for such an occurrence were not plausible. Szymanski History Report 2-4, TRW Environmental Safety Systems, Inc. (December 31, 1992). However, DOE had to utilize substantial resources to address these concerns, which diverted resources from other necessary scientific work.

**Delay in hydrologic testing at Hanford.** While DOE was still required by the NWPA to characterize multiple sites for a possible repository, in order to preserve data pertaining to the local groundwater flow system after shaft construction at Hanford, changes had to be made in the hydrologic testing program. This resulted in a delay of about one year in the exploratory shaft schedule for that site. Furthermore, in consultation with the NRC, DOE decided that the hydrologic tests to be conducted before the start of exploratory shaft construction should be far more comprehensive than originally planned. This delayed shaft construction for approximately two years. Mission Plan Amendment 7, 8.

## 2. REGULATORY DELAYS

Because of the nature and potential severity of the risks associated with radioactive waste disposal, the difficulty of the technical challenges posed by a program designed to safely isolate material for 10,000 years, and the resulting public concerns, the spent fuel disposal program is subject to regulation or oversight by a large, perhaps unprecedented number of agencies and organizations. Each brings its own perspectives and expertise to the task. The challenges of meeting all of the applicable regulatory requirements and expectations and of attempting to build consensus where different regulators have had different approaches to the same or related problems have led to significant and unavoidable delays in the Department's ability to begin to accept spent fuel for disposal.

The following is a description of some of the regulatory, oversight and advisory bodies with whom DOE must work to reach a consensus on the safety and environmental soundness of siting and constructing a repository, and some examples of regulatory issues that have delayed development of a geologic repository.

**Nuclear Regulatory Commission.** The NRC is responsible for approving any OCRWM storage or disposal facility site and its design. It must license the facility and inspect it during construction and operation. The development of criteria for a deep geologic disposal facility has required the NRC to move well beyond its normal scope of activities, which focus primarily on engineered, not natural, systems. The Commission is also responsible for setting packaging standards and regulates the shipment and containment

security of spent nuclear fuel shipments to and from commercial nuclear power plants. Examples of issues raised by the NRC that have unavoidably delayed site characterization for the geologic repository include:

**Inferred fault in the proposed location of the exploratory shaft at Yucca Mountain.** The NRC expressed concern regarding an inferred fault (one that appears to exist but cannot be definitively determined) in the vicinity of the proposed location of the exploratory shafts at Yucca Mountain. In response, DOE had to undertake a technical assessment review in order to further study the possible fracturing of rocks when sinking shafts. Progress Report, Number 2, page 11.

**Unprecedented application of NRC quality assurance standards for reactors to scientific investigations for a repository.** NRC regulations require DOE to implement a quality assurance (QA) program for repository site characterization that is based upon the criteria in 10 CFR Part 50, Appendix B, which was promulgated for use in nuclear power reactor license applications. NRC defines quality assurance as all of those planned and systematic actions necessary to provide adequate confidence that the geologic repository and its subsystems will perform satisfactorily in service. 10 CFR 60.150. Applying the NRC's quality assurance approach for reactors to both the engineered features and the scientific investigation of natural features in a geoscience program at the cutting edge of technology proved to be very difficult. The quality assurance concerns of the NRC were not completely resolved until 1991. OCRWM, DOE, Annual Report to Congress 29, DOE/RW-0144 (April 1987); OCRWM, DOE, FY 1992 Annual Report To Congress 5-6, DOE/RW-0422 (July 1993)

**Design control objections to the Site Characterization Plan.** The NWPA requires DOE to issue a general plan for its site characterization activities. Section 112(b)(1)(A) of the NWPA. In 1988, DOE issued a Consultation Draft Site Characterization Plan (SCP) and submitted it to NRC for review. NRC indicated 5 areas of potential objections. DOE and NRC worked to resolve these issues and the SCP was issued in 1988. In July 1989, NRC issued objections to the design control portions of the SCP that resulted in an on-going series of interactions with the NRC. In March 1993, NRC lifted the design control objections, allowing DOE to proceed with the Exploratory Studies Facility design and construction. The three and one-half year period of delay in the start of construction following issuance of the SCP overlapped the development of the QA plan and was primarily driven by the inability to bring about resolution on the QA requirements for Exploratory Studies Facility co-located with a repository.

**U.S. Environmental Protection Agency**. The Environmental Protection Agency (EPA) is responsible for regulating offsite releases of radioactive material repositories. NWPA, Section 121(a). EPA promulgated such standards in 1986 (40 CFR Part 191), but they were held invalid and remanded to EPA for reconsideration. Natural Resources Defense Council v. EPA, 824 F.2d 1258 (1st Cir. 1987). The Energy Policy Act of 1992 required EPA to develop separate site-specific radiation standards for a repository at Yucca Mountain. EPA has not yet proposed new radiation protection standards. Once EPA promulgates them, the NRC must incorporate the new EPA standards in its repository licensing regulations. The lack of clearly-defined standards has complicated the Department's ability to focus its site investigation activities on clearly-defined regulatory requirements.

**Nuclear Waste Technical Review Board.** As noted above, the 1987 amendments to the NWPA established the Nuclear Waste Technical Review Board to oversee DOE's work at Yucca Mountain. In the late 1980's, the Board recommended that DOE review alternatives to DOE's then-current plan to construct two exploratory shafts and a small underground facility for site characterization. The Board also recommended that DOE conduct more extensive underground investigations than previously planned and maximize the use of the most modern mechanical excavation techniques and tunnel construction methods. DOE reviewed 34 options for the configuration and construction of the Exploratory Studies Facility and concluded that it should use ramps instead of shafts for the Studies Facility. DOE also initiated procurement of state-of-the-art tunnel-boring equipment. The Facility was not completed until April 1997. The significant increase in the extent of underground investigations undertaken since the development of the Mission Plan in 1985 has resulted in a seven-year delay from the schedule originally set in the 1985 Mission Plan. First Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 12,13 (March 1990); Third Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 9-11,13 (May 1991); Mission Plan 59.

**Department of Interior (Bureau of Land Management, Fish and Wildlife Service, Bureau of Indian Affairs, U.S. Geological Survey).** The Bureau of Land Management(BLM) is responsible for approval of plans to site waste management facilities on Federal lands over which it has jurisdiction. BLM has provided DOE access to Yucca Mountain for site investigation. As discussed below, BLM's grant of a right-of-way has been challenged at the Interior Board of Land Appeals and in court. The Fish and Wildlife Service, which is responsible for implementation of the Endangered Species Act, announced its emergency listing of the desert tortoise, which inhabits areas of Yucca Mountain, as an endangered species. As a result of the listing, DOE had to restrict the access to the Yucca Mountain site, and prepare a biological assessment to evaluate the Project's potential effects on the tortoise and alternatives for avoiding or minimizing impacts. OCRWM, DOE, Progress Report on the Scientific Investigation Program for the

Nevada Yucca Mountain Site, Number 2, page 11, DOE/RW-0292P (1990)(Progress Report). The Bureau of Indian Affairs (BIA) is the Federal agency with primary responsibility for working with federally-recognized Indian Tribal governments, including administration and management of land held in trust by the United States for Indians. BIA is the agency responsible for making the determination whether particular Indian tribes are affected tribes under Section 2(2)(B)of the NWPA. The U.S. Geological Survey (USGS) serves as a technical advisor to DOE and the NRC. Under a memorandum of understanding with DOE, USGS conducts geologic investigations of the Yucca Mountain site.

**Department of Transportation (Federal Railroad Administration, Federal Highway Administration, Motor Carrier Safety Program).** The Department of Transportation (DOT) regulates the shipment in commerce of all radioactive material, including spent nuclear fuel shipped under the NWPA, by all modes of transport. DOT is responsible for developing and enforcing regulations covering the labeling, classification, and marking of all spent fuel packages, as well as routing choice and carrier qualifications. DOT regulations on the use of preferred routes for highway shipments will affect the selection of routes for OCRWM shipments of spent nuclear fuel and high-level radioactive waste. The Federal Railroad Administration (FRA) was created to promote and enforce safety throughout the U.S. railroad system. The Office of Motor Carriers within the Federal Highway Administration (FHA) administers the Motor Carrier Safety Assistance Program to enhance commercial motor vehicle safety on the Nation's highways. This program develops policies, standards, and procedures to comply with Federal safety and hazardous materials regulations and monitors field inspection, investigation, and enforcement activities.

**Department of Labor (Occupational Safety and Health Administration).** The Occupational Safety and Health Administration (OSHA) regulates worker health and safety for workers involved in the construction of the Exploratory Studies Facility and site characterization at Yucca Mountain. When operation of the repository begins, conditions for all workers involved in transportation, temporary storage, or burial of the wastes will have to be in compliance with OSHA regulations.

**General Accounting Office.** The General Accounting Office (GAO) is the investigative arm of Congress, headed by the Comptroller General. Responsible for examining matters relating to the receipt and disbursement of public funds, it conducts audits and evaluations of Federal Government programs and activities, including OCRWM. Section 304(d) of the NWPA requires the Comptroller General to conduct an annual audit of the OCRWM program.

**Advisory Committee on Nuclear Waste.** The Advisory Committee on Nuclear Waste (ACNW) was established by the NRC in 1988 to provide the NRC with independent

reviews of, and advice on, nuclear waste facilities, including disposal of spent nuclear fuel and high-level radioactive wastes for geologic repositories. In performing its work, the ACNW reviews and reports on those areas of concern referred to it by the NRC and will undertake other studies and activities on its own initiative related to areas of regulatory activity identified by the NRC.

**Nevada Division of Environmental Protection and Nevada State Engineer.** The Yucca Mountain project, like other federal actions, is subject to extensive state environmental regulation. Because Nevada is an unwilling host for this project, the need to obtain state environmental permits has engendered considerable unavoidable delay. In 1988 and 1989, DOE submitted applications to Nevada for air, underground water withdrawal, and underground injection permits in order to begin site characterization at Yucca Mountain. The State failed to act on those applications. Instead, the State returned the permit applications to DOE on the grounds that: (i) Nevada law made it illegal to store high-level radioactive waste in Nevada, and (ii) recent State legislative resolutions opposed the siting of a radioactive waste repository anywhere in the State and prohibited a repository at Yucca Mountain.

A location was originally selected in Area 25 of the Nevada Test Site to conduct prototype drilling in order to develop a drilling system for Yucca Mountain site characterization. Test drilling at Yucca Mountain was delayed because Nevada refused to issue an operating permit required by Nevada air-quality regulations. In order to proceed, DOE moved the test drilling to a site in Utah to test the prototype dry drilling equipment. Progress Report, Number 1, page 11.

In 1990, DOE, through the Department of Justice, brought suit to force the State to act on the permit applications and to prohibit Nevada from unlawfully interfering with its site characterization activities. The State's interference with site characterization continued until May of 1991 when the court ordered Nevada to process the air and underground injection permits. In July 1991, after issuance of the two permits, DOE began the first surface disturbing work at Yucca Mountain since 1986. In March 1992, following a lengthy hearing, the State issued a water permit to DOE to withdraw water at the Yucca Mountain site. Progress Report Number 5, pages 2-3, DOE/RW-0307P-5(June 1992)

**3. Roadblocks to Implementation of Interim or Monitored Retrievable Storage**

The Department recognized early in the life of the program that it would be extremely difficult to have an operating geologic repository ready to accept spent nuclear fuel by January 31, 1998, and it made two different efforts to provide for temporary storage by that date. The first effort was rebuffed by the utilities; the second effort was blocked by Congress. In fiscal year 1994, DOE was barred from providing funding assistance to facilitate the separate efforts of the Nuclear Waste Negotiator.

**A. Federal Interim Storage.** Beginning in January 1984, DOE offered to provide a Federal Interim Storage Program to utilities as authorized by Subtitle B of the NWPA. OCRWM, DOE, Initial Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0003(1984); OCRWM, DOE, Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0019(1985); Id., DOE/RW-0045(1986); Id. DOE/RW-0120(1986); Id. DOE/RW-0186(1988). The Department considered a number of alternative storage methods, potential sites, and transportation arrangements; it analyzed the need for FIS; and it developed a plan for deployment of FIS, including estimated costs and schedules. Nuclear Waste Policy Act Project Office, DOE, Federal Interim Storage Fee Study for Civilian Spent Nuclear Fuel: A Technical and Economic Analysis, DOE/S-0023(1983). No utility elected to participate in this program. Thus, the program terminated in accordance with the NWPA on January 1, 1990.

**B. Monitored Retrievable Storage.** In 1987, DOE recognized that it could not begin to dispose of spent fuel in a repository before 2003. In light of the statutory and contractual provisions calling for spent fuel acceptance to begin in 1998, the Department announced that its preferred strategy was "to meet the terms of the contract ... based on a waste-management system that includes an integral MRS [monitored retrievable storage] facility." However, DOE was prevented from siting, constructing and operating an MRS facility, first as the result of litigation initiated by the State of Tennessee, which temporarily blocked submission of a proposal to Congress to locate a storage facility in that State, and subsequently by action of Congress in the 1987 amendments to the NWPA.

Section 141(b) of the NWPA directed DOE to complete a detailed study of the need for and feasibility of an MRS and to submit to Congress on or before June 1, 1985, a proposal for construction and operation of one or more MRS facilities for receiving and storing spent nuclear fuel. Pursuant to this direction, DOE completed a study on the need for an MRS and timely prepared a proposal to Congress for authorization to construct and operate a licensed MRS at Oak Ridge, Tennessee. Congressional Proposal EC-1022, 100th Congress. The schedule proposed by DOE called for an MRS facility to be licensed, constructed, and operational at the Oak Ridge site by January 31, 1998.

In 1985, Tennessee sued to block the submission of the proposal to Congress. In 1986, the U.S. District Court in Tennessee granted an injunction preventing submission of the MRS proposal to Congress. That decision was subsequently overturned in Tennessee v. Herrington, 806 F.2d 642 (6th Cir. 1986). The Supreme Court denied review in 1987. Two years were lost in litigation. Moreover, by that time, Congress stepped in to permanently block use of the Oak Ridge site for an MRS and to impose new restrictions with respect to siting an MRS facility at any other site, thus virtually assuring that DOE would not have an operational MRS facility by January 31, 1998. First, Congress nullified DOE's proposal to site, construct and operate an MRS at Oak Ridge, Tennessee. Section

142(a) of the amended NWPA. Second, Congress linked authority to site, construct and operate an MRS to significant progress on the geologic repository, and provided that no MRS could be constructed in the State of Nevada. Sections 142 and 148 of the Amended NWPA.

The 1987 amendments to the NWPA established within the Executive Branch the Office of the Nuclear Waste Negotiator, which was authorized for five years to attempt to locate and recommend for Congressional approval a voluntary candidate site for an MRS. Although the Negotiator's Office was reauthorized for one more year after its original expiration date, it never achieved its purpose of finding a voluntary candidate site. The failure to site an MRS was likely due in part to the provision in DOE's FY 1994 appropriations (Energy and Water Development Appropriations Act, 1994, Pub. L. No. 103-126, October 28, 1993) that prohibited DOE from providing grants to States and Tribes for the purpose of studying the feasibility of siting an MRS.

**4. Funding Restrictions.**

OCRWM's waste disposal and storage program activities are funded through fees paid by Standard Contract holders to the Nuclear Waste Fund. The Nuclear Waste Fund was established to ensure that funds would be available as needed to implement commitments in the NWPA. H.R. Rep. No. 785, 97th Cong., 2d Sess., pt. 1, at 77(1982). Congressional appropriations are required, however, as a prerequisite for OCRWM expenditure of Nuclear Waste Fund monies.

Congressional appropriations matched funding requests during the first several years of the Program. However, deficit control legislation enacted in 1985, the Gramm-Rudman-Hollings deficit control legislation, began to constrain funding requests and appropriations, thus resulting in unavoidable delays in the program. The Waste Fund was not exempted from the unified budget of the U.S. Government as a whole. From FY 1986 through FY 1990, DOE requested increased appropriations for site characterization, but appropriations declined from $499 million to $295 million.

Passage of the Omnibus Budget Reconciliation Act of 1990 resulted in additional budget pressures on the OCRWM's program. Under this legislation, overall budget constraints on DOE discretionary funds resulted in amounts requested for OCRWM operations at levels well below amounts needed to maintain OCRWM's planned schedules. Further exacerbating the funding problem, Congress appropriated amounts significantly below the requested levels. The total appropriations shortfall from FY 1988 through FY 1994 amounted to about $850 million.

From time-to-time, Congress has also restricted spending on particular activities. For example, in an attempt to meet the 1998 deadline, DOE had initiated innovative approaches to repository development, such as the integration of the exploratory shafts into the construction of the repository. However, the conference report accompanying the Department's FY 1987

appropriations directed the Department not to spend any FY 1987 funds for drilling exploratory shafts. H.R. Rep. No. 99-1005, 99th Cong., 2d Sess. 651 (1986). This single action alone added a year to the schedule for sinking shafts.

In 1994, OCRWM reconfigured its program planning under a method designated the Program Approach in order to more effectively deal with the budget constraints. Congress supported it with an FY 1995 appropriation of $522 million. (The Administration had requested $532 million.) For FY 1996, the Administration requested $630 million for OCRWM to continue the new Program Approach, but Congress appropriated only $400 million and earmarked $85 million of that for interim storage. Because there is no statutory authority to site and construct a storage facility, the effective FY 1996 funding level was $315 million, which represented a forty percent reduction in the level of effort from FY 1995. In response, DOE was required to reduce OCRWM's Yucca Mountain operations by one-third. Work on waste acceptance activities and interim storage facility design efforts were also reduced.

## 5. Litigation Delays

As described above, some of the regulatory delays have also entailed litigation. The spent fuel and high level radioactive waste management program has been subject to approximately two dozen different lawsuits. Many--but not all--of those lawsuits were brought by Nevada, reflecting its strong and continuing opposition to the siting of a spent fuel and high level radioactive waste disposal facility within its borders. Regardless of who initiated the suits, however, they have required considerable management attention, thus diverting resources that could otherwise have been devoted to program progress.

1. Wisconsin Electric Power Co. v. DOE, 778 F.2d 1 (D.C. Cir. 1985) Held: The fee charged by DOE for disposal of nuclear waste applies only to electricity generated by a civilian nuclear power reactor and sold on or after April 7, 1983. The fee does not apply to electricity that a generating plant consumes itself.

2. General Electric Uranium Management Co. v. DOE, 584 F. Supp. 234 (D.D.C. 1984), aff'd, 764 F.2d 896 (D.C. Cir. 1985) Held: The court of appeals has exclusive jurisdiction to review rules adopted pursuant to the NWPA; DOE's one-time fee based on nuclear fuel burnup for disposal of nuclear spent fuel used to generate electricity prior to April 7, 1983 was reasonable exercise of discretion.

3. Nevada ex rel. Loux v. Herrington, 777 F.2d 529 (9th Cir. 1985) The Court employed an expansive reading of NWPA funding provisions to grant State of Nevada funding for pre-site characterization studies.

4. Texas v. DOE, 764 F.2d 278 (5th Cir. 1985), cert. denied, 474 U.S. 1008 (1985) Held: Designation by the Secretary of Energy of two sites in Texas as potentially

acceptable sites for a nuclear waste repository was not a "final order" for purposes of review under the NWPA. The Court noted that designation of sites would be revisited in the repository nomination process.

5. Tennessee v. Herrington, 806 F.2d 642 (6th. Cir. 1986) Held: The court of appeals has exclusive and original jurisdiction to review actions of the Secretary of Energy regarding compliance with National Environmental Policy Act; DOE was not required to consult with Tennessee before sending Congress its proposal for location and construction of an MRS facility.

6. Nevada v. Herrington, 827 F.2d 1394 (9th Cir. 1987) Held: The NWPA does not require that DOE provide funding to finance litigation by Nevada.

7. National Assn. of Regulatory Utility Commissioners v. DOE, 851 F.2d 1424 (D.C. Cir. 1988) Held: DOE did not abuse its discretion in denying petitions for rulemaking for a "notice" tentatively establishing a method for allocating waste disposal costs between government defense and commercial waste producers.

8. Consolidated Edison Co. of N.Y. v. DOE, 870 F.2d 694 (D.C. Cir. 1989) Held: The fee payable on electricity generated and sold on or after April 7, 1983 may not include a charge for electricity lost in transmission and distribution.

9. Commonwealth Edisón Co. v. DOE, 877 F.2d 1042 (D.C. Cir. 1989) Held: The court of appeals has original and exclusive jurisdiction to hear Nuclear Waste Fund cases; DOE's determination that the formula calculating interest paid by utilities into the Nuclear Waste Fund is to be based on market or investment yield of Treasury Bills instead of the lower "discount rate" was lawful.

10. Nevada v. Watkins, 914 F.2d 1545 (9th Cir. 1991), cert. denied, 111 S. Ct. 1105 (1991) Held: The Secretary of Energy's decision to continue site characterization of a potential radioactive waste repository in Nevada was not unconstitutional or otherwise contrary to law; Nevada's attempted legislative veto of the Secretary's site characterization activities stood as an obstacle to the accomplishment of Congress' purposes and objectives under the NWPA and was preempted under the Supremacy Clause.

11. Nevada v. Jamison, 918 F.2d 854 (9th Cir. 1990), cert. denied, 111 S. Ct. 2052 (1991) Held: Nevada did not have standing to challenge BLM's 1988 grant of a 13 year-right-of-way over public lands near Yucca Mountain for site characterization.

June 3, 1997

12. Counties of Inyo, California, and Esmeralda, Nevada v. DOE, 925 F.2d 1216 (9th Cir. 1991) Held: The Secretary of Energy's decision not to designate the counties "affected units of local government" was inconsistent with the NWPA.

13. TRW Environmental Safety Systems v. U.S., 18 Claims Court 33 (Cl. Ct. 1989) Held: DOE was enjoined from awarding the systems engineering and development contract for the management of the repository program to Bechtel Systems Management, Inc.

14. Nevada v. Watkins, 943 F.2d 1088 (9th Cir. 1991) Held: Claims under the National Environmental Policy Act challenging the adequacy and selection of repository sites were moot in light of the 1987 statutory designation of Yucca Mountain as the sole site for characterization.

15. Nevada v. Watkins, 939 F.2d 710 (1991) Held: The promulgation of siting guidelines for repositories (10 CFR Part 960) was preliminary decisionmaking under the site nomination provisions of Section 112 of the NWPA; judicial review was barred until the Secretary made his final recommendation on the Yucca Mountain site.

16. In The Matter of DOE Application 52338 (March 2,1992) Held: The State Engineer of Nevada found that there was sufficient unappropriated water at the proposed source to appropriate 94.83 acre feet of water per year (.2 cubic feet per second flow) for ten years from Nevada Test Site well J-13 for use at Yucca Mountain for site characterization; the appropriation would not conflict with existing water rights; and the proposed use does not threatened the public interest. The Nevada Engineer also concluded that the monitoring plan proposed by DOE and approved by the Park Service is sufficient to protect all adjacent water related resources, including those of the National Park Service at Devil's Hole National Park.

17. United States v. Nevada, Case No. CV-S-90-065-HDM (D.Nev. May 13, 1991) Held: Nevada was required to process the DOE applications for permits; the air and surface permits were to be issued forthwith.

18. Nevada v. Watkins, No. 92-70055, 993 F.2d 1442 (9th Cir. 1993) Held: DOE's interpretation of the payments-equal-to-taxes (PETT) provisions of the NWPA was reasonable; DOE's procedures allowed the State to make its own estimate of PETT and furnished an appeal process through DOE's Office of Hearings and Appeals.

19. In re State of Nevada, IBLA 88-229 (June 22, 1994) Held: The State had no standing before the Department of Interior Board of Land Management to question Bureau of Land Management's issuance of 13 year right-of-way-reservation over public lands near Yucca Mountain for site characterization purposes.

20. Nevada v. O'Leary, 57 F.3d 1078 (9th Cir. 1995) Held: Section 113 of the NWPA committed site characterization to the Secretary's discretion, and the Secretary did not have a duty to determine at the earliest possible moment whether the calcite-silica deposits at the site were disqualifying. Because the Secretary was not required to promulgate the siting guidelines as rules, judicial review of the siting guidelines was unavailable.

21. Nevada v. O'Leary, 63 F.3d 932 (9th Cir. 1995) Held: The Court of Appeals updated the district court determination that Nevada had not made a showing under Rule 27 of the Federal Rules of Civil Procedure that there was sufficient to preserve the testimony of 27 scientists.

22. Indiana Michigan Power Co. v. DOE, 88 F. 3d 1272 (D.C. Cir. 1996) Held: In return for the payment of fees by utilities, DOE is obligated to begin disposing of the utilities' spent nuclear fuel by January 31, 1998.

23. Nevada v. O'Leary, No. 96-70774 (9th Cir.) Nevada is seeking an order to compel the Secretary to make payments to the State for FY 96 oversight and monitoring activities under Sections 116 of the NWPA. This case is still pending.

**6. Consultation Requirements.** DOE and its predecessor agencies were founded in the spirit of a war emergency with the development of atomic weapons as a principal mission. This led to a culture of secrecy and a priority on national security that sometimes overshadowed safety, environmental and public participation concerns. The NWPA adopted a sharply different approach. Section 111(a)(6) recognized that "State and public participation in the planning and development of repositories is essential to promote public confidence in the safety of disposal." Not only is any repository or storage facility constructed under the NWPA subject to NRC licensing and the public hearing process that entails, but virtually every element of DOE's spent fuel management program is subject to extensive consultation and public comment requirements. As is appropriate for a program of this magnitude and controversial nature, the Mission Plan, the siting guidelines, environmental assessments, and consultation and cooperation agreements must all be based on public input. Such consultation is nevertheless time consuming and has given rise to a number of unavoidable delays.

The following are some of OCRWM program stakeholders with whom consultation is either required by statute or carried out pursuant to various formalized arrangements entered into in order to implement the NWPA mandates for openness and consultation:

State officials--Sections 101, 116, and 117 of the NWPA require DOE to consult with a state in which it is investigating a site for a potential high-level waste and spent fuel storage or disposal facility. A state also has the right to disapprove the siting of a high-level waste repository once a site has been selected by DOE and recommended to

Congress by the President. A state's veto can be overturned only by enactment of a new law by Congress. DOE provides grants to a state to oversee DOE's work when the Department is investigating a potential site for a repository or storage facility in the state. DOE also provides grants to a state to assess and mitigate the social and economic impacts of site investigation. Nevada refused to enter into a consultation and cooperation agreement with DOE and has continued to oppose the program. Although DOE has provided funds to the State for oversight of DOE activities at Yucca Mountain, the State has used a portion of those funds to oppose DOE's efforts. U.S. General Accounting Office, Nevada's Use of Nuclear Waste Grant Funds, GAO/RCED 96-72 (1996).

County officials--Under Section 116(c) of the NWPA, DOE provides oversight grants to counties and other local governments that it has designated as "affected" by a potential high-level waste storage or disposal facility. DOE must make the following payments to a local government whose jurisdiction contains a repository or monitored retrievable storage facility site: payments equivalent to the taxes that would have been paid if the eligible jurisdiction could tax federal activities at a repository or storage facility; impact assistance payments necessitated by the facility siting, construction, and operation; and payment for an on-site representative, designated by the local government in which the site is located, to oversee DOE activities at the site.

Indian Tribes--Treaties, case law, executive orders, and agreements between the Federal Government and Native American tribal governments guarantee specific rights to the tribes and provide the basis for a government-to-government relationship. Under the NWPA, tribes that are designated by the Secretary of the Interior as "affected" by a potential site (as defined in Section 2 of the NWPA) have the same rights as affected states. Although the Secretary of the Interior has not designated any tribes "affected," DOE has had extensive discussions with tribes on the issue of their designation.

Regional and National Organizations Representing Tribes (Nevada Indian Environmental Coalition, National Congress of American Indians, Intertribal Transportation Association)--Many individual tribes and tribal organizations have become involved in spent nuclear fuel and high-level radioactive waste policy decision-making, including repository siting and the OCRWM transportation program. For example, the National Congress of American Indians, which has a cooperative agreement with OCRWM, monitors and reviews legislation on the OCRWM program and advises the Department and other Federal agencies on potential impacts to the tribes from spent nuclear fuel and high-level waste transportation.

Regional Organizations & National Organizations Representing States, including Council of State Governments (Eastern Regional Council and Midwest Council), Southern States Energy Board, Western Interstate Energy Board, National Conference of State Legislatures--Regional and national organizations representing states foster intergovernmental cooperation through the promotion of regional as well as individual and state responses to common issues. Through various cooperative agreements with OCRWM, regional concerns pertaining to the transportation of commercial spent nuclear fuel and high-level radioactive waste are articulated and presented to OCRWM at organizational and DOE-sponsored meetings.

Transportation External Coordination Working Group (TEC/WG)--Disposal of spent fuel in a repository or centralized temporary storage facility will require transportation of tens of thousands of tons of spent fuel on public highways, railroads and waterways. The Transportation External Coordination Working Group, whose members represent organizations of state, tribal and local governments, and professional and industrial organizations that historically have followed DOE transportation activities, provides a mechanism for continuing and improved coordination between appropriate DOE elements, other levels of government, and outside organizations having a role in preparing for the required transportation activities.

National Transportation Organizations (American Association of State Highway Transportation Officials, Commercial Vehicle Safety Alliance, Association of American Railroads)-- These are national transportation organizations that promote the safety of commercial truck and rail shipping nationwide. The Commercial Vehicle Safety Alliance (CVSA) maintains a cooperative agreement with OCRWM that focuses on developing a commercial truck inspection package for spent fuel. All three organizations participate in the TEC/WG.

National Technical Organizations (National Association of Regulatory Utility Commissioners, Conference of Radiation Control Program Directors)--The chief objective of the National Association of Regulatory Utility Commissioners (NARUC) is to serve consumers by seeking to improve the quality and effectiveness of public utility regulation in the United States. NARUC's Nuclear Waste Program was established with the objective of bringing together the nuclear industry, regulators, environmentalists and others so that site characterization studies leading to the establishment of a high-level nuclear waste repository could proceed. The Conference of Radiation Control Program Directors (CRCPD) is a nonprofit professional organization comprising individuals in state and local governments who regulate and control the use of radiation sources, and of individuals--regardless of affiliation--who have expressed an interest in radiation protection. Both NARUC and CRCPD maintain cooperative agreements with OCRWM.

June 3, 1997

Emergency Management/Response Groups--Emergency management/response groups have provided input into policy decisionmaking for implementation of the Section 180(c) grant program of the NWPA. A number of these groups are members of the TEC/WG.

In addition to the foregoing formal consultation arrangements with governmental and technical organizations, the Department must consult with a large number of other stakeholders on a less structured or more intermittent basis. Citizens, contract holders, utility industry trade organizations, educational and professional organizations with an interest in high level radioactive waste disposal, equipment suppliers, and labor unions are noteworthy among those stakeholders who have been active participants in reviewing, commenting on and participating in various ways in the high level radioactive waste and spent fuel disposal program. With particular respect to citizens, their perspectives about the OCRWM program reflect their roles as taxpayers, consumers (and ratepayers) of electric power, community residents, workers' rights advocates, environmentalists, public health advocates or concerned parents. Citizens have become involved in the OCRWM program by participating in OCRWM-run public participation events, by using grassroots organizing methods, by communicating their views to their elected officials on how to amend the NWPA, and by commenting on rulemakings and NEPA documents. As an indication of the level of citizen interest, DOE's EA's on nine candidate repository sites generated 20,000 public comments. The more recent scoping notice announcing DOE's intention to prepare an Environmental Impact Statement on Yucca Mountain has generated comments from 1,000 different individuals and organizations to date, and more are continuing to come in even though the deadline for comments has passed.

As noted above, it is a fundamental premise of the NWPA that consultation with this broad range of stakeholders is necessary to build public confidence in the high level radioactive waste disposal program. Moreover, input from these stakeholders has played an integral role in shaping the program and allowing it to move forward. Nevertheless, carrying out the required consultation has contributed to the unavoidable delays that the program has experienced.

**CONCLUSION**

For all the foregoing reasons, I have preliminarily determined that the Department's delay in beginning acceptance of spent fuel was unavoidable within the meaning of Article IX of the Standard Contract.

# Department of Energy

Washington, DC 20585

NOV 0 3 2004

QA: N/A

John B. Carden III
Contract Manager
Procurement – TVAN Contracts
Tennessee Valley Authority
1101 Market Street
Chattanooga, Tennessee 37402-2801

Dear Mr. Carden:

This letter responds to your August 24, 2004 letter that replied to my July 28, 2004 letter announcing the resumption of the Delivery Commitment Schedule (DCS) process. Your letter indicates that Tennessee Valley Authority (TVA) will not be submitting DCSs for allocations accorded it by the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) until required by the schedule set forth in the disposal contract between TVA and the Department of Energy (DOE).

Your letter states that "TVA understands that DOE has abandoned the March 1995 APR/ACR waste acceptance allocation schedule." As an initial point of clarification, the method of allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is precisely the same as the method used in the 1995 APR/ACR. Specifically, both the 1995 APR/ACR and the 2004 APR/ACR utilize an "oldest fuel first" method of allocating acceptance positions in the acceptance queue as provided by the Standard Contract. That method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract.

With regard to the acceptance schedule identified in the 2004 APR/ACR, that schedule reflects DOE's current planning for acceptance of SNF at the Yucca Mountain repository once operations begin in 2010, assuming that various factors upon which DOE's planning is based remain unchanged.

With regard to your suggestion that DOE has "abandoned" the 1995 APR/ACR "schedule," it is unclear whether you are referring to the rates at which DOE now anticipates it will be able to accept SNF from Purchasers under the Standard Contract beginning in 2010 or whether, instead, you are referring to an abandonment of the DCSs that were approved in conjunction with the 1991 ACR, the 1992 ACR, and the 1995 APR/ACR. Because TVA has never obtained any approved DCSs, we presume that TVA wants to ensure that DOE anticipates its ability to approve DCSs to be submitted in the future based upon the allocations identified in the 2004 APR/ACR. To the extent that TVA's concern relates to DOE's ability to approve future-submitted DCSs, we anticipate that, based upon current progress at the Yucca Mountain site, we will approve DCSs submitted in accordance with the allocations identified in the 2004 APR/ACR. Although Purchasers are certainly entitled to submit DCSs requesting acceptance of

Printed with soy ink on recycled paper

SNF under different allocation scenarios, DOE does not anticipate that it will be able to approve those requests in light of its obligations to allocate SNF acceptance positions to all Purchasers on an "oldest fuel first" basis and in light of the limitations upon the amount of SNF that DOE can accept in any given year. However, Articles V.B, V.C, and XVI of the Standard Contract provide a mechanism for resolving any disputes about acceptance allocations and disapprovals of DCS submissions.

To the extent that TVA has concerns about the interrelationship between previously approved DCSs and any new DCSs that DOE receives, the DCS approval process should eliminate those concerns. DOE understands that, when it approved DCSs from 1992 through 1997, it created commitments to accept specific amounts of SNF from specific Purchasers during specific periods of time, and, as you know, DOE's delay in accepting SNF in accordance with those DCSs is now the subject of litigation in the United States Court of Federal Claims. Although DOE had hoped when the earlier DCSs were being reviewed beginning in 1992 that it would be able to begin SNF acceptance in 1998 for storage in a monitored retrievable storage facility and based its acceptance rates upon that scenario, DOE currently anticipates being able to begin SNF acceptance at the Yucca Mountain repository in 2010. Because of the different types of facilities contemplated for acceptance in 1998 and in 2010, DOE believes that, once it begins accepting SNF, it will be in a position to accept SNF at a different rate at a repository than it had anticipated when it previously reviewed and approved DCSs for acceptance at a monitored retrievable storage facility. Accordingly, in the 2004 APR/ACR, we have identified new allocations based upon anticipated acceptance rates that are higher than those in the 1991, 1992, and 1995 ACRs.

Because of the increased anticipated acceptance rates and the currently anticipated acceptance dates, it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs, which contain allocations that do not conform to the current anticipated rates. In addition, Purchasers may now wish to change the location from which the SNF is to be accepted or the dates of discharge identified in the original DCS submissions. Accordingly, any new DCSs that Purchasers submit may reflect these changes or request acceptance of the additional SNF covered by the new allocations granted. We anticipate that any new DCSs that are approved will replace, rather than supplement, the previously approved DCSs. To eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs, we will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are approved actually replace, rather than supplement, the previously approved DCSs. That agreement will be reflected in any future DCS approvals.

Please contact me if you have any questions.

Sincerely,

David Zabransky
Contracting Officer
Office of System Analysis & Strategy Development

**Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004**

**Heritage Reporting Corporation**

**Page 3378 to Page 3660**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract -- I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities -- I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was -- several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being -- I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific --
A No.
Q -- rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific -- I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you -- did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3630

written input on their position?
A Yes.
Q All right. I would like to show you what's been identified as Defendant's Exhibit 2.034.
MR. MILLER: Your Honor, I have a paper copy for the Court if you would like it.
THE COURT: Thank you, Mr. Miller.
MR. MILLER: Mr. Morgan, do you need a paper copy?
THE WITNESS: No, thank you.
BY MR. MILLER:
Q Mr. Morgan, I'm showing you now on the screen what's been admitted as Defendant's Exhibit 2.034. And I'll ask you if you recognize that.
A Yes, I do.
Q What is it? What do you recognize it to be?
A It's a letter from Edison Electric Institute to me as the project director on -- the subject being the standard contract.
Q All right, sir. And do you recognize this to be EEI's comments on the draft contract?
A Yes.
Q All right. Specifically, I'll refer you to page 8 of that letter in the first paragraph. Do you see that?

Page 3631

A Yes.
Q All right, sir. It's been blown up on the screen for you there. Can you see it?
A Yes.
Q All right, sir. If you would, sir, read the first sentence into the record, please, sir. It begins with although.
A Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article 2 states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act.
Q All right, sir. I'm sorry. Would you go on and just read the next two sentences?
A However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW, period.
Q All right, and SNF refers to spent nuclear fuel?
A Yes. And HLW is high-level waste.
Q All right, sir. And do you recall that statement to be true, that last statement that you read, that is, that the draft does not -- the draft

Page 3632

contract did not commit DOE to accept any given quantity of SNF?
A That's correct.
Q All right, sir. I'll next refer you to page 2 of appendix A, which is an attachment of this letter. And if you'll look at the second paragraph, please, sir.
All right. Do you see that blown up on the screen for you, sir?
A Yes.
Q All right, sir, beginning in the sentence in the middle of the page that begins while the contract, do you see that?
A Yes.
Q Would you read that, please, sir?
A While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least quantitatively, the need to have adequate annual receiving capacity to handle industry needs.
Q All right, sir. Please go on.
A This would be consistent with the direction of section 302(a)(5) of the act that DOE will take title to spent nuclear fuel and high-level waste as expeditiously and practicable upon request of the

Page 3633

generator or owner.
Q All right. That's "as expeditiously"?
A Expeditiously as practical. Right. Excuse me.
Q That's all right, sir. Start with the sentence that begins with "a new clause."
A A new clause should be added, and then there's a clause.
Q All right, sir. Would you just read that?
A Whereas DOE recognizes that its ability to take the delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.
Q All right, sir. Now, do you recall that to be the acceptance rate that Mr. Mills discussed with you when he came to talk to you about the contract acceptance rate?
A Yes.
Q And, sir, when you published the final rule in April of 1983, did you include that qualitative

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that -- did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you -- even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid -- that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the -- what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of -- I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to -- for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first --
Q All right, sir.
A -- from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the -- what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were -- during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3642

BY MR. MILLER:
Q Can you see that okay, Mr. Morgan?
A Yes.
Q The cover page of this document says that it's the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th to the 15th, 1983.
Do you see that?
A Yes.
Q All right. Do you recall this proceeding, Mr. Morgan?
A Yes.
Q All right. Specifically, I'll refer you to page 11. And do you recognize – recognize page 11, Mr. Morgan? Can you see it?
A Yes.
Q I've got a paper copy.
A No, I can see it.
Q Do you recall making a presentation at this December '83 information meeting?
A Yes.
Q All right. I'll refer you specifically to the second column – I'm sorry, to the right-hand column, the second paragraph. And I believe this document refers to your having just received a

Page 3643

preliminary draft of volume 1 of the mission plan. And you hoped to have that available to interested parties, the states and others, by Christmas. Do you see that?
A Yes.
Q And do you recall whether or not you were able to make that draft mission plan available at or around that time?
A I know we put out the mission plan around that time. But I'm not sure whether it made the Christmas date or not.
Q All right. How about the fourth paragraph, sir. Would you have a look at that. I'm sorry. It's the next paragraph. Okay. Do you see that paragraph now, the one that's highlighted, Mr. Morgan?
A Yes.
Q Would you read that first sentence, please, sir?
A I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the act requires that we receive waste from the utilities by January 1, 1998.
Q All right, sir. I'm sorry. I was just referring to the first sentence there.

Page 3644

And long about the middle of the paragraph where it says the basic strategy, do you see that?
A Yes.
Q Would you read that, please, sir?
A The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on the site.
Q All right, sir. Now the word you used there was strategy. Did you believe that the information you set out in the mission plan was a contractual requirement?
A No.
Q What was it then?
A As required by the act, section 3, it was an informational document, clearly not contractual.
Q All right, sir. And in your mind what did it represent to the program?
A It represented the goals and what we would like to accomplish relative to specific activities.
Q All right, sir. And so with respect to your previous statement about dealing with the acceptance rate in the mission plan, we'll talk a little bit about the mission plan in a minute, but did you perceive the rates in the mission plan to be

Page 3645

contractual requirements?
A No.
Q All right, sir. Now, I would like to refer you to the last sentence in that paragraph – I'm sorry, Dawn. The last sentence in that same paragraph.
Would you just read that, please, sir?
A During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.
Q All right, sir. Did you feel that statement reflected contractual intent on the part of the Department?
A No.
Q All right, sir. Once, again, sir, what did you think it represented?
A It was in the plan to notify or let the utilities realize that they would not have to make additional commitments for on-site storage after the beginning of 1998. But they would – if you look at the mission plan, it shows –
Q Which we're going to do in just a minute.
A It shows an increase of stored fuel because

Page 3646

the rate starting in 1998 did not meet the discharge rates until later on in the program.
Q All right, sir. We'll look at that now, if you don't mind.
Yankee Atomic Exhibit 636. All right.
Mr. Morgan, I'm showing you now what's Plaintiffs' Exhibit 636. Do you recognize this document, sir?
A Yes.
Q And is this the document that was – that was produced by the program during your tenure?
A Yes.
Q All right, sir. If you'll look at page 1-2, please, sir, and the last paragraph. And the first sentence in that paragraph, sir, would you just read it.
A It is the department's intent to update this mission plan periodically as the program progresses.
Q I'm sorry, sir. The first sentence that's highlighted there.
A Oh, the first sentence.
Q Yes, sir. In that paragraph?
A The mission plan has been prepared as a means of both planning the program and demonstrating its conformance to the requirements of the act.
Q All right, sir. And do you recall that –

Page 3647

that that's what you intended the mission plan to be at the time you published this document?
A Yes. It was an informational document.
Q All right, sir. What relationship did it have to the department's contract with the utilities?
A None.
Q And once again, sir, did this statement that's contained in the – I apologize. Let me move on to page 2-1, please.
And actually, I want to – sorry. Can you blow this up.
The last paragraph is the one I wanted to ask you about there, Mr. Morgan. Do you see that?
A Yes.
Q All right, sir. Once again, that first sentence there, would you read that?
A This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site interim storage needs prior to 1998.
Q All right, sir. And just go on. Read the –
A Until 1998, each utility will be responsible for providing its own additional on-site interim

Page 3648

storage unless the utility applies for and is certified for the Federal Interim Storage Program.
Q All right, sir. Do you recall that that represented your view at the time, that was that utilities were responsible for providing their own additional on-site interim storage?
A Yes.
Q And once again in your mind, you intended this plan to inform the utilities about what they could anticipate as far as their additional storage?
A Yes.
Q All right, sir. If we go to the bottom of 2-2 and the top of 2-4.
All right, now, Mr. Morgan, I believe that in between pages 2-2 and 2-4 there's a table that we'll talk about in a minute. But I believe that this language that's highlighted here on 2-2, 2-4 – 2-4 is a continuation of 2-2. So I'll ask you to read that – just read it to yourself and let me know when you're finished.
A I'm finished.
Q All right, sir. Now in the first sentence there you say: While the department's acceptance rate during the initial 5 years is set to prevent, in the aggregate, the need for utilities to provide

Page 3649

additional on-site storage after 1998. Do you see that there?
A Yes.
Q In that part of that sentence that I read, what does in the aggregate mean? Do you recall?
A The total discharge from the utilities versus the acceptance at the repository.
Q Okay. I'm sorry. When you referred to the in the aggregate, as far as the department's acceptance rate is concerned, what was –
A The total.
Q What did you mean?
A The total. In the aggregate means if you look at the discharge – well, in total, you don't – most of the utilities won't have to add on-site storage.
Q All right, sir. And the sentence that begins the planning basis, do you see that?
A Yes.
Q I'll read that. The planning basis assumes that, after 1998, individual utilities who actually realize this need – and that is the need for expanded storage, I believe – will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation.

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.

92

**Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 3, 2004**

**Heritage Reporting Corporation**

**Page 3661 to Page 3887**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3661

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3662

APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

Page 3663

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 3664

P R O C E E D I N G S
\- - - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.
THE COURT: Go ahead, whenever you're ready.
Whereupon--
ROBERT MORGAN
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Resumed)
BY MR. MILLER:
Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

proceeding, there might have been a little bit of confusion on that point.

But ultimately, we're talking about the same relevancy. Thank you for your time.

THE WITNESS: You're welcome.

THE COURT: Any redirect?

MR. MILLER: Short redirect, Your Honor.

THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. You thought you were going to get away, didn't you, Mr. Morgan?

THE COURT: I don't blame you, you want to go back to Oregon, I think.

THE WITNESS: I now live in Colorado.

THE COURT: Oh, Colorado.

BY MR. MILLER:

Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?

A. Yes.

Q. Was that a deliberate choice on your part?

A. Yes.

Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?



A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.

Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?

A. Not in total because of the fact that NRC had not identified the requirements for licensing.

Q. Okay.

A. And quite honestly –

Q. I'm sorry.

A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.

Q. So that was a concern of yours?

A. Yes, that was a concern of mine.

Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?



A. Yes.

Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?

A. No.

Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?

A. No, that was not part of the Act.

Q. Was that a program goal that you had at the time you were director –

A. That was a program goal that we identified in the mission plan.

Q. And is that a goal that DOE specifically declined to put in the contract?

A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.



Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?

A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.

MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.

THE COURT: Anything further?

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: All right. You're excused, and thank you very much for your testimony.

THE WITNESS: Thank you, sir.

MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.

Whereupon–

BENARD C. RUSCHE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Are you all set, Mr. Rusche?

**Tennessee Valley Authority v. U.S. No. 01-249C July 14, 2005**

**Heritage Reporting Corporation**

**Page 2078 to Page 2330**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2186

THE COURT: Mr. Kiraly, I believe – Mr. Crawford?

MR. CRAWFORD: No further questions.

THE COURT: Mr. Shea, may I excuse Mr. Kiraly as a witness?

MR. SHEA: You may, Your Honor.

THE COURT: Mr. Kiraly, I may now excuse you as a witness, and I do so with appreciation, and thanks for your testimony here yesterday and today. You are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. Now, before Ms. – while we're getting set up and Mr. Palmer and others would start getting set up, may I use this little hiatus to make my request to counsel? It really is directed, Ms. Orfield, to the lead counsel and Mr. Shea as the counsel of record. Obviously, there are embedded in Mr. Kiraly's testimony, as there have been some other witnesses, but especially Mr. Kiraly's testimony, some legal concepts. And to my mind, some of those, not all, but some of those legal concepts are reflected in a decision by the Federal Circuit styled Wickham Contracting Company v. Fischer, 12 FR 3d 1574, decided in 1994. That deals specifically with

Page 2187

overhead and AFUDC, what might pass in this case for AFUDC, but that is a case in which a government contractor was making a claim.

This case is a little different. This is just the reverse because the government is providing the service to the private party, rather than the private party providing a service to the government. And my, what I would ask counsel to do when you're engaged in post-trial briefing in this case is to deal with the converse situation in contrast to a case such as Wickham. Am I getting through? I'm trying to be as brief and concise as I can in making this request.

MS. ORFIELD: I think it's clear, Your Honor.

THE COURT: Thank you, Ms. Orfield. Mr. Shea?

MR. SHEA: Absolutely clear, Your Honor, you may have recalled, but I sort of argued that to begin the litigation.

THE COURT: I understand, I understand. It's just that because of Mr. Kiraly's testimony, it's embedded all the way through, and I just think we have to deal with this explicitly. Are we ready, Ms. Sullivan?

Page 2188

MS. SULLIVAN: We are, Your Honor.

MR. LO RE: Your Honor, I wondered if maybe we could just take a very quick break while we set up and if we could reconnoiter here momentarily?

THE COURT: Yes, in fact, we'll go off the record for a minute. Everyone can stay, or they may leave. It's up to them.

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

MS. SULLIVAN: Your Honor, Ms. Heide Herrmann is with Mr. Morgan in Los Alamos. She's a member of our office. Just to speed things along, may I ask, Ms. Herrmann, could you make sure the following exhibits are easily accessible for Mr. Morgan: The binder containing Defendant's Exhibit 5, the separate documents Defendant's Exhibit 5.034, 5.063, Defendant's Exhibit 28, Defendant's Exhibit 27, and Defendant's Exhibit 37. Do you have all those documents?

MS. HERRMANN: Yes, I believe I do.

(Discussion off the record.)

THE COURT: Ms. Sullivan, would you formally call Mr. Morgan as a witness?

MS. SULLIVAN: Yes, Your Honor. The government calls Robert L. Morgan as its next

Page 2189

witness.

THE COURT: Mr. Morgan, I'm authorized by statute and rule to administer the oath to you by this remote means, if you're testifying by video conference. If I give you the oath, will you respond, please?

THE WITNESS: Yes, I will respond.

THE COURT: All right, thank you.

Whereupon–

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Would you please state your full name for the record?

THE WITNESS: Robert L. Morgan.

THE COURT: Thank you, Mr. Morgan. And, Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, when did you serve as the director of what became known as the Office of Civilian Radioactive Waste Management?

A. From late January 1983 until sometime in

Page 2190

January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

Page 2191

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

Page 2192

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.
Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?
A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.
Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?
A. Could you repeat the question, please?
Q. Yes. How have you been employed since you retired from DOE in 1988?
A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

Page 2193

impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.
Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?
A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register. We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.
Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

Page 2194

Civilian Radioactive Waste Management?
A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then --
THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?
A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

Page 2195

A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

Page 2196

lawsuit, and they're hearsay.
THE COURT: Well, let's sort out relevance first. Ms. Sullivan?
MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.
THE COURT: Mr. Small, do you have anything further?
MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.
THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?
MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

Page 2197

because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.
THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?
MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.
BY MS. SULLIVAN:
Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?
A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than

Page 2198

there was from Westinghouse.
So we were trying to formulate a way to make it an equitable cost for both GE and Westinghouse. This is the fuel that existed prior to the establishment of the 1 mil per kilowatts. The average of the expenses to GE and Westinghouse had to be an average of 1 mil per kil watt for the aggregate of that fuel.

Q. Thank you, Mr. Morgan. Turning back to what you recall about your discussions regarding the rate of acceptance, I believe you testified that the request of the utilities with regard to the rate of acceptance was rejected. Why was the request rejected?

A. The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders.
But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I

Page 2199

would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.

Q. Mr. Morgan, do you have the exhibits that comprise Defendant's Exhibit 5 before you?

MS. SULLIVAN: Ms. Herrmann, could you provide those exhibits to Mr. Morgan? Your Honor, this is a binder that's been provided to the Court.

THE WITNESS: Yes, I have.

MS. SULLIVAN: Thank you. And, Your Honor, we elected not to use the Trial Director because, if we did do that, we would lose Mr. Morgan's picture.

BY MS. SULLIVAN:

Q. So, Mr. Morgan, did you have an opportunity to review the stack of materials that's been placed in front of you prior to before we began today?

A. This entire record was transmitted to me by e-mail yesterday, and I spent last evening and a little time this morning going through these records.

Q. Mr. Morgan, do you recognize the set of documents before you to be the administrative record to the standard contract?

A. Yes, I do.

Q. Do you recall receiving these documents in the course of the development of the standard

Page 2200

contract?

A. Yes.

Q. And were these documents sent directly to you?

A. I beg your pardon?

Q. Were these documents sent directly to you?

A. Some of them were sent directly to me. Some were sent to the contracting officer who had signed the rule. But I did review all of these records when they came in.

Q. And why did you review these documents?

A. Because I was held responsible for the contract by the Secretary of Energy and I felt that I had to review those in the rule-making, and I had the responsibility of making the decision as to whether they were included or not.

Q. Thank you, Mr. Morgan.

MS. SULLIVAN: Your Honor, at this time, the government moves for admission of Defendant's Exhibit 5, which is the administrative record for the development of the standard contract. I have questions about two particular sets of comments in this document -- I mean, in this set of documents, but I would like to move for admission of the entire record.

Page 2201

THE COURT: Before we get Mr. Small's reaction to that request, would you please, Ms. Sullivan, identify for the Court exactly what you mean by Defendant's Exhibit 5?

MS. SULLIVAN: Yes, Your Honor. Defendant's Exhibit 5, which are Defendant's exhibits, they're broken up through Defendant's Exhibit 5.000 through Defendant's Exhibit 5.086.

THE COURT: Does that, and this is not going to make sense to Mr. Morgan, but does that essentially comprise this first volume?

MS. SULLIVAN: Yes, Your Honor, that has been provided to the Court.

THE COURT: All right. Mr. Small?

MR. SMALL: Your Honor, we do not dispute that the volume contains letters that were received by DOE regarding the standard contract, apparently, in 1983, but we just had a few minutes to look at it. On the other hand, Your Honor, the letters predominantly -- I mean, I think there might be one in there from TVA, but predominantly, they're from other utilities, not TVA.
And to that extent, they're hearsay, and also, Your Honor, the vast bulk of this record is totally irrelevant to any issue in this case, and to

Page 2206

Q. Mr. Morgan, could I ask you to turn to what
is marked as Defendant's Exhibit 0.34?
A. Yes, I have that document.
Q. Okay. Mr. Morgan, do you recognize this to be a copy of the Edison Electric Institute's comments on the standard contract, the draft standard contract?
A. Yes.
Q. Do you recall reviewing this set of comments at the time it was submitted?
A. Do I recall receiving this?
Q. No, my question, do you recall reviewing this document?
A. It's still -- I still didn't hear the question.
Q. My question was whether you recalled reviewing this document.
A. Yes, I reviewed this document.
Q. Thank you. Mr. Morgan, what is your understanding as to what the Edison Electric Institute is?
A. The Edison Electric Institute is an association of electric generating companies, and I believe that they are a Washington lobbying group.
Q. Thank you. Mr. Morgan, would you please

Page 2207

turn to page eight of the letter from EEI?
A. Page eight?
Q. Yes. And, Mr. Morgan, I would like to read a portion of that first paragraph into the record and then ask you a question. The paragraph begins, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW."
Do you see where I've read, Mr. Morgan?
A. Yes, I see that.
Q. Mr. Morgan, do you recall the concern from EEI that is raised in the portion of the paragraph that I just read?
A. Yes, I recall this concern.
Q. And could I direct your attention to two pages later in the document, the second page of the attached detailed comments, do you have that page in front of you, Mr. Morgan?
A. Yes, I do.

Page 2208

Q. And that second paragraph on that page reads, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated, together with the accumulated backlog of SNF/HLW.
We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize at least qualitatively the need to have adequate annual receiving capacity to handle industry needs.
This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added."
And then, Mr. Morgan, if you turn the page, the clause reads, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and

Page 2209

waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."
Mr. Morgan, do you recall reviewing the material that I just read from EEI's comments on the draft standard contract?
A. Yes, I recall that.
Q. Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. We considered it and rejected it.
Q. And why was it rejected?
A. Because of the uncertainties of the program that I mentioned earlier; and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.
Q. Mr. Morgan, would you please turn your attention now to what's marked as Defendant's Exhibit 5.063?
A. Yes, ma'am.
Q. Mr. Morgan , do you recognize this document

Page 2210

to be TVA's comments on the standard contract?
A. This document that I have does not have a cover letter on it, and so I can't say whether this was addressed to me, but I do know that we've reviewed comments from TVA.
Q. And if I could direct your attention to the first page of the exhibit, I believe the fourth line down in the first paragraph reads, "TVA believes a separate contract should be made for each reactor unit." Do you see that?
A. No, I don't. This is on page -- the first page?
Q. The first page under general comments, the fourth line in that first paragraph.
A. Yes.
Q. "TVA believes."
A. Yes.
Q. Okay. Does that provide any insight as to whether these were TVA's comments on the contract?
A. I don't understand that question, I'm sorry.
Q. I'm being inartful, and I apologize. You said that it doesn't have a cover letter, but you do recall receiving comments from TVA that were reviewed, is that correct?

Page 2211

A. That is correct.
Q. Okay. But without a cover letter, you don't know whether these were TVA's comments?
A. I can't, you know, say whether these were TVA comments sent to me, and, again, it's been a long time since I looked at some of these records.
Q. Well, let me ask you this, do you agree that there are statements with regard to, that mention TVA in them, in this document?
A. Yes.
Q. Mr. Morgan, would you please turn to page five of this document?
A. Yes.
Q. And I direct your attention to the middle of that page, and I'm going to read a section into the record that begins, "In addition, a commitment to *do no more than start accepting deliveries by 1998 is* empty and meaningless without setting forth some *reasonable minimum rate of acceptance which* corresponds with the purposes of the Act. Of course, *under the priority ranking system in the draft* contract, it would be difficult at the time contracts *are executed to give each purchaser assurances of* delivery acceptance at any specific rate. *This could, however, be done on an industry*

Page 2212

wide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V: DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998 at not less than the annual rate of SNF and/or HLW is then being produced from civilian nuclear power plants covered by the contract with DOE for disposal of SNF and/or HLW.
After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to set date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchasers, nuclear power plants specified in Appendix A."
Mr. Morgan, do you recall reviewing the provision or the request and the comments that I just read?
A. I recall reviewing these comments, and they were denied.
Q. And why were they denied?
A. It would be unconscionable for me as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program that I discussed earlier. I don't know

Page 2213

how else to say it, but it is not, it was not required by Nuclear Waste Policy Act, and we did not include it.
Q. Mr. Morgan, would you now look at Defendant's Exhibit 28, please?
MS. SULLIVAN: Your Honor, I understand that Defendant's Exhibit 28 has already been admitted into evidence.
THE COURT: Yes, on the 21st of June.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, I'd like you to turn to the third page of this document, which is titled, "Summary of Disposition of Major TVA Comments."
A. Yes.
Q. Do you have that in front of you?
A. Yes.
Q. And I'd like to read the comment and the response and then ask you a question.
"Comment: The contract should address at *least the minimum duties DOE must perform in return* for payments to the Nuclear Waste Fund.
"Response: DOE made little in the way of substantive changes defining their responsibilities. *The second recital was changed by adding the phrase*

Page 2214

'as expeditiously as possible regarding DOE's responsibilities for taking title to spent nuclear fuel or high-level radioactive waste.' Some clarifications were made regarding establishment of the acceptance priority ranking of purchasers. However, no substantive dates or rates of removal of SNF are established beyond the requirements of the Act, which requires DOE to start accepting SNF by 1998."

Mr. Morgan, the last sentence of that response that I read regarding some clarifications were made, but no substantive dates or rates of removal of SNF were established, that statement, does it comport with your recollection of DOE's consideration of TVA's comments regarding the acceptance rate?

A. Yes.

Q. I now direct your attention to what is page five of this document, but it's marked page three at the top.

A. Page five?

Q. Page five of the document, but it's marked page three, and it's with the third comment. The number three is at the top.

A. Yes.

Page 2215

Q. Great. I'll forego reading the comment, but I'll read the response and then ask you a question.

"Response: DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue not later than January 1st, 1987 a capacity report for planning purposes and, beginning April 31st, 1991, annual acceptance priority ranking the oldest SNF and HLW having priority for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal program's plans and cost projections."

Mr. Morgan, the response that I just read, does that comport with your recollection of DOE's consideration of TVA's comments regarding what should be included in the contract with regard to acceptance rate?

A. Yes.

Q. Mr. Morgan, could I now ask you to look at Defendant's Exhibit 27?

A. I have that.

Q. Mr. Morgan, this is a copy of a May 20th,

Page 2216

1983 letter from Edison Electric Institute to you. Have I described the document correctly?

A. Yes, I recall this document.

Q. And do you recall receiving this document?

A. Yes, specifically.

Q. And why do you recall receiving this document?

A. I beg your pardon?

Q. Why do you recall receiving this document?

A. Because it was the same theme after the final rule-making that they had presented to us during the rule-making process.

Q. And what did you do in response to this letter?

A. I'm not sure what the response was. I don't have that -- I don't know whether it was answered specifically or not. I can't say right now. I don't recall.

MS. SULLIVAN: Your Honor, at this time, I'd like to move for admission of Defendant's Exhibit 27.

THE COURT: Mr. Small?

MR. SMALL: Your Honor, I don't understand that the proper foundation has been laid for 27. It appears to be a copy of an Edison Electric Institute

Page 2217

letter that was sent to DOE in May of 1983. However, it was not part of the rule-making for the standard contract. It was, as I understand his testimony, it was sent after the close of the rule-making, and the witness is unable to say what, if anything, was done in response to it.

THE COURT: Well, I don't have a difficulty with the foundation in that respect because Mr. Morgan just testified he recalls specifically receiving it. I've got a small problem on relevance because it appears that this letter and the attachment relate to the controversy in the early mid-'80s over the way in which the fee would be computed.

MS. SULLIVAN: Your Honor, I agree that that is the primary focus of the letter. However, there is an issue with regard -- there's a mention made of the acceptance rate issue, and that's what I wanted to ask Mr. Morgan about, not about the fee issues, but I understood that I was not to ask any substantive questions prior to seeking admission of the document.

THE COURT: That's right. Where?

MS. SULLIVAN: If you look at the bottom paragraph that begins, "Considering," there's a

Page 2230

*would be a sufficient foundation. I heard him* testify that these were what everyone said, but I did not hear the witness testify that he was present at the entire meeting.

THE COURT: Well, no, but I think it's been established by Mr. Morgan that this was intended to be a complete compilation of the presentations at the meeting, and accordingly, DX-37 is admitted, and it's admitted in lieu of PX-8.

(Defendant's Exhibit Number 37 was received in evidence.)

THE COURT: I just note for the record that pages five through seven of this document appear to contain a statement by Daniel Boggs, Deputy Secretary, U.S. Department of Energy. It's a good thing this case isn't in the Sixth Circuit or Chief Judge Boggs would be recused from the case, and that's a relief to my family because one of my sons, my youngest son is going to be clerking for Chief Judge Boggs in about a month.

Ms. Sullivan, you may continue.

MS. SULLIVAN: Thank you, Your Honor, these are my last questions.

BY MS. SULLIVAN:

Q. Mr. Morgan, could I ask you to turn to

Page 2231

pages 11 and 12 of Defendant's Exhibit 37?

A. Yes.

Q. And may I direct your attention to the paragraph in the right-hand column which begins, "I would like to talk," and I'll read this paragraph into the record and ask you a question or two.

"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be *in accordance with the Act.*

However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of the operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."

Mr. Morgan, do you recall that portion of

Page 2232

*your comments?*

A. Yes, I do.

Q. Why did you make that statement?

A. Why did I make that statement?

Q. Yes.

A. I made it because the Nuclear Waste Policy Act clearly did not specify a repeat rate, but that we recognized that it may be the intent, or our program should be put together to meet the acceptance rate that we were going to put into the mission plan which, as I recall, there was an increase in backlog that went until 2003, but with a lead time of about five years to provide on-site storage that, in '98, that they would not have to make any further commitments for storage of fuel on-site. And that's what we were, that was a goal we were trying to achieve.

Q. Was DOE obligating itself to accept fuel at the rate set forth in the mission plan?

A. Was it a DOE obligation to accept fuel?

Q. Yes.

A. Is that right?

Q. At the rate set forth in the mission plan.

A. No.

Q. Why not?

Page 2233

A. Because there's a, one of the -- a commitment, a contractual commitment is one thing, and another is the mission goal that we were trying to meet. It was not a contractual requirement, but this is what we interpreted the Nuclear Waste Policy Act to say. I will have to say that there were two separate bills, one passed by the House and one passed by the Senate, and that we did not have the benefit of a conference report to get to the final language.

So we had to assume the intent because it was not specified. Some of the members of Congress wanted total emphasis on monitored retrievable storage. Others wanted emphasis on the repository. *So we walked a fine line between the different* directions that we were hearing from Congress.

Q. Mr. Morgan, you just testified about the intent of the NWPA, and your statement, the portion of your statement that I read makes a reference to regarding the intent of the NWPA or the Nuclear Waste Policy Act. How did you determine what you believed to be the intent of the Nuclear Waste Policy Act?

A. How did we determine that?

Q. Yes.

A. *By reading the Nuclear Waste Policy Act;*

Page 2234

that was our, that was our direction.
Q. From your review, did you have an understanding that the NWPA contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel from the utilities?
A. It was silent on rate acceptance.
Q. Did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would preclude utilities from having to add further storage facilities on-site?
A. No, that was not a commitment or a requirement of the Act.
Q. And did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would work down the backlog of spent nuclear fuel in a specific amount of time?
A. No, that was not part of the Act either.
Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement, and I'd like to read that into the record and then ask you a couple questions. That portion reads, "After the initial operation of the repository through the first few years, we would anticipate that the weight of acceptance of fuel should be the rate of discharge from reactors that are in operation at

Page 2235

the time. So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, we would look at bringing home a second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel." And then the statement continues. Mr. Morgan, do you recall that portion of your statement?
A. Yes, I do.
Q. And why did you make that statement?
A. I made it because I thought that that's what we had in the mission plan, though it had not been published at that point in time, but when the mission plan, when we finally published that in late December of the numbers, I think, working down backlogs started in the year 2003, so I was off, so there's an inconsistency between my statement here and the mission plan that came out after that.
Q. At the time you made the statement, did DOE know how much spent nuclear fuel would be discharged

Page 2236

from operating reactors on an annual basis in 2000 or 2001?
A. We had estimates from the industry what discharge weights were going to be, but those changed every year somewhat, so these were estimates only.
Q. And to meet the goal set forth in the portion of your statement that I just read, did you envision that a second repository would be needed?
A. Yes.
Q. And could I direct your attention back to that first paragraph that I read? You described the mission plan as containing a strategy. Why do you describe it as containing a strategy?
A. It was a strategy to integrate all the activities under the Nuclear Waste Policy Act, and it was a plan that we would hope to accomplish, but we were not contractually required to do it.
Q. So did you understand this strategy, as you termed it, to be a contractual requirement?
A. I beg your pardon?
Q. Did you understand this strategy, as you've described it to be, a contractual requirement?
A. Absolutely not.
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Yes.

Page 2237

MS. SULLIVAN: Nothing further, Your Honor, thank you. Mr. Morgan, we're finished with our questions, but I believe that opposing counsel has some questions, so if you'll just stay where you are.
THE COURT: Mr. Morgan, I believe Mr. Small representing the Tennessee Valley Authority will have time for cross-examination now. Mr. Small, you may proceed.
MR. SMALL: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Morgan, you've testified that at least some utilities had serious reservations about the standard contract because of the absence of a rate term, isn't that correct?
A. I cannot understand, I didn't understand you at all, sir.
Q. I'll try again, Mr. Morgan. In the summer of 1983, some utilities -- let me start over again, Mr. Morgan. Can you hear me okay now?
THE COURT: Mr. Morgan?
THE WITNESS: I still didn't hear. I'm sorry. I'm not -- I don't understand.
BY MR. SMALL:
Q. Mr. Morgan, can you hear me now?

Certificate of Filing

I hereby certify that on the 6th day of July 2006, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT UPON DEFENDANT'S RIGHT TO RECOVER UNPAID FEES, AND DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Marian E. Sullivan