# U. S. DEPARTMENT OF ENERGY

## INSTRUCTIONS FOR COMPLETING THE APPENDIX C DELIVERY COMMITMENT SCHEDULE

### GENERAL INSTRUCTIONS

1. **PURPOSE AND USE OF DATA**
The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) states that, beginning January 1, 1992, Purchasers may begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter. The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

2. **WHO SHOULD SUBMIT**
The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste.

3. **WHEN TO SUBMIT**
Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited. For each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992).

4. **WHERE TO SUBMIT**
Purchasers shall forward the completed DCS and one copy to:

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

cc: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

5. AUTHORITY
Data on the DCS are collected under the authority of the Nuclear Waste Policy Act of 1982, as amended, (42 U.S.C. 10101 et seq.) and Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.

6. PROVISIONS REGARDING CONFIDENTIALITY OF INFORMATION
Data being collected on the DCS are not considered to be confidential.

7. BACKGROUND INFORMATION

(a) The 1991 Acceptance Priority Ranking (APR) established the order in which FWMS acceptance capacity is allocated in the 1991 ACR. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual Purchaser allocations. The Purchasers' allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval. Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval (e.g., in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.)

(b) Once a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation (see also Item 7.(h)).

(c) The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

(d) Over the 10 year period for which the 1991 ACR allocated FWMS acceptance capacity, Purchasers may qualify for a specific number of allocations (from 0 through 10). Beginning in January 1992, Purchasers may submit DCSs for any or all of their allocations, up through year 10. Early submission of DCSs will facilitate the exchange of approved DCSs between Purchasers, as allowed by Article V.E. of the Standard Contract.

(e) The actual number of DCSs submitted by a Purchaser will vary according to the number of allocations they have in the ACR and the number of DCSs they choose to submit for each allocation. A DCS should be submitted for only one designated delivery site, only one fuel type (BWR, PWR, or Other) and only one delivery

year. Therefore, if a Purchaser splits an allocation between two or more delivery sites or between fuel types, more than one DCS will be required. There is no limit to the number of DCSs that can be submitted for each allocation, as long as the total metric tons of uranium (MTU) requested does not exceed the Purchaser's total MTU allocation for that year.

(f) Unless specifically requested otherwise, DOE will evaluate all DCSs submitted against a single allocation period independently. If a Purchaser prefers all DCSs submitted against a single allocation year to be considered as one package, this should be communicated to DOE at the time of submission. When evaluating the DCSs as a package, if one DCS is disapproved then all DCSs for that period will be disapproved and returned to the Purchaser for resubmittal.

(g) Waste acceptance capacity allocated to Purchasers is expressed in terms of MTU. The MTU allocation does not necessarily limit the number of assemblies that can be delivered. The DCS is designed to cover a given quantity of SNF as measured in MTU, not assemblies. DOE realizes that the number of assemblies associated with an allocation will vary according to the actual SNF designated for delivery. The appropriate entry for the blank on the DCS labeled "Number of Assemblies" is discussed in more detail below in the Specific Instructions For Completion of DCS.

(h) Since the DCS does not require the identification of the specific fuel to be delivered, each DCS is assumed to be for Standard Fuel, Class S1 or Class S2, as defined in Appendix E of the Standard Contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The Contract makes specific provisions for delivery of other than standard fuel. If a Purchaser intends to deliver other than standard fuel, the Purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the Purchaser has the option to deliver standard fuel on the schedule in the approved DCS or exchange the approved DCS with another Purchaser, provided contractual time limitations can be met.

## 8. DCS PROCESS

Upon receipt by DOE, each DCS will be date stamped. DOE shall approve or disapprove the DCS within 3 months of receipt. Such approval will be confirmed by signatures of the DOE Contracting Officer and DOE Technical Representative on the DCS returned to the Purchaser. If the DCS is incomplete or if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the

Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. QUESTIONS ON THE DCS

If you have any questions or require more information for completing the DCS, please contact **Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634.** Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

## SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 **DCS IDENTIFICATION NUMBER:** A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

YY = the last two digits of the Proposed Delivery Year
RRID = RW-859 reactor identification number of the designated delivery site
NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 **CONTACT PERSON:** Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 **CONTRACT NUMBER:** Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 **REACTOR/FACILITY INFORMATION:** Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 **TYPE OF CASK REQUIRED:** Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 **SHIPPING LOT NUMBER:** ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 **PROPOSED SHIPPING MODE:** Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 **PROPOSED DELIVERY DATE:** Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 **DOE ASSIGNED DELIVERY COMMITMENT DATE:** This entry will be completed by DOE.

2.6 **RANGE OF DISCHARGE DATES (Earliest to Latest):** Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 **METRIC TONS OF URANIUM (Initial):** Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

**(Discharged)** **"Not Required"** has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.

2.8 **NUMBER OF ASSEMBLIES--BWR/PWR/Other:** Enter the number of SNF assemblies corresponding to the Metric Tons Uranium indicated in Item 2.6 in the appropriate blank for BWR, PWR or Other (e.g., HTGR, TRIGA). If the SNF in the designated range of discharge dates encompasses assemblies with a wide range of MTU/assembly, state the maximum number of assemblies that may be delivered. Since the actual number of assemblies to be delivered may vary according to the specific SNF selected for delivery, adjustments to the number of assemblies will be made during the FDS process.

3.0 **CERTIFICATIONS:** An individual duly authorized to bind the Purchaser must sign the DCS, certifying that the Purchaser has the legal right to deliver such SNF to DOE. Insert the appropriate signatory's title and date.

4.0 **NOTIFICATION OF DOE APPROVAL:** The signatures of DOE's Technical Representative and the Contracting Officer will indicate that the DCS has been approved.

NWPA-830C

OMB No.:
Expires:

# U.S. DEPARTMENT OF ENERGY

## APPENDIX C - DELIVERY COMMITMENT SCHEDULE

This information is being collected under mandatory authorities vested in the U.S. Department of Energy under Public Law 97-425 and Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR 961). Data collected on this form are not considered to be confidential. Public reporting burden for this collection of information is estimated to average 5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Statistical Standards, EI-73, 1000 Independence Ave., S.W., Washington, D.C. 20585 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

### 1.0 IDENTIFICATION INFORMATION

1.1 DCS Identification Number: ____________________

1.2 Contact Person:
(a) Name: ____________________
(b) Telephone (include Area Code): ____________________

1.3 Contract Number: ____________________

1.4 Reactor/Facility Information:
(a) Name: ____________________
(b) Address: ____________________
(c) City, State & Zip Code: ____________________

### 2.0 DELIVERY COMMITMENT INFORMATION

2.1 Type Cask Required (Maximum loaded lifting weight, in tons): ____________________
2.2 Shipping Lot Number: (Not Required) (Assigned by DOE)
2.3 Proposed Shipping Mode: Truck______; Rail______; Barge______
2.4 Proposed Delivery Date: ____________________
2.5 DOE Assigned Delivery Commitment Date: ______ (Not Required) (Assigned by DOE)
2.6 Range of Discharge Dates: ___ ___ ___ to ___ ___ ___
(Earliest to Latest) Mo / Day / Yr to Mo / Day / Yr
2.7 Metric Tons Uranium: (Initial)__________ (Discharged)______ (Not Required)
2.8 Number of Assemblies: BWR ______ PWR ______ Other ______

### 3.0 CERTIFICATIONS

**Purchaser hereby certifies that the spent nuclear fuel to be delivered pursuant to this Delivery Commitment Schedule is of domestic origin, has been discharged from a civilian nuclear power reactor, is covered by Purchaser's Contract (identified in Item 1.3 above) and that purchaser has the legal right to deliver such spent nuclear fuel to DOE.**

3.1 ____________________________________________
Authorized Purchaser Signature — Date

3.2 ____________________ 3.3 ____________________
Name (Please Type or Print) — Title (Please Type or Print)

TITLE 18 USC 1001 makes it a crime for any person to knowingly and willfully make to any agency of the United States any false, fictitious, or fraudulent statements as to any matter within its jurisdiction.

### 4.0 NOTIFICATION OF DOE APPROVAL

4.1 Approved by DOE

____________________________________________
Technical Representative — Title — Date

4.2 ____________________________________________
Contracting Officer — Date

VY-GFR-0000000584

**Department of Energy**
Washington, DC 20585

June 3, 1997

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Linda S. Griffin
Treasury and Risk Management
Vermont Yankee Nuclear Power Corporation
Ferry Road, RD #5, Box 169
Brattleboro, VT 05301

Vermont Yankee Nuclear Power Corporation
Contract DE-CR01-83NE44431

Dear Ms. Griffin:

This letter follows up on my letter to you dated December 17, 1996, in which I informed you of the Department's anticipated delay in beginning spent nuclear fuel disposal by January 31, 1998, and on the responses from contract holders to the Department's request for comments on how best to accommodate the delay. The Department has reviewed the comments received, and I am attaching to this letter a summary of those comments and the Department's responses to them. The purpose of this letter is to advise you how the Department intends to proceed in light of the anticipated delay.

The Department has determined that two different provisions of the Standard Contract are applicable in the present circumstance: Article IX - Delays, and Article XV - Amendments. Article IX deals specifically with how the parties are to proceed in the event either the Department or the contract holder experiences a delay in its ability to deliver, accept or transport spent fuel or high level waste in accordance with an applicable schedule. Article XV recognizes the "uncertainties necessarily attendant upon long-term contracts" and provides a means by which the parties can mutually agree to amend the contract "as the parties may deem to be necessary or proper to reflect their respective interests." While the Department believes the Article IX remedy governs the presently anticipated delay, we also recognize that the delay may create particular hardships for certain contract holders. Accordingly, in addition to proceeding under the Delays clause, we are inviting any interested contract holder to propose to the Department, in accordance with Article XV, particularized contract amendments that may assist it in dealing with hardships it may experience as a result of the Department's delay in accepting its spent fuel on the contract holder's presently scheduled delivery date.

Printed with soy ink on recycled paper

**Article IX - Delays**

A number of the contract holders submitted comments in response to the Department's December 17, 1996 letter indicating that they believe the Department's delay in accepting spent fuel was avoidable and that an adjustment of fee or other compensation would therefore be appropriate. The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have preliminarily determined that this delay was unavoidable. (A copy of that preliminary determination is attached.) Because of the difference of views regarding whether or not the delay was avoidable, I have determined that a dispute exists within the meaning of Article XVI-Disputes, regarding whether or not the Department's anticipated delay was avoidable. Therefore, I am hereby providing you with 60 days within which to respond to my preliminary determination by submitting a written statement, supported by any relevant documentation, setting forth the factual and legal basis for any contention that the delay was avoidable. After considering any such submissions, I will issue a final determination that will be appealable to the Board of Contract Appeals as described in Article XVI.

If you wish to contest my preliminary determination that the Department's delay in beginning disposal of spent fuel was unavoidable, please submit on or before August 4, 1997, written statements and documentation supporting your position to the following address:

U.S. Department of Energy
Office of Headquarters Procurement Services
ATTN: Ms. Beth Tomasoni, HR-542
1000 Independence Avenue, S.W.
Washington, D.C. 20585

**Article XV - Amendments**

While the Department believes that the delay at issue was unavoidable, and that the Department is therefore not obligated to provide a financial remedy for the delay, as noted above, we recognize that such delay may have resulted in hardship to certain contract holders. Therefore, the Department is prepared to address individual contract holders' spent fuel storage concerns through negotiation of amendments to individual contracts. Specifically, the Department is willing to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel. Possible amendments could include, for example, compensation for onsite storage costs.

If you are interested in proposing amendments to your contract, please contact Mr. David Zabransky at (202) 586-9198 to schedule a meeting for the purpose of discussing such amendments.

Sincerely,

Beth A. Tomasoni
Contracting Officer
Office of Headquarters Procurement Services

Attachments

cc: Ross Barkhurst (w/o attachment)

**SUMMARY OF COMMENTS AND RESPONSES TO THE DEPARTMENT'S DECEMBER 17, 1996 LETTER TO CONTRACT HOLDERS**

Comment: A number of respondents indicated their belief that the Department has a statutory and contractual obligation to begin spent fuel acceptance in 1998.

Response: The Department recognizes that Section 302 of the Nuclear Waste Policy Act authorizes the Department to enter into contracts for the disposal of spent nuclear fuel. The Department further recognizes that Section 302 specifies that the contracts shall provide for the Department to begin to dispose of spent fuel not later than January 31, 1998. The Department believes that the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date.

Comment: Many respondents stated their belief that the Nuclear Waste Policy Act does not allow for claims of delay in the commencement of waste acceptance and, therefore, the Department cannot utilize the Delays provision of the Standard Contract as a remedy for the delay. Other respondents stated their belief that neither the Delays provision nor any other Standard Contract provision limits their legal rights and remedies or governs the nature and amount of damages, nor limits the options available to DOE for mitigating the harm caused by the delay.

Response: While the Nuclear Waste Policy Act authorized the Department to enter into contracts for the disposal of spent nuclear fuel, it did not prescribe the consequences of a potential inability by DOE to satisfy its obligation to begin disposal by January 31, 1998. The Standard Contract, however, addresses this potential and provides an administrative remedy for such a delay. The Department believes that Article IX - Delays, of the Standard Contract is applicable. As explained in the accompanying letter, the Department believes Article XV - Amendments, can also be applied to the current circumstances to mitigate the impacts of the delay on particular contract holders.

Comment: A number of respondents indicated that any delay in beginning waste acceptance was avoidable, not unavoidable, as they believe that DOE suggested in the Contracting Officer's letter of December 17, 1996.

Response: After reviewing the record of Office of Civilian Radioactive Waste Management activities, the Department has reached the preliminary determination that the delay in waste acceptance is unavoidable as defined under Article IX.A of the Standard Contract. This issue is discussed in further detail in the Contracting Officer's Preliminary Determination which accompanies this Summary of Comments and Responses.

HQ0017321

Comment: Many respondents expressed their concern that the Department's December 17, 1996 letter inappropriately attempts to shift the responsibility for dealing with the delay to the Purchasers.

Response: Through its letter of December 17, 1996, the Department was seeking input from the Purchasers on actions the Department could take to address the delay. The Department recognizes that, under the terms of the Standard Contract, it bears the responsibility of determining the contractual consequences of any delay on its part.

Comment: Some respondents asserted that the Department's position that it lacks the authority under the Nuclear Waste Policy Act to provide interim storage is incorrect, and that it must immediately begin a program that will allow it to begin spent fuel acceptance by January 31, 1998. One respondent suggested that the Department immediately begin the design and construction of an interim storage facility.

Response: Under Section 145(b) of the Nuclear Waste Policy Act, the Secretary may not select a site for a Monitored Retrievable Storage Facility until the Secretary recommends to the President the approval of a site for the development of a repository. The Secretary's recommendation, in turn, must be preceded by scientific characterization analyses, which as yet have not been completed. Under current circumstances, the Department believes it lacks the authority to provide interim storage services. Nevertheless, it has begun generic design work for an interim storage facility, which activity is permitted under the Act.

Comment: Some respondents argued that, if the Department determines that it lacks authority to provide interim storage, it must immediately act to seek authority from Congress. In addition, a number of respondents requested that the Department support ongoing legislative efforts to amend the Nuclear Waste Policy Act.

Response: The Administration is committed to resolving the complex spent fuel storage issue in a timely and sensible manner, consistent with sound science and the protection of public health, safety, and the environment. The Administration believes that the pending legislation would undermine the scientific credibility of the Nation's nuclear waste disposal program by, in effect, designating a site for an interim storage facility before the viability of that site as a permanent geologic repository has been assessed, and therefore it does not support such legislation.

Comment: A number of respondents suggested that some form of compensation might be appropriate to address the impact of the delay, but that compensation would not be a substitute for performance. It was also suggested that the source of the compensation must not be from the Nuclear Waste Fund. One respondent noted the Department is precluded from preferential or discriminatory treatment in implementation of the contracts.

Response: The Department remains committed to accepting spent fuel as soon as practicable under the authority provided by the Nuclear Waste Policy Act. As noted above, the Department has made a preliminary determination that the delay in beginning waste acceptance was unavoidable, as defined in the Standard Contract. Therefore, the appropriate remedy under the Standard Contract is an adjustment of schedules for waste acceptance. The Department also recognizes however, that it has a contractual relationship with each contract holder; consistent with Article XV of the Standard Contract, DOE is willing to discuss with individual contract holders amendments to their own contracts that can address the delay in a mutually-agreed manner. While each contract holder faces unique circumstances, the Department also recognizes it has an obligation to treat all contract holders in a fair and equitable manner. The Department understands the industry's concern regarding use of the Nuclear Waste Fund for compensation for its delay, and will take this concern into account as we move forward.

Comment: A number of respondents cited the recent Department actions, such as the return of highly-enriched foreign research reactor fuel and the settlement with Public Service of Colorado (PSC) which resulted in the Department's taking title and responsibility for PSC's Fort St. Vrain spent fuel, as examples of the Department's ability to begin spent fuel acceptance. They suggested that the Department consider similar actions with respect to implementing its waste acceptance obligation under the Standard Contract.

Response: The Department's action seeking the return of U.S. Government-provided highly-enriched uranium spent fuel from foreign research reactors was made to further the Nation's long-standing policy of reducing weapon proliferation risk of strategic nuclear materials pursuant to the responsibility of the Department under the Atomic Energy Act. There is no parallel between that action and the current situation with commercial reactor spent nuclear fuel. The NWPA grants specific authority for DOE to dispose of commercial spent fuel; the particular limits in the statute on storage and disposal preclude reliance on any more general authority in the Atomic Energy Act. The actions taken with regard to PSC's Fort St. Vrain spent nuclear fuel were the result of a 1965 agreement between the Atomic Energy Commission and PSC under which the government agreed to take title to spent fuel from the Fort St. Vrain reactor demonstration project in connection with the research and development purposes associated with this demonstration project, which was undertaken pursuant to the Atomic Energy Act.

Comment: A number of respondents suggested that the Department consider various arrangements for taking title to spent fuel that is subject to delayed waste acceptance and, in some cases, storage facilities that were constructed due to delayed waste acceptance.

Response: As indicated in the accompanying letter, the Department is inviting contract holders to propose possible amendments to their individual contracts pursuant to Article XV of the Standard Contract to relieve the particular hardships they will experience as the result of the Department's inability to commence spent fuel acceptance on the dates in their current delivery schedules.

Comment: One commentor suggested the establishment of a customer oversight group to monitor the Program's progress. Another suggested that the Department develop a proposal for resolving the current impasse within 30 days, and meet with stakeholders within 60 days.

Response: Subsequent to the submission of comments, Secretary Peña met with representatives of nuclear utilities to discuss the delay in spent fuel acceptance and possible remedies therefor. He also offered to establish working groups to develop options for addressing the delay and to provide additional information to contract holders on the Program's progress. Subsequently, the Department held similar meetings with representatives of stakeholder groups and members of the National Association of Regulatory Utility Commissioners. A meeting is being scheduled for July to follow up on the Department's commitment to keep contract holders apprised of the Program's recent progress and to discuss the technical aspects of some of the remedies that may be available to address the Department's delay.

Comment: One commentor suggested that the Department revise the basis for allocation of waste acceptance capacity from the current "oldest-fuel-first" basis to a methodology that is based upon the need of the contract holder. Another suggested that the Department grant priority waste acceptance capacity to shutdown reactors.

Response: The Department is willing to discuss with individual contract holders amendments to their individual contracts that may address their particular needs. With respect to the issue of delivery schedules, however, the Department remains concerned that in granting priority to any one contract holder or in changing the basis for waste acceptance allocation, it may adversely impact the waste acceptance status of other contract holders.

Comment: Some respondents requested that the Department expedite work at Yucca Mountain to complete the repository as soon as possible.

Response: The Department remains committed to completing work at Yucca Mountain to assess its viability as a permanent geologic repository in 1998 and, assuming that it is viable, to proceed as expeditiously as possible toward a suitability determination, licensing, and operation.

June 3, 1997

**CONTRACTING OFFICER'S PRELIMINARY DETERMINATION THAT THE DEPARTMENT OF ENERGY'S DELAY IN BEGINNING SPENT FUEL DISPOSAL WAS UNAVOIDABLE**

**BACKGROUND**

In Indiana Michigan Power v. DOE, 88 F.3d 1272 (D.C. Cir. 1996), the Court held that section 302(a)(5)(B) of the Nuclear Waste Policy Act of 1982, as amended (Amended NWPA), creates an obligation in the Department of Energy (DOE), in return for payment of fees by utilities that contracted with DOE for disposal services, to start disposing of spent nuclear fuel no later than January 31, 1998. The Court remanded the matter to DOE for further proceedings consistent with the court's opinion. DOE advised contract holders that it anticipated that it will be unable to begin acceptance of spent nuclear fuel for disposal by January 31, 1998. The Office of Civilian Radioactive Waste Management (OCRWM) contends that the delay in disposing of the contract holders' spent fuel is an "unavoidable delay" as defined in Article IX of the Contract, and, accordingly, DOE is not liable for damages caused by failure to perform under the terms of the Contract. In keeping with the mandate of the Court, DOE's Office of Procurement has been requested to review the relevant provisions in the Contract and preliminarily determine whether or not the delay in beginning disposal of spent fuel is unavoidable within the meaning of Article IX.

Article IX provides, in brief, that neither the Government nor the contract holder shall be liable for damages caused by failure to perform its obligations if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. This article indicates that an unavoidable delay includes circumstances beyond the reasonable control of a party to the Contract, such as acts of God, of the public enemy, or of Government in either its sovereign or contractual capacity. In the event of an unavoidable delay, the parties are to readjust schedules as appropriate to accommodate the delay.

**PRELIMINARY DETERMINATION**

The Department's draft Program Plan indicates that, if Yucca Mountain is determined to be suitable and licensable for disposal of spent fuel and high level waste, it would be available for disposal activities in 2010. Furthermore, the Department has indicated that, if it receives authorization from the Nuclear Regulatory Commission to begin construction of a repository at Yucca Mountain in accordance with the time schedule in the draft Program Plan, with Commission approval, the Department could commence spent fuel acceptance at the repository in 2007. I have reviewed the record provided by OCRWM, and I preliminarily find that this delay was due to circumstances beyond the reasonable control of DOE and therefore the anticipated delay was "unavoidable" within the meaning of Article IX of the Standard Contract.

HQ0017325

June 3, 1997

## BACKGROUND OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT PROGRAM

In order to understand the context within which the delays described below have occurred and the basis for my preliminary determination, it is helpful to review the history of the program and how DOE's statutory authority for the implementation of its disposal obligation has evolved over time.

While spent fuel discharged from nuclear power reactors has been safely stored for decades with no discernible adverse effects on the health and safety of the public, spent fuel will remain radioactive, and thus must be isolated, for thousands of years. Consistent with the views of other nations, United States policy has been that our responsibilities to future generations are better discharged by a strategy of final disposal than by reliance on storage. Deep geologic disposal is internationally recognized as a safe and viable means of disposing of spent nuclear fuel. OCRWM, DOE, Mission Plan 3, DOE/RW-0005 (1985), Environmental and Ethical Basis of Geologic Disposal 8,18, Nuclear Energy Agency, OECD, Paris, France. However, there is not yet any permanent disposal facility for spent nuclear fuel anywhere in the world.

The Nuclear Waste Policy Act of 1982 was enacted (NWPA) against this background and consistent with federal policy to utilize deep geologic disposal as a permanent solution to spent fuel and high level radioactive waste management (hereinafter used interchangeably). The NWPA established the Office of Civilian Radioactive Waste Management (OCRWM) within the Department of Energy (DOE) to develop and implement a spent fuel management and disposal system for the nation.

DOE recognized in its 1985 Mission Plan the difficult technical and institutional challenges that must be overcome during the course of this program. The technical challenges are great because the isolation of spent fuel involves long time periods not often considered in other human endeavors. The institutional challenges are complex because a few states, and possibly Indian Tribes, have been and will be, asked to host, for the good of the nation, spent fuel disposal or storage facilities. Many states will be traversed by shipments of spent fuel to one or more centralized facilities. Mission Plan 3. The NWPA not only requires extensive consultation and cooperation with potential host jurisdictions, but also requires grants to be made to such jurisdictions for the purpose of conducting scientific oversight and public information activities. One of the findings of the NWPA is that "State and public participation in the planning and development of repositories is essential in order to promote public confidence in the safety of disposal." Section 111(a)6) of the NWPA.

The original NWPA required DOE to site, obtain a license, construct, and operate two geologic repositories. The NWPA gave DOE 180 days to issue general guidelines for the recommendation of sites, which were published in final in November 1984 after extensive public review and concurrence by the Nuclear Regulatory Commission (NRC). Draft environmental assessments (EA) for nine potential sites were issued in December 1984. More than 20,000 comments were received. As required by the NWPA, after public briefings and hearings on the draft EA's, in

1986, DOE issued five final EA's and selected five potentially acceptable sites for the first repository in Mississippi, Nevada, Texas, Utah, and Washington. DOE then recommended to the President, as required by the NWPA, that three sites (Yucca Mountain, Nevada; Hanford, Washington; and Deaf Smith County, Texas) be characterized to determine their suitability as repositories. The NWPA also required that DOE select potential sites for the second repository. In 1986, DOE issued a draft area recommendation report that identified potentially acceptable sites for the second repository in 12 areas of seven states and an additional eight backup candidate areas in the same seven states. That report was not finalized because DOE suspended work on the second repository so that information gained in the first repository program could be applied to the second repository. OCRWM, DOE Mission Plan Amendment 49-50, DOE/RW-0128 (1987).

In compliance with section 141 of the NWPA, DOE completed a study on the need for a Monitored Retrievable Storage facility and submitted a timely proposal to Congress in 1987 for authorization to construct and operate a licensed temporary storage facility in Oak Ridge, Tennessee. DOE stated in 1987 that its plan to start storage operations in 1998 would allow the system to receive spent fuel a full five years sooner than without the storage facility under then-current schedules. OCRWM, DOE Monitored Retrievable Storage, Submission to Congress Volume 1, page 3 (March 1987), DOE/RW-0035/1-Rev 1.

The Nuclear Waste Policy Amendments Act of 1987 made significant changes to the program. The amendments directed DOE to characterize only the Yucca Mountain site for its suitability as a repository site and prohibited site-specific activities for a second repository. With regard to temporary storage for the spent fuel, the amendments: 1) established an independent Monitored Retrievable Storage (MRS) Review Commission to report to Congress in 1989 on the need for an MRS facility; 2) prohibited MRS siting until the site for the first repository has been recommended to the President and prohibited MRS construction until the issuance of an NRC construction authorization for the repository; 3) limited the capacity of the MRS facility to no more than 10,000 metric tons of heavy metal; 4) nullified DOE's recommendation to site an MRS facility in Tennessee; 5) prohibited siting an MRS facility in Nevada; and 6) established the Office of Nuclear Waste Negotiator for the purpose of finding a volunteer site for an MRS facility. Furthermore, the amendments established an eleven-member Nuclear Waste Technical Review Board to be appointed by the President to evaluate the technical and scientific validity of the program activities.

Although the amendments were intended to ease the task of the geological repository program by limiting site characterization activities to one site, the singling out of Nevada as the only potential site caused the State, which strongly opposed that decision, to greatly increase its efforts to halt the program. Shortly thereafter, the Nuclear Waste Technical Review Board recommended that the major component of the site characterization program at Yucca Mountain be reevaluated.

And the statutory prohibition on siting a temporary storage facility before a site for a repository has been recommended to the President made it virtually impossible for DOE to begin spent fuel acceptance by 1998.

## BASIS FOR DETERMINATION

When Congress passed the Nuclear Waste Policy Act in 1982 (NWPA), it prescribed a complex and cumbersome process for the construction and operation of a first-time, state-of-the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high-level waste. Because such a facility had never been constructed before, either in this country or elsewhere in the world, there was no established blueprint for achieving this goal. Congress, nevertheless, established the expectation that a repository could be sited, licensed, constructed and operating by January 31, 1998. Experience has shown that the schedule established by the NWPA for an operational geologic repository was overly optimistic and underestimated the technical, regulatory and institutional challenges that would confront such effort. I conclude that the Department's inability to meet the date established by Congress was the result of unavoidable delay and that the causes for that unavoidable delay fall into six broad and overlapping categories:

1. Technical problems
2. Regulatory delays
3. Roadblocks to implementation of interim or monitored retrievable storage
4. Funding restrictions
5. Litigation delays
6. Consultation requirements

The discussion that follows demonstrates how each of these causes contributed to the delay.

## 1. TECHNICAL PROBLEMS

As a state-of-the art scientific and engineering project grounded in geoscience, hydrology and other scientific endeavors, and one that must project through mathematical modeling of facility performance of a natural and engineered system for at least 10,000 years, the site characterization program ran into many technical difficulties that led to unavoidable delay in commencement of repository operations. Examples of these technical problems include:

> **Delay in development of prototype dry drilling equipment.** Characterization of the unsaturated rocks at Yucca Mountain required the collection of undisturbed samples from boreholes up to 2,500 feet deep. Then-current drilling technology methods used for environmental, water well, or oil field drilling could not be utilized to obtain the required undisturbed samples. Thus, special, first-of-a-kind drilling systems had to be designed, procured and tested by DOE before drilling could proceed.

Moreover, air had to be used as the circulating medium, rather than mud, to assure that samples were representative of the in situ rock. Air is not a particularly efficient circulation medium for removing cuttings from the bottom of a hole, and a special reverse/vacuum assist system had to be developed. Penetration rates were lower than expected; equipment development time was longer than anticipated; and the cost of borehole drilling and sampling was greater than expected. As a result, the sampling and analysis of the rock at Yucca Mountain was delayed. Acquisition Technical Specifications for the LM-300 Drill Rig, the LM-300 Vacuum System, and the Venturi Reverse Air Circulation Drill Bits.

**Available methods to address volcanism and faulting were inadequate.** Defining the potential hazards posed by volcanoes and earthquakes requires age-dating of soil and rock deposits. Available methods proved to be inadequate to characterize the age either of the Lathrop Wells cinder cone, a volcanic upwelling near Yucca Mountain, or the earthquake faulting at Yucca Mountain. This led to unprecedented scientific debate over the age and origin of the deposits in and around the Yucca Mountain area. As a result, new age-dating techniques had to be pioneered for use in the Yucca Mountain area. Several age-dating techniques were developed, used and then revised based on the scientific debate. We expect to reach closure with Nuclear Regulatory Commission staff on this issue this year. OCRWM, DOE, Characterization Progress Report: Yucca Mountain, Nevada, Number 15, pages A52-A55, DOE/RW-0498 (April 1997)

**Groundwater Debate--The Szymanski Reports.** The vein-like deposits of calcite and silica exposed in the walls of Trench 14 at the Bow Ridge Fault at Yucca Mountain and extending to the floor of the trench have been the subject of extensive scientific debate. The debate concerns the origin of the water responsible for depositing the minerals in the veins. Most scientists believe the deposits were formed by downward percolating rainwater that dissolved carbonate minerals and silica as it moved through the soils and redeposited them when the waters evaporated at lower levels. However, some scientists, including Jerry S. Szymanski, a scientist employed by DOE at Yucca Mountain, believed that these deposits could have been placed by an upward movement of the groundwater aquifer caused by seismic activity. OCRWM, DOE, FY 1992 Annual Report To Congress 20, DOE/RW-0422 (July 1993)

Mr. Szymanski published two reports on this problem, in 1989 and in 1992. Because of the potentially serious impact of the concerns raised on the suitability of Yucca Mountain as a geological repository for spent fuel, DOE concluded that it was necessary to accept Mr. Szymanski's recommendation for "an external and independent peer review" of his 1989 report. In January 1990, a five-member panel was selected. The reports resulting from the peer review were completed in 1991. Those reports prompted still further debate, and additional reviews were performed, one by a panel of 17 scientists at the National Academy of Sciences, and one, at the request of the NRC, by the Center of

Nuclear Waste Regulatory Analysis. The second report was reviewed by the United States Geological Survey and the Los Alamos National Laboratory. These reviews were submitted to OCRWM's Yucca Mountain office in 1992 and indicated the scenarios for such an occurrence were not plausible. Szymanski History Report 2-4, TRW Environmental Safety Systems, Inc. (December 31, 1992). However, DOE had to utilize substantial resources to address these concerns, which diverted resources from other necessary scientific work.

**Delay in hydrologic testing at Hanford.** While DOE was still required by the NWPA to characterize multiple sites for a possible repository, in order to preserve data pertaining to the local groundwater flow system after shaft construction at Hanford, changes had to be made in the hydrologic testing program. This resulted in a delay of about one year in the exploratory shaft schedule for that site. Furthermore, in consultation with the NRC, DOE decided that the hydrologic tests to be conducted before the start of exploratory shaft construction should be far more comprehensive than originally planned. This delayed shaft construction for approximately two years. Mission Plan Amendment 7, 8.

## 2. REGULATORY DELAYS

Because of the nature and potential severity of the risks associated with radioactive waste disposal, the difficulty of the technical challenges posed by a program designed to safely isolate material for 10,000 years, and the resulting public concerns, the spent fuel disposal program is subject to regulation or oversight by a large, perhaps unprecedented number of agencies and organizations. Each brings its own perspectives and expertise to the task. The challenges of meeting all of the applicable regulatory requirements and expectations and of attempting to build consensus where different regulators have had different approaches to the same or related problems have led to significant and unavoidable delays in the Department's ability to begin to accept spent fuel for disposal.

The following is a description of some of the regulatory, oversight and advisory bodies with whom DOE must work to reach a consensus on the safety and environmental soundness of siting and constructing a repository, and some examples of regulatory issues that have delayed development of a geologic repository.

**Nuclear Regulatory Commission.** The NRC is responsible for approving any OCRWM storage or disposal facility site and its design. It must license the facility and inspect it during construction and operation. The development of criteria for a deep geologic disposal facility has required the NRC to move well beyond its normal scope of activities, which focus primarily on engineered, not natural, systems. The Commission is also responsible for setting packaging standards and regulates the shipment and containment

security of spent nuclear fuel shipments to and from commercial nuclear power plants. Examples of issues raised by the NRC that have unavoidably delayed site characterization for the geologic repository include:

**Inferred fault in the proposed location of the exploratory shaft at Yucca Mountain.** The NRC expressed concern regarding an inferred fault (one that appears to exist but cannot be definitively determined) in the vicinity of the proposed location of the exploratory shafts at Yucca Mountain. In response, DOE had to undertake a technical assessment review in order to further study the possible fracturing of rocks when sinking shafts. Progress Report, Number 2, page 11.

**Unprecedented application of NRC quality assurance standards for reactors to scientific investigations for a repository.** NRC regulations require DOE to implement a quality assurance (QA) program for repository site characterization that is based upon the criteria in 10 CFR Part 50, Appendix B, which was promulgated for use in nuclear power reactor license applications. NRC defines quality assurance as all of those planned and systematic actions necessary to provide adequate confidence that the geologic repository and its subsystems will perform satisfactorily in service. 10 CFR 60.150. Applying the NRC's quality assurance approach for reactors to both the engineered features and the scientific investigation of natural features in a geoscience program at the cutting edge of technology proved to be very difficult. The quality assurance concerns of the NRC were not completely resolved until 1991. OCRWM, DOE, Annual Report to Congress 29, DOE/RW-0144 (April 1987); OCRWM, DOE, FY 1992 Annual Report To Congress 5-6, DOE/RW-0422 (July 1993)

**Design control objections to the Site Characterization Plan.** The NWPA requires DOE to issue a general plan for its site characterization activities. Section 112(b)(1)(A) of the NWPA. In 1988, DOE issued a Consultation Draft Site Characterization Plan (SCP) and submitted it to NRC for review. NRC indicated 5 areas of potential objections. DOE and NRC worked to resolve these issues and the SCP was issued in 1988. In July 1989, NRC issued objections to the design control portions of the SCP that resulted in an on-going series of interactions with the NRC. In March 1993, NRC lifted the design control objections, allowing DOE to proceed with the Exploratory Studies Facility design and construction. The three and one-half year period of delay in the start of construction following issuance of the SCP overlapped the development of the QA plan and was primarily driven by the inability to bring about resolution on the QA requirements for Exploratory Studies Facility co-located with a repository.

June 3, 1997

**U.S. Environmental Protection Agency**. The Environmental Protection Agency (EPA) is responsible for regulating offsite releases of radioactive material repositories. NWPA, Section 121(a). EPA promulgated such standards in 1986 (40 CFR Part 191), but they were held invalid and remanded to EPA for reconsideration. Natural Resources Defense Council v. EPA, 824 F.2d 1258 (1st Cir. 1987). The Energy Policy Act of 1992 required EPA to develop separate site-specific radiation standards for a repository at Yucca Mountain. EPA has not yet proposed new radiation protection standards. Once EPA promulgates them, the NRC must incorporate the new EPA standards in its repository licensing regulations. The lack of clearly-defined standards has complicated the Department's ability to focus its site investigation activities on clearly-defined regulatory requirements.

**Nuclear Waste Technical Review Board.** As noted above, the 1987 amendments to the NWPA established the Nuclear Waste Technical Review Board to oversee DOE's work at Yucca Mountain. In the late 1980's, the Board recommended that DOE review alternatives to DOE's then-current plan to construct two exploratory shafts and a small underground facility for site characterization. The Board also recommended that DOE conduct more extensive underground investigations than previously planned and maximize the use of the most modern mechanical excavation techniques and tunnel construction methods. DOE reviewed 34 options for the configuration and construction of the Exploratory Studies Facility and concluded that it should use ramps instead of shafts for the Studies Facility. DOE also initiated procurement of state-of-the-art tunnel-boring equipment. The Facility was not completed until April 1997. The significant increase in the extent of underground investigations undertaken since the development of the Mission Plan in 1985 has resulted in a seven-year delay from the schedule originally set in the 1985 Mission Plan. First Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 12,13 (March 1990); Third Report to the U.S. Congress and the U.S. Secretary of Energy from the Nuclear Waste Technical Review Board 9-11,13 (May 1991); Mission Plan 59.

**Department of Interior (Bureau of Land Management, Fish and Wildlife Service, Bureau of Indian Affairs, U.S. Geological Survey).** The Bureau of Land Management(BLM) is responsible for approval of plans to site waste management facilities on Federal lands over which it has jurisdiction. BLM has provided DOE access to Yucca Mountain for site investigation. As discussed below, BLM's grant of a right-of-way has been challenged at the Interior Board of Land Appeals and in court. The Fish and Wildlife Service, which is responsible for implementation of the Endangered Species Act, announced its emergency listing of the desert tortoise, which inhabits areas of Yucca Mountain, as an endangered species. As a result of the listing, DOE had to restrict the access to the Yucca Mountain site, and prepare a biological assessment to evaluate the Project's potential effects on the tortoise and alternatives for avoiding or minimizing impacts. OCRWM, DOE, Progress Report on the Scientific Investigation Program for the

Nevada Yucca Mountain Site, Number 2, page 11, DOE/RW-0292P (1990)(Progress Report). The Bureau of Indian Affairs (BIA) is the Federal agency with primary responsibility for working with federally-recognized Indian Tribal governments, including administration and management of land held in trust by the United States for Indians. BIA is the agency responsible for making the determination whether particular Indian tribes are affected tribes under Section 2(2)(B)of the NWPA. The U.S. Geological Survey (USGS) serves as a technical advisor to DOE and the NRC. Under a memorandum of understanding with DOE, USGS conducts geologic investigations of the Yucca Mountain site.

**Department of Transportation (Federal Railroad Administration, Federal Highway Administration, Motor Carrier Safety Program).** The Department of Transportation (DOT) regulates the shipment in commerce of all radioactive material, including spent nuclear fuel shipped under the NWPA, by all modes of transport. DOT is responsible for developing and enforcing regulations covering the labeling, classification, and marking of all spent fuel packages, as well as routing choice and carrier qualifications. DOT regulations on the use of preferred routes for highway shipments will affect the selection of routes for OCRWM shipments of spent nuclear fuel and high-level radioactive waste. The Federal Railroad Administration (FRA) was created to promote and enforce safety throughout the U.S. railroad system. The Office of Motor Carriers within the Federal Highway Administration (FHA) administers the Motor Carrier Safety Assistance Program to enhance commercial motor vehicle safety on the Nation's highways. This program develops policies, standards, and procedures to comply with Federal safety and hazardous materials regulations and monitors field inspection, investigation, and enforcement activities.

**Department of Labor (Occupational Safety and Health Administration).** The Occupational Safety and Health Administration (OSHA) regulates worker health and safety for workers involved in the construction of the Exploratory Studies Facility and site characterization at Yucca Mountain. When operation of the repository begins, conditions for all workers involved in transportation, temporary storage, or burial of the wastes will have to be in compliance with OSHA regulations.

**General Accounting Office.** The General Accounting Office (GAO) is the investigative arm of Congress, headed by the Comptroller General. Responsible for examining matters relating to the receipt and disbursement of public funds, it conducts audits and evaluations of Federal Government programs and activities, including OCRWM. Section 304(d) of the NWPA requires the Comptroller General to conduct an annual audit of the OCRWM program.

**Advisory Committee on Nuclear Waste.** The Advisory Committee on Nuclear Waste (ACNW) was established by the NRC in 1988 to provide the NRC with independent