reviews of, and advice on, nuclear waste facilities, including disposal of spent nuclear fuel and high-level radioactive wastes for geologic repositories. In performing its work, the ACNW reviews and reports on those areas of concern referred to it by the NRC and will undertake other studies and activities on its own initiative related to areas of regulatory activity identified by the NRC.

**Nevada Division of Environmental Protection and Nevada State Engineer.** The Yucca Mountain project, like other federal actions, is subject to extensive state environmental regulation. Because Nevada is an unwilling host for this project, the need to obtain state environmental permits has engendered considerable unavoidable delay. In 1988 and 1989, DOE submitted applications to Nevada for air, underground water withdrawal, and underground injection permits in order to begin site characterization at Yucca Mountain. The State failed to act on those applications. Instead, the State returned the permit applications to DOE on the grounds that: (i) Nevada law made it illegal to store high-level radioactive waste in Nevada, and (ii) recent State legislative resolutions opposed the siting of a radioactive waste repository anywhere in the State and prohibited a repository at Yucca Mountain.

A location was originally selected in Area 25 of the Nevada Test Site to conduct prototype drilling in order to develop a drilling system for Yucca Mountain site characterization. Test drilling at Yucca Mountain was delayed because Nevada refused to issue an operating permit required by Nevada air-quality regulations. In order to proceed, DOE moved the test drilling to a site in Utah to test the prototype dry drilling equipment. Progress Report, Number 1, page 11.

In 1990, DOE, through the Department of Justice, brought suit to force the State to act on the permit applications and to prohibit Nevada from unlawfully interfering with its site characterization activities. The State's interference with site characterization continued until May of 1991 when the court ordered Nevada to process the air and underground injection permits. In July 1991, after issuance of the two permits, DOE began the first surface disturbing work at Yucca Mountain since 1986. In March 1992, following a lengthy hearing, the State issued a water permit to DOE to withdraw water at the Yucca Mountain site. Progress Report Number 5, pages 2-3, DOE/RW-0307P-5(June 1992)

**3. Roadblocks to Implementation of Interim or Monitored Retrievable Storage**

The Department recognized early in the life of the program that it would be extremely difficult to have an operating geologic repository ready to accept spent nuclear fuel by January 31, 1998, and it made two different efforts to provide for temporary storage by that date. The first effort was rebuffed by the utilities; the second effort was blocked by Congress. In fiscal year 1994, DOE was barred from providing funding assistance to facilitate the separate efforts of the Nuclear Waste Negotiator.

**A. Federal Interim Storage.** Beginning in January 1984, DOE offered to provide a Federal Interim Storage Program to utilities as authorized by Subtitle B of the NWPA. OCRWM, DOE, Initial Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0003(1984); OCRWM, DOE, Implementation Plan for Deployment of Federal Interim Storage Facilities for Commercial Spent Nuclear Fuel DOE/RW-0019(1985); Id., DOE/RW-0045(1986); Id. DOE/RW-0120(1986); Id. DOE/RW-0186(1988). The Department considered a number of alternative storage methods, potential sites, and transportation arrangements; it analyzed the need for FIS; and it developed a plan for deployment of FIS, including estimated costs and schedules. Nuclear Waste Policy Act Project Office, DOE, Federal Interim Storage Fee Study for Civilian Spent Nuclear Fuel: A Technical and Economic Analysis, DOE/S-0023(1983). No utility elected to participate in this program. Thus, the program terminated in accordance with the NWPA on January 1, 1990.

**B. Monitored Retrievable Storage.** In 1987, DOE recognized that it could not begin to dispose of spent fuel in a repository before 2003. In light of the statutory and contractual provisions calling for spent fuel acceptance to begin in 1998, the Department announced that its preferred strategy was "to meet the terms of the contract ... based on a waste-management system that includes an integral MRS [monitored retrievable storage] facility." However, DOE was prevented from siting, constructing and operating an MRS facility, first as the result of litigation initiated by the State of Tennessee, which temporarily blocked submission of a proposal to Congress to locate a storage facility in that State, and subsequently by action of Congress in the 1987 amendments to the NWPA.

Section 141(b) of the NWPA directed DOE to complete a detailed study of the need for and feasibility of an MRS and to submit to Congress on or before June 1, 1985, a proposal for construction and operation of one or more MRS facilities for receiving and storing spent nuclear fuel. Pursuant to this direction, DOE completed a study on the need for an MRS and timely prepared a proposal to Congress for authorization to construct and operate a licensed MRS at Oak Ridge, Tennessee. Congressional Proposal EC-1022, 100th Congress. The schedule proposed by DOE called for an MRS facility to be licensed, constructed, and operational at the Oak Ridge site by January 31, 1998.

In 1985, Tennessee sued to block the submission of the proposal to Congress. In 1986, the U.S. District Court in Tennessee granted an injunction preventing submission of the MRS proposal to Congress. That decision was subsequently overturned in Tennessee v. Herrington, 806 F.2d 642 (6th Cir. 1986). The Supreme Court denied review in 1987. Two years were lost in litigation. Moreover, by that time, Congress stepped in to permanently block use of the Oak Ridge site for an MRS and to impose new restrictions with respect to siting an MRS facility at any other site, thus virtually assuring that DOE would not have an operational MRS facility by January 31, 1998. First, Congress nullified DOE's proposal to site, construct and operate an MRS at Oak Ridge, Tennessee. Section

142(a) of the amended NWPA. Second, Congress linked authority to site, construct and operate an MRS to significant progress on the geologic repository, and provided that no MRS could be constructed in the State of Nevada. Sections 142 and 148 of the Amended NWPA.

The 1987 amendments to the NWPA established within the Executive Branch the Office of the Nuclear Waste Negotiator, which was authorized for five years to attempt to locate and recommend for Congressional approval a voluntary candidate site for an MRS. Although the Negotiator's Office was reauthorized for one more year after its original expiration date, it never achieved its purpose of finding a voluntary candidate site. The failure to site an MRS was likely due in part to the provision in DOE's FY 1994 appropriations (Energy and Water Development Appropriations Act, 1994, Pub. L. No. 103-126, October 28, 1993) that prohibited DOE from providing grants to States and Tribes for the purpose of studying the feasibility of siting an MRS.

**4. Funding Restrictions.**

OCRWM's waste disposal and storage program activities are funded through fees paid by Standard Contract holders to the Nuclear Waste Fund. The Nuclear Waste Fund was established to ensure that funds would be available as needed to implement commitments in the NWPA. H.R. Rep. No. 785, 97th Cong., 2d Sess., pt. 1, at 77(1982). Congressional appropriations are required, however, as a prerequisite for OCRWM expenditure of Nuclear Waste Fund monies.

Congressional appropriations matched funding requests during the first several years of the Program. However, deficit control legislation enacted in 1985, the Gramm-Rudman-Hollings deficit control legislation, began to constrain funding requests and appropriations, thus resulting in unavoidable delays in the program. The Waste Fund was not exempted from the unified budget of the U.S. Government as a whole. From FY 1986 through FY 1990, DOE requested increased appropriations for site characterization, but appropriations declined from $499 million to $295 million.

Passage of the Omnibus Budget Reconciliation Act of 1990 resulted in additional budget pressures on the OCRWM's program. Under this legislation, overall budget constraints on DOE discretionary funds resulted in amounts requested for OCRWM operations at levels well below amounts needed to maintain OCRWM's planned schedules. Further exacerbating the funding problem, Congress appropriated amounts significantly below the requested levels. The total appropriations shortfall from FY 1988 through FY 1994 amounted to about $850 million.

From time-to-time, Congress has also restricted spending on particular activities. For example, in an attempt to meet the 1998 deadline, DOE had initiated innovative approaches to repository development, such as the integration of the exploratory shafts into the construction of the repository. However, the conference report accompanying the Department's FY 1987

appropriations directed the Department not to spend any FY 1987 funds for drilling exploratory shafts. H.R. Rep. No. 99-1005, 99th Cong., 2d Sess. 651 (1986). This single action alone added a year to the schedule for sinking shafts.

In 1994, OCRWM reconfigured its program planning under a method designated the Program Approach in order to more effectively deal with the budget constraints. Congress supported it with an FY 1995 appropriation of $522 million. (The Administration had requested $532 million.) For FY 1996, the Administration requested $630 million for OCRWM to continue the new Program Approach, but Congress appropriated only $400 million and earmarked $85 million of that for interim storage. Because there is no statutory authority to site and construct a storage facility, the effective FY 1996 funding level was $315 million, which represented a forty percent reduction in the level of effort from FY 1995. In response, DOE was required to reduce OCRWM's Yucca Mountain operations by one-third. Work on waste acceptance activities and interim storage facility design efforts were also reduced.

**5. Litigation Delays**

As described above, some of the regulatory delays have also entailed litigation. The spent fuel and high level radioactive waste management program has been subject to approximately two dozen different lawsuits. Many--but not all--of those lawsuits were brought by Nevada, reflecting its strong and continuing opposition to the siting of a spent fuel and high level radioactive waste disposal facility within its borders. Regardless of who initiated the suits, however, they have required considerable management attention, thus diverting resources that could otherwise have been devoted to program progress.

1. Wisconsin Electric Power Co. v. DOE, 778 F.2d 1 (D.C. Cir. 1985) Held: The fee charged by DOE for disposal of nuclear waste applies only to electricity generated by a civilian nuclear power reactor and sold on or after April 7, 1983. The fee does not apply to electricity that a generating plant consumes itself.

2. General Electric Uranium Management Co. v. DOE, 584 F. Supp. 234 (D.D.C. 1984), aff'd, 764 F.2d 896 (D.C. Cir. 1985) Held: The court of appeals has exclusive jurisdiction to review rules adopted pursuant to the NWPA; DOE's one-time fee based on nuclear fuel burnup for disposal of nuclear spent fuel used to generate electricity prior to April 7, 1983 was reasonable exercise of discretion.

3. Nevada ex rel. Loux v. Herrington, 777 F.2d 529 (9th Cir. 1985) The Court employed an expansive reading of NWPA funding provisions to grant State of Nevada funding for pre-site characterization studies.

4. Texas v. DOE, 764 F.2d 278 (5th Cir. 1985), cert. denied, 474 U.S. 1008 (1985) Held: Designation by the Secretary of Energy of two sites in Texas as potentially

acceptable sites for a nuclear waste repository was not a "final order" for purposes of review under the NWPA. The Court noted that designation of sites would be revisited in the repository nomination process.

5. Tennessee v. Herrington, 806 F.2d 642 (6th. Cir. 1986) Held: The court of appeals has exclusive and original jurisdiction to review actions of the Secretary of Energy regarding compliance with National Environmental Policy Act; DOE was not required to consult with Tennessee before sending Congress its proposal for location and construction of an MRS facility.

6. Nevada v. Herrington, 827 F.2d 1394 (9th Cir. 1987) Held: The NWPA does not require that DOE provide funding to finance litigation by Nevada.

7. National Assn. of Regulatory Utility Commissioners v. DOE, 851 F.2d 1424 (D.C. Cir. 1988) Held: DOE did not abuse its discretion in denying petitions for rulemaking for a "notice" tentatively establishing a method for allocating waste disposal costs between government defense and commercial waste producers.

8. Consolidated Edison Co. of N.Y. v. DOE, 870 F.2d 694 (D.C. Cir. 1989) Held: The fee payable on electricity generated and sold on or after April 7, 1983 may not include a charge for electricity lost in transmission and distribution.

9. Commonwealth Edisón Co. v. DOE, 877 F.2d 1042 (D.C. Cir. 1989) Held: The court of appeals has original and exclusive jurisdiction to hear Nuclear Waste Fund cases; DOE's determination that the formula calculating interest paid by utilities into the Nuclear Waste Fund is to be based on market or investment yield of Treasury Bills instead of the lower "discount rate" was lawful.

10. Nevada v. Watkins, 914 F.2d 1545 (9th Cir. 1991), cert. denied, 111 S. Ct. 1105 (1991) Held: The Secretary of Energy's decision to continue site characterization of a potential radioactive waste repository in Nevada was not unconstitutional or otherwise contrary to law; Nevada's attempted legislative veto of the Secretary's site characterization activities stood as an obstacle to the accomplishment of Congress' purposes and objectives under the NWPA and was preempted under the Supremacy Clause.

11. Nevada v. Jamison, 918 F.2d 854 (9th Cir. 1990), cert. denied, 111 S. Ct. 2052 (1991) Held: Nevada did not have standing to challenge BLM's 1988 grant of a 13 year-right-of-way over public lands near Yucca Mountain for site characterization.

12. Counties of Inyo, California, and Esmeralda, Nevada v. DOE, 925 F.2d 1216 (9th Cir. 1991) Held: The Secretary of Energy's decision not to designate the counties "affected units of local government" was inconsistent with the NWPA.

13. TRW Environmental Safety Systems v. U.S., 18 Claims Court 33 (Cl. Ct. 1989) Held: DOE was enjoined from awarding the systems engineering and development contract for the management of the repository program to Bechtel Systems Management, Inc.

14. Nevada v. Watkins, 943 F.2d 1088 (9th Cir. 1991) Held: Claims under the National Environmental Policy Act challenging the adequacy and selection of repository sites were moot in light of the 1987 statutory designation of Yucca Mountain as the sole site for characterization.

15. Nevada v. Watkins, 939 F.2d 710 (1991) Held: The promulgation of siting guidelines for repositories (10 CFR Part 960) was preliminary decisionmaking under the site nomination provisions of Section 112 of the NWPA; judicial review was barred until the Secretary made his final recommendation on the Yucca Mountain site.

16. In The Matter of DOE Application 52338 (March 2,1992) Held: The State Engineer of Nevada found that there was sufficient unappropriated water at the proposed source to appropriate 94.83 acre feet of water per year (.2 cubic feet per second flow) for ten years from Nevada Test Site well J-13 for use at Yucca Mountain for site characterization; the appropriation would not conflict with existing water rights; and the proposed use does not threatened the public interest. The Nevada Engineer also concluded that the monitoring plan proposed by DOE and approved by the Park Service is sufficient to protect all adjacent water related resources, including those of the National Park Service at Devil's Hole National Park.

17. United States v. Nevada, Case No. CV-S-90-065-HDM (D.Nev. May 13, 1991) Held: Nevada was required to process the DOE applications for permits; the air and surface permits were to be issued forthwith.

18. Nevada v. Watkins, No. 92-70055, 993 F.2d 1442 (9th Cir. 1993) Held: DOE's interpretation of the payments-equal-to-taxes (PETT) provisions of the NWPA was reasonable; DOE's procedures allowed the State to make its own estimate of PETT and furnished an appeal process through DOE's Office of Hearings and Appeals.

19. In re State of Nevada, IBLA 88-229 (June 22, 1994) Held: The State had no standing before the Department of Interior Board of Land Management to question Bureau of Land Management's issuance of 13 year right-of-way-reservation over public lands near Yucca Mountain for site characterization purposes.

20. Nevada v. O'Leary, 57 F.3d 1078 (9th Cir. 1995) Held: Section 113 of the NWPA committed site characterization to the Secretary's discretion, and the Secretary did not have a duty to determine at the earliest possible moment whether the calcite-silica deposits at the site were disqualifying. Because the Secretary was not required to promulgate the siting guidelines as rules, judicial review of the siting guidelines was unavailable.

21. Nevada v. O'Leary, 63 F.3d 932 (9th Cir. 1995) Held: The Court of Appeals updated the district court determination that Nevada had not made a showing under Rule 27 of the Federal Rules of Civil Procedure that there was sufficient to preserve the testimony of 27 scientists.

22. Indiana Michigan Power Co. v. DOE, 88 F. 3d 1272 (D.C. Cir. 1996) Held: In return for the payment of fees by utilities, DOE is obligated to begin disposing of the utilities' spent nuclear fuel by January 31, 1998.

23. Nevada v. O'Leary, No. 96-70774 (9th Cir.) Nevada is seeking an order to compel the Secretary to make payments to the State for FY 96 oversight and monitoring activities under Sections 116 of the NWPA. This case is still pending.

**6. Consultation Requirements.** DOE and its predecessor agencies were founded in the spirit of a war emergency with the development of atomic weapons as a principal mission. This led to a culture of secrecy and a priority on national security that sometimes overshadowed safety, environmental and public participation concerns. The NWPA adopted a sharply different approach. Section 111(a)(6) recognized that "State and public participation in the planning and development of repositories is essential to promote public confidence in the safety of disposal." Not only is any repository or storage facility constructed under the NWPA subject to NRC licensing and the public hearing process that entails, but virtually every element of DOE's spent fuel management program is subject to extensive consultation and public comment requirements. As is appropriate for a program of this magnitude and controversial nature, the Mission Plan, the siting guidelines, environmental assessments, and consultation and cooperation agreements must all be based on public input. Such consultation is nevertheless time consuming and has given rise to a number of unavoidable delays.

The following are some of OCRWM program stakeholders with whom consultation is either required by statute or carried out pursuant to various formalized arrangements entered into in order to implement the NWPA mandates for openness and consultation:

State officials--Sections 101, 116, and 117 of the NWPA require DOE to consult with a state in which it is investigating a site for a potential high-level waste and spent fuel storage or disposal facility. A state also has the right to disapprove the siting of a high-level waste repository once a site has been selected by DOE and recommended to

Congress by the President. A state's veto can be overturned only by enactment of a new law by Congress. DOE provides grants to a state to oversee DOE's work when the Department is investigating a potential site for a repository or storage facility in the state. DOE also provides grants to a state to assess and mitigate the social and economic impacts of site investigation. Nevada refused to enter into a consultation and cooperation agreement with DOE and has continued to oppose the program. Although DOE has provided funds to the State for oversight of DOE activities at Yucca Mountain, the State has used a portion of those funds to oppose DOE's efforts. U.S. General Accounting Office, Nevada's Use of Nuclear Waste Grant Funds, GAO/RCED 96-72 (1996).

County officials--Under Section 116(c) of the NWPA, DOE provides oversight grants to counties and other local governments that it has designated as "affected" by a potential high-level waste storage or disposal facility. DOE must make the following payments to a local government whose jurisdiction contains a repository or monitored retrievable storage facility site: payments equivalent to the taxes that would have been paid if the eligible jurisdiction could tax federal activities at a repository or storage facility; impact assistance payments necessitated by the facility siting, construction, and operation; and payment for an on-site representative, designated by the local government in which the site is located, to oversee DOE activities at the site.

Indian Tribes--Treaties, case law, executive orders, and agreements between the Federal Government and Native American tribal governments guarantee specific rights to the tribes and provide the basis for a government-to-government relationship. Under the NWPA, tribes that are designated by the Secretary of the Interior as "affected" by a potential site (as defined in Section 2 of the NWPA) have the same rights as affected states. Although the Secretary of the Interior has not designated any tribes "affected," DOE has had extensive discussions with tribes on the issue of their designation.

Regional and National Organizations Representing Tribes (Nevada Indian Environmental Coalition, National Congress of American Indians, Intertribal Transportation Association)--Many individual tribes and tribal organizations have become involved in spent nuclear fuel and high-level radioactive waste policy decision-making, including repository siting and the OCRWM transportation program. For example, the National Congress of American Indians, which has a cooperative agreement with OCRWM, monitors and reviews legislation on the OCRWM program and advises the Department and other Federal agencies on potential impacts to the tribes from spent nuclear fuel and high-level waste transportation.

Regional Organizations & National Organizations Representing States, including Council of State Governments (Eastern Regional Council and Midwest Council), Southern States Energy Board, Western Interstate Energy Board, National Conference of State Legislatures--Regional and national organizations representing states foster intergovernmental cooperation through the promotion of regional as well as individual and state responses to common issues. Through various cooperative agreements with OCRWM, regional concerns pertaining to the transportation of commercial spent nuclear fuel and high-level radioactive waste are articulated and presented to OCRWM at organizational and DOE-sponsored meetings.

Transportation External Coordination Working Group (TEC/WG)--Disposal of spent fuel in a repository or centralized temporary storage facility will require transportation of tens of thousands of tons of spent fuel on public highways, railroads and waterways. The Transportation External Coordination Working Group, whose members represent organizations of state, tribal and local governments, and professional and industrial organizations that historically have followed DOE transportation activities, provides a mechanism for continuing and improved coordination between appropriate DOE elements, other levels of government, and outside organizations having a role in preparing for the required transportation activities.

National Transportation Organizations (American Association of State Highway Transportation Officials, Commercial Vehicle Safety Alliance, Association of American Railroads)-- These are national transportation organizations that promote the safety of commercial truck and rail shipping nationwide. The Commercial Vehicle Safety Alliance (CVSA) maintains a cooperative agreement with OCRWM that focuses on developing a commercial truck inspection package for spent fuel. All three organizations participate in the TEC/WG.

National Technical Organizations (National Association of Regulatory Utility Commissioners, Conference of Radiation Control Program Directors)--The chief objective of the National Association of Regulatory Utility Commissioners (NARUC) is to serve consumers by seeking to improve the quality and effectiveness of public utility regulation in the United States. NARUC's Nuclear Waste Program was established with the objective of bringing together the nuclear industry, regulators, environmentalists and others so that site characterization studies leading to the establishment of a high-level nuclear waste repository could proceed. The Conference of Radiation Control Program Directors (CRCPD) is a nonprofit professional organization comprising individuals in state and local governments who regulate and control the use of radiation sources, and of individuals--regardless of affiliation--who have expressed an interest in radiation protection. Both NARUC and CRCPD maintain cooperative agreements with OCRWM.

June 3, 1997

Emergency Management/Response Groups--Emergency management/response groups have provided input into policy decisionmaking for implementation of the Section 180(c) grant program of the NWPA. A number of these groups are members of the TEC/WG.

In addition to the foregoing formal consultation arrangements with governmental and technical organizations, the Department must consult with a large number of other stakeholders on a less structured or more intermittent basis. Citizens, contract holders, utility industry trade organizations, educational and professional organizations with an interest in high level radioactive waste disposal, equipment suppliers, and labor unions are noteworthy among those stakeholders who have been active participants in reviewing, commenting on and participating in various ways in the high level radioactive waste and spent fuel disposal program. With particular respect to citizens, their perspectives about the OCRWM program reflect their roles as taxpayers, consumers (and ratepayers) of electric power, community residents, workers' rights advocates, environmentalists, public health advocates or concerned parents. Citizens have become involved in the OCRWM program by participating in OCRWM-run public participation events, by using grassroots organizing methods, by communicating their views to their elected officials on how to amend the NWPA, and by commenting on rulemakings and NEPA documents. As an indication of the level of citizen interest, DOE's EA's on nine candidate repository sites generated 20,000 public comments. The more recent scoping notice announcing DOE's intention to prepare an Environmental Impact Statement on Yucca Mountain has generated comments from 1,000 different individuals and organizations to date, and more are continuing to come in even though the deadline for comments has passed.

As noted above, it is a fundamental premise of the NWPA that consultation with this broad range of stakeholders is necessary to build public confidence in the high level radioactive waste disposal program. Moreover, input from these stakeholders has played an integral role in shaping the program and allowing it to move forward. Nevertheless, carrying out the required consultation has contributed to the unavoidable delays that the program has experienced.

**CONCLUSION**

For all the foregoing reasons, I have preliminarily determined that the Department's delay in beginning acceptance of spent fuel was unavoidable within the meaning of Article IX of the Standard Contract.

# Department of Energy

Washington, DC 20585

NOV 0 3 2004

QA: N/A

John B. Carden III
Contract Manager
Procurement – TVAN Contracts
Tennessee Valley Authority
1101 Market Street
Chattanooga, Tennessee 37402-2801

Dear Mr. Carden:

This letter responds to your August 24, 2004 letter that replied to my July 28, 2004 letter announcing the resumption of the Delivery Commitment Schedule (DCS) process. Your letter indicates that Tennessee Valley Authority (TVA) will not be submitting DCSs for allocations accorded it by the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) until required by the schedule set forth in the disposal contract between TVA and the Department of Energy (DOE).

Your letter states that "TVA understands that DOE has abandoned the March 1995 APR/ACR waste acceptance allocation schedule." As an initial point of clarification, the method of allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is precisely the same as the method used in the 1995 APR/ACR. Specifically, both the 1995 APR/ACR and the 2004 APR/ACR utilize an "oldest fuel first" method of allocating acceptance positions in the acceptance queue as provided by the Standard Contract. That method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract.

With regard to the acceptance schedule identified in the 2004 APR/ACR, that schedule reflects DOE's current planning for acceptance of SNF at the Yucca Mountain repository once operations begin in 2010, assuming that various factors upon which DOE's planning is based remain unchanged.

With regard to your suggestion that DOE has "abandoned" the 1995 APR/ACR "schedule," it is unclear whether you are referring to the rates at which DOE now anticipates it will be able to accept SNF from Purchasers under the Standard Contract beginning in 2010 or whether, instead, you are referring to an abandonment of the DCSs that were approved in conjunction with the 1991 ACR, the 1992 ACR, and the 1995 APR/ACR. Because TVA has never obtained any approved DCSs, we presume that TVA wants to ensure that DOE anticipates its ability to approve DCSs to be submitted in the future based upon the allocations identified in the 2004 APR/ACR. To the extent that TVA's concern relates to DOE's ability to approve future-submitted DCSs, we anticipate that, based upon current progress at the Yucca Mountain site, we will approve DCSs submitted in accordance with the allocations identified in the 2004 APR/ACR. Although Purchasers are certainly entitled to submit DCSs requesting acceptance of

SNF under different allocation scenarios, DOE does not anticipate that it will be able to approve those requests in light of its obligations to allocate SNF acceptance positions to all Purchasers on an "oldest fuel first" basis and in light of the limitations upon the amount of SNF that DOE can accept in any given year. However, Articles V.B, V.C, and XVI of the Standard Contract provide a mechanism for resolving any disputes about acceptance allocations and disapprovals of DCS submissions.

To the extent that TVA has concerns about the interrelationship between previously approved DCSs and any new DCSs that DOE receives, the DCS approval process should eliminate those concerns. DOE understands that, when it approved DCSs from 1992 through 1997, it created commitments to accept specific amounts of SNF from specific Purchasers during specific periods of time, and, as you know, DOE's delay in accepting SNF in accordance with those DCSs is now the subject of litigation in the United States Court of Federal Claims. Although DOE had hoped when the earlier DCSs were being reviewed beginning in 1992 that it would be able to begin SNF acceptance in 1998 for storage in a monitored retrievable storage facility and based its acceptance rates upon that scenario, DOE currently anticipates being able to begin SNF acceptance at the Yucca Mountain repository in 2010. Because of the different types of facilities contemplated for acceptance in 1998 and in 2010, DOE believes that, once it begins accepting SNF, it will be in a position to accept SNF at a different rate at a repository than it had anticipated when it previously reviewed and approved DCSs for acceptance at a monitored retrievable storage facility. Accordingly, in the 2004 APR/ACR, we have identified new allocations based upon anticipated acceptance rates that are higher than those in the 1991, 1992, and 1995 ACRs.

Because of the increased anticipated acceptance rates and the currently anticipated acceptance dates, it will be difficult to plan for acceptance of SNF based upon the previously approved DCSs, which contain allocations that do not conform to the current anticipated rates. In addition, Purchasers may now wish to change the location from which the SNF is to be accepted or the dates of discharge identified in the original DCS submissions. Accordingly, any new DCSs that Purchasers submit may reflect these changes or request acceptance of the additional SNF covered by the new allocations granted. We anticipate that any new DCSs that are approved will replace, rather than supplement, the previously approved DCSs. To eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs, we will seek, prior to approving new DCSs from any Purchasers with previously approved DCSs, an agreement in writing that any new DCSs that are approved actually replace, rather than supplement, the previously approved DCSs. That agreement will be reflected in any future DCS approvals.

Please contact me if you have any questions.

Sincerely,

David Zabransky
Contracting Officer
Office of System Analysis & Strategy Development