Yankee Atomic Electric v U.S Nos.: 98-126C, 98-154C, 98-474C August 2, 2004

## Heritage Reporting Corporation

## Page 3378 to Page 3660

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3626

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract – I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities – I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was – several of the comments from utilities had requested that. And in

Page 3627

the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being – I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts

Page 3628

were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific –
A No.
Q – rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.

Page 3629

THE COURT: Well, I take it that you are asking about specific – I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you – did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3630

written input on their position?
A Yes.
Q All right. I would like to show you what's been identified as Defendant's Exhibit 2.034.
MR. MILLER: Your Honor, I have a paper copy for the Court if you would like it.
THE COURT: Thank you, Mr. Miller.
MR. MILLER: Mr. Morgan, do you need a paper copy?
THE WITNESS: No, thank you.
BY MR. MILLER:
Q Mr. Morgan, I'm showing you now on the screen what's been admitted as Defendant's Exhibit 2.034. And I'll ask you if you recognize that.
A Yes, I do.
Q What is it? What do you recognize it to be?
A It's a letter from Edison Electric Institute to me as the project director on -- the subject being the standard contract.
Q All right, sir. And do you recognize this to be EEI's comments on the draft contract?
A Yes.
Q All right. Specifically, I'll refer you to page 8 of that letter in the first paragraph. Do you see that?

Page 3631

A Yes.
Q All right, sir. It's been blown up on the screen for you there. Can you see it?
A Yes.
Q All right, sir. If you would, sir, read the first sentence into the record, please, sir. It begins with although.
A Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article 2 states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act.
Q All right, sir. I'm sorry. Would you go on and just read the next two sentences?
A However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW, period.
Q All right, and SNF refers to spent nuclear fuel?
A Yes. And HLW is high-level waste.
Q All right, sir. And do you recall that statement to be true, that last statement that you read, that is, that the draft does not -- the draft

Page 3632

contract did not commit DOE to accept any given quantity of SNF?
A That's correct.
Q All right, sir. I'll next refer you to page 2 of appendix A, which is an attachment of this letter. And if you'll look at the second paragraph, please, sir.
All right. Do you see that blown up on the screen for you, sir?
A Yes.
Q All right, sir, beginning in the sentence in the middle of the page that begins while the contract, do you see that?
A Yes.
Q Would you read that, please, sir?
A While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least quantitatively, the need to have adequate annual receiving capacity to handle industry needs.
Q All right, sir. Please go on.
A This would be consistent with the direction of section 302(a)(5) of the act that DOE will take title to spent nuclear fuel and high-level waste as expeditiously and practicable upon request of the

Page 3633

generator or owner.
Q All right. That's "as expeditiously"?
A Expeditiously as practical. Right. Excuse me.
Q That's all right, sir. Start with the sentence that begins with "a new clause."
A A new clause should be added, and then there's a clause.
Q All right, sir. Would you just read that?
A Whereas DOE recognizes that its ability to take the delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.
Q All right, sir. Now, do you recall that to be the acceptance rate that Mr. Mills discussed with you when he came to talk to you about the contract acceptance rate?
A Yes.
Q And, sir, when you published the final rule in April of 1983, did you include that qualitative

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3642

BY MR. MILLER:
Q Can you see that okay, Mr. Morgan?
A Yes.
Q The cover page of this document says that it's the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th to the 15th, 1983.
Do you see that?
A Yes.
Q All right. Do you recall this proceeding, Mr. Morgan?
A Yes.
Q All right. Specifically, I'll refer you to page 11. And do you recognize – recognize page 11, Mr. Morgan? Can you see it?
A Yes.
Q I've got a paper copy.
A No, I can see it.
Q Do you recall making a presentation at this December '83 information meeting?
A Yes.
Q All right. I'll refer you specifically to the second column – I'm sorry, to the right-hand column, the second paragraph. And I believe this document refers to your having just received a

Page 3643

preliminary draft of volume 1 of the mission plan. And you hoped to have that available to interested parties, the states and others, by Christmas. Do you see that?
A Yes.
Q And do you recall whether or not you were able to make that draft mission plan available at or around that time?
A I know we put out the mission plan around that time. But I'm not sure whether it made the Christmas date or not.
Q All right. How about the fourth paragraph, sir. Would you have a look at that. I'm sorry. It's the next paragraph. Okay. Do you see that paragraph now, the one that's highlighted, Mr. Morgan?
A Yes.
Q Would you read that first sentence, please, sir?
A I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the act requires that we receive waste from the utilities by January 1, 1998.
Q All right, sir. I'm sorry. I was just referring to the first sentence there.

Page 3644

And long about the middle of the paragraph where it says the basic strategy, do you see that?
A Yes.
Q Would you read that, please, sir?
A The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on the site.
Q All right, sir. Now the word you used there was strategy. Did you believe that the information you set out in the mission plan was a contractual requirement?
A No.
Q What was it then?
A As required by the act, section 3, it was an informational document, clearly not contractual.
Q All right, sir. And in your mind what did it represent to the program?
A It represented the goals and what we would like to accomplish relative to specific activities.
Q All right, sir. And so with respect to your previous statement about dealing with the acceptance rate in the mission plan, we'll talk a little bit about the mission plan in a minute, but did you perceive the rates in the mission plan to be

Page 3645

contractual requirements?
A No.
Q All right, sir. Now, I would like to refer you to the last sentence in that paragraph – I'm sorry, Dawn. The last sentence in that same paragraph.
Would you just read that, please, sir?
A During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.
Q All right, sir. Did you feel that statement reflected contractual intent on the part of the Department?
A No.
Q All right, sir. Once, again, sir, what did you think it represented?
A It was in the plan to notify or let the utilities realize that they would not have to make additional commitments for on-site storage after the beginning of 1998. But they would – if you look at the mission plan, it shows –
Q Which we're going to do in just a minute.
A It shows an increase of stored fuel because

90

Page 3646

the rate starting in 1998 did not meet the discharge
rates until later on in the program.
Q All right, sir. We'll look at that now, if
you don't mind.
Yankee Atomic Exhibit 636. All right.
Mr. Morgan, I'm showing you now what's Plaintiffs'
Exhibit 636. Do you recognize this document, sir?
A Yes.
Q And is this the document that was – that
was produced by the program during your tenure?
A Yes.
Q All right, sir. If you'll look at page 1-2,
please, sir, and the last paragraph. And the first
sentence in that paragraph, sir, would you just read
it.
A It is the department's intent to update this
mission plan periodically as the program progresses.
Q I'm sorry, sir. The first sentence that's
highlighted there.
A Oh, the first sentence.
Q Yes, sir. In that paragraph?
A The mission plan has been prepared as a
means of both planning the program and demonstrating
its conformance to the requirements of the act.
Q All right, sir. And do you recall that –

Page 3647

that that's what you intended the mission plan to be
at the time you published this document?
A Yes. It was an informational document.
Q All right, sir. What relationship did it
have to the department's contract with the utilities?
A None.
Q And once again, sir, did this statement
that's contained in the – I apologize. Let me move
on to page 2-1, please.
And actually, I want to – sorry. Can you
blow this up.
The last paragraph is the one I wanted to
ask you about there, Mr. Morgan. Do you see that?
A Yes.
Q All right, sir. Once again, that first
sentence there, would you read that?
A This approach is designed to ensure that all
utilities will be able to establish firm planning
schedules for the disposition of their radioactive
waste sufficiently early to determine their on-site
interim storage needs prior to 1998.
Q All right, sir. And just go on. Read
the –
A Until 1998, each utility will be responsible
for providing its own additional on-site interim

Page 3648

storage unless the utility applies for and is
certified for the Federal Interim Storage Program.
Q All right, sir. Do you recall that that
represented your view at the time, that was that
utilities were responsible for providing their own
additional on-site interim storage?
A Yes.
Q And once again in your mind, you intended
this plan to inform the utilities about what they
could anticipate as far as their additional storage?
A Yes.
Q All right, sir. If we go to the bottom of
2-2 and the top of 2-4.
All right, now, Mr. Morgan, I believe that
in between pages 2-2 and 2-4 there's a table that
we'll talk about in a minute. But I believe that this
language that's highlighted here on 2-2, 2-4 – 2-4 is
a continuation of 2-2. So I'll ask you to read
that – just read it to yourself and let me know when
you're finished.
A I'm finished.
Q All right, sir. Now in the first sentence
there you say: While the department's acceptance rate
during the initial 5 years is set to prevent, in the
aggregate, the need for utilities to provide

Page 3649

additional on-site storage after 1998. Do you see
that there?
A Yes.
Q In that part of that sentence that I read,
what does in the aggregate mean? Do you recall?
A The total discharge from the utilities
versus the acceptance at the repository.
Q Okay. I'm sorry. When you referred to the
in the aggregate, as far as the department's
acceptance rate is concerned, what was –
A The total.
Q What did you mean?
A The total. In the aggregate means if you
look at the discharge – well, in total, you don't –
most of the utilities won't have to add on-site
storage.
Q All right, sir. And the sentence that
begins the planning basis, do you see that?
A Yes.
Q I'll read that. The planning basis assumes
that, after 1998, individual utilities who actually
realize this need – and that is the need for expanded
storage, I believe – will arrange for the right to
ship spent fuel to the Department from a utility who
is next in the queue in shipment allocation.

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.

92

Yankee Atomic Electric v. U.S Nos.: 98-126C, 98-154C, 98-474C August 3, 2004

**Heritage Reporting Corporation**

**Page 3661 to Page 3887**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3661

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

Page 3662

APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)

Page 3663

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 3664

P R O C E E D I N G S
\- - - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.

THE COURT: Go ahead, whenever you're ready.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MILLER:

Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?

A. Yes.

Q. And you recall this document, do you not?

A. Yes.

Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?

A. Yes.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

Page 3693

proceeding, there might have been a little bit of confusion on that point.
But ultimately, we're talking about the same relevancy. Thank you for your time.
THE WITNESS: You're welcome.
THE COURT: Any redirect?
MR. MILLER: Short redirect, Your Honor.
THE COURT: One more round here.
REDIRECT EXAMINATION
BY MR. MILLER:
Q. You thought you were going to get away, didn't you, Mr. Morgan?
THE COURT: I don't blame you, you want to go back to Oregon, I think.
THE WITNESS: I now live in Colorado.
THE COURT: Oh, Colorado.
BY MR. MILLER:
Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?
A. Yes.
Q. Was that a deliberate choice on your part?
A. Yes.
Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.
Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?
A. Not in total because of the fact that NRC had not identified the requirements for licensing.
Q. Okay.
A. And quite honestly –
Q. I'm sorry.
A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.
Q. So that was a concern of yours?
A. Yes, that was a concern of mine.
Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.
Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?
A. No.
Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?
A. No, that was not part of the Act.
Q. Was that a program goal that you had at the time you were director –
A. That was a program goal that we identified in the mission plan.
Q. And is that a goal that DOE specifically declined to put in the contract?
A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?
A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.
MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.
THE COURT: Anything further?
MR. SHAPIRO: Nothing further, Your Honor.
THE COURT: All right. You're excused, and thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.
Whereupon–
BENARD C. RUSCHE
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Just take a seat.
DIRECT EXAMINATION
BY MR. MILLER:
Q. Are you all set, Mr. Rusche?

**Tennessee Valley Authority v. U.S. No. 01-249C July 14, 2005**

**Heritage Reporting Corporation**

**Page 2078 to Page 2330**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2186

THE COURT: Mr. Kiraly, I believe – Mr. Crawford?

MR. CRAWFORD: No further questions.

THE COURT: Mr. Shea, may I excuse Mr. Kiraly as a witness?

MR. SHEA: You may, Your Honor.

THE COURT: Mr. Kiraly, I may now excuse you as a witness, and I do so with appreciation, and thanks for your testimony here yesterday and today. You are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. Now, before Ms. – while we're getting set up and Mr. Palmer and others would start getting set up, may I use this little hiatus to make my request to counsel? It really is directed, Ms. Orfield, to the lead counsel and Mr. Shea as the counsel of record. Obviously, there are embedded in Mr. Kiraly's testimony, as there have been some other witnesses, but especially Mr. Kiraly's testimony, some legal concepts. And to my mind, some of those, not all, but some of those legal concepts are reflected in a decision by the Federal Circuit styled Wickham Contracting Company v. Fischer, 12 FR 3d 1574, decided in 1994. That deals specifically with

Page 2187

overhead and AFUDC, what might pass in this case for AFUDC, but that is a case in which a government contractor was making a claim.

This case is a little different. This is just the reverse because the government is providing the service to the private party, rather than the private party providing a service to the government. And my, what I would ask counsel to do when you're engaged in post-trial briefing in this case is to deal with the converse situation in contrast to a case such as Wickham. Am I getting through? I'm trying to be as brief and concise as I can in making this request.

MS. ORFIELD: I think it's clear, Your Honor.

THE COURT: Thank you, Ms. Orfield. Mr. Shea?

MR. SHEA: Absolutely clear, Your Honor, you may have recalled, but I sort of argued that to begin the litigation.

THE COURT: I understand, I understand. It's just that because of Mr. Kiraly's testimony, it's embedded all the way through, and I just think we have to deal with this explicitly. Are we ready, Ms. Sullivan?

Page 2188

MS. SULLIVAN: We are, Your Honor.

MR. LO RE: Your Honor, I wondered if maybe we could just take a very quick break while we set up and if we could reconnoiter here momentarily?

THE COURT: Yes, in fact, we'll go off the record for a minute. Everyone can stay, or they may leave. It's up to them.

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

MS. SULLIVAN: Your Honor, Ms. Heide Herrmann is with Mr. Morgan in Los Alamos. She's a member of our office. Just to speed things along, may I ask, Ms. Herrmann, could you make sure the following exhibits are easily accessible for Mr. Morgan: The binder containing Defendant's Exhibit 5, the separate documents Defendant's Exhibit 5.034, 5.063, Defendant's Exhibit 28, Defendant's Exhibit 27, and Defendant's Exhibit 37. Do you have all those documents?

MS. HERRMANN: Yes, I believe I do.

(Discussion off the record.)

THE COURT: Ms. Sullivan, would you formally call Mr. Morgan as a witness?

MS. SULLIVAN: Yes, Your Honor. The government calls Robert L. Morgan as its next

Page 2189

witness.

THE COURT: Mr. Morgan, I'm authorized by statute and rule to administer the oath to you by this remote means, if you're testifying by video conference. If I give you the oath, will you respond, please?

THE WITNESS: Yes, I will respond.

THE COURT: All right, thank you.

Whereupon–

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Would you please state your full name for the record?

THE WITNESS: Robert L. Morgan.

THE COURT: Thank you, Mr. Morgan. And, Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, when did you serve as the director of what became known as the Office of Civilian Radioactive Waste Management?

A. From late January 1983 until sometime in

Page 2190

January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

Page 2191

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

Page 2192

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.
Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?
A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.
Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?
A. Could you repeat the question, please?
Q. Yes. How have you been employed since you retired from DOE in 1988?
A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

Page 2193

impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.
Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?
A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register. We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.
Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

Page 2194

Civilian Radioactive Waste Management?
A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then --
THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?
A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

Page 2195

A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

Page 2196

lawsuit, and they're hearsay.
THE COURT: Well, let's sort out relevance first. Ms. Sullivan?
MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.
THE COURT: Mr. Small, do you have anything further?
MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.
THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?
MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

Page 2197

because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.
THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?
MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.
BY MS. SULLIVAN:
Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?
A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than

Page 2198

there was from Westinghouse.
So we were trying to formulate a way to make it an equitable cost for both GE and Westinghouse. This is the fuel that existed prior to the establishment of the 1 mil per kilowatts. The average of the expenses to GE and Westinghouse had to be an average of 1 mil per kil watt for the aggregate of that fuel.
Q. Thank you, Mr. Morgan. Turning back to what you recall about your discussions regarding the rate of acceptance, I believe you testified that the request of the utilities with regard to the rate of acceptance was rejected. Why was the request rejected?
A. The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders.
But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I

Page 2199

would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.
Q. Mr. Morgan, do you have the exhibits that comprise Defendant's Exhibit 5 before you?
MS. SULLIVAN: Ms. Herrmann, could you provide those exhibits to Mr. Morgan? Your Honor, this is a binder that's been provided to the Court.
THE WITNESS: Yes, I have.
MS. SULLIVAN: Thank you. And, Your Honor, we elected not to use the Trial Director because, if we did do that, we would lose Mr. Morgan's picture.
BY MS. SULLIVAN:
Q. So, Mr. Morgan, did you have an opportunity to review the stack of materials that's been placed in front of you prior to before we began today?
A. This entire record was transmitted to me by e-mail yesterday, and I spent last evening and a little time this morning going through these records.
Q. Mr. Morgan, do you recognize the set of documents before you to be the administrative record to the standard contract?
A. Yes, I do.
Q. Do you recall receiving these documents in the course of the development of the standard

Page 2200

contract?
A. Yes.
Q. And were these documents sent directly to you?
A. I beg your pardon?
Q. Were these documents sent directly to you?
A. Some of them were sent directly to me.
Some were sent to the contracting officer who had signed the rule. But I did review all of these records when they came in.
Q. And why did you review these documents?
A. Because I was held responsible for the contract by the Secretary of Energy and I felt that I had to review those in the rule-making, and I had the responsibility of making the decision as to whether they were included or not.
Q. Thank you, Mr. Morgan.
MS. SULLIVAN: Your Honor, at this time, the government moves for admission of Defendant's Exhibit 5, which is the administrative record for the development of the standard contract. I have questions about two particular sets of comments in this document – I mean, in this set of documents, but I would like to move for admission of the entire record.

Page 2201

THE COURT: Before we get Mr. Small's reaction to that request, would you please, Ms. Sullivan, identify for the Court exactly what you mean by Defendant's Exhibit 5?
MS. SULLIVAN: Yes, Your Honor. Defendant's Exhibit 5, which are Defendant's exhibits, they're broken up through Defendant's Exhibit 5.000 through Defendant's Exhibit 5.086.
THE COURT: Does that, and this is not going to make sense to Mr. Morgan, but does that essentially comprise this first volume?
MS. SULLIVAN: Yes, Your Honor, that has been provided to the Court.
THE COURT: All right. Mr. Small?
MR. SMALL: Your Honor, we do not dispute that the volume contains letters that were received by DOE regarding the standard contract, apparently, in 1983, but we just had a few minutes to look at it. On the other hand, Your Honor, the letters predominantly – I mean, I think there might be one in there from TVA, but predominantly, they're from other utilities, not TVA.
And to that extent, they're hearsay, and also, Your Honor, the vast bulk of this record is totally irrelevant to any issue in this case, and to

Page 2206

Q. Mr. Morgan, could I ask you to turn to what is marked as Defendant's Exhibit 0.34?
A. Yes, I have that document.
Q. Okay. Mr. Morgan, do you recognize this to be a copy of the Edison Electric Institute's comments on the standard contract, the draft standard contract?
A. Yes.
Q. Do you recall reviewing this set of comments at the time it was submitted?
A. Do I recall receiving this?
Q. No, my question, do you recall reviewing this document?
A. It's still -- I still didn't hear the question.
Q. My question was whether you recalled reviewing this document.
A. Yes, I reviewed this document.
Q. Thank you. Mr. Morgan, what is your understanding as to what the Edison Electric Institute is?
A. The Edison Electric Institute is an association of electric generating companies, and I believe that they are a Washington lobbying group.
Q. Thank you. Mr. Morgan, would you please

Page 2207

turn to page eight of the letter from EEI?
A. Page eight?
Q. Yes. And, Mr. Morgan, I would like to read a portion of that first paragraph into the record and then ask you a question. The paragraph begins, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW."
Do you see where I've read, Mr. Morgan?
A. Yes, I see that.
Q. Mr. Morgan, do you recall the concern from EEI that is raised in the portion of the paragraph that I just read?
A. Yes, I recall this concern.
Q. And could I direct your attention to two pages later in the document, the second page of the attached detailed comments, do you have that page in front of you, Mr. Morgan?
A. Yes, I do.

Page 2208

Q. And that second paragraph on that page reads, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated, together with the accumulated backlog of SNF/HLW.
We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize at least qualitatively the need to have adequate annual receiving capacity to handle industry needs.
This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added."
And then, Mr. Morgan, if you turn the page, the clause reads, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and

Page 2209

waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."
Mr. Morgan, do you recall reviewing the material that I just read from EEI's comments on the draft standard contract?
A. Yes, I recall that.
Q. Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. We considered it and rejected it.
Q. And why was it rejected?
A. Because of the uncertainties of the program that I mentioned earlier; and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.
Q. Mr. Morgan, would you please turn your attention now to what's marked as Defendant's Exhibit 5.063?
A. Yes, ma'am.
Q. Mr. Morgan , do you recognize this document

Page 2210

to be TVA's comments on the standard contract?

A. This document that I have does not have a cover letter on it, and so I can't say whether this was addressed to me, but I do know that we've reviewed comments from TVA.

Q. And if I could direct your attention to the first page of the exhibit, I believe the fourth line down in the first paragraph reads, "TVA believes a separate contract should be made for each reactor unit." Do you see that?

A. No, I don't. This is on page – the first page?

Q. The first page under general comments, the fourth line in that first paragraph.

A. Yes.

Q. "TVA believes."

A. Yes.

Q. Okay. Does that provide any insight as to whether these were TVA's comments on the contract?

A. I don't understand that question, I'm sorry.

Q. I'm being inartful, and I apologize. You said that it doesn't have a cover letter, but you do recall receiving comments from TVA that were reviewed, is that correct?

Page 2211

A. That is correct.

Q. Okay. But without a cover letter, you don't know whether these were TVA's comments?

A. I can't, you know, say whether these were TVA comments sent to me, and, again, it's been a long time since I looked at some of these records.

Q. Well, let me ask you this, do you agree that there are statements with regard to, that mention TVA in them, in this document?

A. Yes.

Q. Mr. Morgan, would you please turn to page five of this document?

A. Yes.

Q. And I direct your attention to the middle of that page, and I'm going to read a section into the record that begins, "In addition, a commitment to *do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industry*

Page 2212

wide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V: DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998 at not less than the annual rate of SNF and/or HLW is then being produced from civilian nuclear power plants covered by the contract with DOE for disposal of SNF and/or HLW.

After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to set date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchasers, nuclear power plants specified in Appendix A."

Mr. Morgan, do you recall reviewing the provision or the request and the comments that I just read?

A. I recall reviewing these comments, and they were denied.

Q. And why were they denied?

A. It would be unconscionable for me as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program that I discussed earlier. I don't know

Page 2213

how else to say it, but it is not, it was not required by Nuclear Waste Policy Act, and we did not include it.

Q. Mr. Morgan, would you now look at Defendant's Exhibit 28, please?

MS. SULLIVAN: Your Honor, I understand that Defendant's Exhibit 28 has already been admitted into evidence.

THE COURT: Yes, on the 21st of June.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Morgan, I'd like you to turn to the third page of this document, which is titled, "Summary of Disposition of Major TVA Comments."

A. Yes.

Q. Do you have that in front of you?

A. Yes.

Q. And I'd like to read the comment and the response and then ask you a question.

"Comment: The contract should address at least the minimum duties DOE must perform in return for payments to the Nuclear Waste Fund.

"Response: DOE made little in the way of substantive changes defining their responsibilities. *The second recital was changed by adding the phrase*

Page 2214

'as expeditiously as possible regarding DOE's responsibilities for taking title to spent nuclear fuel or high-level radioactive waste.' Some clarifications were made regarding establishment of the acceptance priority ranking of purchasers. However, no substantive dates or rates of removal of SNF are established beyond the requirements of the Act, which requires DOE to start accepting SNF by 1998."

Mr. Morgan, the last sentence of that response that I read regarding some clarifications were made, but no substantive dates or rates of removal of SNF were established, that statement, does it comport with your recollection of DOE's consideration of TVA's comments regarding the acceptance rate?

A. Yes.

Q. I now direct your attention to what is page five of this document, but it's marked page three at the top.

A. Page five?

Q. Page five of the document, but it's marked page three, and it's with the third comment. The number three is at the top.

A. Yes.

Page 2215

Q. Great. I'll forego reading the comment, but I'll read the response and then ask you a question.

"Response: DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue not later than January 1st, 1987 a capacity report for planning purposes and, beginning April 31st, 1991, annual acceptance priority ranking the oldest SNF and HLW having priority for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal program's plans and cost projections."

Mr. Morgan, the response that I just read, does that comport with your recollection of DOE's consideration of TVA's comments regarding what should be included in the contract with regard to acceptance rate?

A. Yes.

Q. Mr. Morgan, could I now ask you to look at Defendant's Exhibit 27?

A. I have that.

Q. Mr. Morgan, this is a copy of a May 20th,

Page 2216

1983 letter from Edison Electric Institute to you. Have I described the document correctly?

A. Yes, I recall this document.

Q. And do you recall receiving this document?

A. Yes, specifically.

Q. And why do you recall receiving this document?

A. I beg your pardon?

Q. Why do you recall receiving this document?

A. Because it was the same theme after the final rule-making that they had presented to us during the rule-making process.

Q. And what did you do in response to this letter?

A. I'm not sure what the response was. I don't have that -- I don't know whether it was answered specifically or not. I can't say right now. I don't recall.

MS. SULLIVAN: Your Honor, at this time, I'd like to move for admission of Defendant's Exhibit 27.

THE COURT: Mr. Small?

MR. SMALL: Your Honor, I don't understand that the proper foundation has been laid for 27. It appears to be a copy of an Edison Electric Institute

Page 2217

letter that was sent to DOE in May of 1983. However, it was not part of the rule-making for the standard contract. It was, as I understand his testimony, it was sent after the close of the rule-making, and the witness is unable to say what, if anything, was done in response to it.

THE COURT: Well, I don't have a difficulty with the foundation in that respect because Mr. Morgan just testified he recalls specifically receiving it. I've got a small problem on relevance because it appears that this letter and the attachment relate to the controversy in the early mid-'80s over the way in which the fee would be computed.

MS. SULLIVAN: Your Honor, I agree that that is the primary focus of the letter. However, there is an issue with regard -- there's a mention made of the acceptance rate issue, and that's what I wanted to ask Mr. Morgan about, not about the fee issues, but I understood that I was not to ask any substantive questions prior to seeking admission of the document.

THE COURT: That's right. Where?

MS. SULLIVAN: If you look at the bottom paragraph that begins, "Considering," there's a

Page 2230

would be a sufficient foundation. I heard him testify that these were what everyone said, but I did not hear the witness testify that he was present at the entire meeting.

THE COURT: Well, no, but I think it's been established by Mr. Morgan that this was intended to be a complete compilation of the presentations at the meeting, and accordingly, DX-37 is admitted, and it's admitted in lieu of PX-8.

(Defendant's Exhibit Number 37 was received in evidence.)

THE COURT: I just note for the record that pages five through seven of this document appear to contain a statement by Daniel Boggs, Deputy Secretary, U.S. Department of Energy. It's a good thing this case isn't in the Sixth Circuit or Chief Judge Boggs would be recused from the case, and that's a relief to my family because one of my sons, my youngest son is going to be clerking for Chief Judge Boggs in about a month.

Ms. Sullivan, you may continue.

MS. SULLIVAN: Thank you, Your Honor, these are my last questions.

BY MS. SULLIVAN:

Q. Mr. Morgan, could I ask you to turn to

Page 2231

pages 11 and 12 of Defendant's Exhibit 37?

A. Yes.

Q. And may I direct your attention to the paragraph in the right-hand column which begins, "I would like to talk," and I'll read this paragraph into the record and ask you a question or two.

"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the Act requires that we receive waste from utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act.

However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of the operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."

Mr. Morgan, do you recall that portion of

Page 2232

your comments?

A. Yes, I do.

Q. Why did you make that statement?

A. Why did I make that statement?

Q. Yes.

A. I made it because the Nuclear Waste Policy Act clearly did not specify a repeat rate, but that we recognized that it may be the intent, or our program should be put together to meet the acceptance rate that we were going to put into the mission plan which, as I recall, there was an increase in backlog that went until 2003, but with a lead time of about five years to provide on-site storage that, in '98, that they would not have to make any further commitments for storage of fuel on-site.

And that's what we were, that was a goal we were trying to achieve.

Q. Was DOE obligating itself to accept fuel at the rate set forth in the mission plan?

A. Was it a DOE obligation to accept fuel?

Q. Yes.

A. Is that right?

Q. At the rate set forth in the mission plan.

A. No.

Q. Why not?

Page 2233

A. Because there's a, one of the -- a commitment, a contractual commitment is one thing, and another is the mission goal that we were trying to meet. It was not a contractual requirement, but this is what we interpreted the Nuclear Waste Policy Act to say. I will have to say that there were two separate bills, one passed by the House and one passed by the Senate, and that we did not have the benefit of a conference report to get to the final language.

So we had to assume the intent because it was not specified. Some of the members of Congress wanted total emphasis on monitored retrievable storage. Others wanted emphasis on the repository. So we walked a fine line between the different directions that we were hearing from Congress.

Q. Mr. Morgan, you just testified about the intent of the NWPA, and your statement, the portion of your statement that I read makes a reference to regarding the intent of the NWPA or the Nuclear Waste Policy Act. How did you determine what you believed to be the intent of the Nuclear Waste Policy Act?

A. How did we determine that?

Q. Yes.

A. By reading the Nuclear Waste Policy Act;

Page 2234

that was our, that was our direction.
Q. From your review, did you have an understanding that the NWPA contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel from the utilities?
A. It was silent on rate acceptance.
Q. Did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would preclude utilities from having to add further storage facilities on-site?
A. No, that was not a commitment or a requirement of the Act.
Q. And did you understand from your review of the Act that DOE was required to accept spent nuclear fuel at a rate that would work down the backlog of spent nuclear fuel in a specific amount of time?
A. No, that was not part of the Act either.
Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement, and I'd like to read that into the record and then ask you a couple questions. That portion reads, "After the initial operation of the repository through the first few years, we would anticipate that the weight of acceptance of fuel should be the rate of discharge from reactors that are in operation at

Page 2235

the time.
So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, we would look at bringing home a second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel." And then the statement continues.
Mr. Morgan, do you recall that portion of your statement?
A. Yes, I do.
Q. And why did you make that statement?
A. I made it because I thought that that's what we had in the mission plan, though it had not been published at that point in time, but when the mission plan, when we finally published that in late December of the numbers, I think, working down backlogs started in the year 2003, so I was off, so there's an inconsistency between my statement here and the mission plan that came out after that.
Q. At the time you made the statement, did DOE know how much spent nuclear fuel would be discharged

Page 2236

from operating reactors on an annual basis in 2000 or 2001?
A. We had estimates from the industry what discharge weights were going to be, but those changed every year somewhat, so these were estimates only.
Q. And to meet the goal set forth in the portion of your statement that I just read, did you envision that a second repository would be needed?
A. Yes.
Q. And could I direct your attention back to that first paragraph that I read? You described the mission plan as containing a strategy. Why do you describe it as containing a strategy?
A. It was a strategy to integrate all the activities under the Nuclear Waste Policy Act, and it was a plan that we would hope to accomplish, but we were not contractually required to do it.
Q. So did you understand this strategy, as you termed it, to be a contractual requirement?
A. I beg your pardon?
Q. Did you understand this strategy, as you've described it to be, a contractual requirement?
A. Absolutely not.
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Yes.

Page 2237

MS. SULLIVAN: Nothing further, Your Honor, thank you. Mr. Morgan, we're finished with our questions, but I believe that opposing counsel has some questions, so if you'll just stay where you are.
THE COURT: Mr. Morgan, I believe Mr. Small representing the Tennessee Valley Authority will have time for cross-examination now. Mr. Small, you may proceed.
MR. SMALL: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Morgan, you've testified that at least some utilities had serious reservations about the standard contract because of the absence of a rate term, isn't that correct?
A. I cannot understand, I didn't understand you at all, sir.
Q. I'll try again, Mr. Morgan. In the summer of 1983, some utilities – let me start over again, Mr. Morgan. Can you hear me okay now?
THE COURT: Mr. Morgan?
THE WITNESS: I still didn't hear. I'm sorry. I'm not – I don't understand.
BY MR. SMALL:
Q. Mr. Morgan, can you hear me now?

106