# In the United States Court of Federal Claims

Nos. 02-898C and 03-2663C

(Filed: October 19, 2006)

| | |
|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION,<br><br>and<br><br>ENTERGY NUCLEAR VERMONT YANKEE, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Spent Nuclear Fuel Case; Partial Breach of Contract; Summary Judgment on Liability; Validity of Assignments Upon Sale and Transfer; Obligation to Pay One-Time Fee. |

*Alex D. Tomaszczuk*, with whom were *Jay E. Silberg, Daniel S. Herzfeld,* and *Jack Y. Chu*, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C., for Plaintiffs. *L. Jager Smith, Jr.*, Wise Carter Child & Caraway, P.A., Jackson, Mississippi, Of Counsel for Plaintiff Entergy Nuclear Vermont Yankee, LLC.[1]

*Marian E. Sullivan*, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Harold D. Lester*, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., and *Jane K. Taylor*, U.S. Department of Energy, Washington, D.C., of Counsel, for Defendant.

---

[1] Plaintiffs have filed motions for substitution of counsel effective October 3 and 10, 2006 respectively. However, the counsel identified above briefed and argued the motions for summary judgment addressed in this opinion.

**OPINION AND ORDER**

WHEELER, Judge.

These cases concern Defendant's potential liability for damages associated with spent nuclear fuel ("SNF") generated at the Vermont Yankee Nuclear Power Station ("Power Station") in Vernon, Vermont. Plaintiff Vermont Yankee Nuclear Power Corporation ("Vermont Yankee") formerly owned and operated the Power Station, but sold it in 2002 to Plaintiff Entergy Nuclear Vermont Yankee, LLC, *et al.* ("ENVY"). These actions stem from the failure of the Department of Energy ("DOE") to begin disposing of SNF at the nation's nuclear power plants not later than January 31, 1998, as agreed under DOE's Standard Contract. Pursuant to the Court's August 15, 2006 Order, these cases are consolidated for purposes of this opinion.

At issue in each case are two motions for summary judgment filed by Defendant on May 4, 2006. The first motion concerns the validity of certain assignments made by Vermont Yankee to ENVY during the sale of the Power Station. The second motion concerns Vermont Yankee's failure to pay a one-time fee which Defendant regards as a condition precedent to DOE's obligation to accept SNF from the Power Station. Plaintiffs have opposed both motions, and have cross-moved for summary judgment on liability. For the reasons stated below, both of Defendant's motions are without merit, and therefore are DENIED. Plaintiffs' cross-motions for summary judgment on liability are GRANTED. The Court will address each motion in turn, applying the standards applicable to motions for summary judgment.

Factual Background[2]

On June 10, 1983, Vermont Yankee and DOE signed a Standard Contract addressing the disposal of SNF and high-level radioactive waste ("HLW") derived from operations at the Power Station. In exchange for payment of substantial fees, DOE agreed that it would begin disposing of SNF from nuclear waste producers not later than January 31, 1998. Through passage of the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. No. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. § 10101-10270), Congress required all domestic nuclear utilities to enter into Standard Contracts as a condition for renewal of their operating licenses. 42 U.S.C. §§ 10222(a), (b); see Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337 (Fed. Cir. 2000). DOE published the terms of the Standard Contract in 10 C.F.R.

---

[2] The facts discussed in this opinion do not constitute findings of fact by the Court. The facts cited herein are either undisputed or alleged and assumed to be true for the purposes of the pending motions.

§ 961.11. DOE did not commence performance by January 31, 1998, as agreed, and it still has not begun to date. Under varying legal theories – partial breach of contract, breach of the implied covenant of good faith and fair dealing, and Fifth Amendment taking without just compensation – Plaintiffs claim that the delay in DOE's performance has resulted in significant damages.

Under the Standard Contract, contract holders such as Vermont Yankee are required to pay two sets of fees. One of the fees is a continuing quarterly fee determined by reference to the amount of electricity that the utility generates and sells. This fee accrues through the life of the Standard Contract as long as the utility continues to generate electricity. The other fee is a one-time fee intended to cover the SNF that utilities already possessed when they signed Standard Contracts in 1983. The amount of the one-time fee is determined by reference to a formula contained in the NWPA, 42 U.S.C. § 10222(a)(3).

Contract holders, including Vermont Yankee, were required within two years after contract execution to elect one of three options for payment of the one-time fee. One option required the utility to pay the fee immediately, a second option allowed the utility to defer its payment until a date prior to the date that DOE was first to accept SNF from that utility, and a third option allowed the utility to make 40 quarterly *pro rata* payments of the fee, with the final payment due before the first date of DOE's acceptance of the utility's SNF. (Standard Contract, Article VIII). Under the second option, the amount due would accrue interest from April 7, 1983 to the date of payment. Id. By letter dated June 5, 1983, Vermont Yankee elected to pay its one-time fee under the second option. According to Defendant, Vermont Yankee's one-time fee was $39,284,623.69, which, with interest, has grown to $128,724,683 as of December 31, 2005. To date, Vermont Yankee has not paid its one-time fee.

Vermont Yankee sold the Power Station to ENVY on July 31, 2002, and with it, transferred its title to the Power Station's SNF to ENVY. As addressed in the "Assignment" discussion below, Vermont Yankee assigned certain rights and duties under the Standard Contract to ENVY, and retained others. Defendant asserts in its motions for summary judgment that Vermont Yankee's allegedly invalid assignment, and Vermont Yankee's failure to pay the one-time fee, legally bar Plaintiffs from recovering damages for partial breach of contract.

## Discussion

### I. Standard for Decision

Summary judgment is appropriate when there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. RCFC 56(c). "Material" facts are those that have the potential to significantly affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute in this context is "genuine" when a reasonable trier of fact could find in favor of the non-moving party based on the evidence presented. Id. at 248. The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing the evidence, the Court resolves all factual doubts and draws all justifiable inferences in favor of the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Anderson, 477 U.S. at 255. With cross-motions for summary judgment, the Court evaluates each motion on its own merits and resolves all doubts and inferences against the party whose motion is being considered. Tenn. Valley Authority v. United States, 60 Fed. Cl. 665, 670 (2004) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed.Cir.1987)).

### II. Vermont Yankee's Assignments

Vermont Yankee transferred ownership of the Power Station to ENVY in 2002, assigning its rights and duties under the Standard Contract pursuant to the following authority and legal instruments: (1) the NWPA, 42 U.S.C. § 10222(b)(3), providing that "[t]he rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel or high-level radioactive waste involved;" (2) the Standard Contract, Article XIV, providing that "[t]he rights and duties of [Vermont Yankee] may be assignable with transfer of title to the SNF and/or the HLW involved; provided, however that notice of any such transfer shall be made to DOE within ninety (90) days of transfer;" (3) a Purchase & Sale Agreement between Vermont Yankee and ENVY, dated August 15, 2001 ("P&S Agreement"); and (4) a Bill of Sale, dated July 31, 2002. Vermont Yankee provided notice of the assignment to DOE by letter dated August 21, 2002.

The provisions of the NWPA and of the Standard Contract, Article XIV, contemplate that ownership of nuclear power facilities occasionally will change hands, and that the rights and duties of the Standard Contract may be assignable. In accord with this authorization, the P&S Agreement contained provisions dealing with "Acquired Assets" (*i.e.*, assets transferred to ENVY), "Excluded Assets" (*i.e.*, assets retained by Vermont Yankee), and "Excluded Liabilities" (*i.e.*, the ongoing liabilities of Vermont Yankee and ENVY respectively).

Article II, Section 2.1 of the P&S Agreement governed the transfer of assets from Vermont Yankee, as seller, to ENVY, as buyer. Therein, Vermont Yankee agreed to "sell, assign, convey, transfer and deliver" to ENVY substantially all of Vermont Yankee's property interests associated with the Power Station (collectively the "Acquired Assets."). Among the Acquired Assets relevant to the present motions are:

> (b) All Nuclear Fuel wherever located and all Spent Nuclear Fuel and other Nuclear Materials located at the site to which [Vermont Yankee] has title; [and]
>
> * * *
>
> (n) Subject to Section 6.11(b)[3], any claims of [Vermont Yankee] related to [DOE's] defaults under the DOE Standard Contract accrued as of the Closing, whether relating to periods prior to or following the Closing, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983.

P&S Agreement, Article II, Section 2.1(b),(n).

Expressly excluded from the definition of Acquired Assets were the "Excluded Assets" identified in Article II, Section 2.2 of the P&S Agreement. Among the Excluded Assets relevant here are the "claims of [Vermont Yankee] related or pertaining to [DOE's] defaults under the DOE Standard Contract to the extent applicable to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983," as well as "[a]ny asserted or unasserted rights or claims that relate to the Excluded Assets or the Excluded Liabilities." P&S Agreement, Article II, Section 2.2(f),(i).[4]

---

[3] In Section 6.11(b) of the P&S Agreement, Vermont Yankee retained responsibility under the Standard Contract for paying the one-time fee for fuel burned before April 7, 1983. Vermont Yankee also retained the correlative right to any rights of set-off resulting from the DOE's default under the Standard Contract.

[4] Sections 2.2(f) and (i), and Section 2.1(n) of the P&S Agreement form the basis for Vermont Yankee's claim, stated in an August 21, 2002 letter to the DOE, that Vermont Yankee "retained the rights to any and all damages and other remedies that might accrue from the [DOE's] breach of [the Standard Contract] to the extent of the one-time fee for fuel used to generate electricity prior to April 7, 1983."

Article II, Section 2.3 of the P&S Agreement governed the treatment of liabilities and obligations. In that section, ENVY agreed to "assume and agree to discharge when due" certain of Vermont Yankee's liabilities relating to the Power Station (collectively, the "Assumed Liabilities and Obligations."). All liabilities and obligations of Vermont Yankee not expressly identified in Section 2.3 remained with Vermont Yankee. P&S Agreement, Article II, Section 2.4. Additionally, Plaintiffs expressly agreed that Vermont Yankee would retain the "Excluded Liabilities" specifically identified in Section 2.4(a)-(o). Pursuant to Section 2.4(m), Vermont Yankee agreed to retain "[a]ny liability . . . under the DOE Standard Contract with respect to the one-time fee for fuel burned prior to April 7, 1983."

A. Validity of Partial Assignments

On the facts and contract provisions presented, Defendant argues that Vermont Yankee's assignment of the Standard Contract to ENVY is invalid because Vermont Yankee did not assign "all of its rights and duties" under the Standard Contract, but instead reserved the obligation to pay the one-time fee. (Defendant's Assignment Motion at 2). According to Defendant, "a valid assignment could only include the transfer of all the rights and duties owed under the Standard Contract." Id. As a result, Defendant asserts, the arrangements in the P&S Agreement violate the Assignment of Contracts Act, 41 U.S.C. § 15, and the Assignment of Claims Act, 31 U.S.C. § 3727 (together, the "Anti-Assignment Acts").[5] Id. The first question for the Court therefore is whether the NWPA and the Standard Contract permit a "partial assignment."

The prohibitions of the Anti-Assignment Acts notwithstanding, "assigned contracts are valid when the assignment takes place by operation of law, or when the government consents to and recognizes the assignment." Rochester Gas and Electric Corp. v. United States, 65 Fed. Cl. 431, 437 (2005) (citing Tuftco Corp. v. United States, 222 Ct. Cl. 277, 614 F.2d 740 (1980)). The Government consents to an assignment when it signs a contract that permits the assignment. Id.

Here, Vermont Yankee's right to assign its "rights and duties" with respect to the Standard Contract is founded in statute and in contract. Both the NWPA and the Standard Contract permit the assignments contemplated in the P&S Agreement. As noted, Section 10222(b)(3) of the NWPA provides, "[t]he rights and duties of a party to a contract entered into under this section may be assignable with transfer of title to the spent nuclear fuel and/or

[5] Defendant acknowledges that the NWPA creates some exceptions to the prohibitions in the Anti-Assignment Acts, but believes Plaintiffs' assignments exceed the intended scope of the exceptions. (Defendant's Assignment Motion at 5, 10-11).

high-level radioactive waste involved." 42 U.S.C. § 10222(b)(3). Rochester Gas concluded that the NWPA "manifestly overrides the Assignment of Contracts Act." 65 Fed. Cl. at 438.

Likewise, the Standard Contract expressly contemplated assignments between future buyers and sellers of nuclear power facilities. Article XIV of the Standard Contract provided, "[t]he rights and duties of [Vermont Yankee] may be assignable with transfer of title to the SNF and/or HLW involved[.]" Accordingly, Article XIV constitutes "governmental recognition and consent under the Assignment of Contracts Act wholly apart from the statutory grant of authority for assignments in Section 302(b)(3) of the NWPA." Rochester Gas, 65 Fed. Cl. at 439 n.8.

The range of assignments permitted under the NWPA is broad, and extends to the "partial" assignment of rights and duties created by the Standard Contract. Such was the conclusion of this Court in Rochester Gas, a case factually similar to the instant case. 65 Fed. Cl. at 439-40. In that case, plaintiff Rochester Gas sold its interest in a nuclear power facility to buyer Ginna LLC ("Ginna") pursuant to the terms of an "asset purchase agreement." Id. at 432-33, 439. Like the P&S Agreement in this case, the asset purchase agreement in Rochester Gas identified certain "excluded assets" and "excluded liabilities" that Rochester Gas agreed to retain upon selling the facility to Ginna. Id. at 439. Among these obligations was "the obligation to pay the one-time fee." Id. at 434-35, 439. Among the assets Rochester Gas agreed to retain was "the right to pursue '[a]ny cause of action or claim for damages or other rights that relate to the One-Time . . . fee.'" Id. at 435. Citing the "unequivocal" language used to divide liabilities and assets in the asset purchase agreement, the Court concluded in that case that "the rights and duties under the Standard Contract were partially assigned," and that "such a partial assignment is permissible under the NWPA and the Standard Contract." Id. at 439-40.

The Court applies the reasoning in Rochester Gas to the present case and concludes that Plaintiffs' assignments are not invalid by virtue of being "partial." Accordingly, the Government is not entitled to judgment regarding the validity of the assignment.

B. Assignment of Pre-Existing Claims

Next, Defendant argues that the Standard Contract does not allow Vermont Yankee to assign damages claims against the Government that arose before the date of the sale of the Power Station (*i.e.*, "pre-existing claims"). (Defendant's Assignment Motion at 2, 13). Defendant attempts to distinguish "claims" from "rights and duties" of a party to a contract, and asserts that only "rights and duties" may be assigned under the Standard Contract. Id. at 14. Consequently, Defendant suggests that the Assignment of Claims Act, 31 U.S.C. § 3727, controls, and prevents Vermont Yankee from assigning "pre-existing claims." Because

31 U.S.C. § 3727 prohibits the assignment of claims, Defendant concludes the assignment is invalid. Id. at 20. The question thus is whether the Standard Contract permits, or the Assignment of Claims Act prohibits, a party's assignment of "pre-existing claims."

Related to this issue, Defendant again raises the specter of double recovery in this litigation. Specifically, Defendant argues that the pre-existing claims Vermont Yankee purportedly assigned to ENVY include damages concurrently sought by Vermont Yankee in its First Amended Complaint, and by ENVY in its Complaint. Id. at 19-20.

The Assignment of Claims Act is analogous to the Assignment of Contracts Act in that it generally prohibits the assignment of claims against the United States. See 31 U.S.C. § 3727. However, an assignment of claims is permissible where the assignment occurs by operation of law, or where the government chooses to "recognize" the assignment of a claim. See Rochester Gas, 65 Fed. Cl. at 440; Tuftco, 614 F.2d at 745, 222 Ct. Cl. at 285.

In Rochester Gas, this Court concluded that Section 302(b)(3) of the NWPA created such an exception to the Assignment of Claims Act, and that a party to a Standard Contract may therefore assign its claims arising under that contract.[6] See 65 Fed. Cl. at 440. Whereas Section 302(b)(3) provides that "[t]he rights and duties of the Purchaser may be assignable[,]" the Court concluded:

> Generally, one of the "rights" that a party has in a contract with the government is to bring a suit for breach of contract. Section 302(b)(3) contains no exceptions to its grant of permission for assignments, and thus it does not bar pre-existing claims from being assigned. Rather, it is worded broadly, and on its face would permit various assignments of rights and duties.

Id. (citations omitted).

The same conclusion applies here. In both this case and in Rochester Gas, a seller agreed to assign the Standard Contract to a buyer, excepting the rights and duties concerning the "excluded assets" and "excluded liabilities." See 65 Fed. Cl. at 435; P&S Agreement, Article II, Section 2.1(n); Article VI, Section 6.11(a). Vermont Yankee's rights under the Standard Contract included the right to sue the DOE for damages resulting from a breach of that agreement. Pursuant to Article II, Section 2.1(n) of the P&S Agreement, Vermont Yankee assigned that right, *i.e.*, the "pre-existing claim," to ENVY.

---

[6] Rochester Gas expressly found that "Section 302(b)(3) of the NWPA supersedes the Anti-Assignments Acts with respect to the Standard Contract." 65 Fed. Cl. at 441 n.11.

In arriving at this conclusion, the Court notes that the criteria for assigning pre-existing claims, discussed in Rochester Gas, are satisfied in the present case: (1) Vermont Yankee transferred title to the SNF to ENVY, (P&S Agreement, Article II, Section 2.1(b)); (2) Vermont Yankee notified the DOE Contracting Officer of the transfer of the SNF within 90 days, (August 21, 2002 Letter from Vermont Yankee to DOE); and (3) Vermont Yankee explicitly assigned its pre-existing damages claims to ENVY, (P&S Agreement, Article II, Section 2.1(n)). See Rochester Gas, 65 Fed. Cl. at 441.

Because the scope of the assignments of the Standard Contract in this case and in Rochester Gas are without practical difference, the Court finds that Vermont Yankee's assignment of its pre-existing damages claims is not invalid for the reasons offered by Defendant. Accordingly, the Government is not entitled to summary judgment with respect to the assignment of pre-existing claims.

### C. Defendant's Argument for Dismissal of Vermont Yankee's Case

Defendant argues in the alternative that, if Vermont Yankee's assignments are valid, the Court should dismiss Vermont Yankee's case. Defendant reasons that, if the challenged assignments are permissible, Vermont Yankee has thereby "assigned all viable pre-assignment damages claims to ENVY," leaving Vermont Yankee with no claims of its own. (Defendant's Assignment Motion at 21-22). Defendant identifies Article II, Section 2.1(n) of the P&S Agreement, and paragraph 22 of Vermont Yankee's First Amended Complaint as the source of overlapping damages claims. Id.

At this stage of the case, the Court is not able to determine as a matter of law whether all of Vermont Yankee's claims have been assigned to ENVY, or whether there is any overlap between the claims of Vermont Yankee and ENVY. The precise nature and components of the Vermont Yankee and ENVY claims must await further development and trial on the merits. Certainly the Court will be sensitive to Defendant's legitimate concern that the Government not be subjected to a double payment of the same damages to two different plaintiffs.

## III. Vermont Yankee's Failure To Pay The One-Time Fee

Having denied Defendant's motions regarding the assignments, the Court assumes for purposes of the remainder of this opinion that Vermont Yankee retains liability for payment of the one-time fee. Accordingly, Defendant's motion for summary judgment as to ENVY's obligation to pay the one-time fee is denied as moot. The remainder of the discussion below therefore concerns only the consequences of Vermont Yankee's nonpayment of the one-time fee.

Counts I and II of Vermont Yankee's Amended Complaint, filed September 2, 2004, provide in relevant part as follows:

> DOE has failed to perform its obligation under the Standard Contract to dispose of SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contract.
>
> * * *
>
> DOE breached the [the Standard Contract's] covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting to avoid its obligations under the contract as defined by the D.C. Circuit; by failing to make any effort to dispose of the Power Station's SNF or even to provide Vermont Yankee with a firm date on which DOE would begin to do so; and by insisting on Vermont Yankee's continued performance (when it owned the Power Station) of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

(Amended Complaint ¶¶ 25, 28). The third count of the Amended Complaint alleges a Fifth Amendment taking without just compensation. Id. ¶ 34.

The NWPA and the Standard Contract represent the basic bargain that resulted from Congress' dual determinations that "the Federal Government has the responsibility for the permanent disposal of high-level radioactive waste . . . in order to protect the public health and safety[,]" and that the "generators and owners" of that waste should bear "the costs of such disposal." See Maine Yankee, 225 F.3d at 1337-38 (discussing DOE's duties under the Act, and the utilities' related obligation to pay "a one-time fee" and "an ongoing fee" for DOE's services). The statutory roots of the one-time fee obligation appear in Section 302(a)(3) of the NWPA, which requires nuclear utilities to pay DOE to accept title to and dispose of SNF generated by domestic civilian power plants. See 42 U.S.C. § 10222(a)(3). The contractual bases for these duties appear in the Standard Contract, Article VIII.

Article VIII, Section B.2. of the Standard Contract identified the three "fee payment options" by which Plaintiff Vermont Yankee could discharge its obligation to pay the one-time fee. In its June 5, 1985 letter, Vermont Yankee notified DOE that it had "selected Option 2 . . . which requires a one-time payment anytime prior to the first delivery of spent nuclear fuel and/or high level waste to DOE." According to the Standard Contract, therefore, Vermont Yankee's one-time fee payment was due "in the form of a single payment anytime

prior to the first delivery, as reflected in the DOE approved delivery commitment schedule [("DCS")]." The Standard Contract, Article I, defined "delivery" as "the transfer of custody, f.o.b. carrier, of spent nuclear fuel of high-level radioactive waste from [Vermont Yankee] to DOE at [Vermont Yankee's] civilian nuclear power reactor[.]" At present, there is no DOE-approved DCS in force,[7] and Vermont Yankee has not paid the one-time fee described under Option 2.

Defendant argues that payment of the one-time fee is a condition precedent to the Government's obligation to accept Plaintiffs' SNF. Because Vermont Yankee has not yet paid the fee, Defendant claims the condition is unsatisfied and performance by the Government is not yet due. Accordingly, Defendant concludes it cannot yet be liable for partially breaching the Standard Contract.[8] (Defendant's One-Time Fee Motion at 2-4). Plaintiffs respond that payment of the one-time fee is not a condition precedent and that, if it were, the Government has excused the condition by failing to build a functional SNF repository. (Plaintiffs' Response at 9-12). Plaintiffs also claim payment is not yet due under payment Option 2. Id. at 6-9. The first questions relevant to the instant motions therefore are whether payment of the one-time fee is a condition precedent to the Government's performance, whether such payment is due, and, if so, what are the effects of Vermont Yankee's non-satisfaction of the condition.

Should the Court reject the Government's primary argument and find a partial breach, Defendant argues in the alternative that it is entitled to recover from Plaintiffs an amount equal to the unpaid one-time fees, plus accrued interest. (Defendant's One-Time Fee Motion

---

[7] This Court has noted DOE's suspension of the DCS process in previous decisions. See, e.g., Consumers Energy Co. v. United States, 65 Fed. Cl. 364, 370 (2005) ("Defendant plainly abandoned the DCS process prior to January 31, 1998, the date under the Contract for Defendant to begin fulfilling its obligations to accept title to, transport, and store the SNF."). After that deadline, DOE Contracting Officer David Zabransky testified, "we were advised to suspend the DCS process for a number of reasons by counsel." As of Mr. Zabransky's April 18, 2002 deposition testimony, it was "impossible for a utility to have a DCS approved." (Zabransky Deposition, Tr. 352-53). According to Defendant, however, Vermont Yankee owes the one-time fee based upon "an approved DCS that provided for the first delivery in 1999[.]" (Defendant's Reply at 2). Defendant reasons this is so because "Vermont Yankee's DCSs were all submitted and approved in 1992," and "were not changed, suspended, or later voided." Id. at 10 n.4 (citation omitted). Therefore, although DOE suspended the overall DCS process, Defendant maintains "[t]he suspension . . . did not, however, eliminate the fact that Vermont Yankee has a valid, approved DCS committing DOE to accept a specific quantity of fuel in 1999." Id. at 10.

[8] Defendant acknowledges that liability for partial breach would lie absent Vermont Yankee's failure to pay the one-time fee. (Defendant's Reply at 11).

at 18-22). Plaintiffs repeat the argument that the one-time fee is as yet not due, and claim that such an offset of damages is improper. (Plaintiffs' Response 15-17). Accordingly, if Defendant has partially breached the Standard Contract, a second question arises concerning the propriety of offsetting the damages by the amount due under the one-time fee arrangement.

The decisions from this Court are divided on whether the payment of the one-time fee is a condition precedent to the Government's obligation to accept and dispose of spent nuclear fuel. See System Fuels, Inc. v. United States, 65 Fed. Cl. 163, 173 (2005) (finding payment to be a condition, citing the unambiguous language in the Standard Contract directing that the fee "shall be paid . . . prior to the first delivery[.]"); Consumers Energy, 65 Fed. Cl. at 371 (concluding that payment is not a condition of DOE's obligation, but rather "one of the parties' mutual contractual promises."). As applied to the issue of partial breach in this case, however, the distinction is immaterial. Assuming, *arguendo*, that payment is a condition, the Court finds that the one-time fee is not yet due, and that DOE has in any event excused the condition.

Article VIII, Section A.1. of the Standard Contract calls for the "fee . . . on electricity generated by [Plaintiffs'] nuclear power reactor(s)" to be paid "as specified in paragraph B of this Article VIII." As noted, the portion of Paragraph B relevant to Option 2 provides that the one-time fee "shall be paid . . . anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule[.]" The Court interprets this language to require payment before the *first delivery*, with the date of such delivery being established in the DOE-approved DCS. To the extent that the actual date of the first delivery is a different date than the date "as reflected in the DOE approved [DCS]," payment remains due anytime prior to the *actual* first delivery. In other words, Vermont Yankee's obligation to pay the one-time fee is not to be accelerated on account of a once-valid DCS being superseded or invalidated. Furthermore, as Chief Judge Damich of this Court concluded, "the setting of the delivery date was *itself* a condition of Plaintiff's payment obligation." Consumers, 65 Fed. Cl. at 371 (emphasis added). Accordingly, while Vermont Yankee cannot withhold payment of the one-time fee until after the actual "first delivery" of SNF, the Government is in no position to demand payment of the one-time fee until a valid, DOE-approved DCS is in effect, setting the schedule for the first delivery at the Power Station.[9]

---

[9] Defendant's argument to the contrary would vitiate, as Plaintiff observed, "the *quid pro quo* that the contract is supposed to reflect." (Plaintiffs' Response at 7). Vermont Yankee bargained for the disposal of SNF, not for the privilege of negotiating a DCS with the Government. Linking the payment of the one-time fee with mere approval of the 1999 DCS does not reflect the spirit and purpose of the Standard Contract. See Hercules, Inc. v. United States, 292 F.3d 1378, 1381 (Fed. Cir. 2002).

The suspension of the DCS process also frustrated the purpose of the Standard Contract. As this Court stated in System Fuels, Option 2 for payment of the one-time fee "incorporates the DCS process into the timing of the payment, by connecting the timing of the payment to 'the DOE approved delivery commitment schedule.'" 65 Fed. Cl. at 173 (citing the Standard Contract, Article VIII.B.2(b)). By suspending the DCS process, the Government has temporarily frustrated the purpose underlying Vermont Yankee's election of Option 2 (ostensibly, as in System Fuels, "to delay payment until the point when delivery of SNF was imminent."). Id. at 174. As a consequence, payment of the one-time fee, assumed for purposes of argument to be a condition precedent, is temporarily excused. Id.

For these reasons, the Court concludes that Vermont Yankee's nonpayment of the one-time fee does not warrant summary judgment for Defendant with respect to Counts I and II of the Complaint. Because payment of the one-time fee is not yet due, Defendant is not at present entitled to recovery of the fee through an award of damages or setoff in this action. Until DOE establishes an approved DCS with an initial delivery date for Vermont Yankee's Power Station, it is premature to assess the issue of an offset.

IV. Plaintiffs' Cross-Motions for Summary Judgment on Liability

Like other nuclear utilities who entered into a Standard Contract, Plaintiffs have moved for summary judgment on the issue of Defendant's partial breach of the Standard Contract resulting from the DOE's failure to begin disposing of SNF. In its Response to Plaintiffs' Cross-Motion for Summary Judgment on Liability ("Defendant's Response"), Defendant attempts to distinguish this case from other cases in which partial breach has been found. Specifically, Defendant contends that the Federal Circuit's decision in Maine Yankee, 225 F.3d 1336, does not constitute *stare decisis* for purposes of establishing liability in this consolidated case. (Defendant's Response at 31). The alleged basis of distinction is the date for delivery of SNF associated with each plaintiff's DCS. Whereas the plaintiffs in Maine Yankee each had DOE-approved delivery commitment schedules requiring delivery by January 31, 1998 or January 31, 1999, the DOE-approved DCS relevant to this case called for DOE to begin accepting Vermont Yankee's SNF between January 31, 1999 and January 30, 2000. Id. at 29.

This distinction, while perhaps relevant to the determination of damages, does not relieve Defendant of liability for partial breach of the Standard Contract. Though Vermont Yankee was not entitled to have its SNF accepted by DOE on January 31, 1998, it was a member of an industry that contracted with the United States for, among other things, relief of the costs of and obligations of interim storage of SNF. Because Vermont Yankee was not first in line for delivery does not mean that it now occupies the same position it would have,

absent the Government's failure to perform.[10] With DOE's dubious pick-up dates now extending into the next decade, the question is not whether Plaintiffs have been injured by DOE's delays, but rather to what extent they have been harmed.

The U.S. Court of Appeals for the Federal Circuit already has determined that the Government breached every utility's Standard Contract, when DOE failed to begin accepting SNF on January 31, 1998. Maine Yankee, 223 F.3d at 1342 ("The breach involved all utilities that had signed the contract – the entire nuclear electric industry."); see also Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000). Accordingly, Plaintiffs' cross-motions for summary judgment on liability shall be granted. Plaintiffs will have the opportunity to prove their damages at trial.

## Conclusion

For the reasons explained above, Defendant's motions for summary judgment due to an invalid assignment or for failure to pay the one-time fee are DENIED, and Plaintiffs' cross-motions for summary judgment on liability are GRANTED. The cases shall proceed to a determination of Plaintiffs' damages.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge

[10] The "oldest fuel first" acceptance requirement in the Standard Contract, referenced by Defendant in its Response, should provide some rigidity to the acceptance rate as it is ultimately implemented. That is, the Court does not anticipate that the DOE will pick up all of ENVY's SNF by a date prior to the dates originally contemplated for delivery. See Defendant's Response at 31.