**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERMONT YANKEE NUCLEAR POWER CORPORATION,** | ) | |
| **and** | ) | |
| **ENTERGY NUCLEAR VERMONT YANKEE, LLC, et al.,** | ) | **Nos. 02-898C & 03-2663C** |
| **Plaintiffs,** | ) | **(Judge Wheeler)** |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS ENTERGY NUCLEAR VERMONT YANKEE, LLC AND ENTERGY NUCLEAR OPERATIONS, INC.'S OPPOSITION TO PLAINTIFF VERMONT YANKEE NUCLEAR POWER CORPORATION'S MOTION TO COMPEL COMPLETE PRODUCTION OF DOCUMENTS**

Plaintiffs Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc. (collectively, "Entergy") submit this opposition to Plaintiff Vermont Yankee Nuclear Power Corporation's ("VYNPC") Motion to Compel Complete Production of Documents and respectfully request that the Court deny VYNPC's motion. As shown in the attached affidavits of Entergy personnel, Entergy's reasonable and good faith efforts to respond to VYNPC's document requests have more than satisfied its discovery obligations under the Rules of the Court of Federal Claims.

## I. ENTERGY'S EFFORTS TO RESPOND TO VYNPC'S DOCUMENT REQUESTS

In responding to VYNPC's very broad document requests, Entergy identified individuals within its organization who it believed would likely be in possession of responsive documents given their roles and responsibilities with Entergy or through their involvement in the Vermont Yankee acquisition, including, but not limited to: Dan Keuter, Curt Bregar, Jay Brister, Frank

Rives, Lea Turnipseed, David Gibbs, Connie Wells, Ben Franklin, and Steve Downs.[1] These individuals were asked to search their paper and electronic files for documents related to the Vermont Yankee acquisition and to identify other possible sources of responsive documents. As indicated in the attached affidavits, in July 2007, these individuals searched the likely sources of such documents in their files and either indicated that they were not in possession of such documents or turned documents that were located over to Entergy counsel. *See* Exhibit 1, Keuter Aff. ¶ 4; Exhibit 2, Bregar Aff. ¶ 4; Exhibit 3, Rives Aff. ¶¶ 5-7; Exhibit 4, Turnipseed Aff. ¶ 4; Exhibit 5, Gibbs Aff. ¶ 4; Exhibit 6, Wells Aff. ¶ 4.

In addition, in response to VYNPC's October 11, 2007 correspondence regarding decommissioning, due diligence, and valuation documents, Entergy asked individuals identified by VYNPC as potential custodians of additional responsive documents to re-evaluate files in their possession to determine whether additional documents existed that may be responsive to the categories identified by VYNPC. As indicated in the attached affidavits, and as previously explained to VYNPC on October 29, 2007 (*see* Exhibit S to VYNPC Motion at 2) and November 1, 2007 (*see* Exhibit U to VYNPC Motion at 1), none of the individuals were aware of any potentially responsive documents in Entergy's possession other than those previously provided, and any potentially responsive documents that might exist would have been contained within the documents previously produced. *See* Exhibit 1, Keuter Aff. ¶¶ 5-7; Exhibit 2, Bregar Aff. ¶¶ 5-7; Exhibit 4, Turnipseed Aff. ¶¶ 5-7; Exhibit 5, Gibbs Aff. ¶¶ 5-7; Exhibit 6, Wells Aff. ¶¶ 5-7. Accordingly, Entergy has reasonably and appropriately searched its files in response to VYNPC's document requests and produced any existing, non-privileged, responsive documents when requested.

---

[1] Entergy is prepared to supplement its opposition, if necessary, with an affidavit from Mr. Downs, but has been unable to secure that affidavit as of this filing. However, Entergy has been informed that Mr. Downs did not possess any documents relating to the Vermont Yankee transaction.

Entergy understands its obligations to supplement its production if additional non-privileged, responsive documents are discovered. Such supplementations are, of course, common in disputes of this magnitude. Since its initial and supplemental productions, Entergy has located five additional responsive documents, as explained in the affidavits of Messrs. Keuter and Rives. *See* Exhibit 1, Keuter Aff. ¶ 8; Exhibit 3, Rives Aff. ¶ 7. Entergy is uncertain whether any of these documents are duplicates of documents previously produced. Under normal circumstances, Entergy would have taken the time and effort to review each of the more than 6,000 PDF, Word, and Excel files it had produced to confirm whether the documents were previously produced. In light of the present circumstances and VYNPC's complaints, however, Entergy has, in an excess of caution, produced the documents without this confirmation in an effort to avoid further allegations that Entergy is not cooperating in discovery. To date, however, Entergy contends it has conducted reasonable searches of its files, and has produced all responsive documents that have been discovered.

## II. "MISSING" DOCUMENTS VYNPC INCORRECTLY ASSUMES TO EXIST

VYNPC's motion is premised on its belief that Entergy has not produced all documents relating to decommissioning, due diligence, and valuation models because similar types of documents sought by VYNPC have been (1) generated and maintained by Entergy in connection with its 1998 acquisition of the Pilgrim Nuclear Power Station; (2) produced to VYNPC by third parties; or (3) referenced in documents produced by Entergy. VYNPC assumes – incorrectly – that the documents it seeks necessarily exist in Entergy's files.

As a general matter, and as Entergy has previously explained to VYNPC on two occasions (*see* Exhibit S to VYNPC Motion at 2; Exhibit U to VYNPC Motion at 1), the distinctions between the Pilgrim and Vermont Yankee transactions – e.g., Entergy's substantially increased experience in purchasing nuclear generating assets and evolving financial modeling

and evaluation methods – render it unreasonable to assume that the mere existence of certain documents relating to the Pilgrim transaction equates to the existence of similar documents, both in substance and volume, relating to the Vermont Yankee transaction.

As indicated in the affidavit of Barrett Green, Vice President, Commercial Analytics, the Pilgrim plant was the first nuclear power plant that Entergy acquired and was one of the first purchases of a nuclear power plant in the United States. Exhibit 7, Green Aff. ¶ 6. Due to Entergy's limited experience in assessing and assimilating nuclear plants at that time, the nuclear organization's internal analyses relating to the feasibility of the Pilgrim acquisition were more extensive than that involved with Vermont Yankee and focused primarily on an analysis of the costs of operation and decommissioning and conservatively assumed a remaining operating life of five years (i.e., the plant could be shut down in five years and decommissioned), rather than continued operations for the life of the remaining license. *Id*. Because of the short assumed lifetime of Pilgrim, the decommissioning event was a relatively large component of the plant's cash flows on both an absolute and present value basis. *Id*. ¶ 7. As such, it merited substantial analysis due to both its materiality to the project and Entergy's relative inexperience in analyzing the decommissioning event in a non-cost of service regulatory environment. *Id*.

Due to the importance of the decommissioning component in the Pilgrim transaction, Entergy's nuclear organization also created multiple modeling scenarios for Entergy's Corporate Finance Department and cash flow models for presentation to the Entergy's Board of Directors in connection with the Pilgrim transaction. *Id*. ¶ 8. The determination of the value of the transaction was dependant on many variables and assumptions, one of which was the purchase price. *Id*. In the Pilgrim case, a purchase price was assumed and input into Entergy's evaluation

based on the discretion of the deal team and executive management, rather than being an output as the result of other assumptions. *Id.*

With respect to the Vermont Yankee acquisition, which was completed in 2002, Entergy had substantially more experience in evaluating and purchasing nuclear generating assets, and the advisors to the sellers (i.e., investment bankers or auction managers) had become more experienced in conducting the sales process of nuclear generating assets. *Id.* ¶ 10. As Entergy gained more experience in acquiring nuclear generating assets, the financial models and evaluation methods utilized for such transactions evolved so that the Vermont Yankee purchase reflected different standards. *Id.* For example, the Vermont Yankee models assumed a much longer operating life for the plant, which pushed the decommissioning date much further into the future, and on a present value, decommissioning provided a much smaller impact to value, although it was still a variable to be considered. *Id.* As such, the decommissioning event received less analysis, as compared to the Pilgrim transaction, both because it was a less material component of the plant's value and because Entergy had substantially more experience in analyzing the decommissioning event. *Id.* For these reasons, the nuclear organization was asked to present to corporate management fewer scenarios relating to operational and decommissioning costs, which were then factored into a financial model submitted to the Board for consideration. *Id.*

In the Pilgrim transaction, the purchase price was one of many variables and assumptions that determined the value of Pilgrim to Entergy. *Id.* ¶ 11. In the Vermont Yankee case, however, the deal team and executive management used the purchase price as one of the last variables to be fixed, so that it was treated more as an output than an assumption. *Id.*

In addition, the Vermont Yankee transaction was completed in July 2002, and at that time, Entergy had no business reason following that transaction to retain any internal due diligence analyses, or valuation modeling documentation associated with the acquisition of an unregulated plant, such as Vermont Yankee. *See* Exhibit 1, Keuter Aff. ¶ 10; Exhibit 5, Gibbs Aff. ¶ 8. Whether Entergy's bid for Vermont Yankee was a good decision or a poor decision was subject only to Entergy's own internal criticism, and was not subject to any post-purchase prudence review or other audit by a third party. For this reason, where preliminary versions of models in the due diligence and bid formulation process leading to the purchase were maintained, they were maintained only at the request of management or in the discretion of the individuals who were in possession of such documents. *Id.*

Contrary to VYNPC's misleading characterization that "certain categories of critical documents were completely missing from [Entergy's] production," and as addressed in more detail below, Entergy has produced over 6,000 PDF, Word and Excel files, which consisted of an exponentially larger number of individual pages contained in over seven gigabytes of data, which related to the information sought in VYNPC's requests, including decommissioning, due diligence, and valuation modeling.

**A. Decommissioning Internal Analyses and Discussions**

In response to VYNPC Document Request Nos. 1 and 6, VYNPC has obtained decommissioning analyses and associated materials from TLG Services, Inc. ("TLG"), an Entergy-owned corporation, and which was owned by Entergy at the time of the Vermont Yankee acquisition and charged with performing the decommissioning studies for the acquisition of that plant. In addition, Entergy has produced other files in its possession that relate to the decommissioning studies and documents produced to VYNPC by TLG. It is important to note that VYNPC does not claim that documents were not produced, but rather, its contention rests

simply on the unsupported assumption that there should be more documents. As explained below, the logic behind VYNPC's claim that additional documents of a particular nature *should* exist is flawed.

In support of the allegation that additional documents reflecting internal analyses or discussions regarding the decommissioning of Vermont Yankee must exist in Entergy's files, VYNPC points to a "Vermont Yankee Action Items" list that Entergy produced, which lists "Decommissioning Cost Comparisons" as an action item assigned to TLG and former Entergy employee Steve Downs. *See* VYNPC Motion at 3. VYNPC leaps to the conclusion that such a generically described document, or series of documents, entitled "Decommissioning Cost Comparisons" *must*, therefore, exist in Entergy's files. Putting aside VYNPC's tenuous assumption, VYNPC ignores the simple fact that TLG did perform analyses consistent with the action item. TLG is and, at that time, was an Entergy-owned corporation. TLG performed the decommissioning studies at Entergy's request. Those documents were produced by TLG in addition to the documents Entergy has produced in conjunction with the written responses to VYNPC's discovery requests. VYNPC's continued claim that Entergy did not produce any "internal" analyses completely ignores that the decommissioning analyses produced were generated internally by an Entergy-owned corporation. In addition, Entergy personnel have conducted reasonable searches for additional documents relating to decommissioning, and those non-privileged, responsive documents, which were located have been included in Entergy's productions. *See* Exhibit 1, Keuter Aff. ¶¶ 4-8; Exhibit 2, Bregar Aff. ¶¶ 4-7; Exhibit 3, Rives Aff. ¶¶ 5-7; Exhibit 4, Turnipseed Aff. ¶¶ 4-7; Exhibit 5, Gibbs Aff. ¶¶ 4-7; Exhibit 6, Wells Aff. ¶¶ 4-7.

VYNPC also assumes that, because TLG produced some 2001 email correspondence between TLG and Entergy personnel regarding assumptions to be used in the decommissioning estimate, Entergy must have retained email correspondence with TLG on this subject. *See* VYNPC Motion at 3. VYNPC's contention ignores three important facts. First, the Vermont Yankee acquisition was not a purchase of a regulated asset. Thus, the only entity Entergy needed to answer to as to whether it made a good deal in the acquisition was its own management. Otherwise, there was not a business reason to take special steps to maintain communications or documents beyond the acquisition date unless requested by management or at the discretion of the individual in possession of the document or communication. *See* Exhibit 1, Keuter Aff. ¶ 10; Exhibit 5, Gibbs Aff. ¶ 8. Further, Entergy's internal email system does not archive email communications automatically. Unless the individual who sends or receives the communication takes special steps to maintain the email, it is discarded by the system after a period of time. Finally, with respect to VYNPC's assertion that Entergy has somehow failed to cooperate in discovery because it did not produce email communications with TLG, the same communications that VYNPC claims Entergy failed to produce were, in fact, produced to VYNPC by TLG – an Entergy-owned and operated company. The fact that the communications came from an Entergy-owned corporation versus the parent corporation does not change the fact the documents were, in fact, produced.

VYNPC further assumes that, because Entergy hired TLG to prepare decommissioning studies related to Vermont Yankee in 1999 and because Entergy generated internal decommissioning analyses in connection with the Pilgrim acquisition, Entergy must have generated and retained internal decommissioning analyses for the Vermont Yankee acquisition. VYNPC Motion at 3-5. As indicated in the attached affidavit of Dan Keuter, however, Entergy's

utilization of TLG to prepare the decommissioning analysis for Vermont Yankee in part *avoided* the necessity for those same comparisons to be prepared by the home office nuclear organization. Exhibit 1, Keuter Aff. ¶ 9. With respect to the Vermont Yankee purchase, given Entergy's experience relating to prior purchases of nuclear generating assets, it was not necessary to generate the multitude of internal models that were generated during Entergy's acquisition of earlier plants, such as Pilgrim, and it was certainly not necessary for Entergy to recreate the efforts of one of its own companies, such as TLG. *Id*.; *see also* Exhibit 7, Green Aff. ¶¶ 6-12.

**B. Due Diligence Internal Analyses**

In response to VYNPC Document Request Nos. 21 and 22, Entergy produced over 1,200 files relating to its due diligence efforts. These documents were a combination of both electronic media, and several bankers boxes of hard copy documents that were converted into electronic media for production.

VYNPC bases its assertion that "extensive" Entergy due diligence reports and analyses necessarily exist on the following: (1) Entergy generated "comprehensive due diligence reports" in connection with the Pilgrim transaction; (2) an Entergy "Vermont Yankee Due Diligence List" itemizes certain due diligence issues for consideration; and (3) an email between TLG and Entergy indicates that Entergy would be conducting due diligence for the Vermont Yankee acquisition. VYNPC Motion at 5-6.

This assertion is without basis. For the reasons already discussed above and in Mr. Green's affidavit (Exhibit 7, Green Aff. ¶¶ 6-12), VYNPC's assumption that extensive due diligence reports and analyses exist because such documents were generated for the Pilgrim acquisition is without basis. Indeed, the email cited by VYNPC indicates that Entergy relied on TLG to provide much of the due diligence input concerning decommissioning and spent fuel issues. *See* Exhibit K to VYNPC Motion. Notably, the email also indicates that Entergy was

conducting only an "*abbreviated* due diligence effort" spanning three days. *Id*. (emphasis added).

**C. VALUATION MODELS REFLECTING ULTIMATE PURCHASE PRICE**

In response to VYNPC Document Request Nos. 21, 24, and 25, Entergy produced a multitude of modeling variations and studies. The models and other documents associated with the modeling total in excess of 3,000 files. Although VYNPC acknowledges that Entergy did produce valuation models in connection with the Vermont Yankee acquisition, it claims that Entergy's production is incomplete because Entergy failed to produce any models that correlate with the breakdown of the final price in the Purchase and Sale Agreement. VYNPC Motion at 6, 7. This claim mistakes the purpose of valuation modeling. Entergy's models indicate what Entergy believed to be the plant's overall worth. The fact that Entergy ultimately paid a different (i.e., lower) price than what is shown in the various valuation models merely suggests that it ultimately paid a lower price than what it believed the plant to be worth (as an attribute of the fact that this was a competitive bidding situation), not that its production is incomplete. VYNPC also complains that none of the models show the precise breakdown of assets that constituted the final purchase price. This ignores the fact that the models were created for the purpose of providing guidance to the Board, which would make the ultimate purchase decision, not as a tool to allocate the purchase price for accounting purposes. Just because there is not a model that shows the precise manner in which the purchase price was divided among the assets being purchased under these circumstances does not support the accusation that other models exist that were not produced. *See* Exhibit 5, Gibbs Aff. ¶ 8; Exhibit 7, Green Aff. ¶ 11.

VYNPC apparently believes that Entergy's production should have contained more versions of or alternative valuation models. VYNPC Motion at 6-7. Although draft or alternate versions of such models may have existed at some point, Entergy's standard practice is to

overwrite older model versions and replace them with current data, rather than save multiple draft versions. As explained in the affidavit of Mr. Gibbs, preliminary versions of models would only be maintained at the request of management or at the discretion of the individual developing the model. Exhibit 5, Gibbs Aff. ¶ 8.

Finally, VYNPC's demand for documents reflecting how Entergy calculated the inputs used in its valuation models is beyond the scope of Document Request Nos. 21, 24, and 25. Request No. 21 seeks "valuation documents relating to the Nuclear Station"; Request No. 24 seeks "valuations … relating to the assessment of the operating life of the Nuclear Station"; Request No. 25 seeks "valuation studies … relating to the Nuclear Station." *See* VYNPC Motion at 3, nn.3-4. The Initial Valuation Manual and Investment Briefing Document Standards demanded by VYNPC for the first time in its motion are not responsive to any of VYNPC's document requests. They are neither valuation documents nor valuation studies that relate with any particularity to Vermont Yankee. VYNPC cannot legitimately complain that Entergy has failed to produce a document that has not been requested.

## III. CONCLUSION

VYNPC assumes – incorrectly – that the documents it seeks necessarily exist, because Entergy generated and maintained similar documents in connection with the Pilgrim transaction and because documents produced by Entergy or TLG make vague, passing references to decommissioning studies, due diligence reviews, and alternate valuation modeling scenarios. As indicated in the attached affidavits of the Entergy personnel referenced herein, Entergy has reasonably and appropriately searched its files and produced non-privileged, responsive documents in response to VYNPC's requests for documents.

For the reasons set forth above, Entergy requests that the Court deny VYNPC's Motion to Compel Complete Production of Documents.

Date: December 7, 2007

Respectfully submitted,

s/ Brad Fagg
Brad Fagg
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5191 (Phone)
(202) 739-3001 (Fax)

*Counsel of Record for Plaintiffs Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc.*

Of Counsel:

L. Jager Smith, Jr.
WISE CARTER CHILD
& CARAWAY, P.A.
1340 Echelon Parkway
Jackson, MS 39213
(601) 368-5572 (Phone)
(601) 368-5816 (Fax)

**CERTIFICATE OF FILING**

I hereby certify that on this 7th day of December, 2007, a copy of the foregoing Plaintiffs Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc.'s Opposition to Plaintiff Vermont Yankee Nuclear Power Corporation's Motion to Compel Complete Production of Documents was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic case filing system. Parties may access this filing through the Court's system.

___s/ Paul Bessette_______________