Lester H. Gordner J. 7092

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION,<br><br>and<br><br>ENTERGY NUCLEAR VERMONT YANKEE, LLC, et al.,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | ) | Nos. 02-898C & 03-2663C<br>(Judge Wheeler) |

PLAINTIFF VERMONT YANKEE NUCLEAR POWER CORPORATION'S RULE 30(b)(6) NOTICE OF DEPOSITION

Please take notice that, pursuant to Rule 30(b)(6) of the Rules of the United States Court of Federal Claims, Plaintiff Vermont Yankee Nuclear Power Corporation ("VYNPC"), will take the deposition of Entergy Nuclear Vermont Yankee, LLC and Entergy Nuclear Operations, Inc. (including all affiliates, parents, and subsidiaries, including but not limited to TLG Services, Inc.) ("Entergy"), or a person or persons designated by Entergy, on April 8-9, 2008 at the offices of Dickstein Shapiro LLP, located at 1825 Eye Street NW, Washington, DC 20037, and on April 15-16, 2008 in Jackson, Mississippi, at a place determined by counsel, or at a time and place agreed upon between counsel for the parties, and continuing from day to day until completed. The deposition will be by oral examination before an officer authorized by law to administer oaths, and will be recorded by stenographic means.

Pursuant to Rule 30(b)(6), Entergy shall designate the most knowledgeable person or persons to testify upon its behalf as to the topics set forth below. VYNPC requests that Entergy identify in writing the name, position, and employ of the individual(s) so designated and to set

COPY

forth the matters upon which such individual(s) will testify no later than six (6) days prior to the agreed upon deposition date.

## GENERAL DEFINITIONS

1. "Communication" means:

A. Any oral statement or utterance of any kind, whether in person, by telephone, by electronic mail, or by any other means of communication, and any gesture intended to convey information, including any nonverbal expressions of assent, denial, doubt, lack of knowledge, or the like; and

B. Any writing, document, or other graphic material of any kind and description, whether inscribed by hand or by mechanical, electronic, microfilm, photographic, or other means, including electronic mail, as well as phonic (such as tape recordings) or visual reproductions of oral communications.

2. "Including" means including, but not limited to.

3. "Information" means all data, facts, or circumstances of any nature, including documents and communications, relating to the given subject matter.

4. "Person" means any natural person, contractor, corporation, partnership, proprietorship, association, venture, Governmental or public entity, or any other form of organization or legal entity and its officers, directors, employees, consultants, representatives, and agents.

5. "Relate(d) to," "relating to," and "referring to" mean to concern, mention, reference, pertain to, reflect, comment upon, discuss, rely upon, relate to, refer to, utilize as input

or source material, support, undermine, critique, or in any manner be connected with the given subject, action, communication, or matter.

SPECIFIC DEFINITIONS

6. "DOE" means the Department of Energy, its sub-agencies, affiliates, contractors, consultants, and employees.

7. "NRC" means the Nuclear Regulatory Commission, its sub-agencies, affiliates, contractors, consultants, and employees.

8. "NWPA" means the Nuclear Waste Policy Act of 1982.

9. "Purchase and Sale Agreement" means the Purchase and Sale Agreement by and between Entergy Nuclear Vermont Yankee, LLC (as Buyer), Entergy Corporation (as Guarantor), and VYNPC (as Seller), dated August 15, 2001.

10. "Standard Contract" means the contract entered into between DOE, on behalf of the United States, and parties owning and/or operating commercial nuclear electric generating facilities which produce spent nuclear fuel.

11. "SNF" means Spent Nuclear Fuel and/or High-Level Nuclear Waste.

12. "Vermont Yankee" means the Vermont Yankee Nuclear Power Station.

DEPOSITION TOPICS

Pursuant to Rule 30(b)(6), Entergy shall produce one or more officers, directors, managing agents, or other persons, who are most qualified, knowledgeable and competent to testify as to all matters known or reasonably available to Entergy with respect to the following listed subject areas:[1]

1. Entergy's reasons and decision-making for participating in the auction of Vermont Yankee, including the persons involved for Entergy and the Entergy decision-making process.

2. Entergy's efforts to purchase Vermont Yankee prior to the auction.

3. Entergy's participation in the sale of Vermont Yankee subsequent to the commencement of the auction, including the solicitation, the bidding, and Entergy's valuations, pro forma analyses, modeling, internal communications, and decision-making related to its bid to purchase Vermont Yankee, including, but not limited to, documents bearing bates ranges VY00025749 to VY00025757 and VYNPC 1st RFP 21-5180 to VYNPC 1st RFP 21-5271.

4. Entergy's due diligence activities with respect to its acquisition of Vermont Yankee, including the make-up by name and title of its due diligence team (including both Entergy employees and non-employees), the number of days and specific dates on which Entergy conducted on-site due diligence (including both through the auction process or any other effort by Entergy to acquire Vermont Yankee), the process(es) and criteria employed by Entergy in conducting due diligence activities, the schedule of specific due diligence activities by day, and the timing and method(s) by which members of the due diligence team communicated the results

[1] Each listed subject area shall be construed independently and no listed subject area shall limit the scope of any other listed subject area.

of due diligence activities to project manager(s), Mr. Keuter and/or Mr. Bregar, including, but not limited to, documents bearing bates ranges VY00087771 and VY 02182008 PROD-2717 to VY 02182008 PROD-2867.

5. Entergy's investigations, analyses, pro forma considerations and/or inputs, modeling and/or studies related to additional or alternative storage options and estimated capital and O&M costs for SNF on-site storage considered by Entergy in preparing its final and accepted bid for Vermont Yankee, including:

A. Any discussions, studies or analyses relating to the storage capacity of the wet storage pool at Vermont Yankee and when that capacity would be reached, including, but not limited to, documents bearing bates ranges VY00002638 to VY00002644;

B. Entergy's expectations and/or assumptions at the time of its execution of the Purchase and Sale Agreement and at closing for Vermont Yankee with respect to the need for, and anticipated cost and timing of, an ISFSI at Vermont Yankee including, but not limited to, documents bearing bates ranges VY00030447;

C. The timing and necessity of re-racking of the wet storage pool at Vermont Yankee and any estimates as to the costs of any such re-racking, including, but not limited to, documents bearing the bates ranges VYNPC 1st RFP 3-266 to VYNPC 1st RFP 3-301;

D. Entergy's expectations or assumptions for future dry storage or re-racking at Vermont Yankee, including any costs associated with such dry storage or re-racking, including, but not limited to, documents bearing bates ranges VYNPC 1st REQUEST 31-793 to VYNPC 1st REQUEST 31-798,

VYNPC 1st REQUEST 31-180 to VYNPC 1st REQUEST 31-203, VYNPC 1st REQUEST 31-724 to VYNPC 1st REQUEST 31-733, VYNPC 1st RFP 28-518 to VYNPC 1st RFP 28-532, VYNPC 1st RFP 21-10515 to VYNPC 1st RFP 21-10526, VYNPC 1st RFP 28-189 to VYNPC 1st RFP 28-208, VYNPC 1st RFP 28-144 to VYNPC 1st RFP 28-182, VYNPC 1st RFP 28-642 to VYNPC 1st RFP 28-688, VYNPC 1st RFP 28-185 to VYNPC 1st RFP 28-188, and VYNPC 1st RFP 21-10482 to VYNPC 1st RFP 21-10507;

E. Entergy's expectations or assumptions relied upon in its final bid as to when DOE would begin accepting SNF generally pursuant to the Standard Contract, and more specifically from Vermont Yankee;

F. Any discussions, studies or analyses by or for Entergy to determine the appropriate schedule for and method of transferring spent nuclear fuel, including, but not limited to, by specific fuel rod assembly, from the Vermont Yankee wet pool storage facility to storage casks to be stored on an ISFSI to be located at Vermont Yankee, including, but not limited to, documents bearing bates ranges VYNPC TLG S 1-9968 to VYNPC TLG S 1-9983, VYNPC 1st REQUEST 31-166 to VYNPC 1st REQUEST 31-176, and VYNPC 1st REQUEST 31-24 to VYNPC 1st REQUEST 31-43;

G. Any technical specifications, instructions or details provided by the manufacturer of the on-site storage casks selected for use at Vermont Yankee that relate to the loading of spent fuel into such on-site storage casks, including, but not limited to documents bearing bates ranges VYNPC 1st RFP 2-251 to VYNPC 1st RFP 2-544;

H. Any orders, directives or other communications from the NRC that relate or refer to the on-site storage casks selected for use at Vermont Yankee; and

I. Any reports or filings made by Entergy to any Federal or State regulatory agency concerning the need and cost estimates for additional or alternative storage options for SNF at Vermont Yankee.

6. Any analysis, financial pro forma, and/or valuation model of Vermont Yankee prepared for, presented to, or performed by Entergy related to or relied upon in determining the proposed purchase price contained in the Investment Proposal, including any supplements thereto, or any other document relied upon by Entergy's Board of Directors in granting its approval of the terms and conditions for the acquisition of Vermont Yankee, including any such or similar documents relied upon in determining the final Purchase and Sale Agreement for the Vermont Yankee acquisition, including, but not limited to, documents produced to VYNPC without bates labeling, but titled (1) Vermont Yankee Auction Model (Bid Version).xlsm, (2) Vermont Yankee Auction Model (Board Version).xlsm, (3) Vermont_ Yankee_Auction_Model_ 010806@1000_wbc.xls, and (4) Vermont_Yankee_Auction_Model_010816@1400_wbc.xls, and documents bearing bates ranges VYNPC 1st REQUEST 29-3313, VYNPC 1st RFP 15-21620 to VYNPC 1st RFP 15-21623, VYNPC 1st RFP 15-21944 to VYNPC 1st RFP 15-21949, VYNPC 1st RFP 15-21950 to VYNPC 1st RFP 15-21955, VYNPC 1st RFP 15-21938 to VYNPC 1st RFP 15-21943, VYNPC 1st RFP 24-VALMAN-1 to VYNPC 1st RFP 24-VALMAN-72, VYNPC 1st RFP 28-518 to VYNPC 1st RFP 28-532, VYNPC 1st RFP 21-10515 to VYNPC 1st RFP 21-10526, VYNPC 1st RFP 28-189 to VYNPC 1st RFP 28-208, VYNPC 1st RFP 28-144 to VYNPC 1st RFP 28-182, VYNPC 1st RFP 28-642 to VYNPC 1st RFP 28-688,

VYNPC 1st RFP 28-185 to VYNPC 1st RFP 28-188, VY00087771, and VY00025749 to VY00025757, and also including:

A. Any discounted cash flow analyses or pro forma modeling designed to determine the value of Vermont Yankee to Entergy, including the purchase price bid that Entergy was willing to submit as part of the auction for Vermont Yankee and the final bid Entergy was willing to submit as part of the its efforts to acquire Vermont Yankee;

B. Any assumptions for and inputs to any and all valuation model(s), pro forma analyses or bid decisions, including, but not limited to documents bearing bates ranges, utilized by or for Entergy to formulate its bid for Vermont Yankee, including but not limited to projected O&M Expenditures, Capital Expenditures, Transition Costs and Revenues by individual line item and year of expenditure or receipt for the period beginning with the closing date through 2032;

C. Any assumptions, conclusions or other information, including any supplemental information, recommendation(s) or materials, provided to Entergy's Board of Directors, or any subcommittee thereof, in any presentations, whether written or oral, that the Board or subcommittee considered or relied upon in determining the final bid that Entergy submitted in order to acquire Vermont Yankee;

D. Formulation of the discount rate as part of the valuation of Vermont Yankee;

E. Formulation of the Internal Rate of Return required by Entergy for the acquisition of Vermont Yankee;

F. Formulation and determination of the Net Present Value to be achieved by Entergy as a result of the acquisition of Vermont Yankee, including the source(s) thereof;

G. Assessment of risks associated with owning and operating Vermont Yankee, including, but not limited to, documents bearing bates ranges VYNPC 1st RFP 21-10482 to VYNPC 1st RFP 21-10507, and VYNPC 1st RFP 21-9983 to VYNPC 1st RFP 21-10002;

H. Methods of mitigating the risks associated with owning and operating Vermont Yankee;

I. Any analyses or modeling performed by or for Entergy of the projected cost to decommission Vermont Yankee, with and without license life extension, as part of its acquisition of Vermont Yankee, including but not limited to Entergy's agreement to the Memorandum of Understanding dated March, 2002 (bates range VY00052860 to VY00052872); and

J. The relationship, if any, of such projected decommissioning costs to Entergy's bid to acquire Vermont Yankee.

7. Any analysis of the effects on the value of Vermont Yankee or the bid or price to be offered by Entergy for Vermont Yankee of DOE's failure to begin acceptance of SNF by January 31, 1998, pursuant to the Standard Contract and/or the NWPA.

8. All analyses by or for Entergy, if any, related to the value of or bid or price for Vermont Yankee if the Government had begun acceptance of SNF by January 31, 1998.

9. Any analysis by or for Entergy with respect to the need to construct an ISFSI at Vermont Yankee, including but not limited to, if the Government had begun acceptance of SNF by January 31, 1998.

10. Entergy's valuation and assessment of the operating life of Vermont Yankee, including all analyses, expectations and assumptions with respect to receipt from all applicable regulatory bodies of approval of an operating license extension for Vermont Yankee.

11. Entergy's analysis of and arrangements for financing the acquisition of Vermont Yankee, including:

A. Entergy's understanding of the financial community's perception of the nuclear industry and any presentations related to financing;

B. Entergy's investigations into financing; and

C. Discussions by or on behalf of Entergy with lenders about funding Entergy's acquisition of Vermont Yankee.

12. The Purchase and Sale Agreement, including:

A. Negotiation of the terms of the Purchase and Sale Agreement;

B. Formulation of the terms of the Purchase and Sale Agreement (VY00012444 to VY00012533);

C. Formulation and negotiation of the Memorandum of Understanding dealing with the transferred decommissioning trust entered into by Entergy with VYNPC; and

D. VYNPC's retention of claims related to the Department of Energy's breach of the Standard Contract, including, but not limited to, all drafts of the Purchase and Sale Agreement and documents bearing bates ranges VY00030445, VY00002339, VY00008202 to VY00008289, VY00012444 to VY00012533, VY00007406 to VY00007482, VY00004481 to VY00004655, and VY 02182008 PROD-2184.

13. Regulatory approval of the sale of Vermont Yankee from VYNPC to Entergy and any related regulatory activities, including:

A. The transfer from VYNPC to Entergy of the Standard Contract, including, but not limited to, documents bearing bates ranges VYNPC 1st RFP 9-2 to VYNPC 1st RFP 9-3 and VYNPC 1st RFP 9-4;

B. The transfer from VYNPC to Entergy of decommissioning trust funds related to Vermont Yankee; and

C. All data or other information requests submitted to Entergy, and any responses provided thereto by or on behalf of Entergy, by any State or Federal regulatory agency, staff or body, or any party to any State or Federal regulatory proceeding reviewing or investigating the sale of Vermont Yankee by VYNPC to Entergy.

Dated: March 21, 2008

Respectfully submitted,

By: ______________________________
Richard J. Conway
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200
(202) 420-2201 (fax)

*Counsel of Record for Plaintiff Vermont Yankee Nuclear Power Corporation*

Of Counsel:
Scott Arnold
Nicholas W. Mattia, Jr.
Bradley D. Wine
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, DC 20006-5403
(202) 420-2200
(202) 420-2201 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this March 21, 2008, I caused to be served via electronic mail and hand-delivery a copy of the foregoing "RULE 30(b)(6) NOTICE OF DEPOSITION" upon counsel of record named below:

Joshua E. Gardner, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Brad Fagg, Esq.
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Scott Arnold



2411783

(Exhibit Green 12 identified.)

Whereupon,

WITNAME

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MR. CONWAY:

Q Good morning, Mr. Green.
A Good morning.
Q Sir, since we broke for the deposition from last night until this morning, have you discussed your deposition or your testimony with anybody except your counsel?
A I have not.
Q And by "counsel," I mean Mr. Smith.
A No.
Q Okay. Have you looked at any documents to prepare for today?
A None that I -- I did not look at any documents last night, no.
Q Even documents that you had seen before,



did you look at any documents last night?
A No, I did not.

MR. CONWAY: At this point I'll pass the witness to you, Mr. Smith.

111

MR. SMITH: I guess Mr. Gardner will have questions.

MR. CONWAY: Do you have questions?

MR. SMITH: I would like for everyone to finish.

(Discussion off the record.)

(Recess.)

MR. GARDNER: We're back on the record. I understand before I begin and I introduce myself formally, I understand, Mr. Smith, you have something you want to put on the record.

MR. SMITH: Yes. Rick, with respect to the 30(b)(6) notice, topic 5 and, specifically, 5 G through I, we spoke yesterday about the fact that I believe you were looking for someone to speak to these technical issues.

MR. CONWAY: Right.

MR. SMITH: But it occurs to me that the header on topic 5 refers to modeling and studies, et cetera, that were involved with the bid. And I just wanted to make sure that I'm understanding correctly that the person you want to talk to on 5

112

G, H, and I, is, again, a technical person who

likely will not have any information about the modeling related to the bid.

MR. CONWAY: By definition, 5 is not just modeling. It's investigations or analysis, /K-RSZ, and/or inputs, modeling, and/or studying. So it's not just modeling. By definition, it is a variety of things. And yes, we are looking for a technical person to talk about those things.

MR. SMITH: Thank you.

MR. GARDNER: Just so the government's clear, is it limited in scope up to the time and the date of the transaction, or does it go beyond that date for G, H, and I and the technical considerations about dry storage? Because I construed the limitation in the header to relate to matters relating to the bid. If it's broader than that, I just need to know that.

MR. SMITH: That's a good point, because the casks may or may not have even been selected at the time of the modeling, but it is my intention -- and correct me if I'm wrong -- to give you someone

113

who can speak to the casks that have, in fact, been selected for use at Vermont Yankee.

MR. CONWAY: It's both. We want to understand what was in the bid, and we do not consider ourselves limited to the date of the bid because we're looking for corroborative information as well that might exist after.

MR. SMITH: Again, my technical person is probably not going to know what was in the bid.

MR. CONWAY: I understand that. But your technical person may have done investigations or analysis or considerations, and that would be fine with us.

MR. GARDNER: For the record, so I understand, when you say corroborative," what do you mean?

MR. CONWAY: Anything that corroborates or reflects on or confirms things in the bid and those documents that exist well after the bid.

MR. GARDNER: The dry storage decisionmaking that occurs after the bid, you want that information to corroborate what's in the bid?

i

114

MR. CONWAY: I'm not limiting myself to the date of the bid, if that's your question.

MR. GARDNER: No, my question is, are you looking to activities that occurred after the bid to corroborate information that's in the bid?

MR. CONWAY: If information after the bid corroborates what's in the bid or reflects on what's in the bid so we understand the bid, yes, I consider that to be fair game. But I'm not interested in, as you know, Josh, from litigating and what occurred yesterday, I'm not only interested in what occurred at the time but I'm looking for any evidence that bears on that before or after the bid.

MR. GARDNER: So you are looking for information after the fact to corroborate what is or is not in Entergy's valuation model; correct?

MR. CONWAY: I'm sorry, Josh?

MR. GARDNER: You are looking for information from Entergy as to their dry fuel storage costs and incurrence after the bid to corroborate what is or is not in Entergy's valuation model?

i

115

MR. CONWAY: No , I'm not looking for the costs incurred after the bid to corroborate -- because that's, as I said in our brief, those are costs that Entergy's incurred. What I'm looking for is information that corroborates the bid or reflects on or explains the bid or supports the bid, and there are documents that I know of that exist after the bid that reflect back on the bid and corroborate the bid. I know of those documents. Okay?

MR. GARDNER: All right. So postacquisition documents.

EXAMINATION

BY MR. GARDNER:

Q Mr. Green, good afternoon. My name is Josh Gardner. We met, obviously, yesterday for the first time. I'm an attorney with the United States Department of Justice, and I represent the United States in this matter of Vermont Yankee nuclear versus United States. I've got a few questions for