# APPENDIX

# EXHIBIT A

5

**EXECUTION COPY**

# VERMONT YANKEE NUCLEAR POWER STATION

# PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

VERMONT YANKEE NUCLEAR POWER CORPORATION, AS SELLER,

ENTERGY NUCLEAR VERMONT YANKEE, LLC, AS BUYER

AND

ENTERGY CORPORATION, AS GUARANTOR

DATED: AUGUST 15, 2001



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

TABLE OF CONTENTS

Page


ARTICLE I DEFINITIONS ..... 1
1.1 Definitions ..... 1
1.2 Certain Interpretive Matters ..... 17

ARTICLE II PURCHASE AND SALE ..... 17
2.1 Transfer of Assets ..... 17
2.2 Excluded Assets ..... 19
2.3 Assumed Liabilities and Obligations ..... 21
2.4 Excluded Liabilities ..... 22

ARTICLE III THE CLOSING ..... 24
3.1 Closing ..... 24
3.2 Purchase Price; Payment ..... 25
3.3 Adjustment to Cash Purchase Price. ..... 25
3.4 Allocation of Purchase Price ..... 27
3.5 Prorations. ..... 28
3.6 Deliveries by the Seller ..... 29
3.7 Deliveries by the Buyer ..... 30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER ..... 31
4.1 Organization; Qualification ..... 31
4.2 Authority ..... 31
4.3 Consents and Approvals; No Violation ..... 31
4.4 Financial Statements. ..... 32
4.5 Reports ..... 33
4.6 Accounting Methods ..... 33
4.7 Title and Related Matters ..... 33
4.8 Real Property Agreements ..... 33
4.9 Insurance ..... 33
4.10 Environmental Matters; etc ..... 34
4.11 Labor Matters ..... 34
4.12 ERISA; Benefit Plans ..... 35
4.13 Real Property; Plant and Equipment. ..... 37
4.14 Condemnation; Public Improvements ..... 37
4.15 Certain Contracts and Arrangements. ..... 38
4.16 Legal Proceedings, etc ..... 38
4.17 Permits; Compliance with Law. ..... 38
4.18 NRC Licenses ..... 39
4.19 Regulation as a Utility ..... 39
4.20 Qualified Decommissioning Fund. ..... 39
4.21 Nonqualified Decommissioning Fund. ..... 41
4.22 Zoning Classification ..... 42






PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.23 Intellectual Property ........ 42
4.24 Taxes ........ 42
4.25 Operability. ........ 43
4.26 Brokers' Fees ........ 43
4.27 Disclaimer ........ 43

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER AND GUARANTOR 44
5.1 Organization ........ 44
5.2 Authority ........ 44
5.3 Consents and Approvals; No Violation ........ 45
5.4 Availability of Funds ........ 45
5.5 Legal Proceedings ........ 45
5.6 WARN Act ........ 45
5.7 "As Is Sale" ........ 46
5.8 Affiliate Guaranty ........ 46
5.9 Qualified Buyer ........ 46
5.10 Brokers' Fees ........ 46

ARTICLE VI COVENANTS OF THE PARTIES ........ 47
6.1 Conduct of Business During the Interim Period. ........ 47
6.2 Access to Information ........ 50
6.3 Expenses ........ 52
6.4 Further Assurances; Cooperation. ........ 52
6.5 Public Statements ........ 54
6.6 Notices, Consents and Approvals ........ 54
6.7 Interim Period Notice. ........ 55
6.8 Employees. ........ 57
6.9 Risk of Loss ........ 61
6.10 Decommissioning Funds. ........ 62
6.11 Spent Nuclear Fuel Fees ........ 62
6.12 Department of Energy Decontamination and Decommissioning Fees ........ 63
6.13 Cooperation Relating to Insurance and Price-Anderson Act ........ 63
6.14 Tax Clearance Certificates ........ 63
6.15 Nuclear Insurance Policies ........ 63
6.16 Private Letter Ruling Requests ........ 64
6.17 Tax Matters. ........ 64
6.18 Intentionally Omitted ........ 65
6.19 Decommissioning ........ 65
6.20 Guarantee. ........ 65

ARTICLE VII CONDITIONS ........ 69
7.1 Conditions to Obligations of the Buyer ........ 69
7.2 Conditions to Obligations of the Seller ........ 72

ARTICLE VIII CONFIDENTIALITY ........ 73




PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

ARTICLE IX INDEMNIFICATION ........ 75
9.1 Indemnification. ........ 75
9.2 Defense of Claims. ........ 76

ARTICLE X TERMINATION ........ 78
10.1 Termination. ........ 78
10.2 Procedure and Effect of No-Default Termination ........ 79

ARTICLE XI MISCELLANEOUS PROVISIONS ........ 80
11.1 Amendment and Modification ........ 80
11.2 Waiver of Compliance; Consents ........ 80
11.3 Survival of Representations, Warranties, Covenants and Obligations ........ 80
11.4 Notices ........ 80
11.5 Assignment ........ 81
11.6 Governing Law ........ 82
11.7 Attorney-Client Matters ........ 82
11.8 Counterparts ........ 83
11.9 Interpretation ........ 83
11.10 Schedules and Exhibits ........ 83
11.11 Entire Agreement ........ 83
11.12 Bulk Sales Laws ........ 83

## LIST OF EXHIBITS AND SCHEDULES

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bill of Sale |
| Exhibit C | Form of FIRPTA Affidavit |
| Exhibit D | Form of Interconnection Agreement |
| Exhibit E | Form of Power Purchase Agreement |
| Exhibit F | Form of Quit Claim Deed |
| Exhibit G | Form of Opinion from Seller's Counsel |
| Exhibit H | Form of Opinion from Buyer's Counsel |
| Exhibit I | Title Commitment |
| Exhibit J | Form of 2001 Amendatory Agreement |

SCHEDULES

| | |
|---|---|
| 1.1(2) (A) | Adjusted Book Value – Nuclear Fuel |
| 1.1(2) (B) | Adjusted Book Value – Inventory |
| 1.1(87) | Licensed Intellectual Property |
| 1.1(102) | Nuclear Insurance Policies |
| 1.1(146) | Sponsors |
| 1.1(157) | Transferable Permits |
| 2.1(a) | Description of Real Property |
| 2.1(g) | Excluded Documents |
| 2.1(j) | Owned Intellectual Property |
| 2.2(e) | Seller's Tariffs and Power Sales Arrangements |
| 2.2(h) | Seller's Intercompany Transactions |
| 2.3(a) | Excluded Seller's Agreements |
| 3.3(a)(ii) | Required Capital Expenditure Amount |
| 4.3(a) | Seller's Third Party Consents |
| 4.3(b) | Seller's Required Regulatory Approvals |
| 4.4(b) | Disclosed Conditions |
| 4.7 | Exceptions to Title |
| 4.8 | Real Property Agreements |
| 4.9 | Insurance Policies and Exceptions |
| 4.10 | Environmental Matters |
| 4.11 | Labor Matters |
| 4.12(a) | Benefit Plans |
| 4.12(b) | Benefit Plan Exceptions |
| 4.12(f) | Benefit Plan Modifications |
| 4.13(b) | Description of Major Equipment Components and Personal Property |
| 4.15(a) | List of Seller's Agreements |
| 4.15(b) | Agreement Exceptions |
| 4.15(c) | Agreement Defaults |



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

| | |
|---|---|
| 4.16 | Legal Proceedings and Court Orders |
| 4.17(a) | Permit Notices |
| 4.17(b) | List of Material Permits (other than Transferable Permits) |
| 4.18(a) | NRC Notifications |
| 4.18(b) | List of Material NRC Licenses |
| 4.20(d) | Financial Matters Relating to Qualified Decommissioning Fund |
| 4.20(f) | Tax Matters Relating to Qualified Decommissioning Fund |
| 4.21(d) | Financial Matters Relating to Nonqualified Decommissioning Fund |
| 4.22 | Zoning Classification |
| 4.23 | Exceptions to Intellectual Property |
| 4.24 | Taxes |
| 5.3(a) | Buyer's Third Party Consents |
| 5.3(b) | Buyer's Required Regulatory Approvals |
| 6.1(a)(vi) | Seller's Operating and Capital Budgets for 2001 and Tentative Operating and Capital Budget for 2002 |
| 6.1(a)(ix) | Changes to Employment Arrangements |
| 6.4(e) | Office Space Provided by Buyer to Seller |
| 7.2(n) | Buyer's Financial Arrangements |


PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

# PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT, dated as of August 15, 2001 (the "Effective Date"), by and among Vermont Yankee Nuclear Power Corporation, a Vermont corporation ("VYNPC" or "Seller"), Entergy Nuclear Vermont Yankee, LLC, a Delaware limited liability company ("Buyer"), and Entergy Corporation, a Delaware corporation ("Guarantor"). The Seller and the Buyer are referred to individually as a "Party," and collectively as the "Parties."

## WITNESSETH

WHEREAS, the Seller owns the Vermont Yankee Nuclear Power Station ("VYNPS"), NRC Operating License No. DPR-28, located in Vernon, Vermont, and certain facilities and other assets associated therewith and ancillary thereto; and

WHEREAS, the Buyer desires to purchase and assume, and the Seller desires to sell and assign, the Acquired Assets (as defined in Section 2.1 below) and certain associated liabilities, upon the terms and conditions hereinafter set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 Definitions. As used in this Agreement, the following terms have the meanings specified in this Section 1.1.

(1) "Acquired Assets" has the meaning set forth in Section 2.1.

(2) "Adjusted Book Value" means the value on the books of the Seller determined in accordance with generally accepted accounting principles consistent with the Seller's past practices and as more fully described in Schedule 1.1(2)(A) with respect to the Seller's Nuclear Fuel and in Schedule 1.1(2)(B) with respect to the Seller's Inventory, as of the date a calculation is to be made, of a specified asset adjusted to reinstate any amounts theretofore eliminated, in accordance with an order issued by FERC, to reflect the amortization of the projected value of such asset at the end-of-life of the Facility.

(3) "Affiliate" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(4) "Agreement" or "PSA Agreement" means this Purchase and Sale Agreement together with the Schedules and Exhibits hereto, as the same may be amended from time to time.

(5) "Amendatory Agreement" means the 2001 Amendatory Agreement, dated as of the Effective Date, between the Seller and each of the Sponsors, substantially in the form of Exhibit J hereto.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(6) "Ancillary Agreements" means the Assignment and Assumption Agreement, the Interconnection Agreement, each Amendatory Agreement, the Power Purchase Agreement, the Security Agreement and the Buyer's Post-Closing Decommissioning Trust Agreement, as the same may be amended from time to time.

(7) "ANI" means American Nuclear Insurers.

(8) "Assignment and Assumption Agreement" means the Assignment and Assumption Agreement between the Seller and the Buyer, substantially in the form of Exhibit A hereto.

(9) "Assumed Liabilities and Obligations" has the meaning set forth in Section 2.3.

(10) "Assumed Thrift Plans" has the meaning set forth in Section 6.8(h).

(11) "Atomic Energy Act" means the Atomic Energy Act of 1954, as amended, or any successor statute.

(12) "Benefit Plans" means any (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), (d) Employee Welfare Benefit Plan or material fringe benefit plan or program or (e) profit sharing, bonus, deferred compensation, incentive, severance, employee retention and hiring, supplemental employee retirement plan, or other benefit plan.

(13) "Bill of Sale" means the Bill of Sale, substantially in the form of Exhibit B hereto, to be delivered at the Closing.

(14) "Business Day" means any day other than Saturday, Sunday and any day on which banking institutions in the State of Vermont are authorized by law or other governmental action to close.

(15) "Buyer" has the meaning set forth in the preamble.

(16) "Buyer Indemnitee" has the meaning set forth in Section 9.1(b).

(17) "Buyer's Post-Closing Decommissioning Trust Agreement" means the decommissioning trust agreement between the Buyer and a trustee, in form and substance reasonably satisfactory to the Seller, pursuant to which the assets of the Decommissioning Funds to be transferred by the Seller at the Closing pursuant to Section 6.10 hereof will be held in trust for the ultimate Decommissioning of the Facility.

(18) "Buyer's Required Regulatory Approvals" has the meaning set forth in Section 5.3(b).



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(19) "Byproduct Material" means any radioactive material (except Special Nuclear Material) yielded in, or made radioactive by, exposure to the radiation incident to the process of producing or utilizing Special Nuclear Material.

(20) "Cash Purchase Price" has the meaning set forth in Section 3.2.

(21) "Closing" has the meaning set forth in Section 3.1.

(22) "Closing Adjustment" has the meaning set forth in Section 3.3(b).

(23) "Closing Date" has the meaning set forth in Section 3.1.

(24) "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the applicable rules and regulations thereunder.

(25) "Code" means the Internal Revenue Code of 1986, as amended.

(26) "Commercially Reasonable Efforts" means efforts which are designed to enable a Party, directly or indirectly, to satisfy its obligations hereunder, or otherwise assist in the consummation of, the transactions contemplated by this Agreement and which do not require the performing Party to expend any funds or assume liabilities other than expenditures and liabilities which are customary and reasonable in nature and amount in the context of the transactions contemplated by this Agreement.

(27) "Confidentiality Agreement" means the Confidentiality Agreement, dated April 16, 2001, between the Seller and the Buyer.

(28) "Decommissioning" means the complete retirement and removal of the Facility from service and the restoration of the Vernon Site, as well as any planning and administrative activities incidental thereto, including, without limitation, (a) the dismantlement, decontamination, storage and/or entombment of the Facility, in whole or in part, and any reduction or removal, whether before or after termination of the NRC license for the Facility, of radioactivity at the Vernon Site and (b) all activities necessary for the retirement, dismantlement and decontamination of the Facility to comply with all applicable Nuclear Laws and Environmental Laws, including the applicable requirements of the Atomic Energy Act and the NRC's rules, regulations and orders thereunder, the NRC Licenses for the Facility and any related decommissioning plan and all applicable requirements of Vermont laws and regulations and other applicable laws.

(29) "Decommissioning Expense" means a "specified liability or loss which is attributable to amounts incurred in the decommissioning of a nuclear power plant" (as that phrase is used in Section 172(f)(3) of the Code) or other expense incurred in Decommissioning.

(30) "Decommissioning Funds" means the Qualified Decommissioning Fund and the Nonqualified Decommissioning Fund.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(31) "Department of Energy" or "DOE" means the United States Department of Energy and any successor agency thereto.

(32) "Department of Energy Decontamination and Decommissioning Fees" means all fees related to the Department of Energy's Special Assessment of utilities for the Uranium Enrichment Decontamination and Decommissioning Fund pursuant to Sections 1801, 1802 and 1803 of the Atomic Energy Act and the Department of Energy's implementing regulations at 10 C.F.R. Part 766, or any similar fees assessed under amended or superseding statutes or regulations applicable to separative work units purchased from the Department of Energy in order to decontaminate and decommission the Department of Energy's gaseous diffusion enrichment facilities.

(33) "Department of Justice" means the United States Department of Justice and any successor agency thereto.

(34) "Direct Claim" has the meaning set forth in Section 9.2(d).

(35) "DOE Standard Contract" means the contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, No. DE-CR01-83NE4431, dated as of June 10, 1983 between the Department of Energy and the Seller.

(36) "Easement Agreement" means, collectively, the Easement Agreement between VELCO and the Buyer in form and substance reasonably satisfactory to the Buyer.

(37) "Easements" means, with respect to the Acquired Assets, the easements, licenses and access rights granted by the Buyer to VELCO pursuant to the Interconnection Agreement or that may be granted to VELCO pursuant to the Easement Agreement, or that may be granted in instruments conveying Real Property from the Seller to the Buyer, including, without limitation, easements authorizing access, use, maintenance, construction, repair, replacement, transmission line use and other activities by VELCO or the Buyer, as the case may be, all in form and substance reasonably satisfactory to the Buyer.

(38) "Effective Date" has the meaning set forth in the Preamble hereto.

(39) "Employee Pension Benefit Plan" has the meaning set forth in ERISA §3(2).

(40) "Employee Welfare Benefit Plan" has the meaning set forth in ERISA §3(1).

(41) "Encumbrances" means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, zoning limitations, conservation easements, deed restrictions, easements, encumbrances and charges of any kind.

(42) "Energy Reorganization Act" means the Energy Reorganization Act of 1974, as amended.

(43) "Environment" means all soil, land surface or subsurface strata, real property, surface waters (including navigable waters, streams, ponds, drainage basins and wetlands),



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

ground water, water body sediments, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life (including fish and all other aquatic life) and any other environmental medium, or natural resource.

(44) "Environmental Claim" means any and all pending administrative or judicial actions, suits, orders, claims, liens, notices, notices of violation, investigations, complaints, requests for information, proceedings or other written communication, whether criminal or civil, pursuant to or relating to any applicable Environmental Law by any Person (including, without limitation, any Governmental Authority, private person and citizens' group) based upon, alleging, asserting or claiming any actual or potential (a) violation of, or liability under, any Environmental Law, (b) violation of any Environmental Permit, or (c) liability for investigatory costs, cleanup costs, removal costs, remedial costs, response costs, natural resource damages, property damage, personal injury, fines or penalties arising out of, based on, resulting from or related to, the presence, Release or threatened Release into the Environment of any Hazardous Substances at any location related to the Acquired Assets, including, without limitation, any off-Site location to which Hazardous Substances, or materials containing Hazardous Substances, were sent for handling, storage, treatment or disposal.

(45) "Environmental Clean-up Site" means any location which is listed on the National Priorities List or any comparable state list of sites requiring investigation or clean-up, or which is subject to any pending action, suit, proceeding or investigation related to or arising from any alleged violation of any Environmental Laws.

(46) "Environmental Condition" means the presence or Release into the Environment, whether at the Site or at an off-Site location, of Hazardous Substances, including, without limitation, any migration of those Hazardous Substances through air, soil or groundwater to or from the Site or any off-Site location regardless of when such presence or Release occurred or is discovered.

(47) "Environmental Laws" means all applicable federal, state and local, civil and criminal laws, regulations or legal requirements relating to pollution or protection of the Environment, natural resources or public health and safety, including, without limitation, laws relating to Releases of Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, transport, disposal or handling of Hazardous Substances. "Environmental Laws" include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Oil Pollution Act (33 U.S.C. §§ 2701 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. §§ 11001 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.), Chapters 23, 47, 48, 49, 56, 59, 61, 123, 157 and 201 of Title 10 of the Vermont Statutes and all other state laws analogous to any of the above. Notwithstanding the foregoing, Environmental Laws do not include Nuclear Laws.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(48) "Environmental Permit" means any federal, state or local permits, licenses, approvals, consents or authorizations required by any Governmental Authority under or in connection with any Environmental Law and includes any and all orders, consent orders or binding agreements issued or entered into by a Governmental Authority under any applicable Environmental Law.

(49) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(50) "ERISA Affiliate" has the meaning set forth in Section 2.4(h).

(51) "ERISA Affiliate Plans" has the meaning set forth in Section 2.4(h).

(52) "Estimated Adjustment" has the meaning set forth in Section 3.3(b).

(53) "Estimated Closing Statement" has the meaning set forth in Section 3.3(b).

(54) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(55) "Excluded Assets" has the meaning set forth in Section 2.2.

(56) "Excluded Liabilities" has the meaning set forth in Section 2.4.

(57) "Facility" means the nuclear generating station, facilities, equipment, supplies and improvements owned by the Seller and included in the Acquired Assets.

(58) "Federal Power Act" means the Federal Power Act, as amended.

(59) "Federal Trade Commission" means the United States Federal Trade Commission and any successor agency thereto.

(60) "FERC" means the United States Federal Energy Regulatory Commission and any successor agency thereto.

(61) "FERC Order" means the Order for Interim Implementation for Services Rendered from July 1, 2001 in FERC Docket Nos. EC00-46-000, etc.

(62) "Final Safety Analysis Report" or "FSAR" means the report, as updated, that is required to be maintained for VYNPS in accordance with the requirements of 10 C.F.R. § 50.71(e).

(63) "FIRPTA Affidavit" means the Foreign Investment in Real Property Tax Act Certification and Affidavit, substantially in the form of Exhibit C hereto.

(64) "Good Utility Practices" means any of the practices, methods and activities approved by a significant portion of the electric utility industry in the United States as good practices applicable to nuclear generating facilities of similar design, size and capacity during the relevant time period or any of the practices, methods or activities which, in the exercise of



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

reasonable judgment by a prudent nuclear operator in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, expedition and applicable law and assuring safety and protection of the public. Good Utility Practices are not intended to be limited to the optimal practices, methods or acts to the exclusion of all others, but rather to be practices, methods or acts generally accepted in the electric utility industry.

(65) "Governmental Authority" means any federal, state, local, provincial, foreign or other governmental, regulatory or administrative agency, commission, body, department, board, or other governmental subdivision, court, tribunal, arbitrating body or other governmental authority.

(66) "Guarantor" meansEntergy Corporation.

(67) "Hazardous Substances" means (a) any petrochemical or petroleum products, oil or coal ash, radioactive materials, radon gas, friable asbestos, urea formaldehyde foam insulation and transformers or other equipment that contain polychlorinated biphenyls, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law, and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any applicable Environmental Law, excluding, however, any Nuclear Material to the extent regulated by Nuclear Laws.

(68) "High Level Waste" means (a) irradiated nuclear reactor fuel, (b) liquid wastes resulting from the operation of the first cycle solvent extraction system, or its equivalent, and the concentrated wastes from subsequent extraction cycles, or their equivalent, in a facility for reprocessing irradiated reactor fuel, (c) solids into which such liquid wastes have been converted, or (d) any other material containing radioactive nuclides in concentrations or quantities that exceed NRC requirements for classification as Low Level Waste.

(69) "High Level Waste Repository" means a facility which is designed, constructed and operated by or on behalf of the Department of Energy for the storage and disposal of Spent Nuclear Fuel and other High Level Waste in accordance with the requirements set forth in the Nuclear Waste Policy Act.

(70) "Holding Company Act" means the Public Utility Holding Company Act of 1935, as amended, and the rules and regulations promulgated thereunder.

(71) "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(72) "IBEW" means Local Union 300 of the International Brotherhood of Electrical Workers.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(73) "IBEW Collective Bargaining Agreement" means at any given time either (i) the Agreement as to Wages, Working Conditions and Seniority between Vermont Yankee Nuclear Power Corporation and Local Union 300 International Brotherhood of Electrical Workers for term beginning June 27, 1997 and ending June 19, 2000, as supplemented by the Letter of Understanding titled "12 hour Shift" dated September 23, 1998 and the Letter of Understanding titled "New Working Hours" dated January 26, 1999, as extended to August 20, 2001 by the Agreement for Extension of Existing Labor Agreement, dated April 4, 2000, and the Memorandum of Understanding between VYNPC and IBEW 300, Unit 8, dated March 28, 2001, while in effect (the "Old IBEW Contract"), or (ii) the Agreement as to Wages, Working Conditions and Seniority between VYNPC and IBEW commencing on or after August 21, 2001, while in effect, or (iii) if neither clause (i) nor (ii) applies, the then existing agreement or arrangement with the IBEW which is in effect .

(74) "Income Tax" means any federal, state, local or foreign Tax (a) based upon, measured by or calculated with respect to net income, profits or receipts (including, without limitation, capital gains Taxes and minimum Taxes) or (b) based upon, measured by or calculated with respect to multiple bases (including, without limitation, corporate franchise taxes) if one or more of the bases on which such Tax may be based, measured by or calculated with respect to, is described in clause (a), in each case together with any interest, penalties or additions to such Tax.

(75) "Indemnifiable Loss" has the meaning set forth in Section 9.1(a).

(76) "Indemnifying Party" has the meaning set forth in Section 9.1(c).

(77) "Indemnitee" means a Buyer Indemnitee or a Seller Indemnitee, as the case may be.

(78) "Independent Accounting Firm" means such independent accounting firm of national reputation as is mutually appointed by the Seller and the Buyer.

(79) "Inspection" means all tests, reviews, examinations, inspections, investigations, verifications, samplings and similar activities conducted by the Buyer or its Representatives with respect to the Acquired Assets prior to the Closing.

(80) "Intellectual Property" means all trade secrets, copyrights, copyright applications, patents, patent applications, patent rights, trademarks, trademark rights, trademark applications, trade names, service marks, service mark applications, inventions, computer programs and other computer software, inventions, designs, samples, specifications, schematics, know-how, proprietary processes, domain names, websites, source and object code and other intellectual property rights.

(81) "Interconnection Agreement" means the Interconnection Agreement between VELCO and Buyer, substantially in the form of Exhibit D hereto.

(82) "Interim Period" has the meaning set forth in Section 6.1(a).

(83) "Inventories" means the alternative fuel (non-Nuclear Fuel) inventories and the materials, spare parts, consumable supplies and chemical inventories relating to the operation of the Facility located at, or in transit to, the Site or identified in Schedule 4.13(b) hereto.

(84) "IRS" means the United States Internal Revenue Service and any successor agency thereto.

(85) "Knowledge" means the actual knowledge of the corporate officers, after reasonable inquiry of the specified Person charged with responsibility for the subject matter of the inquiry, at the date of this Agreement, or, with respect to any certificate delivered pursuant hereto, the date of delivery of the certificate.

(86) "Liability" or "Liabilities" means any liability, responsibility or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due), including, without limitation, any liability for Taxes.

(87) "Licensed Intellectual Property" means all Intellectual Property used in the operation of the Acquired Assets which Seller has licensed from third parties. All Licensed Intellectual Property is set forth in Schedule 1.1(87).

(88) "Loss" means any and all damages, fines, fees, penalties, deficiencies, losses and expenses (including, without limitation, all Remediation costs, fees of attorneys, accountants and other experts, or other expenses of litigation or proceedings or of any claim, default or assessment).

(89) "Low Level Waste" means waste material, including mixed waste, which contains radioactive nuclides emitting primarily beta or gamma radiation, or both, in concentrations or quantities which exceed applicable federal or state standards for unrestricted release. Low Level Waste does not include waste containing more than ten (10) nanocuries of transuranic contaminants per gram of material, Spent Nuclear Fuel, or material classified as either High Level Waste or waste which is unsuited for disposal by near-surface burial under any applicable federal regulations. Notwithstanding the foregoing, the Seller's spare low pressure turbine assembly does not constitute Low Level Waste.

(90) "Material Adverse Effect" means when used in connection with any Party, any change, effect, event, occurrence or state of facts materially adversely affecting the operations of the Acquired Assets and (a) that could reasonably be expected to require the expenditures within three years following the Effective Date of singly in excess of $1,000,000, or in excess of $2,500,000 in the aggregate or (b) that prevents, or would reasonably be likely to prevent, a Party from performing any of its material obligations under this Agreement or the consummation of the transactions contemplated hereby; provided that any such change, effect, event, occurrence or state of facts that is cured prior to the Closing at the expense of such affected Party shall not be considered a Material Adverse Effect; and provided, further, that Material Adverse Effect shall not include any such change, effect, event, occurrence or state of facts (individually or taken together) generally affecting the international, national, regional or local electric industry as a



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

whole or nuclear generating facilities or their operations or operators as a whole which does not affect the Acquired Assets or the Parties in any manner or degree significantly different from the industry as a whole, including, without limitation, (a) changes in wholesale or retail markets for electric power or fuel used in connection with the Acquired Assets, (b) changes (individually or taken together) in the North American, national, regional, or local electric transmission systems or operations thereof or (c) any change or effect resulting from action or inaction by a Governmental Authority with respect to an independent system operator or retail access in Vermont.

(91) "Mortgage Indentures" means the First Mortgage Indenture, dated as of October 1, 1970, as amended, between the Seller and The Chase Manhattan Bank, as successor trustee, and the Second Mortgage, Fixture Filing and Security Agreement and the Security Agreement, both dated as of August 13, 2001 and between the Seller and The Bank of New York, as Agent Bank.

(92) "National Labor Relations Board" means the United States National Labor Relations Board and any successor agency thereto.

(93) "NEIL" means Nuclear Electric Insurance Limited.

(94) "NEPOOL" means the New England Power Pool, established by the NEPOOL Agreement, or its successor.

(95) "NEPOOL Agreement" means the agreement establishing NEPOOL, dated September 1, 1971, as amended by the Restated NEPOOL Agreement filed with FERC on December 31, 1996, as finally approved by FERC and as further amended from time to time.

(96) "Nonqualified Decommissioning Fund" means the external trust fund, that does not meet the requirements of Code Section 468A and Treas. Reg. § 1.468A-5, maintained by the Seller with respect to the Facility prior to the Closing pursuant to the Seller's Decommissioning Trust Agreement.

(97) "Non-Transferred Employees" means employees of the Seller who do not accept an offer of employment from the Buyer.

(98) "Non-Union Employee" means any employee of the Seller employed as of the Closing Date who provides services with respect to the Acquired Assets and is not in a bargaining unit represented by the IBEW or any other properly recognized or certified collective-bargaining representative.

(99) "NRC" means the United States Nuclear Regulatory Commission and any successor agency thereto.

(100) "NRC Licenses" means any and all licenses, permits, approvals or other official acts by the NRC on the basis of which the Seller is authorized to own, possess and operate the Facility and Nuclear Material prior to the Closing Date, including, without limitation, the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Operating License No. DPR-28, granted to the Seller by the Atomic Energy Commission, the predecessor of the NRC, which expires on March 21, 2012.

(101) "Nuclear Fuel" means all fuel assemblies in the Facility reactor on the Closing and any irradiated fuel assemblies that have been temporarily removed from the Facility reactor as of the Closing and all unirradiated fuel assemblies awaiting insertion into the Facility reactor, as well as all fuel assembly constituents (including uranium in any form and separative work units) in any stage of the fuel cycle which are in the process of fabrication for use in the Facility, which are owned by the Seller on the Closing Date or which have been paid for by the Seller prior to the Closing.

(102) "Nuclear Insurance Policies" means the insurance policies set forth in Schedule 1.1(102).

(103) "Nuclear Laws" means all applicable federal, state and local, civil and criminal laws, regulations, rules, and other legal requirements relating to the regulation of nuclear power plants, Source Material, Byproduct Material and Special Nuclear Material; the regulation of Low Level Waste and High Level Waste; the transportation and storage of Nuclear Material; the regulation of Safeguards Information; the regulation of nuclear fuel; the enrichment of uranium; the disposal and storage of High Level Waste and Spent Nuclear Fuel; contracts for and payments into the Nuclear Waste Fund; and, as applicable, the antitrust laws and the Federal Trade Commission Act to specified activities or proposed activities of certain licensees of commercial nuclear reactors, but shall not include Environmental Laws. "Nuclear Laws" include the Atomic Energy Act, the Price-Anderson Act, the Energy Reorganization Act, Convention on the Physical Protection of Nuclear Material Implementation Act of 1982 (Public Law 97 - 351; 96 Stat. 1663), the Foreign Assistance Act of 1961 (22 U.S.C. § 2429 et seq.), the Nuclear Non-Proliferation Act of 1978 (22 U.S.C. §3201), the Low-Level Radioactive Waste Policy Act (42 U.S.C. § 2021b et seq.), the Nuclear Waste Policy Act, the Low-Level Radioactive Waste Policy Amendments Act of 1985 (42 U.S.C. § 2021d, 471), and the Energy Policy Act of 1992 (4 U.S.C. § 13201 et seq.), any Vermont laws analogous to the foregoing and the NRC rules and all rules, regulations and orders promulgated or issued under any of the foregoing.

(104) "Nuclear Material" means Source Material, Special Nuclear Material, Low Level Waste, High Level Waste, Byproduct Material and Spent Nuclear Fuel.

(105) "Nuclear Waste Fund" means the fund established by the Department of Energy under the Nuclear Waste Policy Act in which the Spent Nuclear Fuel Fees to be used for the design, construction and operation of a High Level Waste Repository and other activities related to the storage and disposal of Spent Nuclear Fuel and/or High Level Waste are deposited.

(106) "Nuclear Waste Policy Act" means the Nuclear Waste Policy Act of 1982, as amended.

(107) "Owned Intellectual Property" means all Intellectual Property the Seller has ownership of used in the operation of the Acquired Assets. All Owned Intellectual Property is set forth in Schedule 2.1(j).



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(108) "Party" (and the corresponding term "Parties") has the meaning set forth in the preamble.

(109) "Permits" has the meaning set forth in Section 4.17(a).

(110) "Permitted Encumbrances" means (a) the Easements, (b) those exceptions to title to the Acquired Assets listed in part A of Schedule 4.7 with respect to the Real Property, or listed in part B of Schedule 4.7 with respect to Tangible Personal Property, (c) with respect to any date before the Closing, Encumbrances created by the Mortgage Indentures, (d) statutory liens for Taxes or other governmental charges or assessments not yet due or delinquent, or the validity of which is being contested in good faith by appropriate proceedings, provided that the aggregate amount being so contested does not exceed $500,000, subject to Proration as provided herein, (e) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which is being contested in good faith, and which do not, individually or in the aggregate, exceed $500,000; provided that Seller shall use commercially reasonable efforts to attempt to cause the company issuing the title insurance policy under the Title Commitment to omit such liens from the title insurance policy referred to in Section 7.1(h), (f) zoning, entitlement, conservation restriction and other land use and environmental regulations imposed by Governmental Authorities which do not, individually or in the aggregate, materially detract from the value of the Acquired Assets as currently used or materially interfere with the present use or operation of the Acquired Assets and neither secure indebtedness nor, individually or in the aggregate, result in a Material Adverse Effect, (g) such easements or claims of easements not shown by the public records, boundary line disputes (other than the boundary line dispute identified in Special Exception 44 of Schedule 4.7 hereto), overlaps, encroachments and any other matters not of record disclosed in the surveys delivered pursuant to Section 4.13(a), and (h) such minor liens, imperfections in or failure of title, charges, easements, leases, licenses, restrictions, Encumbrances and defects in title including additional survey matters of a type referred to in clause (g), above, which do not, individually or in the aggregate, materially detract from the value of the Acquired Assets as currently used or materially interfere with the present use or operation of the Acquired Assets and neither secure indebtedness nor, individually or in the aggregate, result in a Material Adverse Effect.

(111) "Person" means any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization or Governmental Authority.

(112) "Post-Closing Adjustment" has the meaning set forth in Section 3.3(c).

(113) "Post-Closing Statement" has the meaning set forth in Section 3.3(c).

(114) "Power Purchase Agreement" or "PPA" means the Power Purchase Agreement between VYNPC and the Buyer, in the form of Exhibit E hereto.

(115) "Price-Anderson Act" means Section 170 of the Atomic Energy Act and related provisions of Section 11 of the Atomic Energy Act.

(116) "Private Letter Ruling Requests" is defined in Section 6.16.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(117) "Proposed Post-Closing Adjustment" has the meaning set forth in Section 3.3(c).

(118) "Proprietary Information" of a Party means all information about the Party or its Affiliates, including their respective properties or operations, furnished to the other Party or its Representatives by the Party or its Representatives, after the Effective Date, regardless of the manner or medium in which it is furnished, including information provided to a Party pursuant to the Confidentiality Agreement. Proprietary Information does not include information that (a) is or becomes generally available to the public (other than as a result of a disclosure by the other Party or its Representatives in violation of a confidentiality agreement), (b) was available to the other Party on a nonconfidential basis prior to its disclosure by the Party or its Representatives, (c) becomes available to the other Party on a nonconfidential basis from a Person, other than the Party or its Representatives, who is not otherwise bound by a confidentiality agreement with the Party or its Representatives, or is not otherwise under any obligation to the Party or any of its Representatives not to transmit the information to the other Party or its Representatives, or (d) is independently developed by the other Party.

(119) "Purchase Price" has the meaning set forth in Section 3.2.

(120) "Qualified Decommissioning Fund" means the external trust fund that meets the requirements of Section 468A of the Code and Treas. Reg. Section 1.468A-5 created pursuant to the Seller's Decommissioning Trust Agreement and maintained by the Seller with respect to the Facility prior to the Closing.

(121) "Real Property" has the meaning set forth in Section 4.13(a).

(122) "Receiving Party" has the meaning set forth in Section 6.7(f).

(123) "Real Property Agreements" has the meaning set forth in Section 4.8.

(124) "Refueling Outage" means the refueling outage number RFO 23 for VYNPS currently scheduled to commence in October, 2002, including the refueling of VYNPS and the performance of certain maintenance, inspection and other work in connection therewith.

(125) "Release" means any actual spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the Environment.

(126) "Remediation" means action of any kind to address a Release, the threat of a Release or the presence of Hazardous Substances at the Site or an off-Site location, including, without limitation, any or all of the following activities to the extent they relate to or arise from the presence of a Hazardous Substance at the Site or an off-Site location: (a) monitoring, investigation, assessment, treatment, cleanup, containment, removal, mitigation, response or restoration work; (b) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such activity; (c) preparing and implementing any plans or studies for any such activity; (d) obtaining a written notice from a Governmental Authority with jurisdiction over the Site or an off-Site location under Environmental Laws that no material additional work is required by such Governmental Authority; (e) the use,



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

implementation, application, installation, operation or maintenance of remedial or removal actions on the Site or an off-Site location, remedial technologies applied to the surface or subsurface soils, excavation and off-Site treatment or disposal of soils, systems for long term treatment of surface water or groundwater, engineering controls or institutional controls; and (f) any other activities reasonably determined by a Party to be necessary or appropriate or required under Environmental Laws to address the presence or Release of Hazardous Substances at the Site or an off-Site location.

(127) "Replacement Welfare Plans" has the meaning set forth in Section 6.8(g).

(128) "Representatives" of a Party means the Party and its Affiliates and their directors, officers, employees, agents, partners and advisors (including, without limitation, accountants, counsel, environmental consultants, financial advisors and other authorized representatives).

(129) "Requested Rulings" has the meaning set forth in Section 6.16.

(130) "Required Capital Expenditure Amount" shall mean the aggregate amount to be spent for each capital project in the years 2001 and 2002, as set forth in Schedule 3.3(a)(ii).

(131) "Safeguards Information" means information not otherwise classified as national security information or restricted data under NRC's regulations which specifically identifies an NRC licensee's detailed (a) security measures for the physical protection of Special Nuclear Material or (b) security measures for the physical protection and location of certain plant equipment vital to the safety of production or utilization Facility.

(132) "SEC" means the United States Securities and Exchange Commission and any successor agency thereto.

(133) "Security Agreement" means the Security Agreement, dated as of the Closing Date, between the Buyer, as secured party, and the Seller, as grantor, creating a security interest in the Amendatory Agreements and the power payments due under the Amendatory Agreements, in form satisfactory to the Parties.

(134) "Seller" has the meaning set forth in the preamble.

(135) "Seller Indemnitee" has the meaning set forth in Section 9.1(a).

(136) "Seller's Agreements" means those contracts, agreements, licenses and leases relating to the ownership, operation and maintenance of the Acquired Assets as more particularly described in Section 4.15(a) and those entered into after the date hereof by the Seller in accordance with this Agreement and any others which singly involve less than $25,000 and in the aggregate involve no more than $500,000.

(137) "Seller's Decommissioning Trust Agreement" means the Indenture of Trust, dated as of March 11, 1988, as amended, between the Seller and The Bank of New York, as successor trustee.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(138) "Seller's Defined Benefit Plans" has the meaning set forth in Section 6.8(i).

(139) "Seller's Required Regulatory Approvals" has the meaning set forth in Section 4.3(b).

(140) "Seller's Retiree Welfare Plans" has the meaning set forth in Section 6.8(j).

(141) "Site" means the parcels of land included in the Real Property (described in Schedule 2.1(a)). Any reference to any Site shall include, by definition, the surface and subsurface elements, including the soils and groundwater present at the Site, and any reference to items "at the Site" shall include all items "at, on, in, upon, over, across, under and within" the Site. "Vernon Site" means those parcels located in Vernon, Vermont and "Brattleboro Site" means those parcels located in Brattleboro Vermont.

(142) "Source Material" means (a) uranium or thorium, or any combination thereof, in any physical or chemical form or (b) ores which contain by weight one-twentieth of one percent (0.05%) or more of (i) uranium, (ii) thorium, or (iii) any combination thereof. Source Material does not include Special Nuclear Material.

(143) "Special Nuclear Material" means plutonium, uranium-233, uranium enriched in the isotope-233 or in the isotope-235, and any other material that the NRC determines to be "Special Nuclear Material." Special Nuclear Material also refers to any material artificially enriched by any of the above-listed materials or isotopes.

(144) "Spent Nuclear Fuel" means nuclear fuel that has been permanently withdrawn from a nuclear reactor following irradiation. Spent Nuclear Fuel includes Special Nuclear Material, Byproduct Material, Source Material, greater than C Class waste and other radioactive materials or components associated with nuclear fuel assemblies.

(145) "Spent Nuclear Fuel Fees" means those fees assessed on electricity generated by VYNPS pursuant to the DOE Standard Contract, as provided in Section 302 of the Nuclear Waste Policy Act and 10 C.F.R. Part 961, as the same may be amended from time to time.

(146) "Sponsors" means, collectively, the sponsoring shareholders of the Seller listed in Schedule 1.1(146), and "Sponsor" means an individual sponsoring shareholder of the Seller listed in Schedule 1.1(146).

(147) "Switchyards" means the switchyard facilities and substation facilities and support equipment within the 115kV and the 345kV substations located on the Site, excluding the equipment therein owned by VELCO.

(148) "Tangible Personal Property" has the meaning set forth in Section 2.1(c).

(149) "Tax Basis" means the adjusted tax basis determined for federal income tax purposes under Code Section 1011(a).



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(150) "Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local, provincial or foreign taxing authority, including, without limitation, income, excise, real or personal property, sales, transfer, franchise, payroll, withholding, social security, gross receipts, license, stamp, occupation, employment or other taxes, including any interest, penalties or additions attributable thereto, but excluding any payments related to the Texas Compact.

(151) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) required to be supplied to any taxing authority with respect to Taxes, including amendments thereto.

(152) "Technical Specifications" means the technical specifications included in the NRC Licenses for VYNPS in accordance with the requirements of 10 C.F.R. § 50.36.

(153) "Termination Date" has the meaning set forth in Section 10.1(b).

(154) "Texas Compact" means the Texas Low-Level Radioactive Waste Disposal Compact Consent Act, P.L. 105-236, 112 Stat. 1542, as implemented by the Vermont General Assembly in 10 VSA c. 162.

(155) "Third Party Claim" has the meaning set forth in Section 9.2(a).

(156) "Title Commitment" means the title insurance commitment attached as Exhibit I hereto.

(157) "Transferable Permits" means those Permits including Environmental Permits that may be transferred by the Seller either (i) without a filing with, or notice to, consent or approval of any Governmental Authority or (ii) with a filing with, or notice to, consent or approval of any Governmental Authority. Schedule 1.1(157) sets forth all such Transferable Permits.

(158) "Transferred Employee Records" means all records related to Transferred Employees, including, without limitation, the following information: (a) skill and development training, (b) biographies, (c) seniority histories, (d) salary and benefit information, (e) Occupational, Safety and Health Administration reports, (f) active medical restriction forms, (g) fitness for duty, and (h) disciplinary actions.

(159) "Transferred Employees" means any employees of the Seller who accept offers of employment from the Buyer.

(160) "Transferred Non-Union Employees" means employees of the Seller who accept offers of employment from the Buyer and are not in a VYNPC unit represented by a union that has been properly recognized or certified.

(161) "Transferred Union Employees" means employees of the Seller who accept offers of employment from the Buyer who are in a VYNPC unit represented by a union that has been properly recognized or certified.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(162) "Transition Committee" has the meaning set forth in Section 6.1(b).

(163) "Trustee" means, as the case may be, prior to the Closing the trustee of the Decommissioning Funds appointed by the Seller pursuant to the Seller's Decommissioning Trust Agreement.

(164) "Union Employee" means any employee of the Seller employed as of the Closing Date who provides services with respect to the Acquired Assets and is in a VYNPC bargaining unit represented by a union.

(165) "VEBA" means a trust which constitutes a "Voluntary Employees' Beneficiary Association" as defined in (and qualified as tax-exempt under) Section 501(c)(9) of the Code.

(166) "VELCO" means Vermont Electric Power Company, Inc.

(167) "Vermont Yankee Spent Fuel Disposal Trust" means the trust (including the assets thereof) formed by the Indenture of Trust, dated as of February 2, 1998, between the Seller and The Bank of New York, as supplemented and amended from time to time in form and substance reasonably satisfactory to the Buyer.

(168) "VTDPS" means the Vermont Department of Public Service and any successor agency thereto.

(169) "VTPSB" means the Vermont Public Service Board and any successor agency thereto.

(170) "VYNPC" has the meaning set forth in the preamble.

(171) "VYNPS" has the meaning set forth in the preamble.

(172) "WARN Act" means the federal Worker Adjustment Retraining and Notification Act of 1988, as amended.

1.2 Certain Interpretive Matters. In this Agreement, unless the context otherwise requires, the singular shall include the plural, the masculine shall include the feminine and neuter, and vice versa. The term "includes" or "including" shall mean "including without limitation." References to a Section, Article, Exhibit or Schedule shall mean a Section, Article, Exhibit or Schedule of this Agreement, and reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented and restated through the date as of which such reference is made.

## ARTICLE II
## PURCHASE AND SALE

2.1 Transfer of Assets. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase, assume and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), all of the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Seller's right, title and interest immediately prior to the Closing in and to all of the properties and assets constituting or used in the operation of the Facility on or prior to the Closing Date (collectively, "Acquired Assets"), including, without limitation:

(a) The Real Property, including, without limitation, all buildings, the Facility, the Switchyards and other improvements thereon, described in Schedule 2.1(a), and all rights arising out of the ownership thereof or appurtenant thereto, including, without limitation, rights of ingress and egress;

(b) All Inventories and Nuclear Fuel wherever located and all Spent Nuclear Fuel and other Nuclear Materials located at the Site to which Seller has title;

(c) All machinery, mobile or otherwise, equipment (including, without limitation, computer hardware and software and communications equipment used for internal corporate purposes or emergency plan purposes), vehicles, tools, spare parts, fixtures, furniture and furnishings, work-in-process, emergency plan supplies and equipment wherever located, and other personal property owned by the Seller, and all of Seller's rights in any leased personal property, relating to or used in the operation or maintenance of the Facility, other than property constituting part of the Excluded Assets (collectively, "Tangible Personal Property");

(d) Subject to the provisions of Sections 2.4(c) and 6.4(c), all the Seller's Agreements (other than the Seller's Agreements listed on Schedule 2.3(a));

(e) Subject to the provisions of Sections 2.4(c) and 6.4(c), all Real Property Agreements;

(f) All Transferable Permits (but with respect to Transferable Permits referred to in clause (ii) of Section 1.1(157), only to the extent such Transferable Permits can be assigned by the Seller to the Buyer through the exercise by the Seller of Commercially Reasonable Efforts);

(g) Except as provided in Schedule 2.1(g), all documents, correspondence, books, records, employee records (including Transferred Employee records and Benefit Plan records), medical records, operating, safety and maintenance manuals, inspection reports, drawings, models, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports, quality assurance records, purchasing records and equipment repair, data, safety, maintenance or service records of the Seller relating to the design, construction, licensing, regulation, operation or Decommissioning of the Facility and the other Acquired Assets, and all other similar items of Seller, which documents are in the possession or control of the Seller, wherever located and whether existing in hard copy or magnetic or electronic form, (including, without limitation, all rights in and licenses or other right to use such documents owned by other Persons and licensed and held for use by Seller) subject to the right of the Seller to retain copies of same for its own use;

(h) All unexpired, transferable warranties and guarantees from third parties with respect to any item of Real Property or personal property constituting part of the Acquired Assets to the extent such warranties and guarantees are transferable by the Seller;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(i) The name "Vermont Yankee Nuclear Power Station";

(j) All Owned Intellectual Property, described in Schedule 2.1(j), relating primarily to, or used in the operation of, the Acquired Assets; provided that the Seller shall retain an irrevocable, perpetual, non-exclusive, and fully paid-up license to use such Owned Intellectual Property; provided, further, that each Party shall have no obligation following the Closing to provide the other Party with any updates, maintenance or technical support with respect to such Owned Intellectual Property;

(k) The assets comprising the Decommissioning Funds, including all income, interest and earnings accrued thereon, together with all related Tax, accounting and other records, including, without limitation, records necessary to determine the Tax Basis of each asset in the Decommissioning Funds;

(l) All Nuclear Insurance Policies to the extent transferable and the rights to proceeds from insurance policies for coverage of Acquired Assets and Assumed Liabilities and Obligations, excluding, however, (i) any rights to receive premium refunds, distributions and continuity credits with respect to periods prior to the Closing pursuant to the ANI nuclear industry credit rating plan and (ii) the Seller's account balance with respect to its membership in NEIL accrued up to the Closing;

(m) All rights in and to any causes of action against third parties (including indemnification and contribution) relating to any of the Acquired Assets or Assumed Liabilities and Obligations, or any portion thereof, if any, including any claims for refunds, prepayments, offsets, recoupment, insurance proceeds, condemnation awards, judgments and the like, whether received as payment or credit against future liabilities, relating to the Acquired Assets or Assumed Liabilities and Obligations, other than any such rights relating solely to Excluded Assets or Excluded Liabilities;

(n) Subject to Section 6.11(b), any claims of the Seller related to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing, whether relating to periods prior to or following the Closing, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983;

(o) All funds held by any third party in connection with the Texas Compact, including those funds held by the State of Vermont with respect to the Texas Low Level Radioactive Waste Disposal Compact pursuant to Vermont Title 10, Ch. 162, Section 7067;

(p) Subject to Section 2.2(k), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8; and

(q) All licenses for the Licensed Intellectual Property, including any related maintenance agreements for such Licensed Intellectual Property.

2.2 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed as conferring on the Buyer, and the Buyer is not acquiring, any right, title or interest in or to the following specific assets which are associated



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

with the Acquired Assets, but which are hereby specifically excluded from the sale and the definition of Acquired Assets herein (the "Excluded Assets"):

(a) Certificates of deposit, shares of stock, securities, bonds, debentures, debt instruments and interests in joint ventures, partnerships, limited liability companies and other entities (including, without limitation, the Seller's member account balances with NEIL), except the assets comprising the Decommissioning Funds, the funds referred to in Section 2.1(o), and, subject to Section 2.1(p), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8;

(b) All cash, cash equivalents, bank deposits, accounts and notes receivable (trade or otherwise), and any income, sales, property, payroll or other Tax receivables, except the assets comprising the Decommissioning Funds, the funds referred to in Section 2.1(o), and, subject to Section 2.1(p), the assets funding the Seller's Benefit Plans that are assumed by the Buyer pursuant to Section 6.8;

(c) All rights to premium refunds made after the Closing under any insurance policies of the Seller, including (i) any rights to receive premium refunds, distributions and continuity credits with respect to periods prior to the Closing Date pursuant to the ANI nuclear industry credit rating plan and (ii) the Seller's account balance with respect to its membership in NEIL accrued up to the Closing;

(d) All claims for refunds of Department of Energy Decontamination and Decommissioning Fees paid by the Seller;

(e) All tariffs, agreements and arrangements to which the Seller is a party for the sale of electric capacity and/or energy or ancillary services and which are set forth in Schedule 2.2(e);

(f) Any asserted or unasserted rights or claims that relate to the Excluded Assets or the Excluded Liabilities;

(g) Any rights that accrue or will accrue to the Seller under this Agreement;

(h) Except as disclosed in Schedule 4.15(a), any and all of the Seller's rights in any contract representing an intercompany transaction between the Seller and an Affiliate of the Seller, whether or not such transaction relates to the provision of goods and services, payment arrangements, intercompany charges or balances, or the like, and which are listed in Schedule 2.2(h);

(i) The Vermont Yankee Spent Fuel Disposal Trust and claims of the Seller related or pertaining to the Department of Energy's defaults under the DOE Standard Contract to the extent applicable to the one-time fee with respect to fuel used to generate electricity prior to April 7, 1983;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(j) The name "Vermont Yankee Nuclear Power Corporation" and any related or similar trade names, trademarks, service marks, corporate names or logos, and any part, derivative or combination thereof, except "Vermont Yankee Nuclear Power Station";

(k) That portion of the assets funding the Seller's Benefit Plans that is necessary to fully fund the benefits for those employees remaining in the employ of the Seller after the Closing;

(l) Any attorney-client privilege between the Seller and any counsel representing the Seller in connection with the negotiation, preparation, execution and delivery of and closing under this Agreement and all matters arising from or relating to this Agreement and the transactions contemplated hereby, and all attorney work product associated therewith; and

(m) The Seller's Agreements set forth in Schedule 2.3(a).

2.3 Assumed Liabilities and Obligations. On the Closing Date, the Buyer shall deliver to the Seller the Assignment and Assumption Agreement pursuant to which the Buyer shall assume and agree to discharge when due, all of the following Liabilities of the Seller (collectively, "Assumed Liabilities and Obligations"):

(a) All Liabilities of the Seller accruing on or after the Closing under (i) the Seller's Agreements (except as set forth in Schedule 2.3(a)), the Real Property Agreements and the Transferable Permits in accordance with the terms thereof (including post-closing continuing Liabilities imposed on Seller by any third party in connection with obtaining consents pursuant to Section 6.4(a)), (ii) the contracts, agreements, personal property leases, commitments, understandings or instruments entered into by the Seller with respect to the Acquired Assets and disclosed on other schedules to this Agreement (other than any schedule specifically excluding any such agreements), (iii) the contracts, agreements, personal property leases, commitments, understandings or instruments entered into by the Seller with respect to the Acquired Assets after the date hereof consistent with the terms of Section 6.1 hereof, and (iv) the Acquired Assets (except to the extent any Liabilities related to such Acquired Assets are Excluded Liabilities), except in each case to the extent such Liabilities, but for a breach or default by the Seller or a related waiver or extension, would have been paid, performed or otherwise discharged on or prior to the Closing or to the extent the same arise out of any such breach or default or related waiver or extension or out of any event which after the giving of notice would constitute a default by the Seller;

(b) All Liabilities (except for Excluded Liabilities) under or related to Environmental Laws or the common law with respect to the Acquired Assets;

(c) All Liabilities associated with the Acquired Assets in respect of Taxes for which the Buyer is liable pursuant to Section 3.5 hereof;

(d) All Liabilities with respect to the Transferred Employees on and after the Closing for which the Buyer is responsible pursuant to Section 6.8;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(e) With respect to the Acquired Assets, any Tax that may be imposed by any federal, state or local government on the ownership, sale, operation or use of the Acquired Assets on or after the Closing, except for any Income Taxes attributable to income received by the Seller or any Taxes allocated to the Seller in Section 6.17;

(f) All Liabilities of the Seller in respect of (i) the Decommissioning of the Facility following permanent cessation of operations, (ii) the management, storage, transportation and disposal of Spent Nuclear Fuel located at the Site (other than that excluded pursuant to Section 2.4(m) and as provided in Section 6.11), (iii) the Texas Compact and (iv) any other post-shut-down disposition of the Facility or any other of the Acquired Assets;

(g) Except as provided in Sections 2.4(m) and 2.4(n) and except for the Seller's obligations set forth in Sections 6.11 and 6.12, all Liabilities arising under or relating to Nuclear Laws or relating to any claim in respect of Nuclear Material arising out of the ownership or operation of the Acquired Assets whether occurring prior to, on or after the Closing, including liabilities or obligations arising out of or resulting from an "extraordinary nuclear occurrence," "nuclear incident" or "precautionary evacuation" (as such terms are defined in the Atomic Energy Act) at the Site, or any other licensed nuclear reactor site in the United States, including, without limitation, liability for any deferred premiums assessed in connection with such a nuclear incident or precautionary evacuation under any applicable NRC or industry retrospective rating plan or insurance policy, including any mutual insurance pools established in compliance with the requirements imposed under Section 170 of the Atomic Energy Act, 10 C.F.R. Part 140, and 10 C.F.R. § 50.54(w);

(h) All Liabilities under the NRC Licenses relating to the period after the Closing imposed by the NRC;

(i) All Liabilities of Seller for any Price Anderson Act secondary financial protection retrospective premium obligations for (i) the Seller's nuclear worker Liability attributable to employment on or prior to the Closing Date or (ii) for any third-party nuclear Liability arising out of any nuclear incident on or prior to the Closing Date (it being agreed that if the Seller is unable to cause the assignment of all or any part of such retrospective premium obligations, the Seller shall remain primarily liable for such obligations and the Buyer shall indemnify the Seller therefor pursuant to Section 9.1); and

(j) All Liabilities of the Seller for retrospective premium obligations under the Seller's NEIL nuclear property insurance policies arising out of any occurrence prior to the Closing Date (it being agreed that if the Seller is unable to cause the assignment of all or any part of such retrospective premium obligations, the Seller shall remain primarily liable for such obligations and the Buyer shall indemnify the Seller therefor pursuant to Section 9.1).

2.4 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed to impose on the Buyer, and the Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Liabilities of the Seller that are not expressly identified in Section 2.3 as Assumed Liabilities and Obligations, including, without limitation, the following excluded Liabilities (the "Excluded Liabilities"):



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(a) Any Liabilities of the Seller in respect of, or otherwise arising from the operation or use of, any Excluded Assets or other assets of the Seller which are not Acquired Assets;

(b) Any Liabilities in respect of Taxes attributable to the ownership, operation or use of Acquired Assets for taxable periods, or portions thereof, ending on or before the Closing, except for Taxes for which the Buyer is liable pursuant to Sections 3.5 or 6.17(a) hereof;

(c) Any Liabilities of the Seller accruing under any of the Seller's Agreements or Real Property Agreements prior to the Closing and any Liabilities of the Seller under the Seller's Agreements listed in Schedule 2.3(a);

(d) Any fines, penalties or costs imposed by a Governmental Authority with respect to the Acquired Assets or any Permits or Environmental Permits or NRC Licenses accruing prior to the Closing, including without limitation those relating to (i) any investigation, proceeding, request for information, or inspection arising out of the acts or omissions of the Seller or its employees, agents or contractors occurring on or prior to the Closing or (ii) any illegal acts, willful misconduct or gross negligence of the Seller or its employees, agents or contractors;

(e) Any payment obligations of the Seller for goods delivered or services rendered prior to the Closing, including, without limitation, rental or lease payments pursuant to the Real Property Agreements and any leases relating to Tangible Personal Property;

(f) Any Liability arising under or related to Environmental Laws or the common law, whether such Liability is known or unknown, contingent or accrued (whether or not arising or made manifest before the Closing Date or on or after the Closing Date), arising as a result of, in connection with or allegedly caused by, the disposal, treatment, storage, transportation, discharge, Release or recycling, or arrangement of such activities, of Hazardous Substances off-Site prior to the Closing;

(g) Any Liabilities to third parties (including employees) for personal injury or tort arising out of the ownership or operation of the Acquired Assets prior to the Closing, whether or not such Liability arose or was made manifest prior to the Closing;

(h) Subject to Section 6.8, any Liabilities relating to any Benefit Plan established or maintained by the Seller, or any employee benefit plan as defined in Section 3(3) of ERISA and maintained by any trade or business (whether or not incorporated) which is or ever has been under common control, or which is or ever has been treated as a single employer, with the Seller under Section 414 (b) , (c) , (m) or (o) of the Code ("ERISA Affiliate") or to which the Seller or any ERISA Affiliate contributed (the "ERISA Affiliate Plans"), including any multi-employer plan contributed to at any time by the Seller or any ERISA Affiliate, or any multi-employer plan to which the Seller or any ERISA Affiliate is or was obligated at any time to contribute, including, without limitation, any such Liability (i) relating to benefits payable under any Benefit Plans, (ii) relating to the PBGC under Title IV of ERISA, (iii) relating to a multi-employer plan, (iv) with respect to noncompliance with the notice and benefit continuation



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

requirements of COBRA, (v) with respect to any noncompliance with ERISA or any other applicable laws, or (vi) with respect to any suit, proceeding or claim which is brought against Buyer, any Benefit Plan, ERISA Affiliate Plan, or any fiduciary or former fiduciary of any such Benefit Plan or ERISA Affiliate Plan;

(i) Subject to Section 6.8, any Liabilities relating to the employment or termination of employment, including discrimination, wrongful discharge, unfair labor practices, the constructive termination by the Seller of any individual or any similar or related claim or cause of action, arising or related to the period prior to the Closing, except to the extent such Liabilities result from the conduct of the Buyer;

(j) Except as provided in Section 6.8, any obligations for wages, overtime, employment Taxes, severance pay, transition payments in respect of compensation or similar benefits or similar claims or causes of action accruing or arising at or prior to the Closing under any term or provision of any contract, plan, instrument or agreement relating to any of the Acquired Assets;

(k) Any Liability of the Seller arising out of a breach by the Seller of any of its obligations under this Agreement or the Ancillary Agreements;

(l) Any obligation of the Seller to indemnify a Buyer Indemnitee under this Agreement;

(m) Any Liability of the Seller under the DOE Standard Contract with respect to the one-time fee for fuel burned prior to April 7, 1983;

(n) Any Liability for assessments for Department of Energy Decontamination and Decommissioning Fees relating to Nuclear Fuel purchased and consumed at the Facility and accrued prior to the Closing; and

(o) Any Liability which is or would be required to be accrued on a balance sheet as of the Closing, prepared in accordance with generally accepted accounting principles, other than those Liabilities which are expressly set forth as Assumed Liabilities and Obligations in Section 2.3.

## ARTICLE III
## THE CLOSING

3.1 Closing. Upon the terms and subject to the satisfaction of the conditions contained in Article VII of this Agreement, the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Buyer, the payment of the Cash Purchase Price to the Seller, and the consummation of the other respective obligations of the Parties contemplated by this Agreement shall take place at a closing (the "Closing") (except for obligations specifically contemplated hereby to be completed after the Closing), to be held at the offices of Ropes & Gray, One International Place, Boston, Massachusetts 02110, at 10:00 a.m. local time, or another mutually acceptable time and location, on the date that is fifteen (15) Business Days following the date on which the last of the conditions precedent to Closing set forth in Article VII of this



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Agreement have been either satisfied or waived by the Party for whose benefit such conditions precedent exist but in any event not after the Termination Date, unless the Parties mutually agree on another date. The date of Closing is hereinafter called the "Closing Date." The Closing shall be effective for all purposes as of 12:01 a.m. on the Closing Date.

3.2 Purchase Price; Payment. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the Seller's sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Buyer, at the Closing the Buyer will (a) pay or cause to be paid to the Seller (A) an aggregate amount of One Hundred Sixteen Million One Hundred Sixty-Nine Thousand Forty-Nine Dollars ($116,169,049) for the Acquired Assets (other than the Seller's Nuclear Fuel and Inventories), (B) an aggregate amount of Thirty-Five Million One Hundred Seven Thousand Eight Hundred Forty-Four Dollars ($35,107,844) for the Seller's Nuclear Fuel (being the estimated Adjusted Book Value of such Nuclear Fuel as of the Closing), and (C) an aggregate amount of Twenty-Eight Million Seven Hundred Twenty-Three Thousand One Hundred Seven Dollars ($28,723,107) for the Seller's Inventories (being the estimated Adjusted Book Value of such Inventories as of the Closing), plus or minus any adjustments pursuant to the provisions of this Agreement (as so adjusted, the "Cash Purchase Price"), in immediately available funds denominated in U.S. dollars in accordance with written instructions of the Seller given to the Buyer at least three (3) Business Days prior to the Closing, and (b) assume the Assumed Liabilities and Obligations specified in Section 2.3 (the sum of the Cash Purchase Price and the Assumed Liabilities and Obligations is referred to herein collectively as the "Purchase Price").

3.3 Adjustment to Cash Purchase Price.

(a) Subject to Section 3.3(b), at the Closing, the Cash Purchase Price shall be adjusted, without duplication, to account for the items set forth in this Section 3.3(a):

(i) The Cash Purchase Price shall be adjusted to account for the items prorated as of the Closing pursuant to Section 3.5.

(ii) If, during the period from the Effective Date and the Closing, the Seller fails to spend the Required Capital Expenditure Amount designated for any capital project set forth in Schedule 3.3(a)(ii), then the Cash Purchase Price shall be decreased by an amount equal to the difference between (A) the Required Capital Expenditure Amount for each such capital project for which the Seller has not spent at least the Required Capital Expenditure Amount and (B) the amount of capital expenditures made by the Seller for such capital project on or after the Effective Date through the Closing, provided that the Required Capital Expenditure Amount for each such capital project scheduled for 2002 shall be pro rated for the number of days of the quarter allocated to such project in Schedule 3.3(a)(ii) elapsed prior to the Closing divided by the total number of days in each such quarter.

(iii) The Cash Purchase Price shall be increased by an amount equal to (w) any amount paid by the Seller pursuant to Section 6.1(d), (x) any operation and maintenance expenses actually paid by the Seller during the Interim Period related to the Refueling Outage that are incurred consistently with the Seller's past practices and



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

approved in writing by the Buyer, (y) any operation and maintenance expenses actually paid by the Seller during the Interim Period that the Seller would not have actually paid but for the specific written request by the Buyer, and (z) any capital expenditures actually paid by the Seller during the Interim Period that are agreed to by Buyer in writing, other than Required Capital Expenditure Amounts.

(iv) The Cash Purchase Price shall be (i) increased if and to the extent that the actual Adjusted Book Value of the Seller's Nuclear Fuel on the Closing Date is greater than the amount stated in clause (B) of Section 3.2 and (ii) decreased if and to the extent such Adjusted Book Value is less than such stated amount.

(v) The Cash Purchase Price shall be (i) increased if and to the extent that the actual Adjusted Book Value of the Seller's Inventories on the Closing Date is greater than the amount stated in clause (C) of Section 3.2 and (ii) decreased if and to the extent such Adjusted Book Value is less than such stated amount.

(vi) The Cash Purchase Price shall be decreased to the extent the Low Level Waste that has been generated at the Facility prior to the Closing and is on Site at the Closing has an associated disposal cost in excess of $250,000.

(vii) The Cash Purchase Price shall be decreased for all accrued but unpaid obligations for vacation pay, sick pay, floating holidays or personal days as may be due to Transferred Employees as of the Closing (determined in accordance with generally accepted accounting principles consistent with the Seller's past practices).

(b) At least thirty (30) calendar days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer an estimated closing statement (the "Estimated Closing Statement") that shall set forth the Seller's best estimate of all estimated adjustments to the Cash Purchase Price required by Section 3.3(a) (the "Estimated Adjustment"), together with reasonably detailed information supporting the calculated Estimated Adjustment. Within twenty (20) calendar days after the delivery of the Estimated Closing Statement by the Seller to the Buyer, the Buyer may object in good faith to the Estimated Adjustment in writing. The Seller agrees to cooperate with the Buyer and give the Buyer and its representatives information used to prepare the Estimated Adjustment. If the Buyer objects to the Estimated Adjustment, the Parties shall attempt to resolve their differences by negotiation. If the Parties are unable to do so prior to the Closing Date (or if the Buyer does not object to the Estimated Adjustment), the Cash Purchase Price shall be adjusted (the "Closing Adjustment") for the Closing by the amount of the Estimated Adjustment not in dispute. The disputed portion shall be resolved in accordance with the provisions of Section 3.3(c) and paid as part of any Post-Closing Adjustment to the extent required by Section 3.3(c).

(c) Within sixty (60) days after the Closing Date, the Seller shall prepare and deliver to the Buyer a final closing statement (the "Post-Closing Statement") that shall set forth all adjustments to the Cash Purchase Price required by Section 3.3(a) not previously effected by the Closing Adjustment (the "Proposed Post-Closing Adjustment") and all work papers detailing such adjustments. The Post-Closing Statement shall be prepared using the same accounting principles, policies and methods as the Seller has historically used in connection with the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

calculation of the items reflected on such Post-Closing Statement. Within thirty (30) days after the delivery of the Post-Closing Statement by the Seller to the Buyer, the Buyer may object to the Proposed Post-Closing Adjustment in writing. The Seller agrees to cooperate with the Buyer to provide the Buyer with the information used to prepare the Post-Closing Statement and information relating thereto. If the Buyer objects to the Proposed Post-Closing Adjustment, the Parties shall attempt to resolve such dispute by negotiation. If the Parties are unable to resolve such dispute within thirty (30) days after any objection by the Buyer, the Parties shall appoint the Independent Accounting Firm, which shall, at the Seller's and the Buyer's joint expense, review the Proposed Post-Closing Adjustment and determine the appropriate adjustment to the Cash Purchase Price, if any, within thirty (30) days after such appointment. The Parties agree to cooperate with the Independent Accounting Firm and provide it with such information as it reasonably requests to enable it to make such determination. The finding of such Independent Accounting Firm shall be in writing and be binding on the Parties hereto. Upon determination of the appropriate adjustment (the "Post-Closing Adjustment") by agreement of the Parties or by binding written determination of the Independent Accounting Firm, the Party owing the difference shall deliver such amount to the other Party no later than two (2) Business Days after such determination, in immediately available funds or in any other manner as reasonably requested by the payee.

3.4 Allocation of Purchase Price. The Buyer and the Seller shall use their good faith efforts to agree upon an allocation among the Acquired Assets of the Purchase Price consistent with Section 1060 of the Code and the Treasury Regulations thereunder within 120 days of the Effective Date (or such other date as the Parties may agree). If the Buyer and the Seller cannot agree on any such allocation, such dispute shall be resolved in accordance with Section 6.17(d) of this Agreement. The Buyer and the Seller shall treat the transaction contemplated by this Agreement as the acquisition by the Buyer of a trade or business for United States federal income tax purposes and agree that no portion of the consideration therefor shall be treated in whole or in part as the payment for services or future services. The allocation required by this Section 3.4 shall be revised based on the Post-Closing Adjustment within one hundred eighty (180) days after the Closing Date. Within thirty (30) days prior to the Closing Date, the Buyer shall prepare and deliver to the Seller a proposed IRS Form 8594. Within ten (10) days after receipt by the Seller of such proposed IRS Form 8594, the Seller shall the notify the Buyer whether it has any objection to such proposed IRS Form 8594, and if so, the Seller and the Buyer shall resolve such objections prior to filing the IRS Forms 8594 as set forth in the next sentence. Each of the Buyer and the Seller agrees to file IRS Form 8594 (which shall be based on the proposed IRS Form 8594 referred to in the preceding sentence) as modified by any Post-Closing Adjustment and as otherwise modified by the Seller and the Buyer pursuant to the preceding sentence, and all federal, state, local and foreign Tax Returns, in accordance with any such agreed allocation as adjusted as provided herein. Each of the Buyer and the Seller shall report the transactions contemplated by this Agreement for federal Tax and all other Tax purposes in a manner consistent with any such allocation determined pursuant to this Section 3.4. Each of the Buyer and the Seller agrees to provide the other promptly with any information required to complete IRS Form 8594. The Buyer and the Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding any allocation of the Purchase Price determined pursuant to this Section 3.4. The Buyer and the



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with such allocation.

3.5 Prorations.

(a) The Buyer and the Seller agree that all of the items normally prorated, including those listed below (but not including Income Taxes), relating to the business and operation of the Acquired Assets shall be prorated as of the Closing, with the Seller liable to the extent such items relate to any time period prior to the Closing, and the Buyer liable to the extent such items relate to periods commencing with the Closing (measured in the same units used to compute the item in question, otherwise measured by calendar days):

(i) Personal property, real estate and occupancy Taxes, assessments and other charges, including those of the type that could give rise to a Permitted Encumbrance, if any, on or with respect to the business and operation of the Acquired Assets;

(ii) Rent, Taxes and all other items (including prepaid services or goods not included in Inventory) payable by or to the Seller under any of the Seller's Agreements (other than the Seller's Agreements listed on Schedule 2.3(a)) or the Real Property Agreements;

(iii) Any permit, license, registration, compliance assurance fees or other similar fees with respect to any Transferable Permit;

(iv) Sewer rents and charges for water, telephone, electricity and other utilities;

(v) Rent and Taxes and other items payable by the Seller under the Real Property Agreements assigned to the Buyer;

(vi) Fees or charges imposed by the Institute for Nuclear Power Operations, Nuclear Energy Institute, NRC or any other Governmental Authority; and

(vii) Insurance premiums with respect to the Nuclear Insurance Policies transferred to the Buyer pursuant to Section 2.1(l).

(b) In connection with the prorations referred to in (a) above, in the event that actual figures are not available at the Closing, the proration shall be based upon the actual Taxes or other amounts accrued through the Closing or paid for the most recent year (or other appropriate period) for which actual Taxes or other amounts paid are available. Such prorated Taxes or other amounts shall be re-prorated and paid to the appropriate Party within sixty (60) days of the date that the previously unavailable actual figures become available. The prorations shall be based on the number of days in a year or other appropriate period (i) before the Closing and (ii) including and after the Closing. The Seller and the Buyer agree to furnish each other with such documents and other records as may be reasonably requested in order to confirm all adjustment and proration calculations made pursuant to this Section 3.5.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

3.6 Deliveries by the Seller. At the Closing, the Seller will deliver, or cause to be delivered, the following to the Buyer:

(a) The Bill of Sale, duly executed by the Seller;

(b) Copies of any and all governmental and other third party consents, waivers or approvals obtained by the Seller with respect to the transfer of the Acquired Assets, or the consummation of the transactions contemplated by this Agreement, together with notice to, and if required by the terms thereof, consents by other Persons that are parties to such Seller's Agreements, Real Property Agreements and Transferable Permits to the extent obtained by the Seller;

(c) The opinion of counsel and officer's certificate contemplated by Section 7.1;

(d) One or more quitclaim deeds conveying the Real Property to the Buyer, substantially in the form of Exhibit F hereto, duly executed and acknowledged by the Seller in recordable form, and any owner's affidavits or similar documents reasonably required by the title company;

(e) All Ancillary Agreements to which the Seller is a party, duly executed by the Seller and the other parties thereto other than the Buyer;

(f) A FIRPTA Affidavit, duly executed by the Seller;

(g) The Power Purchase Agreement, duly executed by the Seller, and the Amendatory Agreements duly executed by the Seller and the Sponsors set forth therein;

(h) The Interconnection Agreement duly executed by VELCO;

(i) The Seller's Decommissioning Funds Certificate, if required by the Seller's Decommissioning Trust Agreement;

(j) Copies, certified by the Secretary or Assistant Secretary of the Seller, of corporate resolutions of the stockholders and board of directors of the Seller authorizing the execution and delivery of this Agreement and all of the agreements and instruments to be executed and delivered by the Seller in connection herewith, and the consummation of the transactions contemplated hereby;

(k) A certificate of the Secretary or Assistant Secretary of the Seller identifying the name and title and bearing the signatures of the officers of the Seller authorized to execute and deliver this Agreement and the other agreements and instruments to be executed and delivered by the Seller in connection herewith;

(l) A certificate of good standing with respect to the Seller (dated a date reasonably close to the Closing Date), issued by the Secretary of State of the State of Vermont;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(m) To the extent available, originals of all written Seller's Agreements, Real Property Agreements, Permits and Environmental Permits and, if not available, true and correct copies thereof, provided that such documents shall be delivered at the Site;

(n) The assets of the Decommissioning Funds to be transferred pursuant to Section 6.10 shall be delivered to the Trustee under the Buyer's Post-Closing Decommissioning Trust Agreement;

(o) Evidence that the Mortgage Indentures have or will be released;

(p) All such other instruments of assignment, transfer or conveyance as shall, in the reasonable opinion of the Buyer and its counsel, be necessary or desirable to transfer to the Buyer the Acquired Assets, in accordance with this Agreement and where necessary or desirable in recordable form; and

(q) Such other agreements, consents, documents, instruments and writings as are reasonably required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith.

3.7 Deliveries by the Buyer. At the Closing, the Buyer will deliver, or cause to be delivered, the following to the Seller:

(a) The Cash Purchase Price, as adjusted pursuant to Section 3.3;

(b) The opinion of counsel and officer's certificate contemplated by Section 7.2;

(c) All Ancillary Agreements to which the Buyer is a party, duly executed by the Buyer;

(d) Copies, certified by the Secretary or Assistant Secretary of the Buyer, of resolutions authorizing the execution and delivery of this Agreement, and all of the agreements and instruments to be executed and delivered by the Buyer in connection herewith, and the consummation of the transactions contemplated hereby;

(e) A certificate of the Secretary or Assistant Secretary of the Buyer identifying the name and title and bearing the signatures of the officers of the Buyer authorized to execute and deliver this Agreement and the other agreements to be executed and delivered by the Buyer in connection herewith;

(f) Certificates of good standing with respect to the Buyer (dated a date reasonably close to the Closing Date), issued by the Secretary of State of the State of Delaware and the Secretary of State of the State of Vermont;

(g) All such other instruments of assumption as shall, in the reasonable opinion of the Seller and its counsel, be necessary for the Buyer to assume the Assumed Liabilities and Obligations in accordance with this Agreement;



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

(h) Copies of any and all governmental and other third party consents, waivers or approvals obtained by the Buyer with respect to the transfer of the Acquired Assets, or the consummation of the transactions contemplated by this Agreement;

(i) Such other agreements, documents, instruments and writings as are reasonably required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably required in connection herewith; and

(j) Evidence of the Buyer's membership in NEPOOL.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as follows:

4.1 Organization; Qualification. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Vermont and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller has heretofore made available to the Buyer complete and correct copies of its Articles of Association and Bylaws as currently in effect.

4.2 Authority. The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. Except for approval of this Agreement by the Seller's shareholders, which approval has not been obtained as of the Effective Date, the execution and delivery of this Agreement and the Ancillary Agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action required on the part of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by the Seller, and assuming that this Agreement constitutes a valid and binding agreement of the Buyer, subject to the receipt of the Seller's Required Regulatory Approvals, constitutes the legal, valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms. When each Ancillary Agreement to which the Seller is a party has been executed and delivered by the other parties thereto, subject to the receipt of the Seller's Required Regulatory Approvals, such Ancillary Agreement will constitute a valid and legally binding obligation of the Seller, enforceable in accordance with its terms.

4.3 Consents and Approvals; No Violation.

(a) Except as set forth in Schedule 4.3(a), and subject to the receipt of the Seller's Required Regulatory Approvals, neither the execution and delivery by the Seller of this Agreement or the Ancillary Agreements to which the Seller is a party nor the consummation of the transactions contemplated hereby or thereby will (i) conflict with or result in the breach or violation of any provision of the Articles of Association or Bylaws of the Seller, (ii) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, license



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

or other restriction of any Governmental Authority to which the Seller or any of its property is subject, (iii) result in a default (or give rise to any right of termination, cancellation, acceleration or create in any Person the right to acquire all or any portion of the Acquired Assets) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller or any of the Acquired Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect, or (iv) constitute violations of any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation, individually or in the aggregate, would have a Material Adverse Effect.

(b) Except as set forth in Schedule 4.3(b) (the filings and approvals, including all relevant decisions and orders, applicable to the Seller and/or the Sponsors and referred to in Schedule 4.3(b) are collectively referred to as the "Seller's Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any Governmental Authority is necessary for the consummation by the Seller of the transactions contemplated hereby.

4.4 Financial Statements.

(a) Seller has delivered to Buyer complete and correct copies of (i) its balance sheets at December 31, 1998, 1999 and 2000 and the related statements of income and retained earnings and statements of cash flows and capital expenditures for the years then ended, together with the notes thereto and the report thereon by Arthur Andersen LLP and (ii) its unaudited balance sheets at the end of each calendar month ended after December 31, 2000 and prior to the Effective Date and its unaudited statements of operations and cash flows for such months. Such financial statements, including all related notes, fairly present in all material respects the consolidated financial position, assets and liabilities (whether accrued, absolute, contingent or otherwise) of the Seller as of the respective dates thereof and the consolidated results of operations, changes in retained earnings and cash flows of the Seller for the periods indicated in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except for changes in accounting principles disclosed in the notes thereto) and subject in the case of interim financial statements to year-end adjustments and the absence of notes. The audited financial statements of the Seller as of and for the year ended December 31, 2000 are referred to herein as the "2000 Financial Statements." The balance sheet of the Seller as of the latest date referred to in clause (ii) above fairly presents in all material respects, subject to year end adjustments and the absence of notes, the amounts owed by the Seller to the Sponsors and owed to the Seller by the Sponsors as of such date.

(b) Since December 31, 2000, except as set forth in Schedule 4.4(b), (a) there has not occurred any facts or circumstances that constitute a Material Adverse Effect, or (b) there has not been any damage, destruction or casualty loss, whether or not covered by insurance, which, individually or in the aggregate, created or could reasonably be expected to create a Material Adverse Effect.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.5 Reports. Since January 1, 1998, the Seller has filed or caused to be filed with the applicable state or local utility commissions or regulatory bodies, the NRC and the FERC, as the case may be, all material forms, statements, reports and documents (including all exhibits, amendments and supplements thereto) required to be filed by the Seller with respect to the Acquired Assets or the operation thereof under each of the applicable state public utility laws, the Federal Power Act, the Atomic Energy Act, the Energy Reorganization Act and the Price-Anderson Act and the respective rules and regulations thereunder, all of which complied in all material respects with all applicable requirements of the appropriate act and the rules and regulations thereunder in effect on the date each such report was filed, and there are no material misstatements or omissions relating to the Acquired Assets in any such report; provided, however, that the Seller shall not be deemed to be making any representation or warranty to the Buyer hereunder concerning the financial statements of the Seller contained in any such reports.

4.6 Accounting Methods. Since December 31, 2000, the Seller has not materially changed its accounting methods or practices.

4.7 Title and Related Matters. Except for Permitted Encumbrances, the Seller has good and marketable title as set forth in the Title Commitment, insurable by a nationally recognized title insurance company, to the Real Property to be conveyed by it hereunder, which, to Seller's Knowledge, is free and clear of all Encumbrances, except the Mortgage Indentures. The Real Property constitutes all of the real property necessary to operate the Facility as currently operated. Except for Permitted Encumbrances and as set forth in Schedule 4.7, the Seller has good and valid title to each of the Acquired Assets not constituting Real Property free and clear of all Encumbrances.

4.8 Real Property Agreements. Schedule 4.8 lists, as of the date of this Agreement, all real property leases, easements, licenses and other rights in real property (collectively, the "Real Property Agreements") to which the Seller is a party and which (a) are to be transferred and assigned to the Buyer on the Closing Date, (b) affect all or any part of any Real Property in any material respect, or (c) (i) provide for annual payments of more than $100,000 or (ii) are material to the ownership or operation of the Acquired Assets. Except as set forth in Schedule 4.8, all such Real Property Agreements are valid, binding and enforceable on the Seller in accordance with their terms and are in full force and effect; there are no existing material defaults by the Seller or, to the Seller's Knowledge, any other party thereunder; and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a material default by the Seller or, to the Seller's Knowledge, any other party thereunder.

4.9 Insurance. All material policies of fire, liability, property damage, worker's compensation, nuclear and other forms of insurance owned or held by the Seller and insuring the Acquired Assets are listed in Schedule 4.9 along with the amount of the coverage, the type of insurance, the risks insured, the expiration date and the policy number. The Seller maintains policies of liability and property insurance with respect to the ownership, operation and maintenance of the Facility which afford protection against the insurable hazards and risks with respect to which units of similar size and type customarily maintain insurance, and which meets the requirements of 10 C.F.R. 50.54(w) and 10 C.F.R. Part 140. Such coverage includes nuclear liability insurance from ANI, in such form and in such amount as meets the financial protection



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

requirements of the Atomic Energy Act, and an agreement of indemnification as contemplated by Section 170 of the Atomic Energy Act. Except as set forth in Schedule 4.9, all of such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the date as of which this representation is being made have been paid or will be paid prior to Closing (other than retroactive premiums which may be payable with respect to comprehensive general liability and workers' compensation insurance policies, as to which Seller has received no notice), and no notice of cancellation or termination has been received with respect to any such policy which was not replaced on substantially similar terms prior to the date of such cancellation. Except as described in Schedule 4.9, the Seller has not been refused any insurance with respect to the Acquired Assets nor has the Seller's coverage been limited by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance during the last twelve months.

4.10 Environmental Matters; etc. The Seller has obtained and holds all Environmental Permits for the ownership and operation of the Facility as currently operated by the Seller, and the Seller is in compliance in all material respects with all Environmental Laws and Environmental Permits. Except as disclosed in Schedule 4.10, (i) the Seller has not received any written notice from any Governmental Authority that the Seller is not or has not been in compliance with Environmental Laws, the violation of which would have a Material Adverse Effect, (ii) there are no Environmental Claims pending or, to the Seller's Knowledge, threatened against the Seller and (iii) the Seller is not aware of any facts or circumstances which are reasonably likely to form the basis for an Environmental Condition or an Environmental Claim against the Seller or the Buyer.

Except as disclosed in Schedule 4.10: (i) Seller has not transported or arranged for the treatment, storage, handling, disposal or transportation of any Hazardous Substances to or at any off-Site location; (ii) the Site is not an Environmental Cleanup Site; (iii) there are no Environmental Conditions and no losses arising under or pursuant to any Environmental Law with respect to the Site or the Acquired Assets; and (iv) Seller has not made any Environmental Claim for any loss or Liability under any insurance relating to the Acquired Assets.

Except as disclosed in Schedule 4.10, there are no underground storage tanks, active or abandoned, or polychlorinated-biphenyl-containing equipment located at the Site. All reports relating to Hazardous Substances or under Environmental Laws by or on behalf of the Seller have been made available to the Buyer prior to execution of this Agreement.

Except as disclosed in Schedule 4.10, no Release of Hazardous Substances has occurred at, from, on, under or to the Site.

The Seller has not disposed or transported, or arranged for the disposal or transportation of, any Nuclear Material to any off-Site location, except for Low Level Waste shipped by or on behalf of Seller, to, and delivered at, licensed disposal sites.

4.11 Labor Matters. Schedule 4.15(a) lists all written agreements with employees in effect as of the Effective Date. The Seller has previously made available to the Buyer a true, correct and complete copy of the Old IBEW Contract, which on the Effective Date is the only collective bargaining agreement with unionized workers to which the Seller is a party or is



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

subject and which relates to the Acquired Assets. With respect to the ownership or operation of the Acquired Assets, except to the extent set forth in Schedule 4.11 (which matters shall remain the sole responsibility of the Seller): (a) the Seller is in material compliance with all applicable laws respecting employment and employment practices, terms and conditions of employment and wages and hours; (b) the Seller has not received notice of any unfair labor practice complaint pending before the National Labor Relations Board or any other Governmental Authority; (c) there is no labor strike, slowdown or stoppage actually pending or, to the Seller's Knowledge, threatened by any authorized representative of any union or other representative of employees against or affecting the Seller; (d) the Seller has not received notice that any representation petition respecting the employees of the Seller has been filed with the National Labor Relations Board; (e) no arbitration proceeding arising out of or under collective bargaining agreements is pending against the Seller; and (f) the Seller has not experienced any primary work stoppage since at least December 31, 1994; and, (g) there are no charges of discrimination or other claims pending with the Equal Employment Opportunity Commission or state or local counterparts, the U.S. Department of Labor, the NRC or any other Governmental Authority related to services performed in connection with the Acquired Assets.

4.12 ERISA; Benefit Plans.

(a) Schedule 4.12(a) lists all deferred compensation, profit-sharing, retirement and pension plans and all material bonus and other employee benefit or fringe benefit plans (including, without limitation, any severance policies and/or agreements or executive or management retirement arrangement) maintained or with respect to which contributions are made by the Seller in respect of employees employed at the Acquired Assets, including any trusts or other funding arrangements maintained in connection therewith ("Seller's Benefit Plans"). True, correct and complete copies of all such Benefit Plans have been made available to the Buyer.

(b) Except as set forth in Schedule 4.12(b), the Seller and any ERISA Affiliates have fulfilled their respective obligations under the minimum funding requirements of Section 302 of ERISA and Section 412 of the Code with respect to each of Seller's Benefit Plans which is an "Employee Pension Benefit Plan" and to which Section 302 of ERISA applies, and each such plan is in compliance in all material respects with the presently applicable provisions of ERISA and the Code. Except as set forth in Schedule 4.12(b), neither the Seller nor any ERISA Affiliate has incurred any liability under Sections 4062(b), 4063 or 4064 of ERISA to the PBGC in connection with any of Seller's Benefit Plans which is subject to Title IV of ERISA, nor any withdrawal liability to any multiemployer pension plan under Section 4201 et seq. of ERISA or to any multiemployer welfare benefit plan, nor is there or has there been any reportable event (as defined in Section 4043 of ERISA) with respect to any of Seller's Benefit Plans except as set forth in Schedule 4.12(b). No non-exempt prohibited transaction under Section 4975 of the Code or Sections 404 or 406 of ERISA has occurred with respect to any Benefit Plans. Except as set forth in Schedule 4.12(b), the IRS has issued a letter for each Benefit Plan which is intended to be a qualified plan determining that such plan is exempt from federal Income Tax under Sections 401(a) and 501(a) of the Code and there has been no occurrence since the date of any such determination or opinion letter (including, without limitation, statutory or regulatory changes to the requirements of Section 401(a) of the Code for



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

which the remedial amendment period has expired or other applicable provision of the Code) which has or could have a Material Adverse Effect on such qualification. Except as set forth in Schedule 4.12(b), any voluntary employees' beneficiary association under Section 501(c)(9) of the Code has been determined to be tax-exempt and there has been no occurrence since the date of any such determination which has or could have a Material Adverse Effect on such qualification. Except as set forth in Schedule 4.12(b), at no time during the last five years has there been a reportable event (as defined in Section 4043 of ERISA) with respect to any of the Seller's Benefit Plans for which a waiver did not apply or that was required to be reported to the PBGC.

(c) Neither the Seller nor any ERISA Affiliate or parent or successor corporation (within the meaning of Section 4069(b) of ERISA) has engaged in any transaction which may be disregarded under Section 4069 or Section 4212(c) of ERISA. The Seller does not contribute to and has no liabilities or obligations under any multiemployer plan (within the meaning of Section 3(37) of ERISA). No Benefit Plan or ERISA Affiliate Plan is a multiemployer plan. Neither the Seller's "Thrift Plan for Management Employees" nor its "Thrift Plan for Employees who are members of the IBEW" is an employee stock ownership plan as defined in Section 4975(c)(7) of the Code.

(d) The Seller has materially complied with all reporting, disclosure, notice, election, coverage and other benefit requirements of Sections 4980B and 9801-9833 of the Code and Sections 601-734 of ERISA as applicable to any Benefit Plan.

(e) With respect to each Benefit Plan Buyer is to assume pursuant to Section 6.8, except as disclosed in Schedule 4.12(b): (i) such Benefit Plan has been maintained in compliance with the applicable requirements of ERISA, the Code, the securities laws, and other applicable law; (ii) such Benefit Plan may, subject to any applicable collective bargaining agreement, be amended, terminated, or otherwise modified by the sponsoring employer to the greatest extent permitted by applicable law (including, without limitation, elimination of future accruals under any such Benefit Plan which is an Employee Pension Benefit Plan and the elimination of the obligation to make any benefit payments with respect to any other such Benefit Plan), and no employee communication or provision in any document governing such Benefit Plan has failed to reserve effectively the right of the sponsoring employer (including, after its assumption of such Benefit Plan, the Buyer) to so amend, terminate, or otherwise modify such Benefit Plan; (iii) no litigation or governmental administrative proceeding (or investigation) or other proceeding (other than those relating to routine claims for benefits) is pending or, to the Seller's knowledge, threatened with respect to such Benefit Plan; (iv) such Benefit Plan covers and provides (and has covered and provided) benefits to (or in respect of) only those individuals who have been classified by Seller as its employees for federal income tax withholding purposes and Seller has not failed to classify properly as its employee (for federal income tax withholding purposes) any individual who should have been so classified.

(f) Except as set forth in Schedule 4.12(f), the Seller has not made any commitment to establish any new Benefit Plan, to modify any Benefit Plan (except as required under applicable law), nor has any intention to do so been communicated to employees or former employees of the Seller.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.13 Real Property; Plant and Equipment.

(a) Schedule 2.1(a) contains a description of, and exhibits indicating the location of, the real property owned by the Seller and included in the Acquired Assets (the "Real Property"). Complete and correct copies of any current surveys in the Seller's possession or any policies of title insurance currently in force and in the possession of the Seller with respect to the Real Property have heretofore been made available by the Seller to the Buyer. Except for Permitted Encumbrances and except as set forth in such surveys or in Schedules 2.1(a) and 4.7, to Seller's Knowledge there are no encroachments onto, overlaps, boundary line disputes or other similar matters with respect to the Real Property and no improvements included in the Real Property encroach upon any adjacent property or any easement or right-of-way.

(b) Schedule 4.13(b) contains a description of the major equipment components, personal property and inventory under the agreement between the Seller and Pooled Equipment Inventory Company (f/k/a BWR Equipment Inventory Company) comprising the Acquired Assets.

(c) The Acquired Assets conform in all material respects to the Technical Specifications and the Final Safety Analysis Report (FSAR) and are being operated and are in material conformance with all applicable requirements under the Atomic Energy Act, the Energy Reorganization Act, and the rules, regulations, orders and licenses issued thereunder. The Acquired Assets related to the metering of power to and from the VYNPS are in material conformance with all applicable NEPOOL standards and requirements.

(d) The Facility is operational and the Seller is not aware of any condition that would prevent the Facility's operation at full rated power.

(e) The sewer and water systems and all other utilities that currently service the Real Property are sufficient for the operation of the Facility. The Seller has no reason to believe that such systems and utilities will not be sufficient to continue to service the Facility, or that such services will not exist on the Closing Date. The Seller has not received and has no reason to believe that it will receive any notice of the curtailment of any utility service supplied to the Real Property.

4.14 Condemnation; Public Improvements. Neither the whole nor any part of the Real Property or any other real property or rights leased, used or occupied by the Seller in connection with the ownership or operation of the Acquired Assets is subject to any pending or, to the Seller's Knowledge, threatened suit for condemnation or other taking by any Governmental Authority. No assessment for public improvements has been served upon the Seller with respect to the Real Property which remains unpaid, including, without limitation, those for construction of sewer, water, electric, gas or steam lines and mains, streets, sidewalks and curbing. There are no public improvements with respect to the Real Property which have been ordered to be made by any Governmental Authority which have not been completed, assessed and paid for prior to the date hereof.



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER

4.15 Certain Contracts and Arrangements.

(a) Except (i) as listed in Schedule 4.15(a) or the other schedules to this Agreement or (ii) for contracts, agreements, personal property leases, commitments, understandings or instruments in which all obligations of the Seller will expire prior to the Closing or (iii) contracts or agreements entered into during the Interim Period in accordance with this Agreement, the Seller is not a party to any written contract, agreement, personal property lease, commitment, understanding or instrument which is material to the ownership or operation of the Acquired Assets.

(b) Except as disclosed in Schedule 4.15(b), each of the Seller's Agreements and each of the Real Property Agreements (i) constitutes the legal, valid and binding obligation of the Seller, (ii) is in full force and effect, and (iii) may be transferred or assigned to the Buyer at the Closing without consent or approval of the other parties thereto, and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder.

(c) Except as set forth in Schedule 4.15(c), there is not, under any of the Seller's Agreements or Real Property Agreements, any default or event which, with notice or lapse of time or both, would constitute a default on the part of any of the Seller or, to the Seller's Knowledge, the other parties thereto, except such events of default and other events as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, have a Material Adverse Effect.

4.16 Legal Proceedings, etc. Except as set forth in Schedule 4.16, there are no claims, actions, proceedings or investigations pending or, to the Seller's knowledge, threatened against the Seller before any Governmental Authority or any arbitrating body which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 4.16 or in any filing made by the Seller prior to the date hereof pursuant to the Atomic Energy Act, the Seller is not subject to any outstanding judgment, order, writ, injunction or decree of any Governmental Authority which, individually or in the aggregate, would have a Material Adverse Effect.

4.17 Permits; Compliance with Law.

(a) The Seller has all permits, licenses, franchises and other governmental authorizations, consents and approvals other than with respect to permits under Environmental Laws referred to in Section 4.10 or permits issued by the NRC referred to in Section 4.18 hereof (collectively, "Permits"), necessary for the ownership and operation of the Acquired Assets as presently conducted. Except as set forth in Schedule 4.17(a), the Seller has not received any written notification that it is in violation of any such Permits, or any law, statute, order, rule, regulation, ordinance or judgment of any Governmental Authority applicable to it, except for notifications of violations which would not, individually or in the aggregate, have a Material Adverse Effect. The Seller is in compliance with all Permits, laws, statutes, orders, rules, regulations, ordinances or judgments of any Governmental Authority applicable to the Acquired Assets, except for violations which would not, individually or in the aggregate, have a Material



PROTECTED AND CONFIDENTIAL MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE
WITH U.S. COURT OF FEDERAL CLAIMS
PROTECTIVE ORDER