# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERMONT YANKEE NUCLEAR POWER CORPORATION and ENTERGY NUCLEAR VERMONT YANKEE, LLC, et al | * | |
| | * | NOS. 02-898C |
| vs. | * | 03-2663C |
| THE UNITED STATES | * | |

D E P O S I T I O N

Of

JOHN BOGUSLAWSKI

taken on behalf of The United States on Tuesday, February 19, 2008, at the law offices of Hampton Inn, Brattleboro, Vermont.

APPEARANCES:

RICHARD J. CONWAY, ESQ., and NICHOLAS MATTIA, ESQ., of the firm Dickstein Shapiro, 1825 Eye Street NW, Washington, DC, 20006-5403, appeared on behalf of Vermont Yankee Nuclear Power Corporation.

L. JAGER SMITH, JR., PE, ESQ., of the firm Wise, Carter, Child & Caraway, 1340 Echelon Parkway, Jackson, Mississippi, 39213, appeared on behalf of Entergy Nuclear Vermont Yankee, LLC.

JOSHUA E. GARDNER, ESQ., of the U.S. Department of Justice, Civil Division, 1100 L Street, NW, Room 7052, Washington, DC 20530, appeared on behalf of The United States.

COURT REPORTER: Cindy B. Hall, RMR, CRI



2e6ec192-52c6-4d21-af4d-e82d514cbbba

-- any rights -- any -- the rights to any claims related to the -- the one-time fee with respect to fuel use to generate electricity prior to April 7th, 1983.
Q Did Mr. Wiggett explain to you why his understanding that Vermont Yankee retained all claims that accrued prior to the sale, why that sentiment was not contained in the Purchase and Sale Agreement?
A He couldn't explain it.
Q Okay. So then you spoke to Kent Brown. What did you talk to Mr. Brown about?
A With regard to the matter at hand today, the same subject, the Vermont Yankee claim rights as retained under the PSA.
Q Okay. And specifically you asked Mr. Brown what his understanding was as to what claims were retained by Vermont Yankee?
A Yes.
Q And what was Mr. Brown's response to you?
A Mr. Brown had a pretty good recollection of the exact language in the PSA.
Q Good for him. And what was Mr. Brown's understanding of what that language in the PSA meant?



A Exactly what the PSA says, that Vermont Yankee retains the rights to any claims related to -- do you want me to repeat the whole thing again?
Q No. That's okay. So other than repeating what the language of the PSA said, what else did Mr. Brown tell you about the scope of the claims retained by Vermont Yankee?
A Nothing other than, you know, exactly what it says.
Q Did Mr. Brown go into any level of detail to explain to you what was meant by the retainer of claims related to the one-time fee?
A Yes, did he.
Q Okay. And what did he tell you that meant?
A He said it was -- he said it was all related to the fact that Vermont Yankee was also retaining the one-time fee, the obligation to pay the one-time fee. Vermont Yankee was also -- was retaining the spent fuel trust set up to pay the one-time fee, or at least most of it when it becomes due, and this was Vermont Yankee's way of -- of limiting our net exposure, basically having to pay on a net basis less to the DOE. So, in other words, he said that, you know, Vermont Yankee would certainly have to pay the one-time fee when it becomes due, but at



the same time by retaining these claims and obtaining payment for damages from the DOE it would limit our net exposure, if you will.
Q When you say obtaining damages from DOE, are those damages claims that Vermont Yankee would obtain or that Entergy Nuclear Vermont Yankee would retain?
A No, that Vermont Yankee Nuclear Power Corporation retained.
Q What type of damages claims did Mr. Brown tell you were contemplated were retained associated with the one-time fee?
A Any types of claims.
Q Okay. So it's Mr. Brown's understanding that the claims related to the one-time fee relates to any types of claims for damages against the DOE?
A As I pointed out, he had a pretty good recollection of the language in the PSA. I might point out also that I called him out of the blue, so it was amazing to me what he remembered.
Q In your view -- since you've had the opportunity now to speak to Mr. Brown and I guess also Mr. Wiggett, is it your view that Mr. Brown and Mr. Wiggett have different recollections as to the scope of the claims retained by Vermont Yankee?



A They had -- they had a different recollection as to the -- the language in the PSA. I don't think their -- I don't think their recollections as to what Vermont Yankee's claims rights were differed that much.
Q So it's Vermont Yankee's view then that in fact Vermont Yankee retained all claims against DOE that accrued up to the date of the sale as Mr. Wiggett --
A No. It's Vermont Yankee's position that we retain rights consistent with what the PSA says.
Q Okay. But I thought you had also just said that Mr. Wiggett's view or his understanding is inconsistent with the language that's contained in the PSA, correct?
A No. But as a practical matter they're -- they're not much different.
Q So then as a practical matter then is it Vermont Yankee's view that it retained all claims that accrued up to the date of sale?
A No.
MR. CONWAY: Objection. Asked and answered.
BY MR. GARDNER:
Q Well, explain this to me then, Mr. Boguslawski,

A I do.
Q That's consistent with Mr. Wiggett's recollection as to the rights retained by Vermont Yankee, correct?
A I believe it is, yes.
Q That language doesn't appear in the Purchase and Sale Agreement that was ultimately signed between Vermont Yankee and Entergy Nuclear, correct?
A There is some similar language, but it's not exactly the same, no.
Q And despite the fact that that exact language isn't contained in the ultimate Purchase and Sale Agreement, it's Vermont Yankee's understanding that Vermont Yankee did in fact retain any claims of the seller relating or pertaining to the Department of Energy's defaults under the DOE standard contract accrued as of the closing date?
MR. CONWAY: Objection. Asked and answered.
BY MR. GARDNER:
Q You may answer.
A You're going to have to ask that again. I'm sorry.
MR. GARDNER: Please reread the



question.
(Last question read back)
A No, that's not our understanding.
Q Okay. So your understanding is not that Vermont Yankee retained any claims relating or pertaining to the Department of Energy's defaults that accrued as of the closing date?
A Correct.
Q Okay. It's just those claims that relate to the one-time fee, correct?
MR. CONWAY: Objection. The document speaks for itself.
BY MR. GARDNER:
Q You may answer.
A Related to the one-time fee with respect to the pre-1983 fuel.
Q Now how is that different, the claims related to the one-time fee with respect to pre-1983 fuel different than all claims that accrued prior to the closing date in Vermont Yankee's mind? What's the difference there?
A It's more restrictive.
Q The actual Purchase and Sale Agreement language is more restrictive?
A Yes.



Q How is it more restrictive?
A The damage claims need to relate to the pre-'83 fuel.
Q And what types of damages relate to the -- the pre-1983 fuel or the one-time fee associated with the pre-1983 fuel?
MR. CONWAY: Are you asking -- Josh, are you asking the questions that deal with Topic Number 3, the 30(b)6, because those are on the table?
MR. GARDNER: No, I'm not asking about that.
BY MR. GARDNER:
Q At the time the Purchase and Sale Agreement was signed what claims for damages did Vermont Yankee understand it was retaining with respect to pre-1983 fuel?
A Exactly what the language says, any claims.
Q And were there specific claims that Vermont Yankee had in mind that it was retaining?
A Any claims. Any claims.
Q Any specific claims that Vermont Yankee understood that it was retaining?
A It would have been any claims. It was a -- it was a busy time. I don't think that was number one



on the priority list, but the language speaks for itself. It says any claims.
Q You said that wasn't number one on the priority list. What do you mean?
A We weren't -- we had not yet filed a claim. That was not number one on the priority list at the time. We were trying to sell the plant.
Q And so as a consequence how does that relate to -- how does that concept relate to the language that ultimately is contained in the PSA about the assignment? I'm not sure I understand the connection there.
A Connection to what?
Q Well, you were explaining -- when I asked you about what any claim related to the one-time fee meant, you said it was a busy time, it wasn't number one on our priority list.
A Well, you're asking me about specific claims.
Q Yes.
A And I'm just saying it says any claims here. That's all I'm saying.
Q I understand what the language says. I'm asking you, did you ask Mr. Wiggett specifically what types of claims were contemplated at the time the Purchase and Sale Agreement was signed?





2e6ec192-52c6-4d21-af4d-e82d514cbbba

the plant knew they were basically buying damaged goods. Because they would need to incur costs to store spent fuel, they would take on the additional risk of operating the plant without any ability to get rid of its waste.
Q And then I assume the same would be true -- the same connection would be true with respect to the dry fuel storage studies and the one-time fee payment?
A That's correct.
Q Now based upon your conception as to the relationship between the claims for damages and the one-time fee, I guess I'm a little confused because it seems to me like what Vermont Yankee is saying is that it did retain all claims that accrued prior to the date of closing related to spent fuel because all claims will relate to pre-1983 fuel at some level, correct?
MR. CONWAY: Objection, argumentative. Objection, mischaracterizes his testimony.
BY MR. GARDNER:
Q You may answer.
A If it relates to pre-'83 fuel, it's a claim that Vermont Yankee retained, yes.



Q And because no spent fuel was accepted from Vermont Yankee, regardless of whether the specific fuel assemblies related to pre-'83 discharges or post-'83 discharges, it's Vermont Yankee's claim that basically all incurred costs it had suffered up to the date of the sale, those claims belong to Vermont Yankee, correct?
MR. CONWAY: Objection, mischaracterizes his testimony.
BY MR. GARDNER:
Q You may answer.
A I think we're getting into, you know, calculation of damages and I'm not sure I need to go there.
Q No, I'm not asking you to calculate damages. I'm asking you what your understanding of the scope of retainer of claims language is, and it sounds to me, ultimately what you're saying, the retainer of claims seems fairly consistent with the 9/18/99 draft, the Exhibit 3, that any claims of the seller relating or pertaining to the Department of Energy's defaults under the DOE standard contract accrued as of the closing date. Why is that different than what you're telling me right now as to the claims that Vermont Yankee retained?



MR. CONWAY: Objection. Asked and answered.
A It's different only because it adds another restriction, but as I said -- as I said upfront, I don't see much of a difference between the two.
Q As a practical matter that restriction is fairly much a distinction without a difference, correct?
A There's a difference there, but in -- with the given facts it doesn't -- it doesn't produce much of a difference.
MR. GARDNER: Okay. Why don't we take our first break. Off the record.
(Discussion off the record)
BY MR. GARDNER:
Q Mr. Boguslawski, you testified earlier, if I recall, that it was Vermont Yankee's understanding that the fuel related to the one-time fee was the oldest fuel discharged, is that correct?
A Fuel related to the one-time fee. It's the pre-April 7th, 1983, fuel or the fuel used to generate electricity prior to that date is related to the one-time fee, correct.
Q And because the pre-'83 fuel is the earliest discharged fuel, that's the oldest fuel that



Vermont Yankee has?
A That's correct.
Q And I think you also testified, if I'm not mistaken, that it was Vermont Yankee's understanding that that pre-1983 fuel would have been the first fuel accepted from DOE, is that correct?
A That's correct.
Q What's the basis for that statement or that understanding?
A It's my understanding that -- it's my understanding that DOE takes the oldest and coldest fuel first, and I would imagine that's for safety reasons. It's the longest time to decay both in terms of decay heat and decay radiation heat.
Q Do you have an understanding or does Vermont Yankee have an understanding that, in fact, Vermont Yankee can choose to send a DOE any fuel so long as it otherwise meets the requirements of the contract?
A Don't know.
Q Okay. So, in other words, if I represented to you that utilities can ship essentially any fuel that at least meets the five years cooled time period and otherwise meets the contract, Vermont

Yankee has no understanding one way or the other about that?
A No.
Q Now why -- you mentioned that the language in the PSA is more restrictive than what we saw in the September 18th, 1999, draft. That's Exhibit 2, correct -- or, sorry, Exhibit 3, correct?
A Yes.
Q Why did Vermont Yankee ultimately choose a more restrictive retainer of claims language than that which is contained in Exhibit 3?
A I don't know. I don't know. I mean, unless -- I mean, I would be guessing so I'm not going -- I'm going to say I don't know.
Q I don't want you to guess. You never spoke to Mr. Wiggett or Mr. Brown as to why the ultimate language that's contained in the PSA was chosen?
A Mr. Brown indicated that he thought it was -- it was like that because it was consistent with the -- the one -- the one-time fee in terms of the fuel used to generate electricity prior to 1983.
Q What do you mean that it was consistent with --
A In other words, look, we retained the obligation to pay the one-time fee, okay? The one-time fee was based upon that same fuel. Okay.



So since we were retaining that obligation and with the -- the idea that we wanted to limit our net exposure, we wanted to retain those claims related to that same fuel.
Q Now if you turn -- we are still on Exhibit 3 here. If you turn to the Bates ending in 1446, it's Page 6 of the draft PSA, there's a Section 2.4 in the middle, liabilities not assumed. Do you see that?
A Yes.
Q And this purports to be a list of liabilities that Vermont Yankee would have continued to assume after the sale, correct?
A Yes, I believe that's correct.
Q All right. If you turn to the next page, the 1447, the Bates label, do you see there's a little (i) there? Do you see that?
A Uh-huh.
Q This says that all liability for fees in connection with the disposal of spent nuclear fuel consumed prior to April 7th, 1983, plus interest thereon as referred to in section blank of the DOE standard contract, and then there's a parentheses, and it says: But that as between the buyer and the seller, seller shall remain solely responsible for



the payment of such deferred disposal fees and that seller shall indemnify buyer therefore pursuant to Section 9.3D.
Do you see that?
A I do.
Q So this retention of liabilities for the one-time fee is consistent with the retention of liabilities for the one-time fee that's contained in the actual PSA signed between Entergy and Vermont Yankee, correct?
MR. CONWAY: Objection. Witness is not a lawyer. You're asking a legal question.
BY MR. GARDNER:
Q You may answer.
A You're asking me about something that I don't recall ever seeing before so --
Q Let me ask you this. Is Section I consistent with Vermont Yankee's understanding as to the retention of liabilities that it ultimately retained in the PSA?
MR. CONWAY: Objection. The PSA speaks for itself.
BY MR. GARDNER:
Q You may answer.



A Well, based upon my reading, if this is talking about the one-time fee and Vermont Yankee remaining -- continuing to remain liable for paying that one-time fee, that is consistent.
Q Now -- so in this PSA, Vermont Yankee's retaining all the liability for paying the one-time fee, but it's also retaining all claims that accrued up to the date of the sale, correct?
MR. CONWAY: Objection. The document speaks for itself. He had no involvement with this. Hadn't seen it before today.
MR. GARDNER: I would ask you to stop making speaking objections, Mr. Conway. You know better than that.
MR. CONWAY: That's a proper objection.
BY MR. GARDNER:
Q Answer my question, Mr. Boguslawski.
A Can you repeat that question?
MR. GARDNER: Will you read it back please.
(The following question was read back:
Q: Now -- so in this PSA, Vermont





2e6ec192-52c6-4d21-af4d-e82d514cbbba

Yankee's retaining all the liability for paying the one-time fee, but it's also retaining all claims that accrued up to the date of the sale, correct?)

THE WITNESS: It's also retaining what to the date of sale?

(The following was read back:

Q: But it's also retaining all claims that accrued up to the date of the sale, correct?)

A I believe that to be the case, yes.

Q So it's Vermont Yankee's testimony that in the ultimate Purchase and Sale Agreement that it signed with Entergy that it wanted to have, what, some sort of relationship between the liabilities of paying the one-time fee and the claims associated with the one-time fee, correct?

A It's my understanding that that was the thinking at the time, yes.

Q Okay. Now let's take a look. You had mentioned that you had reviewed the offering memoranda --

A Correct.

Q -- in preparation for your testimony. Let's take a look at that.



Mr. Boguslawski, you've been handed what has been marked as Exhibit 4 to your deposition. It's entitled Vermont Yankee Nuclear Power Corporation Divestiture of the Vermont Yankee Power Station, Offering Memorandum, J.P. Morgan. It's got a Bates label of VY00008202. Was this the offering -- it's got a date of April 2001 at the top. Is this the offering memorandum that you reviewed in preparation for your testimony today?

A It looks to be, yes.

Q Okay. Had you seen this document before you prepared for your deposition as a 30(b)6 witness?

A I probably saw it back in around April of 2001 and not since.

Q Okay. That's fair enough. And this has the Morgan Stanley --

A Morgan? J.P. Morgan.

Q I'm sorry, J.P. Morgan logo on it. Is this a document J.P. Morgan prepared on behalf of Vermont Yankee?

A I think that's correct, yes.

Q Did you personally have any involvement in providing information to J.P. Morgan for the preparation of this document, which is Exhibit 5?

A I may have, yes.



Q Do you recall what specific information you provided?

A It would have been the dollars and cents as you see included in here. I think there's probably a -- might be a balance sheet. That was -- I was the controller at the time so --

Q Okay. So you would have provided some of the financial information that's contained in Exhibit 5?

A Correct.

Q Now what's the purpose of Exhibit 5?

A I don't know.

Q I'm sorry, Exhibit 4. I apologize. It is Exhibit 4. What is the purpose of Exhibit 4?

A This whole thing?

Q Yeah.

A I'm looking for Exhibit 4 of the document.

Q That's fine.

A Okay.

Q The offering memorandum, what's the purpose of it?

A As I understand it, J.P. Morgan was basically hired to conduct an auction to sell Vermont Yankee, the power station, and I believe this is the document that gets sent to all prospective bidders



giving a lot of background information on the company, that sort of thing.

Q So it allows the prospective bidders to formulate terms for their bids essentially?

A Yes.

Q Okay. Now you said this was a document that you had looked at -- Exhibit 4 was a document you had looked at in preparation for your testimony today on behalf of Vermont Yankee. Is there a specific portion that you reviewed?

A Yes.

Q And what portion is that?

A The portion related to retention of claims.

Q All right. Why don't we take a look at that. That begins on what page, 8227, the Bates label, description of assets. Do you see that? If it helps you, it's Page 19 of the overall documents. Do you see that?

A I see that section, yes.

Q So under description of assets describes a number of assets, many of which we're not going to go through, but if you turn to the Bates ending in 8238, Page 30, there's a heading entitled Spent Fuel. Do you see that?

A I do.





2e6ec192-52c6-4d21-af4d-e82d514cbbba

Vermont Yankee's understanding is. If Entergy Nuclear loads pre-1983 fuel into that dry storage that it's complaining is damaged, is that a claim that Vermont Yankee retained under the Purchase and Sale Agreement?
A No.
Q Why not?
A Those are costs incurred by Entergy -- potentially damages for Entergy, not Vermont Yankee.
Q But that's not the way the PSA reads, does it? It says that it could -- they could be incurred after the sale, correct, under the PSA?
MR. CONWAY: Objection. The document speaks for itself.
BY MR. GARDNER:
Q Let's take a look again at the PSA language. If you look at Page 19 of the PSA, it says: Accrued as of the closing, whether relating to periods prior to or following the closing, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7th, 1983.
Why under Vermont Yankee's understanding would it not be entitled to claim the costs associated



with Entergy's work in storing that pre-1983 fuel?
A Well, again, I think we're pursuing Vermont Yankee damages, and maybe I can hire you as a lawyer and we can pursue that, too, but --
Q You couldn't afford me, sir.
So what's the answer to my question?
A Your question again?
MR. GARDNER: Madam Reporter.
(The following question was read back:
Q: Let's take a look again at the PSA language. If you look at Page 19 of the PSA, it says: Accrued as of the closing, whether relating to periods prior to or following the closing, excluding such claims as may relate to the one-time fee with respect to fuel used to generate electricity prior to April 7th, 1983.
Why under Vermont Yankee's understanding would it not be entitled to claim the costs associated with Entergy's work in storing that pre-1983 fuel?)
A Those are any claims of the seller so, again, to the extent that we're damaged and it relates to pre-'83 fuel, we will pursue it, otherwise we



won't.
Q So under Vermont Yankee's understanding could it claim as damages the costs of loading spent fuel to dry storage after the date of the closing?
A Can I consult with my attorney on that?
Q No.
MR. CONWAY: You need to answer his question.
A I don't know. It's not one we've talked about.
Q So Vermont Yankee has no understanding one way or the other as to whether it could claim costs associated with the dry storage of pre-1983 spent fuel?
A With regard to the costs that Entergy's incurring now, no. I don't know.
Q You don't know?
A No.
Q And, more importantly, Vermont Yankee doesn't know, correct?
A Correct.
Q That wasn't something that was discussed to Vermont Yankee's knowledge at the time the PSA language was drafted, correct?
A As far as I know, no, it wasn't discussed.
Q How much fuel did Vermont Yankee discharge



prior to 1983?
A I don't know. I mean, you can do a quick arithmetic and come pretty close in your head, but I don't know.
Q But Vermont Yankee has no personal firsthand knowledge as to how much spent fuel was discharged prior to April 7th, 1983?
A No. I don't know how that's relevant either but, anyway --
Q Well, let's actually parse this out. The language here in Clause N says may relate to the one-time fee. Do you see that?
A As may relate to the one-time fee with respect to fuel usage to generate electricity prior, yes.
Q Okay. What's may relate mean as Vermont Yankee understands that term?
A Has some -- has some correlation to the fuel usage to generate electricity prior to April 7th, 1983, some association.
Q So, again, if Entergy puts the pre-1983 spent fuel into dry storage, doesn't that relate to the fuel that was generated prior to April 7th, 1983?
A It could.
Q Okay. So is there any point at which Vermont Yankee's claim for damages ends temporally? In

other words, if Entergy Nuclear chooses to load some of its newer fuel to dry storage first and chooses to load the pre-1983 fuel in 2012, again, that is theoretically something that Vermont Yankee can claim as a damage, correct, under Vermont Yankee's construction of the PSA?
A Again, it says any claims of the seller, so I keep coming back to that and it -- that is not the sort of claim that we discussed.
MR. CONWAY: One second, please, before you ask your question.
MR. GARDNER: Let's note for the record that counsel for the plaintiff is consulting with the Rule 30(b)6 witness.
BY MR. GARDNER:
Q Are you ready, Mr. Boguslawski?
A I am.
Q Now with your discussing the substance of your testimony with counsel for Dickstein Shapiro --
MR. CONWAY: I advised the witness not to get into the substance of what was discussed here. That's attorney-client privilege. I advised the witness not to answer that question.
MR. GARDNER: I didn't ask for a



specific communication. I asked Mr. Boguslawski did you discuss with counsel for Dickstein Shapiro the substance of your testimony?
MR. CONWAY: I advised him not to answer what was discussed.
MR. GARDNER: I didn't ask for what specifically was discussed.
BY MR. GARDNER:
Q Did you generally discuss with counsel for Dickstein Shapiro the substance of your testimony?
A I'm not going to answer that.
Q Let's do it this way.
MR. GARDNER: Mr. Conway, did you just discuss with the 30(b)6 witness the substance of the 30(b)6 witness's testimony?
MR. CONWAY: The communication is attorney-client privilege. You're not allowed to inquire into that.
MR. GARDNER: I didn't ask for the substance. I just asked --
MR. CONWAY: You got my answer.
BY MR. GARDNER:
Q Let's do it this way. Mr. Boguslawski, if



you're compelled by the court to answer that question, will you still refuse to answer that question?
MR. CONWAY: The witness will answer any question compelled by the court.
MR. GARDNER: I didn't ask you, Mr. Conway; I asked Mr. Boguslawski.
BY MR. GARDNER:
Q Mr. Boguslawski -- let's do it this way. Mr. Boguslawski, are you going to refuse to answer the question whether or not counsel discussed with you the substance of your testimony? Yes or no.
A I would say he didn't discuss the substance of my testimony. He was pointing out some language.
MR. CONWAY: Don't get into what I said to you. This is what he's trying to do to you. He's trying to get you to talk about the substance which he's agreed he's not allowed to inquire into.
BY MR. GARDNER:
Q I simply asked, it's your testimony that Mr. Conway did not discuss the substance of your testimony with you?
A I'm not going to answer.



Q Okay. If you're compelled by the court to answer that question, will you still refuse to answer that question?
A I will answer if compelled by the court.
Q Okay. Thank you.
Now I think about four questions ago -- that's okay. I'll remember it.
It says Subject N or Paragraph N talks about claims of the seller. It doesn't talk about whether the costs are incurred by the seller, does it?
A It doesn't mention costs incurred by the seller, correct.
Q So why isn't it -- under Vermont Yankee's construction of the PSA, why couldn't it claim the costs associated with Entergy's actions in storing spent fuel into dry storage if that spent fuel is the pre-1983 spent fuel?
A Vermont Yankee's claims were established as of the time of the closing.
Q What's your basis for that?
A That's what it says.
Q Where does it say that?
A It says accrued as of the closing.
Q Yes, but it -- it excludes such claims as may

A Yes.
Q Now why isn't that number of assemblies relevant in understanding what claims Vermont Yankee retained?
A It could be relevant.
Q Oh, it could be relevant?
A It could be relevant, yes.
Q Okay. But you don't know -- Vermont Yankee doesn't know sitting here today what that number is, correct?
MR. CONWAY: I'm sorry, Josh, which number? You've now got three concepts going.
MR. GARDNER: No. I just have one.
MR. CONWAY: Objection. Three concepts going. Vague.
BY MR. GARDNER:
Q Okay. You can answer the question.
MR. CONWAY: Read the question back please.
A I don't know here today sitting what it is. I don't know what it is today. I mean, we have experts that are dealing with this right now, but those expert reports aren't due for a couple of



months.
Q Let me ask you this. Under the language of Section N of the PSA, this says that the buyer is actually retaining claims accrued as of the closing whether related to periods prior to or following the closing, correct? Those are the claims of the buyer, right?
A With the exclusion stated, correct.
Q With the exclusion stated. Could you think of a circumstance or could Vermont Yankee think of a circumstance where Entergy as the buyer can claim costs associated with periods prior to the closing?
A I would say that, yeah, if the DOE had come in and taken the fuel away as scheduled, then probably we wouldn't have a claim.
Q I didn't ask that question. I asked a different question.
A That's exactly what you asked me.
Q No. I said that you say that or this says that claims associated with DOE's delay, whether accrued -- whether relating to periods prior to or following the closing, with the one exception we just discussed, are Entergy's claims, correct?
A With that exception, that's correct.
Q Okay. What claims prior to the closing did



Vermont Yankee contemplate that Entergy would be retaining?
A I don't know.
Q Okay. You never spoke to anyone about that?
A No.
Q Now the -- the view that Vermont Yankee has about its retention of claims, do you know if Entergy shares that view?
A I don't believe they do.
Q Why don't you believe they do?
A Well, let me rephrase that. Certain individuals don't. I think some people within Entergy probably do.
Q Okay. Who do you believe does not?
A Probably Jager Smith for one.
Q I didn't realize he was part of Entergy these days. That's fine. Fair enough.
MR. CONWAY: Let the fact speak for itself.
MR. SMITH: That's a big secret.
BY MR. GARDNER:
Q How is it that you came to understand that Mr. Smith doesn't agree with Vermont Yankee's construction?
A Well, we received a letter from Entergy



basically challenging the claims that we had made.
Q When did you receive that letter?
A A couple of years ago. I don't recall the exact date.
Q Did Vermont Yankee respond to that letter?
A We did.
Q What did Vermont Yankee say?
A We disagree.
Q And what happened after that letter in which Vermont Yankee -- did you personally write that letter expressing disagreement?
A No. I believe it was prepared by counsel.
Q And after that letter or those exchange of letters did anything else happen with respect to Entergy Vermont Yankee's interactions relating to the scope of the claims language?
A Yeah, we tried to get together and work out a -- you know, an agreement.
Q Who tried to get together?
A Vermont Yankee and Entergy.
Q Who from Vermont Yankee?
A That would have been myself and -- and my attorney.
Q Who was your attorney at the time?
A That's a good question.





2e6ec192-52c6-4d21-af4d-e82d514cbbba

Now if you go back to Page 6 of this document, the very first paragraph says: Pursuant to the assumptions described above Entergy incurred 47.8 Million in nominal damages associated with the design and installation of Holtec racks, and then a variety of other items. Do you see that?
A I do.
Q Those are the same Holtec racks that Vermont Yankee is claiming as damages in this case, correct?
A I'm not sure I can tell just from that.
Q Let's go to the next page of this document, see if I can help you out here. Page 7. Are you there?
A Yeah.
Q If you go to the last paragraph, on January 31st, 1998, do you see that?
A Yes.
Q And it talks about the plant required additional spent fuel storage in order to maintain a desirable margin to FCR. First, two new Holtec racks were installed in the VYNPS spent fuel pool in 2001. After Entergy acquired VYNPS, it completed the Holtec rack project by purchasing the temporary rack under the existing Holtec purchase



order, and then it talks the ISFSI.
Now based upon that description, Mr. Boguslawski, you understand that Entergy Nuclear Vermont Yankee's claiming the costs associated with the same racks that Vermont Yankee is claiming, correct -- that Entergy is claiming, correct?
A It appears so, yes.
Q Okay. But it's Vermont Yankee's position that because those rack additions were necessitated by the existence of pre-1983 spent fuel that, therefore, those are claims that rightfully belong to Vermont Yankee, correct?
A Again, our experts are sorting that out right now.
Q I'm asking for Vermont Yankee's understanding as a corporation. In terms of the retention of claims, it's Vermont Yankee's understanding that it is the rightful owner of claims associated with that re-rack because the re-rack was necessitated by the storage of pre-1983 spent fuel, correct?
MR. CONWAY: You can answer.
A To the extent that they relate to the pre-1983 fuel, yes, those are Vermont Yankee claims.
Q And did Vermont Yankee at the time of the sale make a conclusion that those re-racks were related,



I think was the term you used, to pre-1983 spent fuel?
A At the time of the sale?
Q Yes.
A No. I think I need a follow-up on that.
Q Please.
A At the time of -- at the time of the -- at the time of the sale, I mean, we didn't -- we didn't -- we hadn't hired experts to figure out what was related to the pre-'83 fuel and what wasn't. We suspected that they were, but we didn't -- we didn't yet know that.
Q Why do you need an expert to tell you that if there's fuel in the pool that results in you having to build a re-rack -- let me back up. Let me back up. I want to make sure I understand what Vermont Yankee's position here is.
Vermont Yankee's position is that the pre-1983 spent fuel would have been the first fuel to go to DOE, correct?
A Correct.
Q And as a result of the pre-1983 fuel not leaving a re-rack was needed, correct?
A That's true, yes.
Q Okay. And then that's why Vermont Yankee



reaches the conclusion that the pre-1983 fuel or the re-rack relates to the pre-1983 spent fuel, correct?
A I'm going to let the experts sort -- sort that out.
Q Why do we need an expert to build that last relationship? It seems to me that it seems logical under what you're telling me that if the re-rack was needed because of the pre-1983 spent fuel, then the related-to language that you pointed to earlier means that the re-rack's related to the pre-1983 --
A Its seems logical to me, too, but I'm going to wait until I hear from my experts on that one.
Q That goes back to sort of my earlier point. At the time of the sale then there had been no analysis as to what claims related to pre-1983 spent fuel, correct?
MR. CONWAY: Objection, mischaracterizes his prior testimony. You can answer.
BY MR. GARDNER:
Q Please.
A There was no analysis specific to Vermont Yankee claims at the time. There were certainly books and records that -- that established what we

Q You'll see there are four numbers. Each number is on the top of the right-hand corner indicating the page. Do you see that?
A Right.
Q Because there are four transcript pages per page. On Page 185 you'll see an index with the witnesses listed. Do you see that?
A I do.
Q And the first witness is Paul Dabbar and the second witness is Bruce Wiggett. Do you see that?
A I do.
Q And Bruce Wiggett's testimony apparently begins on Page 198. Do you see that?
A I do.
Q Now did you review Bruce Wiggett's oral -- what I'll call oral testimony or testimony in the Public Service Commission in preparation for your testimony today?
A I probably didn't review all of it.
Q Okay.
A I read some of it. I'm looking for something that looks familiar to me.
Q Good luck.
A I don't remember -- I don't remember if I reviewed this or not.



Q That's fine. Let's take a look at -- I'm going to refer to the page number at the top right-hand corner because I think that might be a little bit easier if we're looking at transcripts. Can you look at Page 291? It's towards the very end. And I want to focus on -- beginning on Line 5 where it says actually on the chart, do you see that?
A Yes.
Q It says: Actually, on the chart you have spent fuel costs from spent fuel trust fund and under the old deal it's 14.9 Million and new deal is not applicable.
Could you explain that? Now just to give some context hearings you understand that this is Page 291. This is Mr. Wiggett's testimony, correct, as we saw looking at the index in the front?
A Yes.
Q Okay. So Mr. Wiggett answers as follows: Yes. Under the previous deal Vermont Yankee would have had to pay $14.9 Million to -- relative to the cost of spent fuel. Spent nuclear fuel disposal under the new deal, we don't have to do that.
And the next question says: Why did Vermont Yankee keep -- decide to keep the SNF trust and the obligation that goes with it? And the answer was:



We decided to keep the fund because we thought that there was some opportunity for -- to get extra value for the customer because that fund grows to the 90 day T bill rate and can be invested at a different rate. For instance, currently we are paying like 1.7 percent interest on the fund to the DOE and we can invest it at 2.3 percent. So we are making money on that fund.
So now that's an accurate statement by Mr. Wiggett on behalf of Vermont Yankee, correct?
A I can't speak to the percentage but, yes, generally that's an accurate statement.
Q So one of the reasons Vermont Yankee wanted to retain the one-time fee obligation was because it believed it could actually earn money on the fund over time?
A The investments could earn more than the broken liability over time.
Q And at least according to the percentages here we're talking about, what, .06 percent on the fund in a given year, correct?
A I'm sorry?
Q At least according to Mr. Wiggett's testimony, that would be approximately -- it would get a rate of return of .06 percent a year, correct?



A Well, it sound like that's a snapshot in time. Sometimes you make; sometimes you lose.
Q Okay. But these are the figures that Mr. Wiggett was providing to the Public Service Commission at the time, correct?
A He says currently we are paying, yes, so that's a snapshot.
Q Now as you testified to earlier, it's Vermont Yankee's position that it retains certain claims for damages associated with DOE's delay in spent fuel acceptance, correct?
A Yes.
Q Now at the time of the sale Vermont Yankee did not believe the DOE would reimburse Vermont Yankee for the costs associated with the delay in spent fuel acceptance, correct?
A No, that's not correct.
Q All right. Let's take a look at Mr. Wiggett's testimony again. Going to look at a different day, I think. All right. Mr. Boguslawski, I've handed you what's been marked as Exhibit 12 to your deposition. This is entitled the Rebuttal Prefiled Testimony, Volume 1, dated February 25th, 2002, with a Bates label VY00005067. And, in fact, if you flip in a few pages, on 5073 you see the

Page 174

A Hello.
Q Jager Smith for Entergy Nuclear Vermont Yankee. Can you hear me okay?
(Discussion off the record)
BY MR. SMITH:
Q Mr. Boguslawski, I think you said you did not talk to Ross Barkhurst in preparation for the 30(b)6 deposition today?
A I did not.
Q Where is he now?
A Where is he? I believe he's -- he has two homes and he could be at either one. One is at Louisiana and one is in I think it's the state of Washington. Built himself a place out in the middle of nowhere, I think.
Q Is he retired?
A He's retired, yes.
Q Do you know if he does any consulting work?
A I don't know.
Q You mentioned Bobbi Kilburn as someone that works with you, the other person?
A Yes.
Q What is Ms. Kilburn's job function?
A Her title is vice president, treasurer, and secretary. I think as a practical matter, as you

Page 175

might expect with an office of two, our job functions are very much alike. When I'm not there, she needs to fill in; when she's not there, I need to fill in. So we pretty much do much of the same thing.
Q Was she involved at all by the acquisition by Entergy of the VY plant?
A She would have had some involvement. Certainly she reported to Bruce Wiggett. Probably much like my involvement to some extent in that she would be providing like, you know, spent fuel trust values and that sort of thing. She also had insurance responsibility so she would have been involved in that. Probably more in transition than in the auction process.
Q And do I correctly understand your testimony that you did not speak with her without the 30(b)6 topics?
A Not specifically, no. She was there when I talked to Bruce.
Q Okay. And your discussion with Bruce Wiggett was in person?
A Yes.
Q Did she have anything to add to the conversation?

Page 176

A I mean, I don't recall. She was sort of just there, I mean, and, you know, we were talking about other things as well, Bruce becoming a professor, that sort of thing, so she would have certainly contributed to that conversation.
Q You testified earlier, I believe, that the pre-1983 fuel would be the first to go from the site. Do you remember that testimony?
A Yes.
Q And I believe you said the basis for that was just your understanding?
A My understanding is that that was prudent practice. The oldest and coldest fuel should go first.
Q And prudent practice from the vantage point of an operator?
A From an operator, yes.
Q Do you know anything about spent fuel cask loading strategy?
A No.
Q Does VYNPC's understanding of its retention of rights to DOE damages claim depend on that premise, that is, the premise that the oldest fuel would be the first to go from the site?
A No.

Page 177

Q Okay. Why not?
A Because the pre-'83 spent fuel is still there, still requires storage, still taking up slots that could be used for other spent fuel assemblies.
Q Do you know if any of the pre-1983 fuel is located in any of the new racks that were purchased in the re-racking project?
A I don't know.
Q Does that matter to VYNPC?
A No, it shouldn't.
Q In either case, whether there's any pre-1983 fuel in the new racks, that wouldn't alter your opinion as to whether those racks -- the claim for those racks belongs to VYNPC or Entergy?
A No.
Q Now Mr. Gardner talked to you about the claim split language that was in the Purchase and Sale Agreement, and I think you told him that you didn't know where the language actually came from or who drafted that language, is that correct?
A That's correct.
Q Who would we ask to find out who knows about that?
A I'm not sure. I think I also stated that I thought it was probably Ropes & Gray. Ropes & Gray





2e6ec192-52c6-4d21-af4d-e82d514cbbba